**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPRI SUN GMBH, | |
| *Plaintiff*, | Civil Action No. 1:19-cv-01422 (PAE) |
| vs. | |
| AMERICAN BEVERAGE CORPORATION, | |
| *Defendant*. | |

**DEFENDANT AMERICAN BEVERAGE CORPORATION'S OPPOSITION
TO PLAINTIFF'S MOTION TO STRIKE AND FOR A PROTECTIVE ORDER**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  THE RELEVANT FACTS ................................................................................. 3

III. TRADE DRESS AND FUNCTIONALITY ...................................................... 6

IV.  PUBLIC POLICY REQUIRES THAT THE NO-CHALLENGE PROVISION BE HELD
     UNENFORCEABLE ......................................................................................... 7

   A.  A Balancing Test Is Used to Determine the Enforceability of a No-Challenge Clause ..... 8

   B.  The Policy Behind and Merits of ABC's Functionality Defense .................................... 10

      1.  The Policy Behind the Functionality Defense Generally ............................................. 10

      2.  The Merits of ABC's Functionality Defense ................................................................ 14

   C.  The Policy Interests Behind the Functionality Defense Heavily Outweigh the Policy
       Interests Behind the Enforcement of the No-Challenge Provision ........................... 16

V.   FUNCTIONALITY IS PART OF A PROPER INFRINGEMENT ANALYSIS ................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boritzer v. Blum*,
   No. 80-cv-480, 1985 WL 25022 (E.D.N.Y. Apr. 2, 1985) ....................................................21

*Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*,
   834 F.2d 1142 (2d Cir. 1987)......................................................................................................6

*Can't Stop Prods., Inc. v. Sixuvus, Ltd.*,
   295 F. Supp. 3d 381 (S.D.N.Y. 2018)...................................................................................9, 14

*Canon Inc. v. Tesseron Ltd.*,
   115 F. Supp. 3d 391 (S.D.N.Y. 2015).......................................................................................14

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
   696 F.3d 206 (2d Cir. 2012)...........................................................................................7, 11, 16

*Fabrication Enterprises, Inc. v. Hygenic Corp.*,
   64 F.3d 53 (2d Cir. 1995) ................................................................................................ *passim*

*HSW Enterprises, Inc. v. Woo Lae Oak, Inc.*,
   2009 WL 4823920, (S.D.N.Y. Dec. 15, 2009), judgment entered, No. 08 CIV.
   8476(LBS), 2010 WL 1630686 (S.D.N.Y. Apr. 21, 2010)..................................................9, 14

*Icahn Sch. of Medicine at Mount Sinai v. Neurocrine Biosciences, Inc.*,
   243 F. Supp. 3d 470 (S.D.N.Y. 2017).......................................................................................14

*Idaho Potato Comm'n v. M & M Produce Farm & Sales*,
   335 F.3d 130 (2d Cir. 2003)............................................................................................ *passim*

*Jeffrey Millstein, Inc. v. Greger, Lawler, Roth, Inc.*,
   58 F.3d 27 (2d Cir. 1995) ..........................................................................................................10

*Kellogg Co. v. Nat'l Biscuit Co.*,
   305 U.S. 111, 59 S. Ct. 109, 83 L. Ed. 73 (1938)................................................................14, 16

*Lear, Inc. v. Adkins*,
   395 U.S. 653, 89 S. Ct. 1902, 23 L. Ed. 2d 610 (1969)..................................................... *passim*

*LeSportsac, Inc. v. K Mart Corp.*,
   754 F.2d 71 (2d Cir. 1985).......................................................................................................6, 7

*Malaco Leaf, AB v. Promotion In Motion, Inc.*,
   287 F. Supp. 2d 355 (S.D.N.Y. 2003).......................................................................................13

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
  269 F.3d 114 (2d Cir. 2001)...........................................................................6, 11

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995)...........................10, 16, 17

*Rates Tech., Inc. v. Speakeasy, Inc.*,
  685 F.3d 163 (2d Cir. 2012)..................................................................... *passim*

*Sears, Roebuck & Co. v. Stiffel Co.*,
  376 U.S. 225, 84 S. Ct. 784, 11 L. Ed. 2d 661 (1964)....................................... 15-16

*Stormy Clime Ltd. v. ProGroup, Inc.*,
  809 F.2d 971 (2d Cir. 1987)..................................................................... *passim*

*Times Mirror Magazine, Inc. v. Field & Strem Licenses Co.*,
  294 F.3d 383 (2d Cir. 2002)...............................................................................14

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001).....................................11, 12, 14, 17

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992).......................................21

*Wal-Mart Stores, Inc. v. Samara Bros.*,
  529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000)...................................6, 21

*Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*,
  177 F.3d 1204 (11th Cir. 1999) .........................................................................12

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001)................................................................................6, 21

**Statutes**

15 U.S.C. § 1065.................................................................................................11

15 U.S.C. § 1115...............................................................................................7, 11

**Other Authorities**

144 Cong. Rec. S6573 (daily ed. June 18, 1998) (statement of Rep. Hatch) ...............................12

The defendant, American Beverage Corporation ("ABC"), respectfully submits this Opposition (the "Opposition") to Plaintiff's Motion to Strike and for a Protective Order and Memorandum of Law in Support thereof (the "Motion") (DE 39 and 40).[1]

## I.    INTRODUCTION

In a desperate attempt to avoid the consequences of forty years of misuse of trademark law, the plaintiff, Capri Sun GmbH ("Capri Sun"), badly misstates the law, at times consciously ignoring Second Circuit precedent that controls the analysis presently before the Court.  Based on that controlling Second Circuit precedent, functionality is relevant and admissible in this case in two ways.

First, with regard to invalidity, Section 6.3, the no-challenge provision (the "No-Challenge Provision") in the Settlement and License Agreement (the "Settlement Agreement") is void as against public policy, and therefore cannot be used to restrict ABC's defenses.  The Second Circuit's decision in *Idaho Potato* directs this Court to balance the public policy behind the functionality defense with the public interest in enforcing terms in a settlement agreement. Here, the public policy behind the functionality defense clearly prevails.  That defense encourages competition by ensuring that trademark owners do not use trademark law to improperly monopolize ideas that otherwise should be in the public domain.  That policy is akin to the policy behind validity challenges to patents, which consistently has been held to overcome contract enforcement.

In the Motion, Capri Sun simply ignores this important policy concern, likely because the policies behind the functionality defense are fully on display in this case.  As the Supreme Court

---

[1] For purposes herein, and unless otherwise stated, references and citations to the "Motion" refer to Capri Sun's Memorandum of Law in Support of Plaintiff Capri Sun GmbH's Motion to Strike and For a Protective Order (DE 40).

has explained, the existence of a prior patent on a trademarked design is strong evidence that that design is functional.  Here, within three months of the expiration of the patent on its pouch design (U.S. Patent No. 3,380,646 (the "'646 Patent")), Capri Sun[2] sought trademark protection for that very same design.  Further, in support of its request for its trademark, Capri Sun did not hesitate to extol the functional benefits of the pouch's design features.  By this improper exploitation of trademark law, Capri Sun has been able to extend for over four decades a monopoly on a product design that should have received protection for only seventeen years.

The public interest behind ABC's functionality defense, meanwhile, must be balanced against the public interest in enforcing settlement agreements and *res judicata*.  That issue was addressed, albeit in dicta, by the Second Circuit in *Rates Technology*.  There, the Second Circuit explained that a no-challenge clause in a settlement agreement could, at least potentially, be enforceable, but only if the parties engaged in full and complete discovery on the invalidity issue in dispute.  To be clear, the Second Circuit stated only that full discovery "*may* support" a rule that upholds a no-challenge clause.  Indeed, the overall holding in *Rates Technology* suggests that the Second Circuit is unlikely to enforce a no-challenge clause where the unauthorized monopolization of ideas is at issue because, in the end, voiding a no-challenge clause does not void a settlement agreement in its entirety.

Regardless, full discovery on functionality did not take place in the prior litigation.  Although ABC's predecessor-in-interest, Faribault Foods, Inc. ("Faribault"), served discovery requests on functionality, the parties did not engage in meaningful discovery regarding functionality before the case settled.  Specifically, no depositions of any nature were taken, no

---

[2] For purposes herein, "Capri Sun" refers to the plaintiff, Capri Sun GmbH, and its parent and predecessor-in-interest, Rudolph Wild GmbH & Co. KG (formerly Zick-Zack Werk Rudolf Wild, the applicant for the Pouch Trademark before the United States Patent and Trademark Office).  *See* Undisputed Facts for Functionality Briefing (DE 31-1) (the "SUF") at ¶¶ 1-2, 5.

documents on functionality were exchanged and no interrogatories were propounded on the subject.  Such limited activities do not constitute the type of full discovery that the Second Circuit viewed as necessary to at least establish that: (1) Faribault made an informed decision on its functionality defense, and (2) the defense reflected a genuine dispute between the parties.  As such, the No-Challenge Provision is void as against public policy.

Second, independent of validity, where the asserted mark is a product design, as is the case here, functionality must be considered when performing an infringement analysis. Disturbingly, the Motion simply ignores the Second Circuit cases that discuss this requirement, instead citing to this Court only word mark cases.  This case, however, involves a design mark. A proper infringement analysis for a design mark requires two stages of inquiry: (1) proof of distinctiveness and confusion; and (2) proof regarding whether the allegedly similar features are or are not functional.  In performing the second stage of this analysis, the law requires that several factors be considered along a continuum, specifically: (1) the degree of functionality of the similar features of the two products; (2) the degree of similarity of the non-functional features of the products; and (3) the feasibility of alternative designs that would not impair the utility of the product.  The No-Challenge Provision has no bearing on this infringement analysis because that clause pertains only to validity.  As such, regardless of invalidity and the No-Challenge Provision, functionality is inextricably a part of this case.

## II.    THE RELEVANT FACTS

In 1968, the United States Patent and Trademark Office ("PTO") issued a utility patent on a juice pouch.  SUF at ¶ 52; *id*. at Ex. K (DE 31-12).  The claimed pouch as depicted in the patent is below:



**Ex. K (DE 31-12) ('646 Patent at Figs. 1 and 2)**

In describing the pouch, the '646 Patent explains that "[i]t has a unique shape which enables it to stand upright." Ex. K (DE 31-12) at 1:20. After further explaining the construction, including the shape of the base, the rigid walls and the pouch's triangular shape, the '646 Patent explains that the "result of this construction is that the thrust exerted by the liquid on the bottom part, even in the case of shock, is evenly distributed and the container possesses high strength." *Id*. at 1:30-41.[3] The '646 Patent then claimed virtually all aspects of the pouch design in significant detail:

> 4. A generally flat self-supporting pouch type container comprising a pair of opposite flat side walls of bendable yet relatively stiff material, a gusset construction along one margin of said container interposed and normally folded inwardly between said side walls, said side walls along other margins of said container being sealed to each other in face-to-face relationship closely adjacent said other margins to provide such pouch with flat fin-type seams and with a product-containing area extending substantially the full extent of said side walls between said other margins; said gusset construction comprising a flexible gusset panel secured to marginal portions of said side walls and being folded inwardly therebetween, said flexible gusset panel being joined with said side-wall marginal

---

[3] These claimed features parallel Capri Sun's description of the claimed trademark in its interrogatory answers, which were provided after the parties created their agreed-upon facts. In those answers, Capri Sun asserts that the trademark "is a pouch having a unique trapezoid design; straight lines; a wider top than bottom; and an elongated bottom side in a 'potbelly' shape." Declaration of Mark T. Goracke in Support of Defendant American Beverage Corporation's Opposition to Plaintiff's Motion to Strike and For A Protective Order (filed concurrently herewith), Ex. 1 (Excerpts from Plaintiff Capri Sun GmbH's Objections and Responses to Defendant American Beverage Corporation's First Set of Fed. R. Civ. P. 33 Interrogatories (Nos. 1-21)) at 4-5.

> portions along non-straight seal lines removed from said one margin which together define a non-rectangular stress-distributing generally elliptical unsealed area inwardly of said seal lines when said gusset is expanded.

*Id*. at 5:39-6:16 (claim 4).  Capri Sun was the exclusive licensee of the patent for use with fruit juice products.  SUF at ¶ 55.  That patent expired in April 1985.  *Id*. at ¶ 54.

Three months later, in July 1985, Capri Sun sought a trademark registration on the very same pouch, as depicted below:



**Ex. B (the Pouch Trademark)**

Ex. B (DE 31-3) (the "Pouch Trademark").  In seeking that protection, Capri Sun did not shy away from the functional benefits of its pouch.  For example, Capri Sun observed to the PTO that "[t]he advantages of buying fruit drinks contained in a pouch 'that lets you punch it, squeeze it, pack it, bend it or freeze it', as the advertisements in Exhibits 1 and 2 proclaim, have always been an important and integral part in the marketing of Applicant's product."  SUF at ¶ 8(a).  *See also id*. at ¶¶ 8-16.

Capri Sun received a registration on the Pouch Trademark on November 25, 1986.  *See id*. at ¶ 6; Ex. B (DE 31-3).  Although discovery in the instant action has just begun, it is fair to conclude that Capri Sun has been enforcing its rights since that time, and consistently has been putting no-challenge provisions in its licenses, as it required of Faribault.  The result is that,

despite holding an exclusive license to a patent that expired in 1985, Capri Sun has, for over four decades, been able to effectively extend the life of the '646 Patent indefinitely.

Capri Sun's strategy is directly contrary to the policy behind trademark law.  Based on the foregoing, and the clear utilitarian aspects of Capri Sun's pouch design, Capri Sun gained a registration on a functional design that should have been available to the public since 1985.  As a former licensee and one of the few entities with the economic incentive to challenge Capri Sun's decades-long practice, the law makes clear that the No-Challenge Provision should not be used to block ABC from asserting a functionality defense.[4]

## III.    TRADE DRESS AND FUNCTIONALITY

Capri Sun asserts infringement by ABC of its trade dress, both with regard to its registered mark and at common law.  Trade dress "involves the 'total image of a product and may include features such as size, shape, color or color combinations, texture [or] graphics.'" *Fabrication Enterprises, Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir. 1995) (quoting *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir. 1985)).  Trade dress also may include a product's design, as is the claim here.  *See Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir. 1987).  For a trade dress to be protectable, it must, *inter alia*, either be inherently distinctive or acquire secondary meaning.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001).  A product design trade dress must acquire secondary meaning to be protectable.  *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000).

---

[4] Capri Sun claims that ABC asserts a functionality defense because it otherwise infringes Capri Sun's Pouch Trademark.  *See* Motion at 2.  That assertion is false.  ABC has asserted a functionality defense because of Capri Sun's four-decade long misuse of trademark law.  SUF at ¶¶ 3-6, 52-54.  Beyond that, Capri Sun will not be able to prove distinctiveness, secondary meaning or likelihood of confusion.  Indeed, notwithstanding Capri Sun's false claim that the parties previously litigated "virtually identical claims," *see* Motion at 1, Capri Sun in fact admitted in that prior litigation that ABC's present designs do not infringe the Pouch Trademark.

Even if distinctive, however, "an alleged infringer can defeat Lanham Act protection by showing that the trade dress, or a feature of the trade dress, is functional." *Fabrication Enterprises,* 64 F.3d at 58 (citing *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995)).  That is true even if the trademark registration is otherwise incontestable.  *See* 15 U.S.C. § 1115(b)(8) (incontestable marks "shall be subject to the following defenses or defects . . . [t]hat the mark is functional.").  A feature is functional "if it is (1) 'essential to the use or purpose of the article,' or if it (2) 'affects the cost or quality of the article.'"  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 219 (2d Cir. 2012) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982)).  "A feature is essential 'if [it] is dictated by the functions to be performed' by the article."  *Id.* (quoting *LeSportsac*, 754 F.2d at 76).   "It affects the cost or quality of an article where it 'permits the article to be manufactured at a lower cost' or 'constitutes an improvement in the operation of the goods.'"  *Id.* (quoting *LeSportsac*, 754 F.2d at 76).

## IV.   PUBLIC POLICY REQUIRES THAT THE NO-CHALLENGE PROVISION BE HELD UNENFORCEABLE

One question before this Court is whether the No-Challenge Provision bars ABC from challenging the validity of the Pouch Trademark.  Two Second Circuit cases drive this Court's determination of that issue.  One (*Idaho Potato*) addresses the balancing test to be applied under the present circumstances, and the other (*Rates Technology*) addresses the enforceability of no-challenge clauses in settlement agreements.  Notably, the Motion barely acknowledges either case, even though both were discussed by ABC at length in the parties' joint letter to the Court. *Compare* Motion at 22-23 (regarding *Idaho Potato*), 24 (regarding *Rates Technology*) *with* DE 31 at 4-7.

**A.      A Balancing Test Is Used to Determine the Enforceability of a No-Challenge Clause**

In *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130 (2d Cir. 2003), the Idaho Potato Commission ("IPC") claimed that M&M Produce Farm and Sales ("M&M") had infringed IPC's certification mark, which is used to certify that "goods so marked are grown in the State of Idaho." *Id*. at 131-32.  Specifically, IPC alleged that, after M&M voluntarily relinquished its license to use the mark, M&M nevertheless continued to pack its potatoes in bags containing the mark.  *Id*. at 133.

With regard to M&M's assertion of an invalidity defense, the Second Circuit characterized the issue as follows:

> M&M signed a licensing agreement with the IPC in which M&M recognized the validity of the IPC marks and promised not to attack the rights of the IPC in those marks during the term of the agreement or at any time thereafter.  The basic question on the facts before us, therefore, is whether such a provision in a certification mark licensing agreement is enforceable against a licensee when the licensee no longer holds a license.

*Id*. at 134.  The Second Circuit then began its analysis with a discussion of the Supreme Court's holding in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S. Ct. 1902, 23 L. Ed. 2d 610 (1969).  In that case, the Supreme Court was faced with the issue of whether the defendant-licensee was estopped from challenging the validity of a patent.  *Id.* at 670-72.  In assessing whether licensee estoppel barred such a challenge, the Supreme Court balanced the "'strong federal policy favoring the full and free use of ideas in the public domain'" – one of the fundamental policies behind patent law – against the "'competing demands of the common law of contracts.'"  *Idaho Potato*, 335 F.3d at 135 (quoting *Lear*, 395 U.S. at 668, 674).  Ultimately, the Supreme Court concluded that the policy favoring the free use of ideas weighed heavier than contract

enforcement, and it declined to enforce plaintiff's assertion of licensee estoppel. *See Lear*, 395 U.S. at 668, 670-71.

After discussing *Lear,* the Second Circuit in *Idaho Potato* went on to observe that "[o]ther courts, including this one, have weighed these interests to reach differing results, but each has recognized the applicability of the balancing test first articulated in *Lear*." *Idaho Potato*, 335 F.3d at 135 (citing cases). That balancing approach, the Court explained, must be applied in trademark licensing disputes.[5] *Id.* at 136. Specifically, the Second Circuit explained that, when assessing whether to enforce a no-challenge provision involving intellectual property, "*Lear* makes clear that courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest." *Id.* at 137. *See also Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 393 (S.D.N.Y. 2018) ("The Second Circuit seems to have taken a policy-based approach with respect to licensee estoppel."). In so stating, the Court explained that, "to decide the issue of public injury we must look to the public interest implicated by the merits of the licensee's challenges." *Idaho Potato*, 335 F.3d at 139.

As such, in addressing the issues presently before it, this Court must balance two competing interests: (1) the public interest behind the functionality defense, as asserted in the present litigation; and (2) the public interest behind the enforcement of no-challenge clauses in settlement agreements. *See id*. Ultimately, in *Idaho Potato*, where a certification mark was involved, the Court refused to enforce the no-challenge provision because that provision could

---

[5] It is unclear if Capri Sun agrees that a balancing framework is appropriate. Toward the end of the Motion, Capri Sun somewhat acknowledges that some balancing of competing interests needs to take place. *See* Motion at 20-24. But earlier in the Motion it maintains that the "plain, unambiguous language of the No-Challenge Provision" is enough. *See id.* at 15. The only case it cites in support of that proposition is *HSW Enterprises*. *See id.* But that case went through the very balancing analysis articulated in *Idaho Potato*. *See HSW Enterprises, Inc. v. Woo Lae Oak, Inc.*, No. 08 CIV.8476 (LBS), 2009 WL 4823920, at *2-*5 (S.D.N.Y. Dec. 15, 2009), judgment entered, No. 08 CIV. 8476(LBS), 2010 WL 1630686 (S.D.N.Y. Apr. 21, 2010).

not overcome the fact that "the certification mark regime protects a further public interest in free and open competition among producers and distributors of the certified product." *Id.* at 138. The same principles apply in the present case.

### B. The Policy Behind and Merits of ABC's Functionality Defense

#### 1. The Policy Behind the Functionality Defense Generally

In the Motion, Capri Sun simply ignores the policy behind the functionality defense, despite its obvious relevance to the Court's analysis, and despite ABC's discussion of that policy in the parties' joint letter. *See* DE 31 at 6-7. Instead, Capri Sun merely observes that the public policy interest behind ABC's invalidity challenge is "separate and distinct from the public's interest in avoiding confusion." *See* Motion at 22. ABC agrees.

"The purpose of the functionality defense is to prevent advances in functional design from being monopolized by the owner of the design's trade dress in order to 'encourage competition and the broadest dissemination of useful design features.'" *Fabrication Enterprises*, 64 F.3d at 58 (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir. 1983)). The doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legal competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164. "If a product's functional features could be used as trademarks . . . a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever." *Id.* at 164-65. *See also id.* at 164 ("It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time [citation omitted], after which competitors are free to use the innovation."); *Jeffrey Millstein, Inc. v. Greger, Lawler, Roth, Inc.*, 58 F.3d 27, 33 (2d Cir. 1995) (The purpose of trade dress law is "to protect an owner of a [trade] dress in informing the public of the source of its products, without permitting

the owner to exclude competition from functionally similar products."); *Christian Louboutin*,

696 F.3d at 218 ("'[T]he doctrine of functionality prevents trademark law from inhibiting

legitimate competition by giving monopoly control to a producer over a useful product.'")

(quoting *Nora Beverages*, 269 F.3d at 120 n. 4); *id.* at 218-19 ("[F]unctional features can be

protected only through the patent system, which grants a limited monopoly over such features

until they are released into general use."); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S.

23, 29-33, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001) (holding that the determination that a

proposed mark is functional constitutes, for public policy reasons, an absolute bar to registration

on either the Principal or the Supplemental Register, regardless of evidence showing that the

proposed mark has acquired distinctiveness).  *See also* Trademark Man. of Exam. Proc.

1202.02(a)(ii) (Oct. 2018 ed.) ("The functionality doctrine, which prohibits registration of

functional product features, is intended to encourage legitimate competition by maintaining a

proper balance between trademark law and patent law.").

     Reflective of the importance of the functionality defense is the fact that the defense may

be asserted against marks that are otherwise deemed to be incontestable.  *See* 15 U.S.C. §

1115(b)(8).  A mark is "incontestable" if it has been registered and in continuous use for five

consecutive years subsequent to the date of such registration and is still in use in commerce,

subject to certain conditions.  *See* 15 U.S.C. § 1065.  Nevertheless, the trademark statute carves

out certain defenses that may be asserted against even an incontestable mark's validity.  15

U.S.C. § 1115.  One of those defenses is functionality.  *Id.* at § 1115(b)(8).  The reason for that

exception is explained in the Congressional record:

> To exempt the registration of a wholly functional design from being
> subject to cancellation five years after the registration has issued
> permits the trademark owner with such a registration ***to obtain
> patent-like protection for its wholly functional design without the***

> *limited term that the patent law imposes*. This change is therefore
> wholly consistent with both the purpose of the Trademark Act and
> the codifications of current practice regarding functionality made in
> this Act.

144 Cong. Rec. S6573 (daily ed. June 18, 1998) (statement of Rep. Hatch) (emphasis added). As

the Eleventh Circuit explained with regard to this exception:

> The functionality doctrine serves the extremely important function
> of avoiding conflict between the trademark law and the patent
> law. It does this *by denying a perpetual exclusive right in a wholly
> functional product feature or configuration under the trademark
> law, where such a grant under the Patent Act would be
> unconstitutional*. Under the doctrine, any exclusive right to
> functional features must be obtained under the Patent Act subject to
> the constitutional requirement of limited duration.

*Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1211 (11th Cir. 1999) (emphasis

added).

These policy considerations were discussed at length by the Second Circuit in *Stormy

Clime*. There, the Second Circuit observed that courts "must proceed with caution" when

assessing product designs "so as not to undermine the objectives of the patent laws." *Stormy

Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977-98 (2d Cir. 1987). *See also TrafFix Devices*,

532 U.S. at 29 ("product design almost invariably serves purposes other than source

identification") (quoting *Wal-Mart*, 529 U.S. at 213). The Court explained that patents are the

principal means of protecting ideas, and are of a limited duration and scope. *See Stormy Clime*,

809 F.2d at 978. In the short term, society benefits to the extent that the patent holder

implements his or her idea into a useful product, and benefits long term "because novel ideas fall

into the public domain upon the expiration of the patent protection." *Id.* "Since trademark

protection extends for an unlimited period, expansive trade dress protection for the design of

products would prevent some functional products from enriching the public domain." *Id.* That

is especially true, the Court explained, where, as here, "a first manufacturer seeks broad trade

dress protection for a product on the ground that its arrangement of predominantly functional features is distinctive." *Id. See* SUF at ¶ 10 ("[f]rom the time CAPRI SUN products were introduced in the United States to date, Affiant believes there exists no other fruit juice or beverage product which is packaged in a pouch."); *see also Malaco Leaf, AB v. Promotion In Motion, Inc*., 287 F. Supp. 2d 355, 366 (S.D.N.Y. 2003) ("The legal tenet that the nonfunctionality requirement protects competition even at the cost of potential consumer confusion is even more critical in a product configuration case because monopoly right in the design of the product itself is more likely to preclude competition.  Consequently, rigorous application of the requirement of nonfunctionality is necessary in trade dress claims based on product design.") (internal citations and quotations omitted).

This policy – ensuring that ideas that should be part of the public domain remain freely available – is the same interest as that invoked by invalidity challenges under patent law. Specifically, a major policy concern behind patent law is to support "full and free competition in the use of ideas which in reality are a part of the public domain."  *Idaho Potato*, 335 F.3d at 136 (quoting *Lear*, 395 U.S. at 670-71).  *See also Rates Tech., Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 167 (2d Cir. 2012) ("Federal patent law . . . requires 'that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent.'") (quoting *Lear*, 395 U.S. at 668).  This overriding principle has routinely overcome the public policy interest in enforcing contracts.  *See, e.g., Lear*, 395 U.S. at 670 ("Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain."); *Rates Tech.*, 685 F.3d at 171-72 ("[W]e believe that enforcing no-challenge clauses in pre-litigation settlements would significantly undermine the 'public interest in discovering invalid

13

patents.'") (quoting *Idaho Potato*, 335 F.3d at 135); *Canon Inc. v. Tesseron Ltd.*, 115 F. Supp. 3d

391, 396 (S.D.N.Y. 2015) ("The public interest in identifying invalid patents requires that [no-

challenge provisions] be nullified."). *See also Idaho Potato*, 335 F.3d at 138 ("[P]ublic interest

in free and open competition among producers and distributors of the certified product"

outweighs enforcement of no-challenge provision in certification mark context).[6]

### 2.  The Merits of ABC's Functionality Defense

"[T]o decide the issue of public injury we must look to the public interest implicated by

the merits of the licensee's challenges."[7] *Idaho Potato*, 335 F.3d at 139.  The policies behind the

functionality defense are fully in evidence in this case.  As the Supreme Court has explained, a

prior patent "has vital significance in resolving [a] trade dress claim.  A utility patent is strong

evidence that the features therein claimed are functional." *TrafFix Devices*, 532 U.S. at 29.  *See*

*also Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 119-20, 59 S. Ct. 109, 83 L. Ed. 73 (1938)

(trademark law could not be used to extend a monopoly over the "pillow shape" of a shredded

wheat biscuit after the patent expired).  Here, not only did Capri Sun secure the exclusive right to

use the design claimed in the '646 Patent (*i.e.*, the pouch design presently in dispute) (*see* SUF at

---

[6] As such, Capri Sun is profoundly wrong in claiming that "the public policies in favor of judicial economy and holding parties to the terms of their bargains override any interest that the public may have in discovering invalid patents." Motion at 2.  Capri Sun also grossly misstates the holding in *Icahn Sch. of Med. at Mount Sinai v. Neurocrine Biosciences, Inc.*, 243 F. Supp. 3d 470 (S.D.N.Y. 2017).  *See* Motion at 17, 19.  That case expressly acknowledged the holding in *Lear*, but held that the principle did not apply to royalties already owed before the parties' license was terminated.  *See Icahn Sch. Of Medicine at Mount Sinai*, 243 F. Supp. 3d at 474-75.

[7] Unquestionably, the specifics of the case are relevant to a court's analysis.  *See Idaho Potato*, 335 F.3d at 139.  For example, in *Can't Stop Productions, Inc.*, the district court considered whether a naked licensing defense could overcome a licensee estoppel argument.  *See Can't Stop Prods.*, 295 F. Supp. 3d at 393.  The purpose of a naked licensing defense is "to prevent the public from being misled into thinking it will receive a product of similar quality and character from a licensee." *Id.* at 394 (internal citations and quotations omitted).  In rejecting the licensee's argument, a significant factor for the court was the undisputed fact that "Defendants at all times produced a high quality product . . . and thus the public was not at risk of being misled." *Id.  See also Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 396 (2d Cir. 2002) ("[R]escission of a freely bargained trademark contract" could occur, for example, in cases of "consumer confusion," if "the quality of the junior user's product or of the junior user's reputation is at issue"); *HSW Enterprises,* 2009 WL 4823920, at *3 ("Sufficiently grave injuries [that result in rescission] include misleading the public into buying the wrong insurance based on reputational confusion or depleting the general stock of vocabulary available to refer to commercial goods and services.").

¶ 55), it sought trademark protection for that very same design within months of expiration of the patent.  *See id*. at ¶¶ 5, 54.  Importantly, the patented pouch and trademarked pouch are virtually identical:





**Ex. B (the Pouch Trademark)**                    **Ex. K ('646 Patent at Fig. 1)**

*See* Ex. B (DE 31-3)[8]; Ex. K (DE 31-12).  On top of that, in seeking trademark protection for its pouch design, Capri Sun did not hesitate to extol the functional virtues of that design.  *See* SUF at ¶¶ 8-16.

As such, it is clear that Capri Sun has used trademark law to extend the term of an expired patent.  By improperly manipulating trademark law, Capri Sun has taken a seventeen-year patent that expired in 1985 and extended it for decades, indeed indefinitely.  *See id*. at ¶¶ 3-6, 52-54.  By doing so, Capri Sun is doing exactly what the patent and trademark laws seek to avoid.  Capri Sun is exploiting trademark law to create a monopoly in an idea that should have been in the public domain decades ago.  In this case, the idea is a unique and effective way to package juice in a pouch that is able to stand on its own, with resiliency and elasticity, and has a high capacity for user enjoyment.  *See, e.g*., Ex. K (DE 31-12) at 1:20; SUF at ¶¶ 8-16.  Both the Supreme Court and the Second Circuit have placed a high premium on being able to challenge this type of behavior.  *See, e.g., Kellogg*, 305 U.S. at 119-20; *Sears, Roebuck & Co. v. Stiffel Co.*,

---

[8] This image is taken directly from the Pouch Trademark, but flipped on its horizontal axis, such that the pouch is oriented in the same direction as the pouch depicted in the '646 Patent at Fig. 1 and the comparison between the images is easier to make.  *See* Ex. B (DE 31-3) and Ex. K (DE 31-12) ('646 Patent at Fig. 1).

376 U.S. 225, 230, 84 S. Ct. 784, 11 L. Ed. 2d 661 (1964); *Qualitex*, 514 U.S. at 164; *Christian Louboutin*, 696 F.3d at 218-19.

In addition, allowing the functionality defense to move forward is especially important here because ABC is a former licensee.  As the Second Circuit has observed, licensees often are the "only individuals with enough economic incentive to challenge" the validity of the asserted intellectual property.  *Rates Tech.*, 685 F.3d at 172-73 (quoting *Lear*, 395 U.S. at 670).  In the present instance, Capri Sun has engaged in a decades-long campaign to monopolize its pouch concept.  Only a company like ABC has the economic incentive to go through litigation to challenge that practice.  Enforcing the No-Challenge Provision would "muzzle" licensees like ABC in a way that is contrary to the public interest.  *See id.  See also Lear*, 395 U.S. at 670 ("If [licensees] are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification.").

### C.    The Policy Interests Behind the Functionality Defense Heavily Outweigh the Policy Interests Behind the Enforcement of the No-Challenge Provision

As a preliminary matter, were the No-Challenge Provision in anything but a post-litigation settlement agreement, the case law overwhelmingly establishes that the clause would not be enforceable.  That is because, as explained above, the policy behind the functionality defense is the same as the policy behind patent challenges, and *Lear* and its progeny make clear that that policy trumps the enforcement of no-challenge provisions.  *See Lear*, 395 U.S. at 670 ("Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain."); *Rates Tech.*, 685 F.3d at 171-72 (upholding "strong

policy 'favoring the full and free use of ideas in the public domain'" against no-challenge clauses in pre-litigation agreements); *Idaho Potato*, 335 F.3d at 138-39.

The only issue, then, is whether that result changes when the no-challenge provision is part of a settlement agreement.[9]  To resolve that issue, the Court must turn to the Second Circuit's discussion in *Rates Technology*.  There, the Second Circuit "consider[ed] whether a clause in a settlement agreement which bars a patent licensee from later challenging the patent's validity is void for public policy reasons under [*Lear*], where the parties entered into the agreement after an accusation of infringement by the patent owner but prior to any litigation." *Rates Tech.*, 685 F.3d at 164.

As it did in *Idaho Potato*, the Court began its analysis with *Lear*, and began by observing that "[f]ederal patent law . . . requires 'that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent.'"  *Id.* at 167 (quoting *Lear*, 395 U.S. at 668).  Notably, this articulation parallels the same goals that support a functionality challenge in the trademark context.  *See, e.g., Qualitex,* 514 U.S. at 164-65; *TrafFix Devices*, 532 U.S. at 29; *Fabrication Enterprises,* 64 F.3d at 58; *Stormy Clime*, 809 F.2d at 977-78.  Citing *Idaho Potato*, the Court then observed that *Lear* requires a balancing test, "weighing the 'public interest in discovering invalid patents' against other competing interests."  *Rates Tech.*, 685 F.3d at 168 (quoting *Idaho Potato*, 335 F.3d at 135).  The competing interest in *Rates Technology* involved the public policy behind the enforcement of a settlement agreement, one that the parties entered into after an accusation of infringement but before litigation.  *Id.* at 171.  In that instance, the Court held that a pre-suit settlement agreement operated much like a license agreement, and declined to enforce the provision.  *Id.*

---

[9] Capri Sun flatly states that the enforcement of settlement agreements always trumps challenges to No-Challenge provisions.  *See* Motion at 2.  That claim – at least in this Circuit – is unsupported and demonstrably wrong.

In explaining its reasoning, the Second Circuit provided insights that are highly relevant to the present dispute. Specifically, it discussed the situation where a no-challenge clause in a settlement agreement could, at least potentially, trump the policy of ensuring that ideas are not improperly monopolized. *Id.* at 172. Addressing that issue, the Second Circuit stated in dicta that the enforcement of a no-challenge clause potentially could prevail if, before entering into the settlement agreement, the parties engaged in full and complete discovery on the invalidity issue. *See id.* (discussing *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1370 (Fed. Cir. 2001) which "uph[eld] a no-challenge clause where the parties settled after the alleged infringer 'had an opportunity to conduct discovery on validity issues' and the parties had 'fully briefed opposing summary judgment motions on the issue of validity'").

The Court provided two reasons why full discovery was necessary before even considering the enforcement of a no-challenge clause in a settlement agreement. The Court explained that the "fact that the parties have conducted discovery seems to us significant in two respects":

> (1) "it suggests that the alleged infringer has had a full opportunity to assess the validity of the patent, and is therefore making an informed decision to abandon her challenge to its validity"; and
>
> (2) "the fact that parties have conducted discovery is evidence that they had a genuine dispute over the patent's validity. . . ."

*Id.*

No such discovery took place in the prior litigation. Capri Sun is correct when it claims that ABC's predecessor-in-interest, Faribault,[10] *initiated* discovery on functionality in that litigation. *See* Motion at 4-7, 24. But Capri Sun fails to disclose that the case settled long before any meaningful discovery actually took place. No documents on functionality were produced,

---

[10] The prior lawsuit was not "between the parties," as Capri Sun sloppily claims. *See* Motion at 1.

no interrogatories on the topic were asked or answered and no depositions of *any* kind were taken.  *See* SUF at ¶¶ 67-69.  Under such circumstances, Faribault clearly did not fully assess its functionality defense, and as a result could not have made an informed decision as to whether to abandon that defense.  *See Rates Tech.*, 685 F.3d at 172.

Similarly, the absence of meaningful discovery on functionality suggests that, like in the pre-litigation context, Faribault's decision to settle the case was based on factors other than a determination of the merits of its functionality defense.  In fact, given the timing, it is likely that the impending sale of a portion of Faribault's business to ABC was the driver of the decision to settle.  *See* SUF at ¶ 75 (Settlement Agreement executed July 1, 2016), ¶ 82 (Faribault assigned the Settlement Agreement to ABC on November 1, 2016).  In any event, while the Second Circuit provides only dicta on the subject, the conditions it requires to even consider enforcement of a no-challenge clause in a settlement agreement do not exist here.

Further, the Second Circuit stated only that full discovery "*may* support" a rule that upholds post-litigation no-challenge clauses, but it clearly did not hold that that would be the case.  *Rates Tech.*, 685 F.3d at 172 (emphasis in original).  Based on a fair reading of *Rates Technology*, it is unlikely that the Second Circuit would enforce the No-Challenge Provision even if Faribault had conducted full discovery.  Certainly, upholding settlement agreements and *res judicata* is important.  But as the Second Circuit noted in *Rates Technology* in striking down the no-challenge clause there, the Court was not voiding the entire settlement agreement.  *Id.* at 173.  Nor was it upending the dismissal of the prior case.  *Id.*  Rather, it simply chose not to enforce one provision in an agreement.  *Id.*  As the Court observed, nothing prohibited the parties from settling that dispute, nor would it prohibit future settlements.  *Id.*  And, "[t]o the extent that

our rule may discourage the insertion of such clauses into [future] licenses or settlement agreements, that is a desirable consequence for the reasons stated in *Lear*." *Id.*

As such, it is a false premise to compare the importance of settlement agreements and *res judicata* in general to the importance of protecting ideas that should be in the public domain. ABC does not advocate that the entire Settlement Agreement be voided, nor does it claim that the Settlement Agreement as a whole is not enforceable. ABC attacks only one provision in it, the voiding of which, by the express agreement of the parties, has no effect on the Settlement Agreement as a whole, which is expressly contemplated under the Settlement Agreement. *See* DE 5-1 (filed under seal) at § 11.9. Refusing to enforce that provision has clear salutary benefits, and as the Second Circuit has observed, voiding such a provision is unlikely to discourage future settlements. *Rates Tech.*, 685 F.3d at 173. For that reason as well, the No-Challenge Provision should be declared void as against public policy.

## V.   FUNCTIONALITY IS PART OF A PROPER INFRINGEMENT ANALYSIS

The Motion is disturbing on a number of levels. While Capri Sun references the two most important cases on the validity question – *Idaho Potato* and *Rates Technology* – it did so only reluctantly and not for the rulings most applicable to its Motion. *See* Motion at 22-24. In addition, Capri Sun never expressly acknowledges the balancing framework required by *Idaho Potato* and *Lear*, nor does it acknowledge the policy interests behind the functionality defense. For those reasons alone, the Motion is concerningly disingenuous, especially where, as here, ABC fully disclosed these issues prior to the Motion. *See* DE 31 at 6-7.

Most disturbing, however, is Capri Sun's treatment of the applicability of functionality to a proper infringement analysis. Citing only *word* mark cases, Capri Sun claims that functionality is not relevant to an infringement analysis. *See* Motion at 15-17. But this case involves a <u>design</u> mark, not a <u>word</u> mark, and ABC previously disclosed the controlling Second Circuit precedent

for an infringement analysis of a design mark.  *See* DE 31 at 7.  Capri Sun not only improperly

ignores those cases (*see, e.g. Boritzer v. Blum*, No. 80-cv-480, 1985 WL 25022, at *7 (E.D.N.Y.

Apr. 2, 1985) ("[I]t is still an important element of responsible advocacy for counsel to explain

why the apparently controlling authority should not be binding or applicable in the pending

case.") (internal citations and quotations omitted)), but it apparently expects the Court to do the

same.

As the Second Circuit explained in *Stormy Clime*, where the asserted mark is a product

design, functionality *must* be considered in performing a proper infringement analysis.

Specifically, where a product design is at issue, a proper analysis requires "two stages of

inquiry."  *Stormy Clime*, 809 F.2d at 974.  "In the first stage, the plaintiff must show that the

trade dress of its product has acquired secondary meaning[11] in the marketplace and that the

design of the competitor's product is confusingly similar to that of the plaintiff's product."  *Id.*

In the second stage, a "competitor [still] can prevail . . . by showing that the similar arrangement

of features is functional."  *Id.*  In this context, too, the "purpose of the functionality defense" also

must be taken into account.  *Id.* at 976.  *See also Fabrication Enterprises*, 64 F.3d at 59 (analysis

needs to assess impact of trademark protection on competition).

As the Second Circuit has explained, in performing the second stage of the analysis,

several factors "should be considered along a continuum":

> (1) the degree of functionality of the similar features of a product,
> (2) the degree of similarity between the non-functional (ornamental)

---

[11] As a result of the Supreme Court's decisions in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992) and *Wal-Mart*, 529 U.S. 205, the Second Circuit clarified that, in a trade dress infringement claim, "the plaintiff may prove distinctiveness by showing either that the 'intrinsic nature' of the mark serves to identify a particular source (what is known as 'inherent distinctiveness') or that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' (what is known as 'acquired distinctiveness' or 'secondary meaning').  The product design plaintiff, however, must always make the second, more difficult showing."  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

> features of the competing products, and (3) the feasibility of the
> alternative designs that would not impair the utility of the product.

*Fabrication Enterprises*, 64 F.3d at 59 (quoting *Stormy Clime,* 809 F.2d at 977).  On one end of the continuum are similarities only in purely functional features and, on the other end, are "distinctive and arbitrary arrangements of predominantly ornamental features."  *Stormy Clime,* 809 F.2d at 977.  "In between, the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product (including maintenance of low cost), especially where the competitor copying such features has taken significant steps to differentiate the product."  *Id.*

The above unquestionably constitutes an infringement analysis.  ABC will show in this case that any similarities between the Pouch Trademark and the accused pouches are purely functional, and that the differences between the mark and the products are non-functional.  ABC also will show that Capri Sun's and ABC's product design features were not motivated by distinctiveness, but by utilitarian goals, and that ABC has made very clear through its labeling and design differences that its products are not to be associated in any way with Capri Sun.  As such, regardless of validity issues, functionality is inextricably a part of this case.  *See id.* at 974; *Fabrication Enterprises*, 64 F.3d at 59.

## <u>CONCLUSION</u>

The defendant, American Beverage Corporation, respectfully requests that the Motion be denied, and that it be allowed to assert and take discovery on issues and facts relevant to the functional features found in the Pouch Trademark.

Dated:  July 23, 2019                         Respectfully Submitted,

*/s/ Joshua C. Krumholz*
Dawn  Rudenko (DR8290)
Email: dawn.rudenko@hklaw.com
HOLLAND & KNIGHT LLP

263 Tresser Boulevard
Suite 1400
Stamford, CT 06901
Telephone:  (203) 905-4520
Facsimile:  (203) 905-4501

Joshua C. Krumholz
Admitted *pro hac vice*
Email: joshua.krumholz@hklaw.com
Mark T. Goracke
Admitted *pro hac vice*
Email: mark.goracke@hklaw.com
HOLLAND & KNIGHT LLP
10 Saint James Avenue; 11th Floor
Boston, MA  02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

*Attorneys for American Beverage  Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2019, a true and correct copy of the foregoing was served via the Court's CM/ECF System to all counsel of record.

*/s/Joshua C. Krumholz*
Joshua C. Krumholz
