UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/29/19

------------------------------------------------------------------------X
                                  :

CAPRI SUN GMBH,                     :

                       Plaintiff,     :

             -v-              :

AMERICAN BEVERAGE CORP.,      :

                       Defendant.   :

                                    :
------------------------------------------------------------------------X

19 Civ. 1422 (PAE)

<u>OPINION & ORDER</u>

**PAUL A. ENGELMAYER, District Judge:**

This case raises novel questions regarding the interplay of contract law and the trademark law defense of functionality.

Plaintiff Capri Sun GmbH ("Capri Sun") holds a trademark for its familiar tinfoil pouch design for fruit juice drinks containing water (the "Pouch Trademark"). Less than three years before this lawsuit was commenced, Capri Sun's predecessor in interest, and that of defendant American Beverage Corporation ("ABC"), settled a substantially similar lawsuit involving the Pouch Trademark. Their Settlement and License Agreement included a clause that then barred ABC's predecessor, and today bars ABC, from challenging the trademark's validity (the "No-Challenge Provision"), while giving ABC's predecessor a right to license that design for its own products.

Although ABC has since terminated the license, it remains bound by the No-Challenge Provision. In this lawsuit, Capri Sun claims that ABC, notwithstanding the termination of its license, is selling fruit-juice drinks in pouches that infringe Capri Sun's trademark. Capri Sun brings claims against ABC for breach of the Settlement and License Agreement, for, *inter alia*,

federal trademark infringement pursuant to 15 U.S.C. §§ 1114 and 1125(c), and for federal trade-dress infringement pursuant to 15 U.S.C. § 1125(a).

The issue at hand is whether ABC is precluded contractually from challenging Capri Sun's trademark as invalid. Specifically, as an affirmative defense, ABC asserts that the Pouch Trademark is invalid on the grounds that it is functional in nature, i.e., protectable, at most, under patent law, but not protectable in trademark. The No-Challenge Provision, however, would bar such a challenge. A line of cases beginning with *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969), has significantly limited the enforceability of contract and license provisions that explicitly or implicitly preclude challenges to patents, and has occasionally limited the enforceability of provisions that preclude challenges to trademarks. Invoking this line, ABC argues that the No-Challenge provision is void for public policy reasons.

In the instant motion, Capri Sun seeks to preclude that line of defense. It moves: (1) to strike all references to the alleged functionality of the Pouch Trademark from ABC's affirmative defenses, pursuant to Federal Rule of Civil Procedure 12(f)(1); and (2) for a protective order that would bar ABC from seeking discovery regarding the trademark's functionality, pursuant to Federal Rule of Civil Procedure 26(c)(1)(D).

For the following reasons, the Court sustains the No-Challenge Provision and therefore grants Capri Sun's motion.

# I.    Background

## A.    Factual Background[1]

### 1.    The Parties and their Predecessors

Capri Sun is a Gesellschaft mit beschränkter Haftung (limited liability company) organized under the laws of, and headquartered in, Germany. Compl. ¶ 8. On December 17, 2018, the company recorded its change of name from Deutsche SiSi-Werke Betriebs GmbH ("SiSi") to Capri Sun GmbH with the U.S. Patent and Trademark Office (the "PTO"). SUF ¶ 1. Rudolph Wild GmbH & Co. KG (formerly Zick-Zack Rudolf Wild) ("Wild") is the parent and a predecessor-in-interest of Capri Sun. *See id.* ¶¶ 1–2, 5.

Faribault Foods, Inc. ("Faribault") was the defendant in a prior lawsuit in which SiSi alleged that Faribault was infringing SiSi's rights in and to the Pouch Trademark. *Id.* ¶¶ 23, 25. As discussed further below, on July 1, 2016, Faribault and SiSi duly executed a Settlement and License Agreement to resolve that lawsuit. *Id.* ¶ 75. On November 1, 2016, Faribault duly assigned the Settlement and License Agreement to ABC in conjunction with ABC's acquisition of certain of Faribault's beverage business assets. *Id.* ¶ 82. The assignment to ABC included, *inter alia*, the obligations of the No-Challenge Provision. *Id.* ABC is a private corporation with its principal place of business in the State of Pennsylvania. Answer ¶ 9.

### 2.    The Pouch Trademark and the Utility Patent

On July 11, 1985, Wild—Capri Sun's parent and predecessor-in-interest—applied for a registration for a trademark of a "pouch design" for "fruit drinks." SUF ¶ 5. On November 25,

---

[1] The Court draws its account of the underlying facts primarily from the parties' joint statement of undisputed facts, Dkt. 31-1 ("SUF"), and the exhibits attached thereto, Dkts. 31-2–26. For background purposes, the Court has also considered Capri Sun's Complaint, Dkt. 5 ("Compl."); and ABC's Answer, Dkt. 14 ("Answer").

1986, the application was registered on the PTO's principal register as U.S. Trademark

Reg. No. 1,418,517 (the "'517 Registration"). *Id.* ¶¶ 3, 6. Capri Sun still owns the incontestable

'517 Registration, which covers the Pouch Trademark for "fruit juice drinks containing water."

*Id.* ¶¶ 3–6, 17–21.

Before registering the Pouch Trademark, Capri Sun had held a utility patent for a similar

pouch design (U.S. Patent No. 3,380,646), entitled "Container of Plastic Material and Method of

Producing Same." *Id.* ¶ 52. On April 30, 1985—just a few months before Wild applied for the

Pouch Trademark—the prior patent expired. *Id.* ¶¶ 52, 54.

###    3.    The Prior Lawsuit

On July 24, 2015, Capri Sun (then known as SiSi) commenced a lawsuit against Faribault

in the United States District Court for the District of Minnesota, Case No. 0:15 Civ. 3138

(D. Minn.) (the "Minnesota Action"). *Id.* ¶¶ 23–24; *see* Dkt. 31-5. SiSi asserted claims against

Faribault for: (i) federal trademark infringement under 15 U.S.C. § 1114(a); (ii) federal unfair

competition under § 1125(a); (iii) federal trademark dilution under § 1125(c); (iv) trademark

infringement under Minnesota statutory law; (v) dilution under Minnesota statutory law; (vi)

trademark infringement under Minnesota common law; and (vii) unfair competition under

Minnesota common law. SUF ¶¶ 25–26.

On December 8, 2015, the Minnesota Action was transferred to the Hon. Kimba M.

Wood in this District, where it was captioned *Deutsche SiSi-Werke Betriebs GmbH v. Faribault

Foods, Inc.*, No. 15 Civ. 9750 (KMW) (S.D.N.Y.) (the "Prior Lawsuit"). *Id.* ¶ 27; *see* Dkt. 31-6.

SiSi amended the complaint, swapping out its Minnesota state law claims for New York state

law claims, while maintaining its principal allegations that Faribault was infringing the Pouch

Trademark. SUF ¶¶ 29, 30, 40, 41; *see* Dkts. 31-7, 31-9.

### a) Faribault's Functionality Defense

In the Prior Lawsuit, Faribault challenged the Pouch Trademark's validity on functionality grounds in its Second and Third Affirmative Defenses:

#### Functionality of SiSi's Purported Trademark

SiSi's claims are barred because the pouch design that is the subject of the SiSi Registration and in which SiSi claims trademark rights is functional and is incapable of legal protection under the Lanham Act, and under New York statutory law and under New York State common law.

#### SiSi's Purported Trade Dress is Functional and/or Generic

SiSi's claims are barred because the silver edging around the primary design, i.e., the aluminum border of the pouch, which SiSi asserts as an element of its trade dress, is functional and is incapable of legal protection under the Lanham Act, under New York State statutory law and under New York State common law.

SUF ¶¶ 42–45; *see* Dkt. 31-10 at 27–28. Faribault also challenged the Pouch Trademark's validity on functionality grounds in each of its three Counterclaims. To this end, Faribault alleged that "[t]he pouch design depicted in the ['517 Registration] is a functional design for packaging for pouch beverages," and that "[t]he pouch design depicted in the ['517 Registration] is functional, is not entitled to federal registration, and should be cancelled on that basis." SUF ¶¶ 47, 49.

### b) Discovery in the Prior Lawsuit

On January 21, 2016, Judge Wood approved a discovery plan pursuant to which discovery was to begin immediately and be completed no later than May 2, 2016. Prior Lawsuit, ECF No. 24. Throughout the discovery period, Faribault sought extensive discovery, including deposition testimony, on the issue of whether the Pouch Trademark was functional. *See* SUF ¶¶ 56–59, 62–64, 66.

On January 26, 2016, five days after Judge Wood's discovery order, Faribault served its first set of document production requests on SiSi. *Id.* ¶ 56. Out of 37 requests, four sought discovery regarding the alleged functionality of the Pouch Trademark:

> <u>REQUEST NO. 27</u>: All documents relating to or concerning the cost and/or ease of manufacture of the SiSi Pouch.
>
> <u>REQUEST NO. 28</u>: All documents relating to or concerning the cost and/or ease of manufacture of pouch designs for pouch beverages other than the SiSi Pouch.
>
> <u>REQUEST NO. 29</u>: All documents relating to or concerning benefits of the SiSi Pouch including but not limited to benefits in (i) manufacturing, (ii) storage, (iii) transport, (iv) distribution, and/or (v) product quality or integrity.
>
> <u>REQUEST NO. 30</u>: All documents relating to or concerning any utility patent other than the Utility Patent that relates to, covers, addresses or discloses pouch packaging.

Dkt. 31-13 at 11–12; *see* SUF ¶ 57.

The same day, Faribault served its first set of requests for admission. SUF ¶ 58. Out of 46 requests, 12 sought admissions on the issue of whether the Pouch Trademark was functional. *Id.* ¶ 59 (listing Requests for Admission Nos. 29, 30, 36, 37, 38, 39, 40, 41, 42, 43, 44, and 45). For example, Faribault sought functionality-related admissions that: the "Pouch is designed to stand on its own"; the "Pouch is the best design for a stand-up pouch beverage package"; the "Pouch is less expensive [and easier] to manufacture than any other stand-up pouch packaging known to Plaintiff for use in connection with juice"; the "Pouch is designed to withstand high pressures and violent shocks without danger of breaking"; "allowing Plaintiff to enforce its claimed trademark would extend the exclusivity of the [expired] Utility Patent"; and "if Plaintiff were permitted exclusive use of the [Pouch Trademark] competitors would be competitively disadvantaged." Dkt. 31-14 at 6–7.

On April 14, 2016, SiSi responded to Faribault's Requests for Admission, providing responses to only four out of the 12 functionality-related requests—mostly in the form of objections to and denials of each request. SUF ¶¶ 60–61; Dkt. 31-15 at 5–7.

On March 1, 2016, in connection with SiSi's filing a second amended complaint, Judge Wood granted the parties' request for an extension of the fact discovery period to June 30, 2016. SUF ¶ 74; *see* Prior Lawsuit, ECF Nos. 30, 31. On May 16, 2016, Faribault served its third set of document production requests on SiSi, again seeking discovery on the issue of the Pouch Trademark's alleged functionality. SUF ¶¶ 63–64; *see* Dkt. 31-17.

SiSi's April 14, 2016 response to Faribault's requests for admission was the only discovery response provided by SiSi in the Prior Lawsuit. SUF ¶ 65. Despite Faribault's multiple requests over the course of four months, SiSi did not produce any documents regarding functionality in the Prior Lawsuit. *Id.* ¶ 68.

On May 25, 2016, Faribault served a Rule 30(b)(6) deposition notice on SiSi. *Id.* ¶ 66. Topic No. 41 in the deposition notice sought testimony on the "functionality, or lack thereof, of the [Pouch Trademark]." *Id.*; Dkt. 31-18 ¶ 41. However, no depositions were taken in the Prior Lawsuit before it settled. SUF ¶ 69.

### c)    Settlement of the Prior Lawsuit

On June 3, 2016, less than a month before the scheduled close of fact discovery, SiSi and Faribault executed a Settlement Term Sheet. *Id.* ¶¶ 70, 74. In a section titled "Validity of the Trademark," the Term Sheet provided that: "Faribault acknowledges the validity of the [Pouch] Trademark and covenants not to directly or indirectly challenge or contest, or assist in the challenging or contesting, of the validity, enforceability or ownership of the [Pouch] Trademark." *Id.* ¶¶ 71–72; Dkt. 31-19 at 2. On June 27, 2016, three days before the scheduled

close of all fact discovery, the parties filed a joint letter with the Court seeking to stay the Discovery Schedule for 60 days.  SUF ¶ 81.

On July 1, 2016, after nearly a year of litigation, SiSi and Faribault executed a Settlement and License Agreement (the "Agreement") to resolve the Prior Lawsuit.  *Id.* ¶ 75.  Section 6.3 of the Agreement, titled "Validity of the Trademark," contained the No-Challenge Provision at issue in the present motion.  The No-Challenge Provision stated, in pertinent part:  "*Faribault acknowledges the validity of the [Pouch] Trademark and covenants and agrees not to either directly or indirectly (a) challenge or contest, or assist in the challenging or contesting, of the validity, enforceability or ownership of the [Pouch] Trademark.*"  *Id.* ¶¶ 76–77 (emphasis added).  In § 5.4 of the Agreement, the parties agreed that the No-Challenge Provision would survive the termination of the Agreement.  *Id.* ¶ 78.

On July 21, 2016, pursuant to § 4.5 of the Agreement, the parties filed a Stipulation and Order of Dismissal With Prejudice, which Judge Wood endorsed the same day, dismissing, with prejudice, the parties' claims and counterclaims.  *Id.* ¶ 79; *see* Dkt. 31-20.

On November 1, 2016, as part of ABC's acquisition of certain of Faribault's beverage business assets, Faribault assigned the Agreement, including the No-Challenge Provision, to ABC.  SUF ¶ 82.

### 4.    Termination of the Agreement

On March 26, 2018, ABC sent Capri Sun written notice of its intent to terminate the Settlement Agreement.  *Id.* ¶¶ 83–84.  On April 11, 2018, Capri Sun sent ABC a written acknowledgement, noting that certain provisions, including the No-Challenge Provision, would survive the Agreement's termination.  *Id.* ¶¶ 85–87.  On April 27, 2018, ABC acknowledged

receipt of the letter, stating that it was "aware of its obligations under the . . . Agreement."

*Id.* ¶¶ 88–89.

### B.   Procedural Background

On February 14, 2019, Capri Sun filed a complaint against ABC, commencing the current lawsuit.  SUF ¶ 90; *see* Compl.

Capri Sun's claims derive from its central factual allegation that ABC has begun to market and license a pouch for fruit juice drinks that competes—allegedly in breach of the Agreement, and in violation of federal and New York State law—with Capri Sun's.  Capri Sun alleged that, over the last four decades, it, its predecessors, and its licensees have spent hundreds of millions of dollars promoting and selling fruit-flavored beverages under the Pouch Trademark around the world.  Compl. ¶ 45.  It alleged that between 2009 and 2014, Capri Sun sold more than $7 billion worth of such beverages under the Pouch Trademark in the United States alone.  *Id.* ¶ 46.  But, Capri Sun alleged, since the termination of the License Agreement, ABC has illegally encroached on this business by continuing to manufacture, distribute, market, and sell at least 10 fruit-flavored beverage products using confusingly similar pouches to the Pouch Trademark.  *Id.* ¶ 113; *see id.* ¶¶ 101–117.

Capri Sun asserts claims for (i) breach of the Agreement under New York law; (ii) federal trademark infringement under 15 U.S.C § 1114(a); (iii) federal trade-dress infringement under 15 U.S.C. § 1125(a); (iv) federal unfair competition and false association under 15 U.S.C. § 1125(a); (v) federal trademark dilution under 15 U.S.C. § 1125(a); (vi) trademark infringement under New York common law; (vii) trade-dress infringement under New York common law; (viii) unfair competition under New York common law; and (ix) dilution under New York General Business Law § 360-l.  *Id.*; SUF ¶¶ 90–92.

On March 11, 2019, ABC answered the complaint, asserting 10 affirmative defenses—including two that challenge the validity of the Pouch Trademark on the ground that it is functional. *See* Answer; SUF ¶ 94.

In particular, ABC's Third Affirmative Defense, as currently articulated, is that Capri Sun's claims are barred due to the "functional or otherwise non-protectable characteristics of the [Pouch Trademark], including but not limited to the pouches' height, weight, trapezoid shape, straight side and/or 'potbelly,'" which ABC alleges "are essential to the purpose of [the] pouch packaging and if excluded from public use would affect the cost and quality of that packaging and would put ABC at a significant non-reputation-related disadvantage." SUF ¶ 95. And ABC's Ninth Affirmative Defense is that Capri Sun's "claims are barred to the extent plaintiff is impermissibly attempting to broaden the scope of its '517 trademark by claiming that generic and functional elements of a pouch container fall within its registration." SUF ¶ 96.

On May 20, 2019, ABC served its first set of document requests and its first set of interrogatories on Capri Sun. SUF ¶¶ 99, 101. On June 7, 2019, ABC served its second set of document requests on Capri Sun. SUF ¶ 103. In each set of discovery requests, ABC sought discovery on the issue of whether the Pouch Trademark is functional. SUF ¶¶ 100–04.

On June 26, 2019, the parties filed a joint letter "seek[ing] a determination from the Court about whether ABC may assert trademark functionality as a defense in this case, in light of a 'no-challenge' provision in a [prior] settlement agreement," and suggesting the instant motion to strike and for a protective order as the most efficient method for making such a determination. Dkt. 31; *see also* Dkt. 33 (clarifying nature of relief sought in motion). In connection with the joint letter, the parties also filed a joint statement of undisputed facts, SUF, attaching 25 exhibits, Dkts. 31-2–26. On July 2, 2019, the Court set a briefing schedule for the motion. Dkt. 35.

On July 16, 2019, Capri Sun filed its motion to strike and for a protective order, Dkt. 39, and an accompanying memorandum of law in support, Dkt. 40 ("Pl. Mem."). On July 23, 2019, ABC submitted a memorandum of law in opposition, Dkt. 42 ("Def. Mem."). On July 30, 2019, Capri Sun submitted its reply, Dkt. 44 ("Pl. Reply"). On September 27, 2019, the Court heard argument.

## II.     Legal Standards

### A.     Motion to Strike

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)(1).[2] "Federal courts have discretion in deciding whether to grant motions to strike." *Orientview Techs. LLC v. Seven For All Mankind, LLC*, No. 13 Civ. 0538 (PAE), 2013 WL 4016302, at *3 (S.D.N.Y. Aug. 7, 2013) (internal quotation marks and citations omitted). For a court to strike an affirmative defense as insufficient, "(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010) (citation omitted).

In considering the sufficiency of a defense under the first two prongs of the analysis, courts apply the same legal standard that applies to a Rule 12(b)(6) motion to dismiss. *Id.*; *see City of New York v. FedEx Ground Package Sys., Inc.*, 314 F.R.D. 348, 355 (S.D.N.Y. 2016). In evaluating the third prong, the court "may consider whether inclusion of the legally insufficient

---

[2] A "pleading," in turn, is defined as "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a).

defense would needlessly increase the time and expense of trial or duration and expense of litigation." *Id.* (internal quotation marks omitted); *see Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 287 (S.D.N.Y. 2017) ("The burden of additional discovery and increasing the duration and expense of litigation can constitute sufficient prejudice.").

### B.     Motion for a Protective Order

Under Federal Rule of Civil Procedure 26, the court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(D).

The party seeking the protective order carries the burden "to show that good cause exists for issuance of the order." *Schoolcraft v. City of New York*, No. 10 Civ. 6005 (RWS), 2013 WL 4534913, at *3 (S.D.N.Y. Aug. 27, 2013) (internal quotation marks omitted). "[I]t is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978). Ultimately, "the grant or denial of a protective order lies within the sound discretion of the district court." *Dove v. Atl. Capital Corp.*, 963 F.2d 15, 20 (2d Cir. 1992).

## III.     Discussion

Capri Sun's motion tests whether the No-Challenge Provision can be enforced, under the *Lear* line of cases, to preclude ABC from seeking to establish that Capri Sun's pouch is functional in nature. The motion principally raises the issue of whether the No-Challenge Provision estops ABC from challenging the validity of the Pouch Trademark on the grounds that the trademark is functional and therefore not protectable in trademark. Capri Sun's motion also

seeks to block ABC, on account of the same provision, from raising functionality in connection with the Court's infringement analysis.

###### A.    Is ABC Estopped From Challenging the Validity of Capri Sun's Trademark?

###### 1.    The Balancing Test Established by the *Lear* Line of Case Law

Under 15 U.S.C. § 1115(b), Capri Sun's incontestable '517 Registration of the Pouch Trademark is conclusive evidence of: (i) the validity of the trademark; (ii) the validity of the registration of the trademark; (iii) Capri Sun's ownership of the trademark; and (iv) Capri Sun's exclusive right to use the trademark for fruit juice drinks containing water.  Ordinarily, however, even an incontestable registration may be challenged on the grounds of functionality. 15 U.S.C. § 1115(b).

Capri Sun argues that the No-Challenge Provision estops ABC from so challenging the validity of the Pouch Trademark.  ABC counters that the No-Challenge Provision is void for public policy reasons, and hence unenforceable, under a line of cases beginning with the 1969 decision in *Lear*.

*Lear* examined the contract doctrine of licensee estoppel.  Before *Lear*, that doctrine had all but categorically barred a licensee of intellectual property from challenging, in a later dispute, the validity of the licensor's intellectual property rights.  This estoppel had been justified on the grounds that "the licensee effectively recognizes the validity of [the licensed intellectual] property" when the licensee enters into an agreement with the licensor to use the property.  *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 135 (2d Cir. 2003) (citing *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1368 (Fed. Cir. 2001), *cert. denied*, 541 U.S. 1027 (2004)).  The doctrine had been held to apply to any intellectual property license, whether or not there was an explicit provision in a license agreement prohibiting a future challenge to the validity of the licensor's intellectual property.  In cases involving a so-called "'no-challenge'

provision in a license agreement," the provision "ma[de] the estoppel clear and explicit." *HSW Enters., Inc. v. Woo Lae Oak, Inc.*, No. 08 Civ. 8476 (LBS), 2009 WL 4823920, at \*2 (S.D.N.Y. Dec. 15, 2009) (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:63 (4th ed. 2009)).

The Supreme Court in *Lear* reassessed that doctrine in the context of a licensee's challenge to the validity of the licensor's patent. The Court held that the doctrine of licensee estoppel does not automatically bar such a challenge by the licensee. That was so for policy reasons particular to patent law. *Lear*, 395 U.S. at 671. Patent law, the Court explained, reflects the "strong federal policy favoring the full and free use of ideas in the public domain." *Id.* at 674. The policy in assuring "that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent," *id.* at 668, the Court noted, may be advanced by enabling a challenge to a patent to proceed by the entity, a licensee, that may have the greatest economic incentive to bring such a challenge, *id.* at 670. However, that interest must be balanced against the "competing demands of the common law of contracts." *Id.* at 668. The Court in *Lear* assigned relatively limited weight to the competing interest in contracts. "[T]he equities of the licensor do not weigh very heavily," the Court explained, "when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Id.* at 670. Ordinarily, the Court therefore held, "the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued." *Id.* at 670–71.

The cases since *Lear* have applied the balancing test that it established "for weighing the 'public interest in discovering invalid patents' against other competing interests." *Rates Tech.*

14

*Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 168 (2d Cir. 2012) (quoting *Idaho Potato Comm'n*, 335 F.3d at 135). In the patent context, as in *Lear*, these considerations have led courts to give heavy weight to the interest in free competition that is served by enabling challenges to the validity of patents. Such courts "have enforced no-challenge contract provisions only when" the patent laws' prescription of free and full competition in the use of ideas in the public domain is outweighed by a countervailing public interest—such as "the important policy of enforcing settlement agreements and res judicata." *Idaho Potato Comm'n*, 335 F.3d at 135.

The Second Circuit has held that the *Lear* balancing test is also to be used in trademark licensing disputes. *See id.* at 136; McCarthy, *supra*, § 18:63. In that context, however, as reviewed further below, courts have been more apt to bar challenges by licensees, recognizing that "the public interest in promoting challenges to the validity of trademarks, if indeed there is any, . . . is not nearly as weighty as in the patent area." *E. G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 291–92 (S.D.N.Y.2000), *aff'd*, 4 F. App'x 81 (2d Cir. 2001); *see infra*, pp. 17–18. The Circuit has also held that, although *Lear* involved an implicit estoppel—that embodied in the fact of a license—the *Lear* balancing test also applies to contractual provisions explicitly estopping an entity from challenging a patent or trademark: "*Lear* makes clear that courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual [no-challenge] provisions and render unenforceable those provisions that would undermine the public interest." *Idaho Potato Comm'n*, 335 F.3d at 137.

Under this line of authority, the Court here must, first, determine the public interest served by the challenge ABC proposes: a challenge to the validity of the Pouch Trademark based on the claim that it is functional and hence outside the scope of trademark protection. *Id.* at 137–138 (in applying the balancing test, first "we must identify the public interest in [the

relevant law of intellectual property] and the public injury that might result from enforcement of the estoppel provision"); *see id.* at 139 ("[T]o decide the issue of public injury we must look to the public interest implicated by the merits of the licensee's challenges."). The Court must then balance that interest against the competing interests in enforcing the No-Challenge Provision here. These interests are the public policies in favor of settlements and predictable contractual relationships, as present in the concrete context of this controversy. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 740–41 (S.D.N.Y. 2000) (the "strong public interest in the judicial policy of encouraging extra-judicial settlement of trademark litigation" and the "strong public interest in protecting the reliance that contracts induce" together "weigh[] in favor of enforcing the parties' agreements"), *aff'd*, 294 F.3d 383 (2d Cir. 2002).

### 2.   The Public Policy Interests Furthered by a Functionality Challenge

The parties identify differently the public interest furthered by permitting ABC's functionality challenge to proceed. Capri Sun depicts ABC's invalidity defense as a garden-variety challenge to a trademark. It depicts ABC's challenge as implicating only the interest, furthered by trademark protection, in avoiding confusion among products. It downplays the public interest in permitting a claim of excessive trademark protection to go forward here. ABC, by contrast, argues that the relevant public interest is that protected by the functionality defense to trademark. As developed below, that defense protects competition, insofar as it guards against the misuse of trademarks that purport to protect interests capable of protection only in patent.

This dispute—over how the *Lear* doctrine should apply to a functionality defense to a trademark infringement claim—appears to be one of first impression. *See, e.g.*, Dkt. 31 at 6 (parties unaware of cases addressing issue). And whether the functionality defense is viewed as

primarily protecting trademark, as opposed to patent, interests is consequential under *Lear*. The

case law, in trademark cases, generally holds the public interest served by assuring the validity of

a trademark as insufficient to overcome implied or express estoppel. *See HSW Enters.*,

2009 WL 4823920, at *3 (citing *Idaho Potato Comm'n*, 335 F.3d at 136). However, the case

law, in patent cases, generally holds that the public interest in protecting free competition

outweighs the interest in enforcing a no-challenge provision in a patent license absent important

public interests in the particular case that require enforcement of the provision. *See Rates Tech.*

*Inc.*, 685 F.3d at 172.

a)      ***Lear* in the Trademark Context**

Trademark law "protects the public by making consumers confident that they can identify

brands they prefer and can purchase those brands without being confused or misled." *Two*

*Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 784 n.19 (1992) (Stevens, J., concurring); *see*

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 50 (2d Cir. 2016) ("The public has a

great interest in administration of the trademark law in a manner that protects against

confusion."); *Idaho Potato Comm'n*, 335 F.3d at 136 (the public policy of trademarks, unlike

that of patents, is "guarding the public from being deceived into purchasing an unwanted

product").

In the *Lear* context, a licensee-challenger to a trademark's validity must do more than

show a likelihood of confusion to avoid estoppel. Rather, a "party entering into [an agreement]

with respect to a trademark will be held to his contract unless enforcement of the contract would

result in *injury* to the public through confusion." *Times Mirror*, 103 F. Supp. 2d at 738

(*quoting VISA Int'l Serv. Ass'n v. Backward Holders of Am.*, 784 F.2d 1472, 1473

(9th Cir. 1986)). In other words, the confusion must "threaten [the public's] health or safety."

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 396 (2d Cir. 2002); *see HSW Enters.*, 2009 WL 4823920 at *3–4 (collecting cases).

Unsurprisingly, courts applying the *Lear* balancing test in the trademark context "have generally precluded licensees from challenging the validity of a mark they have obtained the right to use." *Idaho Potato Comm'n*, 335 F.3d at 136 (citing with approval *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973) (holding that "the public interest in [trademarks] . . . is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings")); *see E. G.L. Gem Lab*, 90 F. Supp. 2d at 291–92 ("The public interest in promoting challenges to the validity of trademarks, if indeed there is any, therefore is not nearly as weighty as in the patent area.").

Invoking this line of cases, Capri Sun argues that the public interest at issue here is no more than the standard one at issue in trademark cases: the prevention of consumer confusion. It argues that such an interest is insufficient to prevent enforcement of the No-Challenge Provision.

### b)      Application of *Lear* to the Functionality Defense

ABC, in contrast, argues that the relevant public policy to be weighed under *Lear* is not the general one at issue in trademark cases, but the one served by the functionality doctrine.

The functionality doctrine holds that "functional" features of a product are incapable of trademark or trade dress protection. As the Supreme Court has explained, "[i]n general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (internal quotation marks and citations omitted). Put differently, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Qualitex Co. v. Jacobson*

*Prods. Co.*, 514 U.S. 159, 165 (1995)).  In 1998, Congress codified the common law

functionality rule, amending the Lanham Act by, *inter alia*, adding functionality to the list of

possible challenges to the validity of an incontestably registered mark.  Trademark Law Treaty

Implementation Act, Pub. L. No. 105-330, 112 Stat. 3064 (1998).  Functionality is an affirmative

defense to a trademark infringement claim; where a party establishes "[t]hat the mark [allegedly

infringed] is functional," the mark is invalid.  15 U.S.C. § 1115.

The public policy behind the functionality defense, like that of patent law, is to protect

competition.  "The purpose of the functionality defense is to prevent advances in functional

design from being monopolized by the owner of the design's trade dress in order to 'encourage

competition and the broadest dissemination of useful design features.'"  *Fabrication Enter., Inc.*

*v. Hygenic Corp.*, 64 F.3d 53, 58 (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*,

724 F.2d 327, 331 (2d Cir. 1983)); *see* 1 J. Thomas McCarthy, *McCarthy on Trademarks and*

*Unfair Competition* § 7:63 (4th ed. 2009) (policy rationale underlying rule against trademark

protection for functional features is "[p]reserving free and effective competition by ensuring that

competitors can copy features that they need to compete effectively").  The doctrine of

functionality thus prevents trademark law from "inhibiting legal competition by allowing a

producer to control a useful product feature." *Qualitex*, 514 U.S. at 164.

The functionality defense thus safeguards competition by guarding against encroachment

by trademarks into areas protected, if at all, by patent law.  "It is the province of patent law, not

trademark law, to encourage invention by granting inventors a monopoly over new product

designs or functions *for a limited time*." *Id.* at 164 (emphasis added); *see Christian Louboutin*

*S.A. v. Yves St. Laurent Am. Holdings, Inc.*, 696 F.3d 206, 218–19 (2d Cir. 2012) ("[T]he

doctrine of functionality prevents trademark law from inhibiting legitimate competition by

giving monopoly control to a producer over a useful product . . . . [F]unctional features can be protected only through the patent system, which grants a limited monopoly over such features until they are released into general use."); *see also Jay Franco & Sons, Inc. v. Franek,* 615 F.3d 855, 857 (7th Cir. 2010) ("[T]he functionality doctrine polices the division of responsibilities between patent and trademark law by invalidating marks on useful designs."). The functionality defense reflects that "[i]f a product's functional features could be used as trademarks, . . . a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever." *Qualitex*, 514 U.S. at 164–65.

ABC therefore argues that, insofar as a party's functionality challenge to a trademark's validity protects competition much as a party's claim of patent invalidity does, a functionality challenge should be viewed as furthering the significant public interest in protecting competition recognized in patent cases like *Lear,* not the limited public interest served in trademark cases not implicating a functionality defense.

The Court agrees.  Applying the *Lear* line to ABC's functionality challenge to the Pouch Trademark's validity, the public policy to consider is the weighty one—protecting competition—that the functionality defense serves.  The Second Circuit has instructed that "to decide the issue of public injury we must look to *the public interest implicated by the merits of the licensee's challenges,*" *Idaho Potato Comm'n*, 335 F.3d at 139 (emphasis added), as well as "the public injury that might result from enforcement of the estoppel provision," *id.* at 138.  *See id.* (treating certification marks like patents for *Lear* purposes—even though certification marks are otherwise "generally treated the same as trademarks"—because, *inter alia*, the public injury that would result from estoppel was a harm to competition, not consumer confusion).  Cases applying *Lear* in the trademark context heretofore have addressed licensee challenges that implicated only

the interest in preventing consumer confusion.  But those cases are inapposite here, because they did not implicate the functionality defense.  *See HSW Enters.*, 2009 WL 4823920, at *3 (inquiring as to "the public interest served by a challenge to a trademark *based on the [particular] doctrine*" on which the licensee relied, rather than trademark law as a whole).

ABC's functionality challenge here squarely implicates the public interest in the protection of competition in the use of ideas—the same interest implicated by challenges to the validity of patents and certification marks.  *Idaho Potato Comm'n*, 335 F.3d at 138–39.  ABC's affirmative defenses note the allegedly functional characteristics of Capri Sun's pouch, "including but not limited to the pouches' height, weight, trapezoid shape, straight side and/or 'potbelly.'"  SUF ¶ 95.  ABC characterizes the Pouch Trademark as "a unique and effective way to package juice in a pouch that is able to stand on its own, with resiliency and elasticity, and [with] a high capacity for user enjoyment."  Def. Mem at 15 (citing SUF ¶¶ 8–16; Dkt. 31-12). ABC further notes that Capri Sun previously held a patent for a similar pouch design that expired approximately three months before Capri Sun applied for a registration of the Pouch Trademark. It argues that Capri Sun's prior utility patent "is strong evidence that the features therein claimed are functional."  *TrafFix Devices*, 532 U.S. at 29.  ABC is further correct that the protection of competition is strongly implicated when the would-be challenger is a current or former licensee, as licensees often are the "only individuals with enough economic incentive to challenge" the validity of the asserted intellectual property.  *Rates Tech. Inc.*, 685 F.3d at 172–73 (quoting *Lear*, 395 U.S. at 670).

The merits of ABC's functionality defense are not currently before the Court.  The Court recognizes that Capri Sun has previewed substantial counterarguments, *see* Pl. Reply at 6 n.1. But the factors reviewed above, viewed in combination, make persuasive ABC's argument that

the public interest implicated by its challenge is the protection of competition served by assuring that trademarks stay "in their lane" and do not serve as shadow means of obtaining patent-like protection with infinite duration. There is a strong public interest in not allowing a trademark-based monopoly over an allegedly functional mark to stand unchallenged. The Court therefore concludes that the cases applying *Lear* in the competition-protection (patent) context, not the confusion-avoidance (trademark) context, are most apposite here. In the balancing inquiry that the Court must undertake, a meaningful public interest favors permitting ABC's functionality challenge to proceed.

### 2. Application of *Lear* to the No-Challenge Provision Here

#### a) *Rates Technology:* Applying *Lear* to Settlement Agreements

That, however, is only the start of the inquiry. Although courts applying *Lear* in the patent and certification mark contexts often find that the public interest in protecting competition outweighs the interest served by enforcing a no-challenge provision, when a countervailing public interest has been found that tips the balance, courts have enforced such provisions. *See Rates Tech. Inc.*, 685 F.3d at 172. In particular, where, as here, a no-challenge provision appears in an agreement settling litigation, courts must weigh the "strong judicial policy favoring the settlement of litigation, including patent litigation," when considering whether to estop a validity challenge. *Id.*; *see Idaho Potato Comm'n*, 335 F.3d at 139 (courts may be "persuaded . . . to enforce no-challenge provisions" where there is "a strong countervailing public interest other than the general interest in enforcing written contracts (like the interest in settlements)").

In *Rates Technology*, the Second Circuit identified four "methods by which patent disputes can be resolved" and reviewed how the *Lear*-balance applied to each. 685 F.3d at 169 (internal quotation marks and citation omitted).

First, "a dispute over patent infringement and invalidity can be litigated to a final decision by a court." *Id.* "Such a decision," the Circuit stated, "ordinarily triggers the doctrine of res judicata, . . . [and] we are aware of no court which has even suggested that *Lear* abrogates the application of res judicata principles based on a judgment imposed by the court after full litigation." *Id.* (internal quotation marks and citation omitted).

Second, "disputes regarding patent infringement and validity can be—and often are—resolved through the entry of a consent decree following litigation between the parties." *Id.* Such decrees similarly "estop future challenges to a patent's validity." *Id.* Although "in some cases this policy may result in in the survival of invalid patents," the Circuit stated, this outcome is justified because "the agreements are arrived at in settlement of adversary litigation . . . with the discovery machinery of the courts available to the parties, and are subject to court scrutiny, in contrast to the purely private license agreements on which pre-*Lear* estoppel was based." *Id.* (quoting *Wallace Clark & Co. v. Acheson Indus., Inc.*, 532 F.2d 846, 849 (2d Cir. 1976)).

Third, "disputes about patent infringement and validity can be resolved by agreement *prior* to any litigation between the parties." *Id.* at 170 (emphasis added). The no-challenge provision at issue in *Rates Technology* appeared in such a pre-litigation settlement agreement. The Circuit held that "covenants barring future challenges to a patent's validity entered into prior to litigation are unenforceable, regardless of whether the agreements containing such covenants are styled as settlement agreements or simply as license agreements." *Id.* at 172.

Fourth and finally, the Circuit identified the context present here: "a patent dispute . . . settled privately after the initiation of litigation, without the imprimatur of a consent decree." *Id.* at 169. The Circuit in *Rates Technology* noted its decisions had not yet directly "addressed how *Lear* should apply to a settlement that resolves pending patent litigation and contains a

no-challenge clause."[3]  *Id.* at 170.  And that context was not present in *Rates Technology*.  The

Circuit there nevertheless addressed this category of agreements, distinguishing them from the

pre-litigation agreement at issue in that case.  Its discussion yields insights relevant to assessing

the public interest served by enforcing the No-Challenge Provision here.

In particular, the Circuit in *Rates Technology* quoted at length, and with approval, from

*Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001), in which the Federal Circuit had

"held that a no-challenge clause in such a settlement is valid under *Lear*":

> Concluding that the policy interests underlying the 'settlement of litigation [are]
> more strongly favored by the law' than the 'technical requirements of contract
> doctrine' at issue in *Lear*, the Federal Circuit held that '[o]nce an accused infringer
> has challenged patent validity, has had an opportunity to conduct discovery on
> validity issues, and has elected to voluntarily dismiss the litigation with prejudice
> under a settlement agreement containing a clear and unambiguous undertaking not
> to challenge validity and/or enforceability of the patent in suit, the accused infringer
> is contractually estopped from raising any such challenge in any subsequent
> proceeding.'

*Rates Tech. Inc.*, 685 F.3d at 170 (quoting *Flex-Foot*, 238 F.3d at 1369–70).

The Circuit explained that *Flex-Foot*'s focus on an alleged infringer's having had the

opportunity to conduct discovery on validity issues "seems to us significant in two respects."  *Id.*

at 172.  First, "it suggests that the alleged infringer has had a full opportunity to assess the

validity of the patent, and is therefore making an informed decision to abandon her challenge to

its validity."  *Id.*  Second, "the fact that parties have conducted discovery is evidence that they

---

[3] The Circuit had previously held that such a settlement did not estop a patent licensee from later
challenging the validity of the patent in a later dispute where the settlement agreement did *not*
contain a no-challenge clause, while noting that the result might have been different had the
agreement contained a no-challenge clause.  *Warner-Jenkinson Co. v. Allied Chemical Corp.*,
567 F.2d 184, 188 (2d Cir. 1977) ("[I]f a settlement agreement contains an explicit prohibition
on licensee suits during some future period . . . a court may feel that effect should be given to
such provisions.").  In *Rates Technology*, the Circuit confirmed that the decision in *Warner-
Jenkinson* was inapplicable to agreements containing explicit no-challenge provisions.  685 F.3d
at 169–70, 172 n.7.

had a genuine dispute over the patent's validity, and that the patent owner is not seeking to prevent its monopoly from being challenged by characterizing ordinary licensing agreements as settlement agreements." *Id.*

The parties here debate how the Second Circuit's analysis in *Rates Technology* of the decision in *Flex-Foot* applies to the mid-litigation settlement of the Prior Litigation here by Capri Sun and the predecessor in interest to ABC.

In particular, ABC argues that the Circuit's use of the phrase "the parties *have conducted* discovery"—in conjunction with the fact that *Flex-Foot* itself advanced to the briefing of summary judgment motions—requires that the parties in a prior litigation must have actually completed discovery on validity issues in order to justify a later estoppel. This Court declines to read such an inflexible rule into the Second Circuit's choice of this phrase. Notably, the Circuit primarily described the *Flex-Foot* requirement as something less—"an opportunity to conduct discovery," *id.* at 170, 172—and neither the Federal Circuit in ensuing cases nor district courts interpreting *Flex-Foot* have imposed such a stringent bright-line rule. *See Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1363 (Fed. Cir. 2010) ("[W]e do not think that a settlement agreement is ineffective to release invalidity claims unless the exact circumstances described in *Flex-Foot* are present."); *Peparlet Co. v. Shepherd Specialty Papers, Inc.*, No. 3:12 Civ. 492 (JZ), 2013 WL 2151634, at *3 (N.D. Ohio May 16, 2013) ("*Flex-Foot* only required litigation to be initiated, thereby providing an opportunity for the challenger to conduct discovery on validity issues."). This Court shares the assessment of the Federal Circuit that "[e]ach case must be examined on its own facts in light of the agreement between the parties" and the nature of their prior litigation, *Baseload Energy*, 619 F.3d at 1363, mindful of the "two respects" in which the

Second Circuit found relevant the fact of discovery in the settlement-yielding prior litigation, *Rates Tech. Inc.*, 685 F.3d at 172.

> b)   **The Application of *Rates Technology* Here**

It is undisputed that, in the Prior Lawsuit, ABC's predecessor "challenged [the Pouch Trademark's] validity" on functionality grounds and "elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing" a no-challenge provision. *Id.* at 170 (quoting *Flex-Foot*, 238 F.3d at 1369–70); *see* SUF ¶¶ 43–47, 73.  At issue under the *Rates Technology* analysis is whether ABC's predecessor in interest had a sufficient "opportunity to conduct discovery on validity issues" to justify estoppel.  685 F.3d at 170.

As reviewed above, in the Prior Litigation, Capri Sun and ABC's predecessor executed a settlement term sheet nearly a year into the litigation and with just 27 days remaining in the fact discovery period set by Judge Wood.  *See* SUF ¶¶ 23, 70, 74.  Before executing the term sheet, ABC's predecessor had the opportunity to—and did—seek discovery regarding the alleged functionality of the Pouch Trademark in its: (i) first set of document requests, served on January 26, 2016; (ii) first set of requests for admission, served on January 26, 2016; (iii) third set of document requests, served on May 16, 2016; and (iv) Rule 30(b)(6) deposition notice, served on May 25, 2016.  *See id.* ¶¶ 56–59, 63–64, 66.

The Court here finds that the fact that the Prior Litigation lasted nearly a year before settling, and that ABC's predecessor sought discovery on validity in discovery requests served over the course of four full months, are strong evidence that the parties "had a genuine dispute over the patent's validity, and that the patent owner is not seeking to prevent its monopoly from being challenged by characterizing ordinary licensing agreements as settlement agreements." *Rates Technology*, 685 F.3d at 172.

To be sure, the Court can imagine patent-validity cases, or trademark-validity cases involving a functionality defense, involving unusually complex product features in which, to justify estoppel, it might be necessary for the challenger to have obtained or even completed substantial discovery bearing on validity, as opposed to as here, where the challenger merely pursued discovery over an extended period.  But this is not such a case.  It involves a tinfoil pouch with which ABC's predecessor was familiar as a licensee.  And the parties have not suggested, and the Court does not find, that full discovery regarding the functionality of the Capri Sun tinfoil pouch was necessary for ABC's predecessor to have had "a full opportunity to assess the validity of the [Pouch Trademark], and . . . therefore mak[e] an informed decision to abandon [its] challenge to [the Pouch Trademark's] validity." *Id.*

The Court therefore concludes that the significant investment of time and energy that the parties and the court invested in the Prior Litigation, as reflected in the parties having reached a settlement 27 days before the close of discovery, squarely implicates the judicial interest in settlements.  Under the *Lear* line of cases and the analysis in *Rates Technology* and *Flex-Foot*, this interest outweighs the interests protected by the functionality doctrine.  Notwithstanding the interests served by a challenge to functionality of a trademark, ABC is, therefore, estopped from challenging the validity of the Pouch Trademark.

### B.   What Effect Does the No-Challenge Provision Have on the Infringement Analysis?

Having held that ABC is barred from challenging the validity of the Pouch Trademark, the Court must determine whether the alleged functionality of the Pouch Trademark has any other role to play in this litigation.  Specifically, ABC seeks to raise the alleged functionality of the mark in disputing Capri Sun's claim of infringement.  Capri Sun counters that the

No-Challenge Provision precludes ABC from raising functionality in defending against the infringement claim, too.

Under the No-Challenge Provision, which the Court has held enforceable, ABC's predecessor "acknowledge[d] the validity of the [Pouch] Trademark and covenant[ed] and agree[d] not to either directly or indirectly . . . challenge [Capri Sun's] ownership of or right to license or the validity of the [Pouch] Trademark." SUF ¶ 76. Thus, ABC will be estopped from raising functionality issues—and will have its Third and Ninth Affirmative Defenses stricken and the discovery it seeks blocked—unless functionality has some relevance *independent of* a direct or indirect challenge to the trademark's validity.

Courts in this Circuit "analyze trademark infringement claims in two stages." *Christian Louboutin*, 696 F.3d at 216. First, "we look to see whether plaintiff's mark merits protection." *Id.* (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006)). In other words, a court must first determine the "[v]alidity of the [plaintiff's] [m]ark." *Tiffany and Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 246 (S.D.N.Y. 2015). "A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.,* protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Christian Louboutin*, 696 F.3d at 217 n.10 (citation omitted); *see* 15 U.S.C. § 1115 (a trademark's registration is, *inter alia*, "conclusive evidence of the validity of the registered mark"). Thus, "[a] defendant contesting the validity of a registered mark bears the burden of demonstrating either that the mark is invalid or that the use of its own mark is not likely to confuse consumers." *Tiffany & Co.*, 127 F. Supp. 3d at 247.

Second, "if (and only if) the plaintiff's trademark is . . . valid and protectable, we must then determine 'whether [the] defendant's use of a similar mark is likely to cause consumer

confusion.'" *Christian Louboutin*, 696 F.3d at 217 (quoting *Louis Vuitton Malletier*, 454 F.3d at 115). In evaluating the likelihood of consumer confusion, courts apply the test articulated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), which set out a number of factors by which the likelihood of confusion is measured. *See, e.g., Tiffany & Co.*, 127 F. Supp. 3d at 247. The "*Polaroid* factors" include "the strength of the Plaintiff's mark; the degree of similarity between the Plaintiff's and Defendant's marks; the proximity of the products or services in the marketplace; evidence of actual confusion; the Defendant's good faith in adopting its own mark; the quality of the defendant's product; and the sophistication of the relevant population of consumers." *Id.* (citing *Polaroid*, 287 F.2d at 495); *see Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 49 (2d Cir. 2017) (same). These factors aim to capture the likelihood that a consumer would be confused by defendant's use of a similar mark. None, however, entails any analysis of whether a plaintiff's mark is functional.

To be sure, even "if a markholder has successfully demonstrated that its mark is valid and that the competitor's mark is likely to cause confusion, 'the competitor can [nevertheless] prevail . . . by showing that the [mark] is functional'—a traditional defense to the enforcement of a trademark." *Christian Louboutin*, 696 F.3d at 217 (quoting *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 974 (2d Cir. 1987)). Some courts have analyzed a defendant's functionality challenge in connection with the first prong, relating to validity. *See, e.g., Victorinox AG*, 709 F. App'x at 47–48 (considering functionality in context of the "first stage" of determining trademark validity); *Louis Vuitton Malletier v. Dooney & Bourke. Inc.*, 340 F. Supp. 2d 415, 440 (S.D.N.Y. 2004) (same), *vacated in part on other grounds*, 454 F.3d 108. Others analyze a defendant's functionality defense only *after* a plaintiff "has successfully demonstrated" both the trademark's validity and the likelihood of confusion. *Christian Louboutin*, 696 F.3d at 217

(quoting *Stormy Clime*, 809 F.2d at 974).[4]  This "traditional" defense to the enforcement of a trademark is the one that the Court has held ABC is estopped from asserting as a result of the No-Challenge Provision here.

Regardless of whether functionality is considered at the threshold as evidence negating the element of trademark validity, or at the close of analysis as an affirmative defense after a finding of a likelihood of confusion, it is clear that functionality is relevant to the infringement analysis only as a direct or indirect challenge to the validity of the trademark.  A trademark's allegedly functional features otherwise are irrelevant.  They have no bearing on a court's analysis of potential consumer confusion.

Accordingly, because any assertion by ABC of the allegedly functional quality of Capri Sun's Pouch Trademark would entail a direct or indirect challenge to validity, and because ABC is estopped from mounting a challenge by the No-Challenge Provision, the Court precludes ABC from litigating the issue of functionality.  In light of the No-Challenge Provision to which ABC bound itself, functionality has no proper role to play in this litigation.

C.    **Remedies**

Capri Sun moves that the Court: (i) strike, pursuant to Rule 12(f)(1), all references to the Pouch Trademark's alleged functionality from ABC's Third and Ninth Affirmative Defenses; and (ii) enter a protective order, pursuant to Rule 26(c)(1)(D), directing that Capri Sun need not respond to ABC's Document Requests and Interrogatories that seek discovery on the issue of whether the Pouch Trademark is allegedly functional, as well as forbidding ABC from seeking any further discovery on, or otherwise inquiring into, the matter of trademark functionality. Pl. Mem. at 17.

---

[4] *See also Victorinox AG*, 709 F. App'x at 47–49 (applying the former approach while citing the latter).

The Court grants both types of relief.  ABC does not dispute Capri Sun's argument that, if the Court finds ABC estopped from challenging the Pouch Trademark's validity, Capri Sun is entitled to such relief.  *See, e.g.*, *Western Bulk Carriers KS v. Centauri Shipping Ltd.*, No. 11 Civ. 5952 (RJS), 2013 WL 1385212, at *4 n.4 (S.D.N.Y. Mar. 11, 2013) ("[A] party 'concedes through silence' arguments by its opponent that it fails to address.") (quoting *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392–393 & n.116 (S.D.N.Y. 2002) (considering argument not addressed in opposition brief waived).  And the parties, after meeting and conferring, *jointly* petitioned the Court to allow them to brief this motion as early as possible, Dkt. 31, with the issues presented being whether Capri Sun's motion to strike and for a protective order were warranted on account of the No-Challenge provision, Dkt. 33.

In any event, the Court independently finds the relief requested here appropriate, for the following reasons.

### 1.   Striking Functionality Allegations from ABC's Affirmative Defenses

For a court to strike an affirmative defense as insufficient on a Rule 12(f) motion to strike, "(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *Coach, Inc.*, 756 F. Supp. 2d at 425 (S.D.N.Y. 2010) (citation omitted); *see also Icahn School of Med. at Mount Sinai v. Neurocrine Biosciences, Inc.*, 243 F. Supp. 3d 470, 474–76 (S.D.N.Y. 2017) (striking patent invalidity defenses as a result of holding that patent licensee was estopped from raising them).

Here, as noted, ABC's Third and Ninth Affirmative Defenses include allegations that the Pouch Trademark is invalid on functionality grounds.  Because the Court has held ABC estopped

from challenging the validity of the Pouch Trademark on such grounds, any affirmative defense premised on the alleged functionality of the Pouch Trademark is "legally insufficient." The first two prongs of the Rule 12(f) analysis are, therefore, met. *See Coach, Inc.*, 756 F. Supp. 2d at 425; *Pony Pal, LLC v. Claire's Boutique, Inc.*, No. 05 Civ. 2355 (CSH), 2006 WL 846354, at *2 (S.D.N.Y. Mar. 31, 2006) (striking affirmative defense of invalidity due to licensee estoppel); *see also Kenall Mfg. Co. v. Cooper Lighting, LLC*, 354 F. Supp. 3d 877, 888 (N.D. Ill. 2018) (granting motion to strike invalidity defense in light of no-challenge provision in prior settlement and license agreement).

As to the third element, prejudice to Capri Sun, there is no question that "inclusion of the legally insufficient defense would needlessly increase the time and expense of trial or duration and expense of litigation." *FedEx*, 314 F.R.D. at 355 (internal quotation marks omitted). Capri Sun would face the burden of "additional discovery and increasing the duration and expense of litigation," which here would "constitute sufficient prejudice." *Epazz, Inc.*, 252 F. Supp. 3d at 287; *see Icahn School of Med. at Mount Sinai*, 243 F. Supp. 3d at 477 (holding that movant would suffer prejudice from the "delay and unnecessary expense" of litigating the validity of the underlying intellectual property in light of estoppel ruling).

The Court therefore strikes all allegations concerning the Pouch Trademark's alleged functionality from ABC's Third and Ninth Affirmative Defenses.

### 2.       Protective Order Concerning Functionality

Capri Sun seeks a protective order, pursuant to Rule 26(c)(1)(D), preventing ABC from seeking discovery regarding, or otherwise inquiring into, functionality and relieving Capri Sun of any obligation to respond to the functionality-related discovery requests ABC has already served. A court "may, for good cause, issue [such] an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1)(D). For

largely the same reasons that the Court grants Capri Sun's motion to strike, the Court also grants its motion for a protective order.

Although "relevance is broadly construed in the context of discovery, 'it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 375 (S.D.N.Y. 2006) (quoting *Oppenheimer Fund*, 437 U.S. at 352); *see Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc.*, 759 F. Supp. 1039, 1047–48 (S.D.N.Y. 1991) ("drawing the line" of what constitutes relevant subject matter for discovery "at stricken claims").  Having held that the allegations regarding functionality in ABC's affirmative defenses should be stricken—and that, with those allegations struck, functionality has no relevance in this case—the Court finds good cause to issue the requested protective order.  To do otherwise would improperly subject Capri Sun to significant "undue burden" and "expense," and the Court exercises its discretion not to allow such a result.

## CONCLUSION

For the foregoing reasons, the Court grants Capri Sun's motion to strike and for a protective order.  The Court therefore:

(i) pursuant to Federal Rule of Civil Procedure 12(f)(1), strikes all references to the Pouch Trademark's alleged functionality from ABC's Third and Ninth Affirmative Defenses;

(ii) pursuant to Federal Rule of Civil Procedure 26(c)(1)(D), orders that Capri Sun does not have to respond to Request Nos. 3, 9-16, 19, 40, 43, 44, 46, 73–90, 95, 98 113, 114, and 115 in ABC's First Set of Document Requests; Interrogatory Nos. 5, 7, 9, 17, and 21 in ABC's First Set of Interrogatories; and Request Nos. 126, 128, 129, 130, 131, 132, 133, and 137 in ABC's Second Set of Document Requests; and

(iii) pursuant to Federal Rule of Civil Procedure 26(c)(1)(D), bars ABC from seeking any additional discovery on, or otherwise inquiring into, the matter of whether the Pouch Trademark is allegedly functional.

The Court respectfully requests that the Clerk of Court terminate the motion pending at docket 39.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 29, 2019
      New York, New York