1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CAPRI SUN GmbH,

4                   Plaintiff,              New York, N.Y.

5            v.                             19 Civ. 1422 (PAE)

6   AMERICAN BEVERAGE CORPORATION,

7                   Defendant.

8   ------------------------------x

9                                           September 27, 2019
                                            4:10 p.m.
10
    Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                            District Judge
13

14                              APPEARANCES
15

16  MAYER BROWN, LLP (NY)
         Attorneys for Plaintiff
17  BY:  A. JOHN MANCINI
    BY:   JONATHAN W. THOMAS
18           -and-
    BY:  KATHERINE STEAPPER, In-house counsel
19
    HOLLAND & KNIGHT, LLP
20       Attorneys for Defendant
    BY:   JOSHUA C. KRUMHOLZ
21  BY:   DAWN L. RUDENKO

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, state your appearance for

3    the record, please.

4          MR. MANCINI:  Good afternoon, your Honor.  John

5    Mancini on behalf of Mayer Brown for plaintiff Capri Sun.

6          THE COURT:  Good afternoon, Mr. Mancini.

7          MR. THOMAS:  Good afternoon, your Honor.  Jonathan

8    Thomas of Mayer Brown, also on behalf of Capri Sun.

9          THE COURT:  Very good.  Good afternoon.

10          MR. MANCINI:  And your Honor with your permission we

11    have in house counsel Ms. Katherine Steapper from Capri Sun.

12          THE COURT:  Good afternoon, Ms. Steapper.  Always

13    happy to have you here.

14          For the defense?  You may be seated, front table.

15          MR. KRUMHOLZ:  Good afternoon, your Honor.  Josh

16    Krumholz from Holland & Knight on behalf of defendant ABC.

17          MS. RUDENKO:  Good afternoon, your Honor.  Dawn

18    Rudenko from Holland & Knight also on behalf of defendant ABC.

19          THE COURT:  Good afternoon to you.

20          I apologize for keeping you waiting.  I had some

21    translation issues at the previous conference which made it

22    move much more slowly than I had ever anticipated but I

23    appreciate everyone's forbearance.

24          So, to begin with, thank you for the very interesting

25    and well done briefs in the case.  It is quite an interesting

1    problem and not one that has any resemblance to any case I have

2    had.  I think I will be best off simply putting questions to

3    counsel rather than having a freestanding argument because I

4    have already read your briefs.

5            Let me begin with plaintiff's counsel, Mr. Mancini.

6    Will you be taking the lead?

7            MR. MANCINI:  Yes, your Honor.

8            THE COURT:  To begin with, I have now read the series

9    of cases in this line.  Is there any case that involves the

10    specific posture here involving a functionality defense?  In

11    other words, there are patent cases, there are trademark cases;

12    I haven't come upon one involving a trademark case where it's a

13    functionality defense that the *Lear* balancing test is applied

14    to.  Is there a case that specifically raises that?

15            MR. MANCINI:  We don't think that there is, your

16    Honor.

17            THE COURT:  Let me ask, this is a yes or no because I

18    am trying to get a sense; defense counsel, same answer?

19            MR. KRUMHOLZ:  Yes.  I would go one step further and

20    say there is no product design case, period, in this particular

21    area.

22            THE COURT:  So back to you then, Mr. Mancini.  I just

23    wanted --

24            (Defendant and counsel conferring)

25            MR. MANCINI:  Sorry.

1      THE COURT:  Okay.  Back to you.

2      Can you help me, as one who is not well-versed in the

3  area, when a functionality defense is litigated what's the

4  question being asked and what does the discovery look like to

5  probe functional?

6      MR. MANCINI:  Yes.

7      So, in trademark law generally, when one seeks to

8  contest the validity of a trademark, one of the grounds upon

9  which one would seek to contest it, for example, you can

10  contest it on the basis that it is a generic term, a

11  descriptive term, or that it is functional.  And the

12  functionality defense to a design mark would go that some

13  feature of the claim designs has some function such as it

14  serves, like potentially the Coca-Cola glass bottle serves some

15  function in retaining the liquid rather than the unique, iconic

16  shape.

17      THE COURT:  So, if one were litigating that question,

18  what does discovery look like on that point?  In other words is

19  that something that can be evaluated simply by examination of

20  the drawing or the papers submitted to the trademark office?

21  Is this an area of expertise?  I am just trying to get a sense

22  of what is at stake here when they're talking about discovery

23  into functionality.  How does functionality get litigated?

24      MR. MANCINI:  Well, interesting question.

25      There is a pretty good analogy here because in the

1  prior litigation between essentially the same parties, the

2  predecessor interests of the current defendant, there were

3  numerous discovery requests that were propounded to this --

4              THE COURT:  Be that as it may, but my understanding is

5  the discovery only got but so far there.  I am trying to

6  understand not what happened in prior litigation but just if

7  this were to go the distance, if your application were denied

8  and we were to have discovery on functionality, what would it

9  in fact look like?  And I assume that's a question for the

10 Court.

11             MR. MANCINI:  Yes.  Well, I would go back to the

12 examples here.

13             So, for example, from memory, one of the types of

14 requests and requests for admission that ABC has before is does

15 the shape promote the ability of the Capri Sun package -- and

16 we have some here -- to stand up.

17             THE COURT:  Right.

18             MR. MANCINI:  And their argument would be that that

19 design, because presumably they would claim it has some

20 functional feature, our client would not be able to maintain

21 the design mark.

22             THE COURT:  Right.  So that would be the argument in

23 favor of it being functional rather than properly trademarked

24 but what would the -- would I be seeing battling experts?

25 Would it be something that instead could be resolved simply

1    based on paper submissions made to the trademark office?  I am

2    trying to understand what, as a matter of discovery, how we

3    would test the proposition that that which you are seeking,

4    that which you have trademarked is, in fact, functional.

5              MR. MANCINI:  So, I think it would be a combination of

6    both factual discovery and potentially expert testimony.

7    Presumably, if ABC were able to get around the no contest

8    provision.

9              THE COURT:  I am asking you to assume that.

10             MR. MANCINI:  Assuming that, then they presumably

11   would come forward with likely factual testimony and perhaps

12   expert testimony that suggests the unique iconic design of this

13   somehow is functional.

14             THE COURT:  How involved would that process be?  In

15   other words how -- I know that patent litigation is notorious

16   for being cost-intensive.  This is a somewhat more refined

17   discrete issue.  How involved would be plenary discovery on the

18   functionality question?

19             MR. MANCINI:  I don't think it would be unsubstantial,

20   your Honor.  I do think that it is quite likely that ABC would

21   come forward with expert testimony to try to proffer that some

22   aspects of the design are functional because, presumably, they

23   allow the pouch to stand up.  We would presumably rebut with an

24   expert of our own, I suspect there would be extensive document

25   discovery on that question.

J9R5capA                    argument

1          THE COURT:  What would the nature of the document

2    discovery be?

3          MR. MANCINI:  From what we have seen so far, trying to

4    revisit all over again --

5          THE COURT:  Sorry.  Just help me.  I am not worried

6    about what we have seen so far, I am trying to understand.

7    What discovery would be aimed at the functionality question?

8    In other words, if it is a question of expertise -- would the

9    discovery be essentially testing, in point of fact, why the

10   pouch is designed in a particular way historically, whether

11   functional aspects went into its construct?

12         MR. MANCINI:  Yes.  And I also think that likely it

13   would be examining the entire file history of the trademark

14   application that led to the registration of the design pouch.

15         THE COURT:  Okay.  All right.

16         MR. MANCINI:  Which is a pretty voluminous file.

17         THE COURT:  As to functionality, again putting aside

18   for the moment the legal issue before me and just trying to

19   understand a little better what the possible outcomes could be.

20   I mean, I understand one outcome is that this whole thing is

21   functional and therefore outside the ambit of properly

22   protectable trademarks and another possibility is none of it is

23   functional and that it is entirely fairly protected.  Is there

24   a middle ground in which, hypothetically speaking, a court

25   could find that some dimension of the construct here is

1   functional and some dimension is not functional and properly

2   trademarked?

3           MR. MANCINI:  That's a very interesting question.

4           I suspect there could be a scenario where the Court

5   could so find but the risk is this.  This mark is 33 years old.

6           THE COURT:  Right.

7           MR. MANCINI:  It has been registered since 1986.  To

8   find that the design is functional risks invalidating it,

9   despite having gone to the trademark office and having had the

10  registration in place for 33 years and litigating against

11  parties.  In that middle ground that you describe, the risk

12  would be that the Court might be forced to find that the

13  trademark, therefore itself, is invalid.

14          THE COURT:  Right.  That's a business risk for you but

15  I am asking if we litigate that point and if trademark is found

16  to be invalid, you will have gotten 33 years worth of use out

17  of it before that happened but I understand why it is a

18  regrettable business risk from your client's perspective but

19  from the perspective of a Court having to resolve it, is it

20  correct that there is at least an imaginable scenario under

21  which some dimension of what is trademark now is functional and

22  some is not.

23          Is there a split decision here that is a possible

24  outcome?

25          MR. MANCINI:  It is possible.  There is theoretically

1   a path where the Court could go that way.  That, fine, although

2   we could find, for example that some aspects of the pouch are

3   functional, they're not the aspects that are in common between

4   the two and therefore there is still a claim.

5           THE COURT:  Right.

6           MR. MANCINI:  Now remember, even if the Court were to

7   find that the trademark were functional and therefore valid,

8   there is still common law claims and unfair competition claims.

9   There is still other ways in which ABC could be found to be

10  infringing and therefore in violation because, fundamentally,

11  trademark law is more akin to false advertising claims and

12  unfair competition claims.

13          THE COURT:  Understood.

14          Now to broaden out the discussion about functionality

15  a little bit more, is another way of saying functional to say

16  that if there is an area of law that permits this to be

17  protected it is called patent?  In other words, the

18  functionality serves as an exception, in effect, to that which

19  is trademarkable.  It doesn't mean it is not protectable, it

20  means you seek your rights in the world of patent.  Is that an

21  essentially accurate way of capturing what functionality

22  doctrine is?

23          MR. MANCINI:  I would say it slightly differently,

24  your Honor.

25          THE COURT:  Go ahead.

1        MR. MANCINI:  I believe ABC's argument is there is one

2   way to argue that based on patent rights that a trademark

3   holder may have once had, that that could influence the

4   question as to whether or not features claimed in a trademark

5   are therefore functional.  I think that might be the more

6   precise way it describe it.

7        THE COURT:  Let's suppose that a Court were to find

8   the design here functional, and let's suppose the time period,

9   as appears to be the case for getting this patented, is past.

10  Is there any place you can go to get some other form of

11  protection for what you have here?

12       MR. MANCINI:  Not registrable.  Great question.  Not a

13  registration.  At that point we would be left with common law

14  rights such as unfair competition, claims for false designation

15  of goods.  Common law claims.

16       THE COURT:  And how would that work?  In other words,

17  hypothetically, let's suppose that this was found to be

18  functional -- again, not making any finding, far from it, I am

19  trying to understand how the doctrine works.  If the Court were

20  to find that this was entirely functional, since patent is out

21  of the question now, patent protection, and since the

22  functionality determination would obviate any need or ability

23  or claim for trademark, what would the nature for a common law

24  claim against the defendants be?  What would they be doing that

25  isn't, in effect, occupied by the trademark field?

1          MR. MANCINI:  Yes.  Excellent question.

2          There is actually a provision of the Lanham Act called

3     Section 43A that also gives common law rights.  So even our

4     client claims for registration, which is Section 32 of the

5     Lanham Act --

6          THE COURT:  Right.

7          MR. MANCINI:  -- even if this registration were deemed

8     to be invalid, there are still common law rights and the Court

9     would then still look to common law and Courts have looked at

10    analogous situations and looked at whether or not that design,

11    in and of itself, creates common law rights does it, for

12    example, cause confusion in the marketplace amongst consumers.

13         THE COURT:  So, even if it is unprotectable federally

14    in patent or trademark, if, for example, there was something

15    that the defendants did that was trying to piggyback on

16    Capri Sun's unique look and feel here, even if it is not

17    trademarkable, that might be a source of state law relief.

18         MR. MANCINI:  Let me make it more precise.

19         THE COURT:  Please.

20         MR. MANCINI:  It would be a source of state law relief

21    and there are ancillary state law claims but it would still be

22    a source of federal claim relief under 43 of the Lanham Act.

23    43 of the Lanham Act says even if your trademark is not

24    registered, you still have common law rights.  To assert

25    trademark claims in the U.S. does is not always require you to

1    register.  What registration does is it gives you a presumption

2    of validity, for example.

3              THE COURT:  In other words, is there a functionality

4    defense to a non-registered trademark?

5              MR. MANCINI:  That's where the difference lies,

6    correct.

7              THE COURT:  That's where the what?

8              MR. MANCINI:  That is where the difference lies.

9              In a nonregistered trademark then the functionality

10   defense comes into play and the burdens shift.

11             THE COURT:  If it is a registered trademark as you

12   have now --

13             MR. MANCINI:  If it is registered trademark, validity

14   is presumed.

15             THE COURT:  Right.

16             MR. MANCINI:  And the burden would be upon the

17   infringer.

18             THE COURT:  Right.  But if it is not registered it is

19   still at issue but the burden is on you.

20             MR. MANCINI:  The burden would then be upon us.

21   Because it is unregistered the party claiming design mark would

22   have to establish that design is nonfunctional.

23             THE COURT:  So I take it that as to the common law

24   claim, you would have common law claims even if you completely

25   lose the motion here.

1          MR. MANCINI:  Correct.

2          THE COURT:  And even if, in fact, worse than that for

3    you, we were to have discovery and litigation and I were to

4    find the functionality issue, I was to find this functional,

5    will you still have common law claims or would a finding by me

6    of functionality defeat the common law claims, i.e., the

7    nonregistered claims?

8          MR. MANCINI:  Great question.

9          It would depend on how far the Court's findings on

10   functionality went because if there are aspects of the

11   packaging --

12         THE COURT:  Right.

13         MR. MANCINI:  -- that are not covered by that finding,

14   then we would still have the ability to argue that those

15   aspects are nonfunctional.

16         THE COURT:  I see.  If I were to find across the board

17   functionality, that literally every dimension of this were

18   functional -- again, just hypothetical -- at that point that

19   clears the decks of all your claims?

20         MR. MANCINI:  If, under that hypothetical that were

21   so, with all due respect difficult to do with a package like

22   this then, yes, then it likely would cause some issues with

23   respect to --

24         THE COURT:  What is the aspect of the packaging here

25   that you are suing on that is least susceptible to an argument

1    of functional?  I understand in the end you would contend, if

2    you had to that none of this is functional, but what is the

3    dimension that is, where your win is clearest from your

4    perspective?

5            MR. MANCINI:  I actually think none of it is

6    functional.

7            THE COURT:  I know that.

8            MR. MANCINI:  But I would point your Honor to the

9    iconic shape of this package.  But I don't know if you can tell

10   but if you look at it -- and I am holding it up for the court

11   reporter -- a copy of the Capri Sun all natural wild cherry

12   package, one of the packages implicated in this case, you will

13   note that it sort of a has a belly feature.

14           THE COURT:  A belly feature?

15           MR. MANCINI:  A belly feature, right.  It has an

16   iconic look because sometimes Capri Sun will market it as a

17   face, as an anthropomorphic feature.  There are many ways to do

18   an aluminum pouch -- it could be a square, it could be shaped

19   differently in terms of its tapering.

20           THE COURT:  Right.

21           MR. MANCINI:  This iconic feature was well thought out

22   by our client.  Its unique design --

23           THE COURT:  In other words you are not trying to

24   protect all pouches, just one with your belly feature?

25           MR. MANCINI:  Well, that is one of the aspects of it

1    that is unique, yes, your Honor.

2             THE COURT:  Let me try it this way.  You are trying to

3    protect all pouches but the belly feature is --

4             MR. MANCINI:  No, no.  I didn't go that far.  I didn't

5    go that far.

6             We are not trying to protect all packages.  In fact,

7    one of the arguments that we have made in our brief that I

8    think your Honor has seen is that to enforce the settlement

9    agreement and license agreement no contest would simply mean

10   that ABC is free to offer a juice in an aluminum pouch of a

11   different shape that is not confusingly similar.

12            THE COURT:  And what are the parameters of what your

13   trademark protects in terms of the shape of the pouch?

14            MR. MANCINI:  What I would say is at the end of the

15   day that's a matter of the likelihood of confusion analysis --

16            THE COURT:  Right.

17            MR. MANCINI:  -- which is for the Court to decide.

18   One of the ways we can prove it would be, for example, with

19   consumer surveys to establish that.

20            THE COURT:  Right.  But, in other words, as you have

21   drawn the trademark do you purport to loop in all pouches or

22   only pouches within some defined parameter?

23            MR. MANCINI:  Only pouches within a certain shape and

24   design which is actually exhibited, the image is actually

25   shown, correct?  And I am holding undisputed statement of facts

1    document --

2              THE COURT:  Paragraph 3, right.

3              MR. MANCINI:  Correct, -1.

4              THE COURT:  But here is the question.  I am looking at

5    the sketch on paragraph 3 and it doesn't at least, maybe there

6    is something else that was left out for economy's sake but this

7    picture does not contain measurements or something that would

8    let me know, you know, what the outer bounds are on, let's say,

9    the circumference of the base of the pouch or something like

10   that.  How does one know, how would a competitor know at what

11   point you are no longer, in terms of the shape, claiming

12   trademark protection?

13             MR. MANCINI:  Yes.  Great question.

14             So, in trademark law, when design marks are submitted,

15   they're done in this type, black and white, which are done in a

16   linear way to try to suggest a three-dimensional shape.  And

17   you can see by the dotted lines underneath, which are

18   exhibiting the belly feature, it is demonstrating the

19   three-dimensional shape of the anthropomorphic belly feature.

20             THE COURT:  Right, but, in other words, if one were to

21   look at this, one might conclude that the shape at the base is

22   a little more oval than purely round and it is, if you will, if

23   you are looking from the right to the left here, it is a little

24   more narrow than wide and so, hypothetically, if I were a

25   competitor and I looked at that, I might say to myself, boy, if

1    I just do a pure circle at the bottom as opposed to this more

2    oblong oval design that's here, maybe I'm outside of what

3    Capri Sun says is protected by its trademark.

4          How does the competitor know kind of what the outer

5    bound of what you're claiming trademark protection are on the

6    shape?

7          MR. MANCINI:  There is many ways.  The simplest way is

8    to look at the pouch that we sell that embodies the registered

9    trademark.

10          THE COURT:  Right.  Can you bring the pouch up,

11    please?

12          MR. MANCINI:  Yes.  By all means, your Honor.

13          THE COURT:  I think I will be able to illustrate my

14    point better.  Thank you.

15          So, I am looking at the pouch and I take your point

16    that -- I guess, depending how one squeezes it, it could be a

17    very squeezed circle or it could be, if you squeeze it at the

18    long ends you could get a little more towards a circular base.

19    I guess the question is, and it is hard to me to know what the

20    resting norm is here.  Where I am going is I am trying to

21    understand, is there some objective way to figure out at what

22    point you don't claim a trademark on the shape of the bottom?

23          MR. MANCINI:  Great question.

24          So, unfortunately, in trademark law ultimately that's

25    the analysis of consumer confusion which is aided by consumer

1  surveys, sometimes experts but I would say, put simply, you can

2  look at thee features.  The bottom is essentially elliptical.

3  You can see now the dotted line smiley face almost on the

4  bottom of the front of the pouch, that almost looks like a

5  smiley face.

6          THE COURT:  Where is the smiley face?  Oh, yes.

7  Indicating on the face of the front.  Correct.  Exactly.

8          MR. MANCINI:  And there are versions of this pouch

9  that show --

10          THE COURT:  If you go like this it is kind of a frown

11  though, right?

12          MR. MANCINI:  It could be.  And there are versions of

13  the pouch that in fact show the smiley face to mimic that

14  feature, the anthropomorphic feature.  So, there are many

15  aspects that you can look at and say if I want to offer an

16  aluminum pouch for juice, I just need to design around the

17  elements.  That's not what ABC did, by the way.

18          THE COURT:  Right.

19          So, again, just trying to examine functionality.  On

20  almost any way I can squeeze this thing it stands whether it is

21  horizontal, vertical, compressed a lot or broadened out a lot.

22  Suppose the argument is that what makes this functional is that

23  it permits the pouch to stand, and if that were at least a

24  component of the defense argument is functionality, what will

25  you say to counter that?

1          MR. MANCINI:  I don't think that could be the strength

2     of the argument upon which they would rise or fall because

3     there is many ways to do an aluminum pouch that could stand.

4     That could be a rectangular bottom.

5          THE COURT:  Right.

6          MR. MANCINI:  It could be square bottom.  There are

7     plenty of juice boxes that have those kinds of features and

8     stand.

9          THE COURT:  Let me shift gears a little bit.  This is

10     very helpful and I am just trying to understand this better.

11          How many licensees does Capri Sun have?

12          MR. MANCINI:  Around the world or just in the U.S.?

13          THE COURT:  Let's take the U.S.

14          MR. MANCINI:  So, great question.

15          In the U.S., Capri Sun has an exclusive license with

16     Kraft Heinz.

17          THE COURT:  Wait.  Capri Sun owns for argument for

18     now, the trademark.

19          MR. MANCINI:  Correct.

20          THE COURT:  And you are saying Kraft Heinz alone --

21          MR. MANCINI:  Has the exclusive license for the United

22     States market.  And so, the product sold in the United States

23     market are sold pursuant to an exclusive licensee relationship.

24          THE COURT:  Right.  So, but ABC had previously also

25     been a licensee?

1          MR. MANCINI:  Great question.

2          A nonexclusive licensee but not to sell Capri Sun.  A

3      nonexclusive –– Kraft Heinz has an exclusive license to the

4      trademark and the trade dress.  The defendant had a

5      nonexclusive license to use the pouch design which this one is

6      not inflated but, were it so, you would see it to be virtually

7      identical to this one.

8          THE COURT:  Right.  What I am trying to understand is

9      I am trying to understand the universe of entities that either

10     in the past or presently are allowed to use what you have

11     trademarked.  I am less concerned about people offering the

12     Capri Sun product and more concerned about right to use the

13     trademark design.  Is there anybody besides Kraft Heinz who,

14     regardless of what beverage is in here or the what outside

15     words and pictures are, is there anybody other than Kraft Heinz

16     who is licensed to use the trademark?

17         MR. MANCINI:  Currently at the time it was only

18     Kraft Heinz and ABC.

19         THE COURT:  I see.  And going back, it has been a

20     33-year process, at any time given time has there been, let's

21     say, more than two licensees?

22         MR. MANCINI:  Oh, yes, there was at least one other.

23         THE COURT:  When was that?

24         MR. MANCINI:  1991 or 1990s, approximately.

25         THE COURT:  Why is it that there are so few licensees?

1              MR. MANCINI:  Well, great question.

2          This comes back to the heart of the matter.  Consumers

3    come to know this iconic shape as affiliated with Capri Sun and

4    that's why we are vigorous in protecting that.

5              THE COURT:  Right, but protecting doesn't mean --

6    protecting may mean against legal challenges but you might be

7    happy to have other licensees making money for you using the

8    shape.  Why don't do you that?

9              MR. MANCINI:  Great question.

10         Because trademark owners will decide whether or not

11   the licensee has the same quality standards.  For example, will

12   the juice taste just as good so when consumers go to purchase

13   the other product, if they are disappointed -- one of the

14   things, and this is what trademark law seeks to protect is if

15   they are disappointed with the taste what it could do is harm

16   the Capri Sun mark because they may no longer come back --

17             THE COURT:  Right.

18             MR. MANCINI:  -- to Capri Sun and purchase our

19   product.

20             THE COURT:  Does Kraft Heinz, as part of its license,

21   explicitly commit not to challenge the validity of the

22   trademark?

23             MR. MANCINI:  Does Kraft Heinz as part --

24             THE COURT:  The only surviving licensee, have they

25   bound themselves not to challenge the trademark whose use

1    they're licensing?

2              MR. MANCINI:  I just can't remember, your Honor.

3              THE COURT:  I assume that you would argue at least

4    implicitly that they do but I would imagine legal counsel would

5    probably want them to commit not to do so.

6              MR. MANCINI:  As I stand here, I just can't remember.

7    From recollection I believe they do but they clearly want to.

8              THE COURT:  They clearly?

9              MR. MANCINI:  They clearly want to be able to maintain

10   the validity of the mark because it is to their benefit.

11             THE COURT:  I am not asking you about the scale of the

12   Kraft Heinz business but given what I can infer it might be, I

13   would assume you would have estimable legal counsel making sure

14   that a licensing agreement doesn't expose your trademark to a

15   challenge by Kraft Heinz.

16             MR. MANCINI:  Correct.  As I stand here I can't

17   remember, but there is an important fact that suggests to me

18   that it does for this reason, which is confidential, if I may,

19   your Honor, because it is not in this case.  What I am aware of

20   is in the Kraft Heinz agreement, permission is required by

21   Kraft to use the pouch design for non-Capri Sun products such

22   as its product Kool-Aid.

23             THE COURT:  And, presumably, you are satisfied

24   yourself that Kraft Heinz is not going ruin the brand, that

25   they are putting quality enough stuff in the pouch so it is not

1   going to associate your pouch with sub par drinks.

2               MR. MANCINI:  Exactly right.  And in fact, your Honor,

3   for a period of time, this I do know, in the course of the time

4   with Kraft there was -- they were very explicit with what are

5   known as quality control provisions which are about the quality

6   of the juices.  Our client, through one of its affiliates, was

7   also providing the flavors for the juices so that we could be

8   certain that they met our quality standards.

9               THE COURT:  Got it.

10              MR. MANCINI:  So, when consumers bought it, they knew

11  it was the quality that they got to be used to with Capri Sun.

12              THE COURT:  Let me then now push us a little closer to

13  the issue at hand.

14              Reading the line of cases, *Lear* and progeny that deal

15  with the patent context, one of the concerns that leaps out

16  from those cases is the value in having licensees as the entity

17  with the greatest business interest in the availability of the

18  patentable things to be able to sue.  And so, while it is a

19  balancing test on one feature of the balance as discussed in

20  *Lear* and progeny is it is a good thing and not a bad thing to

21  empower a licensee to bring the patent challenge.  Obviously,

22  if you look at cases like Rates there is a continuum depending

23  on how far along and what context the agreement or settlement

24  occurred.  But, conceptually, the idea of a licensee being in

25  place to make the challenge is regarded as a good thing because

1    those people have a business interest in pursuing the question.

2    So, my question to you is as follows.  Let's suppose you are

3    right here and ABC is out of bounds, they can't sue because of

4    the settlement agreement in the earlier litigation.  And let's

5    suppose, for argument's sake, that Kraft Heinz for one reason

6    or another chooses not to settle.  Is there anybody out there,

7    if one hypothesizes that this is actually functional, that your

8    product is actually functional and could be vulnerable to a

9    viable challenge, is there any entity out there with the

10   economic interest or incentive to challenge yours as an invalid

11   trademark on functionality grounds?

12           MR. MANCINI:  Meaning is there anyone other than ABC?

13           THE COURT:  Is there anybody other than ABC.

14           If you had told me that you had 25 other licensees out

15   there and that ABC had disqualified itself by virtue of the

16   settlement agreement I would say to myself, well, there are 24

17   people out there, the public interest in making sure that there

18   is somebody who can carry this torch and raise this issue is

19   not really harmed by ABC having sidelined itself.  But if all

20   we have is Kraft Heinz and nobody else, the question naturally

21   presents itself, if not them, if not the back table, who?  Who,

22   actually, is a viable entity to raise this functional defense?

23           MR. MANCINI:  So, there are no licensees other than

24   Kraft Heinz --

25           THE COURT:  Right.

1          MR. MANCINI:  -- and formerly ABC so that is off the

2     table.  That opportunity doesn't exist for anybody else.  To

3     the extent that anybody else tries to enter the market --

4          THE COURT:  Right.

5          MR. MANCINI:  -- I like to think Capri Sun does a very

6     good job of monitoring the market and making sure that

7     third-parties don't unfairly seek to pass off of our good will.

8          THE COURT:  Sure, but let's suppose, let's indulge the

9     hypothetical, that for all of these years you have actually

10     been trademarking something that is functional.  Indulge the

11     hypothetical, you are not conceding anything.  But, assume that

12     it is at least vulnerable to a challenge like that and the

13     question is, who could bring that?  Would it require somebody

14     to bring a product to market and either sue you or you sue them

15     claiming infringement there seeking a declaratory judgment as

16     to invalidity.  Who is out there?  Who has got the incentive to

17     do that?

18          MR. MANCINI:  Somebody like you described who would

19     have, presumably, wants to enter the market with a confusingly

20     similar package, would either make plans to or take steps to --

21          THE COURT:  Right.

22          MR. MANCINI:  -- to launch such a package, and

23     presumably might either get sued by my client or might, itself,

24     after the receipt of a potential cease and desist letter bring

25     declaratory judgment action.

1    THE COURT:  That's the question.  In other words, if I

2    am the would-be competitor, instead of ABC we will call it DEF.

3    I'm DEF and I want to get into this market but I don't want to

4    open up a plant and manufacture all of this stuff if ultimately

5    I am going to learn that legally I'm not allowed to do what I

6    am proposing to do.  What would it take for DEF to have

7    standing to challenge, in a declaratory judgment action, your

8    trademark as functional?

9    MR. MANCINI:  So, all they would have to have is

10   concrete steps towards offering for sale into the market a

11   competing product that is confusingly similar to the design.

12   THE COURT:  So, if DEF basically developed a marketing

13   plan, had somebody develop the way in which it was going to be

14   manufactured, they wouldn't actually have to get into the

15   market.  They would write you a letter saying this is what we

16   propose to do, your legal team would write back and say

17   no-can-do, this is trademarked, and then you would have a

18   crystallized dispute and DEF could go into court seeking

19   declaratory relief?

20   MR. MANCINI:  Under that hypothetical, yes, your

21   Honor.

22   THE COURT:  Okay.  What are the barriers to entry

23   here?  In other words, if we were making a space vehicle we

24   would have very substantial barriers to entry.  If we are

25   making juice packs maybe it is not so hard for somebody to get

1    to the point of being able to challenge your trademark.  How

2    much time, work, effort would it take for an entity to get to

3    the point where it's economically they've done enough work to

4    have a product design in mind so as to crystallize this

5    declaratory judgment suit?

6              MR. MANCINI:  That's an interesting question because

7    it really goes to the heart of this case.

8              We don't think it would take much for somebody to

9    offer an aluminum pouch for a juice drink with a sufficiently

10   different shape that's not confusingly similar and we would

11   think that the only reason --

12             THE COURT:  Suppose they wanted to offer exactly the

13   same shape and just argue that yours is protectable only in

14   patent but not in trademark.  Forget whether they're

15   confusingly similar, suppose they are going for the full monty

16   and want to mimic you entirely and simply argue that you don't

17   have a valid trademark.  How much cost, effort, would it be for

18   them to reverse-engineer what you have done and come up with a

19   plan that is sufficiently developed that they could then be

20   poised to go to market assuming that they won the declaratory

21   judgment suit?

22             MR. MANCINI:  I can't sort of speculate from scratch

23   but what I can say is this:  They would certainly know places

24   to go.  ABC likely has third-party manufacturing that makes --

25   it would not be hard to find a manufacturing entity that makes

1   this exact same shape if that's what they seek to do.

2              THE COURT:  Right.  All right.

3              Next question has to do with a prior lawsuit.  I guess

4   it's the Minnesota suit, what is the right shorthand for that

5   suit so I am referring to it by the terms that you all refer

6   to?

7              MR. MANCINI:  I would call it the prior Minnesota

8   lawsuit.

9              THE COURT:  So, in the prior Minnesota lawsuit my

10  understanding is that it settled with something like 27 days to

11  go in the fact discovery period as to the calendar and that

12  there had been a lot of demands for discovery but ultimately

13  little discovery in fact got produced.

14             Is that about right?

15             MR. MANCINI:  About right, with this clarification.

16             THE COURT:  Yes.

17             MR. MANCINI:  The case was actually transferred to

18  SDNY.

19             THE COURT:  Who was the Judge?

20             MR. MANCINI:  Judge Kimba Wood.  And after it being

21  transferred to Judge Wood, only then and after some discovery

22  in advance, the case settled.  Just small clarification --

23             THE COURT:  What discovery -- put aside demands, what

24  discovery actually got in the hands of the other side?

25             MR. MANCINI:  I would concede that little was yielded

1    but much was sought.

2              THE COURT:  No, no, no.  I know that much was sought,

3    I don't think there is any dispute about that.  I am asking you

4    what, if anything, actually got either produced -- were any

5    depositions taken in the case?

6              MR. MANCINI:  No.  I'm not aware of any depositions

7    being taken.

8              THE COURT:  Were any documents produced?

9              MR. MANCINI:  I do believe some documents were

10   produced.

11             THE COURT:  What documents bearing on functionality

12   were produced?

13             MR. MANCINI:  That I'm not aware of but --

14             THE COURT:  Can I assume for the purposes of the

15   analysis the answer is none?

16             MR. MANCINI:  I think as far as we know of the record

17   that is correct, your Honor.

18             THE COURT:  So, why was that?  Just explain to me -- I

19   mean, I have plenty of cases where the lawyers don't do any

20   discovery and then I have to yell at them because the end of

21   the discovery period has come and nobody has done any discovery

22   but that usually involves unsophisticated counsel who kind of

23   go into power save mode and forget about their case.  I am

24   assuming, with sophisticated counsel here, there is method to

25   the madness.  Why was there no discovery to speak of on this

1   point as of the point of the settlement?

2           MR. MANCINI:  I can't speak to that question because I

3   wasn't counsel in that case, your Honor, but all I can surmise

4   from the record and from discussions having learned about that

5   case, is because the parties decided early on that the better

6   route was to settle it.

7           THE COURT:  Right.

8           MR. MANCINI:  And senior executives from both

9   companies went to Mexico City and directly negotiated first a

10  settlement term sheet and then a settlement license agreement

11  to terminate the litigation.

12          THE COURT:  Notwithstanding the lack of actual

13  provision of discovery, was exactly the same issue raised there

14  as here?

15          MR. MANCINI:  Exactly.

16          THE COURT:  In other words, was ABC's predecessor

17  essentially litigating the same issue that is now being pursued

18  in the parties' competing papers?

19          MR. MANCINI:  Yes.  Exactly the same issue.  In fact,

20  in the prior, if I call it the SDNY lawsuit because it got

21  transferred here, at that point ABC's predecessor in interest,

22  Faribault, represented by Paul Hastings -- competent counsel, I

23  think no one disputes that -- challenges the validity of the

24  trademark on functionality grounds in its second affirmative

25  defense, in its third affirmative defense, and it also had two

1    counterclaims, the first and second counterclaim in the prior

2    litigation sought a declaration that the pouch's trademark was

3    invalid on functionality grounds under both federal law and New

4    York common law.

5                    THE COURT:  Okay.

6                    MR. MANCINI:  All in the same prior litigation.  And,

7    there was a third counterclaim for cancellation of the

8    trademark which goes back to I think your Honor's very first

9    question.

10                    So, we are uniquely in this position where this court

11   is now empowered by federal law to revisit what the trademark

12   office did.  There was no, by the way, counterclaim for

13   cancellation here but in the prior lawsuit it went further,

14   ABC's predecessor in interest Faribault went further and sought

15   affirmative relief from Judge Wood --

16                    THE COURT:  Right.

17                    MR. MANCINI:  -- that she enter an order affirmatively

18   canceling the trademark from the Federal Register.

19                    THE COURT:  Be that as it may, suppose you lost here

20   on what is being litigated now, in other words suppose that

21   hypothetically I would have ruled that this is entirely

22   functional, notwithstanding the absence of a claim for relief

23   for cancellation; wouldn't that finding of invalidity on

24   account of wholesale functionality, if you will, have the same

25   effect?

1          MR. MANCINI:  It would have the same effect.  It

2     wouldn't lead to the technical cancellation of the trademark

3     but, yes, the same effect.

4          THE COURT:  In practice, Capri Sun couldn't, without

5     disturbing that adverse ruling, use its trademark as a shield

6     against other people.

7          MR. MANCINI:  Correct, except for the points I made

8     before about the common law rights that would remain.

9          THE COURT:  Okay.  One moment.

10         (pause)

11         THE COURT:  May I ask you what the relationship is

12    between that which Capri Sun earlier patented going back some

13    years and the trademark now?  There is a suggestion in your

14    adversary's brief that the trademark is essentially the linear

15    successor to the patent atmospherically tending to suggest that

16    it is more likely that this is functional.  What is the

17    relationship?

18         MR. MANCINI:  We completely disagree.

19         THE COURT:  I thought so, but tell me why.

20         MR. MANCINI:  Like many brand owners, innovators,

21    Capri Sun protects its intellectual property by what are

22    typically referred to as multiple baskets of IP rights.

23    Patents and utility features of the invention, designs such as

24    the unique nature of the pouch, often times trade secrets in

25    terms of how the pouch foil is sealed so that it doesn't spill.

1    That is what all innovators do, they protect their intellectual

2    property with multiple levels of IP rights and the fact that

3    they do is never, per se, a conclusion that because a patent

4    precedes, for example, a design mark, it is invalid.  It is

5    what good IP holders do.

6         THE COURT:  Sure, but just because good lawyers do

7    their thing doesn't necessarily mean they don't sometimes get

8    it wrong.  I am trying to understand the difference between

9    that which was patented on the one hand and that which was

10   later trademarked.

11        Let me try it a little differently.  At the time of

12   the patent, had Capri Sun separately trademarked this?

13        MR. MANCINI:  No.

14        THE COURT:  So, if you are right that good lawyers are

15   using belt and suspenders and protecting everything they can,

16   for heaven's sake, why didn't Capri Sun seek trademark

17   protection at the time of its patent?  Wouldn't that be

18   evidence that Capri Sun thought that the trademark protected

19   something different from what it was patenting?

20        MR. MANCINI:  Not necessarily so, your Honor, because

21   one doesn't necessarily need to do that at that time because

22   one could decide it will simply rely on its patent rights at

23   the time to prevent third-party from unfairly competing.  But

24   what the trademark does, as per the image that your Honor was

25   viewing before from the statement of undisputed facts, is it

1   protects a design, a very simple design.

2            THE COURT:  The trademark does?

3            MR. MANCINI:  The trademark does.

4            THE COURT:  What did the patent protect?

5            MR. MANCINI:  The patent protected other features of

6   the, what we would describe as the utility of the invention.

7            THE COURT:  Just explain to me in a way that I can

8   understand the difference because the design and utility seem

9   awful close.  Help me, with reference to this specific product,

10  to differentiate more graphically what's being protected by the

11  patent on the one hand and the later trademark.

12           MR. MANCINI:  So, again, from memory because that was

13  not the issue we briefed but I want to indulge the Court --

14           THE COURT:  But it is more than indulging the Court.

15  The other side has said that one reason to be suspicious and

16  one factor in the *Lear* analysis is essentially, under the

17  circumstances here, this trademark, given the lineage, looks

18  like the successor to a lapsed patent.

19           MR. MANCINI:  I understand that that is their argument

20  but I think if you look at the patent and if you look at the

21  design in its claim and its unique anthropomorphic feature that

22  I have described, I think the reasonable conclusion is that

23  does not, it is something different that is claimed by the

24  trademark.

25           THE COURT:  I am asking you to pin down for me what

1    the trademark protects here that the patent didn't.

2                MR. MANCINI:  So, I would say from memory that the

3    aspects such as that belly design and that unique sort of

4    conical bottom shape that suggests a smile, that that feature,

5    that that design feature which is reflected and shown in the

6    '917 registration almost suggesting a smile at the belly of it,

7    is a unique feature of the design, almost like the very simple

8    hourglass design that is the Coca-Cola bottle, that that is the

9    iconic nature of this pouch and its shape.

10                THE COURT:  Let me ask you, you have an exclusive with

11    Kraft Heinz.

12                MR. MANCINI:  Yes.

13                THE COURT:  Does that preclude you from settling this

14    case with ABC much as the prior case settled?  In other words,

15    if there were a settlement that gave ABC a license, is that as

16    a matter of the agreement with Kraft Heinz unavailable?

17                MR. MANCINI:  No, because of two reasons.

18                So, Kraft has exclusive license to the mark Capri Sun

19    and a nonexclusive license to the pouch-shaped design.

20                THE COURT:  I see.  It is the pouch-shaped design that

21    I am concerned about here.

22                MR. MANCINI:  But I will expand even further to give

23    the Court some comfort.  In the agreements with Kraft that are

24    confidential, by the way --

25                THE COURT:  Which are or are not?

1          MR. MANCINI:  Are confidential; Capri Sun has right

2    the right to enforce its IP rights in the U.S. market with

3    consulting Kraft.  That's it.

4          THE COURT:  But, in other words, there is nothing that

5    would preclude you from licensing the body here, the design,

6    putting aside the words, to somebody other than Kraft,

7    including ABC if, as this litigation went forward, you decided

8    that was the right course.

9          MR. MANCINI:  Correct.  And in fact we did in this

10   case.  We settled the prior litigation not only by means of a

11   settlement agreement but a trademark license agreement that

12   granted to the defendant's predecessor license to the pouch

13   design --

14         THE COURT:  All right.  Very good.

15         MR. MANCINI:  -- non exclusive license.

16         THE COURT:  All right.

17         Assuming you win on the current motion, what is left

18   of this lawsuit?

19         MR. MANCINI:  What is left of this lawsuit is

20   confusing similarity between the packages, which is what it

21   should have only been about and which is why we were surprised

22   that they tried to change the dynamic.

23         THE COURT:  In other words, supposing that the defense

24   of functionality is knocked out, which is essentially where you

25   are going here, and therefore any discovery that is pertinent

1    to it; if that is knocked out then we have litigation as to

2    whether what they're doing is or isn't confusing, you say yes,

3    they say no.  That's what the case is about, right?

4            MR. MANCINI:  Yes, but it has two aspects.

5            So, if your Honor may recall, the license agreement in

6    place previously giving the parties that settled the prior

7    litigation with this no challenge clause, had essentially two

8    triggers.  There was a defined term that is licensed packaging.

9    For licensed packaging, that was the package that they actually

10   sold pursuant to the settlement and license agreement that

11   settled the prior case before Judge Wood.  That has a run off

12   period or sell off period sometimes referred to in trademark

13   law.  If they continue to sell those products post that period,

14   no analysis is required, that's prohibited -- and we think they

15   are --

16           THE COURT:  Sell what products, though?  In other

17   words, they may contend, rightly or wrongly, that what they are

18   doing is outside the prohibition of the agreement.  They may

19   have some feature of what they're selling that is outside the

20   parameters here.  Does the settlement agreement simply run to

21   the perimeter of the patent of the trademark or does the

22   settlement agreement knock them out of this industry entirely?

23           MR. MANCINI:  No, it does not knock them out of this

24   industry, it does two things.  The first that I was referring

25   to is they can't continue to sell the license products.  Think

1    of it as something that is virtually identical as to what they

2    sold before.  The second thing it does, they cannot sell a

3    confusingly similar package to the trademark.

4                THE COURT:  Okay.

5                MR. MANCINI:  So the Court wouldn't have to analyze if

6    the slightly rounded edges at the top, if all the other

7    features are the same means it is confusingly similar.

8                THE COURT:  I see.

9                So, does that right, though, go any farther than the

10   rights you already have under trademark?  In other words,

11   confusingly similar is familiar to me from trademark law.  Is

12   there a right you achieve under the settlement agreement that

13   exceeds the statutory right you have, assuming a valid

14   trademark?

15               MR. MANCINI:  No.  I think we discussed this, your

16   Honor may recall, in the April status conference.

17               THE COURT:  Yes.

18               MR. MANCINI:  We believe that that right is

19   coterminous with our rights under trademark law and that's why

20   it is drafted that way.

21               THE COURT:  Understood.

22               So, in the end, if you are right in knocking out

23   functionality and therefore the trademark is valid, the

24   litigation proceeds but essentially on the issue of confusingly

25   similar whether cast as a settlement agreement issue or a

1   Lanham Act issue.

2              MR. MANCINI:  Correct, your Honor.

3              THE COURT:  Okay.  Very good.  Thank you.  Very

4   helpful.

5              Let me begin with you, Mr. Krumholz.

6              MR. KRUMHOLZ:  Yes.

7              THE COURT:  How come your client settled the previous

8   case?

9              MR. KRUMHOLZ:  That wasn't our client.

10             THE COURT:  I know but I mean, for better or worse,

11  for rich or for poor, you are their advocate; how come they

12  settled the earlier case?

13             MR. KRUMHOLZ:  Well, the reason I raise that is I can

14  only speculate as well as you.

15             THE COURT:  Well, but that may not be good enough.  In

16  other words I am trying to -- that's not actually right.  I

17  mean you represent a client so I am asking you, on behalf of

18  your client you bound yourself to a settlement agreement saying

19  you are not going to do exactly what are you doing here.  Why

20  did your client do that?

21             MR. KRUMHOLZ:  I'm sorry.  I don't mean to be dancing

22  around it but Faribault entered into the agreement without

23  ABC's input or involvement.

24             THE COURT:  Sorry.  Look.  ABC then --

25             MR. KRUMHOLZ:  Okay --

1          THE COURT:  Sorry.  Sorry.  Sorry.  If that's what you

2   are going to say we are about to go down this five-minute

3   detour.

4          What diligence, if any, did ABC do before buying this

5   product line of its successor?  Did ABC look into the

6   potentially preclusive quality of the settlement in the prior

7   litigation before it bought this business line?

8          MR. KRUMHOLZ:  It certainly knew about the settlement

9   agreement and the terms of the settlement agreement at the time

10  it acquired the company, yes.

11         THE COURT:  Did it believe -- and so it knew, when it

12  acquired the company, that it was potentially bound by the

13  settlement agreement.  Period.  Right?

14         MR. KRUMHOLZ:  Well, it certainly agrees that it is

15  bound, certainly understood then and agrees now that it is

16  bound by the settlement agreement.  We are not seeking to

17  terminate the settlement agreement, just one provision within

18  it.

19         THE COURT:  No.  But it understood that it was taking,

20  with knowledge of the no challenge provision, right?

21         MR. KRUMHOLZ:  Yes.

22         THE COURT:  And so, look.  I appreciate that it may be

23  a little harder as counsel for ABC to reconstruct the state of

24  mind of the predecessor company but you can understand, as

25  Judge Wood's colleague in this court house, how it looks for

1    you to say *'no, we won't.  No, we won't.  No, we won't, we will*

2    *settle for value.  Oh, never mind.  Yes, we will.'*

3            MR. KRUMHOLZ:  Right.

4            THE COURT:  If these cases had been before me I would

5    have been appalled by the dishonesty of having your fingers

6    crossed behind your back saying we are going to settle and

7    agree not to challenge and then to say *'just kidding.'*

8            MR. KRUMHOLZ:  Well, I would make a few observations.

9            One is, from ABC's perspective, when they decided to

10   terminate the license agreement, they terminated the license

11   agreement with the understanding that they were not infringing

12   the trademark, they don't believe they're infringing the

13   trademark so the action was taken not with some grand scheme to

14   say we are going to attack functionality.  The action was taken

15   because they did not believe and do not believe now that there

16   is infringement.

17           THE COURT:  That's great.  That's the residual issue

18   in the lawsuit if the front table wins the dispute before me

19   now.  The question is, you chose to answer with a defense of

20   functionality.  That's a choice, but the settlement agreement

21   you entered into signed off on by my esteemed colleague says

22   you won't do just that.

23           MR. KRUMHOLZ:  But I would say -- well, two things.

24   One, just as an aside, we believe functionality is part of the

25   infringement analysis but we will deal with that separately.

1          But what you are talking about, we totally understand,

2      but it is also the exact same position that the licensee was in

3      in *Lear*, it was the exact same position the licensee was in

4      *Rates Technology*, the exact same position that the licensee was

5      in in *Idaho Potato*.  In fact, if anything, it was more so there

6      because they did sign on the dotted line and we took

7      responsibility later

8          THE COURT:  Look.  *Rates* sets out a very useful stage

9      by stage assessment of how the law applies with the broad

10     take-away being the deeper you get into the litigation process

11     the more there is a public policy interest in enforcing

12     settlement.

13         This settlement was entered into in this court, in

14     litigation in this court just a few years ago, just a couple

15     years ago.  Was it three years ago?  Something like that?  And

16     now you're seeking a Mulligan and I am trying to understand

17     what the thought process was.

18         MR. KRUMHOLZ:  So, the thought process from a

19     going-forward basis, so for ABC, which is where I am most

20     comfortable talking about it, is that we did not expect to get

21     sued for infringement because we don't believe we have

22     infringed.  Having found ourselves in court here before your

23     Honor, we believe we should have all the defenses available to

24     us to defend it.  Now, I will say, had I been involved in that

25     prior lawsuit I would have given the advice I have given every

1    client which is if you are going to give a no contest provision

2    you have a caveat that if you are sued again you can raise it

3    then.

4              THE COURT:  But, look.  If you are sued again, if your

5    client gets into this market and starts selling a juice pack,

6    your client knows that Capri Sun is going to be alert to the

7    competing product and will make its own judgment whether or not

8    they've got a viable infringement suit.  They may or may not be

9    right or wrong about confusing similarity but it can't be that

10   this turns on who files the lawsuit because if it turns on

11   that, then all you would do would be put out there some

12   competing product and wait for Mr. Mancini to sue you and then

13   you can say, well, because you're the nominal, we are only the

14   defendant, we get to avoid the agreement.  It can't be that who

15   is the P and who is the D affects anything unless the

16   settlement agreement says that.

17             MR. KRUMHOLZ:  I don't believe that what I said

18   impacts the legal analysis.  I was trying to answer the Court's

19   question as to what the thought process was with the client.

20             THE COURT:  Look.  You are playing a hand you were

21   dealt by predecessor counsel to the predecessor company, but in

22   the end you're ABC took with knowledge.  When ABC bought the

23   predecessor company did it intend to put a product out on the

24   market along the lines of what it is presently selling?

25             MR. KRUMHOLZ:  It was selling product -- I mean, if

1  you are asking whether it intended at the time of purchase to

2  terminate the license agreement and then sell the present

3  product --

4          THE COURT:  Right.  That's right, it had a license

5  from Capri Sun.

6          MR. KRUMHOLZ:  Right.

7          THE COURT:  And then it terminates the license.  Is

8  what it is selling after terminating the license identical to

9  what it was selling before terminating the license?

10         MR. KRUMHOLZ:  That is kind of a yes and no.  It went

11 back to what was identified by Capri Sun as not infringing.

12         THE COURT:  Okay.

13         MR. KRUMHOLZ:  So we have a period where they were

14 not -- there was no claim of infringement, then we had a new

15 product line which they claimed infringed, then when we

16 decided, when ABC decided that it didn't need the license

17 agreement anymore because it could go and just basically sell

18 what it previously not been accused of infringement, that was

19 the thought process.

20         THE COURT:  So, in other words your client, after

21 terminating the settlement agreement and the license that came

22 with it, made a modification in what it was selling so as from

23 your client's perspective to steer around the obstacle

24 presented by the Capri Sun trademark.

25         MR. KRUMHOLZ:  Yes.  That's fair.

1          THE COURT:  And now that Capri Sun has said, no, you

2     actually are selling something confusingly similar, in addition

3     to defending on the grounds that it is not confusingly similar

4     you want to go back and do what the settlement agreement says

5     you can't do which is to challenge the validity of the

6     trademark.

7          MR. KRUMHOLZ:  Yes.  And I should be clear, your

8     Honor, I am not making light in any way of the sanctity of an

9     agreement, of the sanctity of the settlement agreement, of the

10    sanctity of res judicata.  I am looking at what the law tells

11    us.

12         THE COURT:  Well, the law may or may not allow to you

13    do what you are doing, that's the issue before me.  I am just

14    trying to understand what the thought process was.  Let's go

15    back to the settlement process.  It is not disputed, is it,

16    that the settlement occurred 27 days before the end of the fact

17    discovery period, correct?

18         MR. KRUMHOLZ:  I think that -- I believe that's

19    correct.

20         THE COURT:  Do you disagree with Mr. Mancini's

21    description of essentially how the settlement came about which

22    is essentially that, early on, business folks from both

23    companies took ownership of the settlement process and worked

24    it out, and because that was in progress essentially there was

25    an agreed slow down or stand still as to, actually, the

1   production of discovery?

2           Is that a fair characterization?

3           MR. KRUMHOLZ:  I don't have any reason to dispute it.

4   I can't affirmatively -- I am just trying to be candid with the

5   Court.  I can't affirmatively say that I know that that's what

6   happened.  I don't have a reason to dispute that that's what

7   happened.

8           THE COURT:  You are not aware of any case that --

9   Look.  This is formally a trademark case but it deals with a

10  defense that has a strong echo of patent and so there is a

11  little bit about this case, a quality of which is it more like.

12  Do you have any case that in any way helps me on the

13  proposition that a trademark case, where a functionality

14  defense is being offered, ought to be analyzed pursuant to the

15  patent law line of cases?

16          MR. KRUMHOLZ:  No case that we haven't cited.  I think

17  it's by --

18          THE COURT:  Is there a case you cited, though, that

19  really sorts a case that is nominally trademarked as patent?

20  Is there anything that -- that's what you are trying to do

21  here, I fully understand why you are trying do it.  I am trying

22  to see if there is law that supports you.

23          MR. KRUMHOLZ:  No.  The answer is, no, there is no

24  case law.  Certainly, if we were aware of it we would have

25  cited it.  I think the closest we get is *Idaho Potato* tells us

1    that when we are doing the balancing test we have to look at

2    the policies behind the defense.

3              THE COURT:  Right.

4              MR. KRUMHOLZ:  And I don't think there seem to be

5    dispute as to what the policies are for the functionality test.

6              THE COURT:  In other words, in your point of view once

7    you talk about the functionality defense you are, for all

8    intents and purposes, talking about patent.

9              MR. KRUMHOLZ:  Yes.

10             THE COURT:  Is it the case that anything that is

11   functional is patentable?

12             MR. KRUMHOLZ:  Well, no.  It has to be new and novel.

13   Merely being functional does not make it patentable, it has to

14   be a new and novel function.

15             THE COURT:  If that's the case then, just because

16   there is an exception to trademark validity called

17   functionality, why should I treat that as tantamount to patent?

18   Maybe it is just an exception to trademarkability.

19             MR. KRUMHOLZ:  Because we have to -- because it's

20   tantamount in the sense that the policies are exactly the same.

21   Right?

22             So, in *Idaho Potato*, where we are farther afield --

23             THE COURT:  Right.

24             MR. KRUMHOLZ:  -- we are dealing with a certification

25   mark where the Second Circuit said, well, the defenses to that

1    certification mark touch upon free and open competition, that's

2    analogous to making sure public ideas remain public, that

3    trumps the sanctity of the contract so balance in favor of

4    avoiding it.

5            Here we have a much stronger connection.  Right?  In

6    fact, I mean the words in the cases are almost identical

7    between what the policy behind the functionality defense and

8    the policy behind an invalidity test on the patent side, right?

9    Both are doing the exact same thing which is to ensure that

10   ideas that should be dedicated to the public are dedicated to

11   the public.  I would actually go further and say that while

12   that invalidity policy was enough in *Lear* and *Rates*, etc., it

13   is even more compelling here because we are dealing with the

14   possibility of an indefinite monopoly.  Indeed, this case is a

15   good example of that, we are talking about 50 years of

16   monopoly.

17           THE COURT:  Again, I suppose it depends on the level

18   of generality with which the analysis is done but let me pursue

19   with you a little bit what I pursued with Mr. Mancini.

20           The case law, let's assume now we are in the box, the

21   analysis of a patent box.  Let's assume I am persuaded by you

22   that functionality, for all intents and purposes, turns us into

23   a patent discussion and therefore the balancing test is

24   consistent with the *Lear* line.  Okay?  Even indulging that,

25   wouldn't one have to ask the question just because ABC tied its

1   own hands and made its own bed and settled before Kimba Wood

2   and Judge Engelmayer, with respect to what happened in front of

3   Judge Wood, why would that, as a practical matter, prevent

4   other would-be members of the industry from challenging this

5   trademark?  In other words, we are not talking about something

6   that appears to have massive barriers to entry.  From the

7   public policy perspective, why does the public care about ABC

8   if others have the wherewithal to raise the issue?  The public

9   policy seems to be triggered more where sidelining a particular

10  challenger injures the public.  I am having difficulty seeing

11  that here.

12          MR. KRUMHOLZ:  Well, I would start first with the

13  observation which you have made which is *Lear* and *Rates*

14  *Technology* actually has express language that ABC is exactly

15  the kind of player that should be out there given freedom to

16  challenge --

17          THE COURT:  But that originally comes in the context

18  of a license agreement, either an applied estoppel or a literal

19  statement in a license agreement.  *Rates Technology* recognizes

20  that the farther we go down the line in litigation, the more

21  sanctified the settlement agreement is.

22          So, yes, I understand that you are, your client in one

23  sense is the type of challenger that ought to be allowed to --

24  that is incented to perform the role.  In another hand, it is

25  the worst possible challenger because of the, you know,

1    hypocrisy of saying, no, we won't and then saying, well,

2    actually, we will.

3            MR. KRUMHOLZ:  Who will be the other players be which

4    is your question, right?

5            THE COURT:  Yes.

6            MR. KRUMHOLZ:  So, as we have heard there is just

7    Heinz who doesn't seem to have any incentive to do it at this

8    point in time.  So, you need -- so somebody is not going to --

9            THE COURT:  Why doesn't Heinz have an incentive to do

10   that?  I mean, they were in the same situation as you, they're

11   a licensee.  Presumably, if Capri Sun is protecting the

12   unprotectable, they ought to, Kraft Heinz should be happy to

13   stop having to pay Capri Sun and they must be paying a lot of

14   money.

15           MR. KRUMHOLZ:  You know, companies are litigation

16   averse.  It is not surprising to hear that a company does not

17   want to be paying to have all these people sitting in a

18   courtroom with an uncertain result when they could build it

19   into their budget and move on.

20           THE COURT:  Right.

21           MR. KRUMHOLZ:  That's what companies do.  Here we

22   actually have somebody who has made the decision that they are

23   willing to have this fight and are prepared for this fight.

24   Now, if it is going to be somebody else I don't -- you were

25   talking about a scenario --

J9R5capA                    argument

1      THE COURT:  You say your client didn't want this

2 fight, you are saying your client was so confident that this

3 was not confusingly similar that it was surprised to be sued.

4      MR. KRUMHOLZ:  Yes, but now that we are here, we are

5 prepared to have the fight.

6      THE COURT:  Right.

7      MR. KRUMHOLZ:  I mean because, yes --

8      THE COURT:  The question is just whether you took an

9 arrow out of the quiver.

10      MR. KRUMHOLZ:  Understood.  But to your specific

11 question of incentive and dis-incentive when you find yourself

12 in litigation you have a stronger incentive because it is a

13 marginal additional cost --

14      THE COURT:  Right.

15      MR. KRUMHOLZ:  -- versus I have a stable relationship,

16 I don't like paying lawyers, I have an uncertain result.  It is

17 a very different scenario between the two existing and former

18 licensees.

19      THE COURT:  How many other companies are in the

20 single-size beverage business putting aside the packaging?

21      MR. KRUMHOLZ:  I'm not comfortable making a

22 representation on that.  I will say we have -- let me just back

23 track on that question a little bit?

24      THE COURT:  Yes.

25      MR. KRUMHOLZ:  ABC makes pouches, right, and has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    related companies that will sell product, and it also sells to

2    third-parties that sell juice products.  So, the consequence is

3    what it has been accused is multiple, different product with

4    all different labels, all different brands that have been

5    accused of infringement and then there are other players on the

6    market --

7              THE COURT:  Forgive me, it is a little -- I have got

8    58-year-old eyes here.

9              MR. KRUMHOLZ:  Yes.

10             THE COURT:  Does this lawsuit implicate all of the

11   products that are sitting in front of Ms. Rudenko?

12             MR. KRUMHOLZ:  I think we have -- so we have --

13             MS. RUDENKO:  Not this one or this one.  Those two.

14   Kool-Aid is the Kraft.

15             THE COURT:  Sorry.  A little louder for the court

16   reporter.  One person staging.

17             MR. KRUMHOLZ:  So, we pulled out ones that are on the

18   market that have not been accused and then there is --

19             THE COURT:  Let the record reflect that counsel have

20   arranged a bunch of the juice drinks and you are saying that

21   half of them have been challenged and half of them have not?

22             MR. KRUMHOLZ:  Correct.

23             THE COURT:  So, if you are wrong about your right to

24   challenge functionality, we would still be having a fight then

25   called confusingly similar or not with respect to the ones that

1   have been challenged, correct?

2               MR. KRUMHOLZ:  Right.  And that analysis, and again I

3   don't want to lose sight of what we believe to be the role of

4   functionality in the likelihood of confusion analysis, the

5   infringement analysis, but, yes, we would --

6               THE COURT:  Finish the sentence and then I will ask

7   you about that.

8               MR. KRUMHOLZ:  Yes; the fight would be whether the

9   consuming public would be somehow confused on the totality,

10  with all these different labels, all these different brands,

11  all in different coloring, that on the totality they somehow

12  will think that these are all the same source, that this is all

13  associated with Capri Sun.

14              THE COURT:  Right.

15              MR. KRUMHOLZ:  And it is our view that independent of

16  the functionality piece, there is no way they're going to be

17  able to show that.

18              THE COURT:  And we are going to litigate that one way

19  or the other, it sounds like.  I mean, obviously, if you

20  invalidate the patent, the trademark, it's another story.

21              MR. KRUMHOLZ:  Right.

22              THE COURT:  But if we don't, either because you can't

23  litigate it or because you are allowed to litigate it and don't

24  prevail, we are going to get there.

25              MR. KRUMHOLZ:  Yes.

1      THE COURT:  Help me with the point you just alluded

2  to.  Let's suppose I uphold the no challenge provision.  You

3  are saying that functionality nevertheless plays a role not in

4  challenging the settlement agreement, not in challenging the

5  trademark but it plays some role in the infringement analysis.

6  Slowly walk me through how that would work.

7      MR. KRUMHOLZ:  Sure.

8      So, you start with the Polaroid factors, there are

9  multiple Polaroid factors.  One of the Polaroid factors is

10  similarity of the mark and the accused product.  So, we would

11  need to do a similarity analysis, right?  *Stormy Clime*, a

12  Second Circuit case, has told us how to do that analysis.  You

13  actually raised this the last time we were here which is what

14  *Stormy Clime* talks about is doing a comparison along a

15  continuum.  You identify which features are similar, which

16  features are dissimilar, and identify whether those are

17  functional or nonfunctional.  So, at the one end you have

18  purely arbitrary features that are the same, right, and that's

19  clear infringement.  On the other hand, you have either no

20  similarity or the only similarity are functional features and

21  then you have the continuum where --

22      THE COURT:  Sorry.  Let's suppose there were 10

23  features of this thing, this juice container.  Would you be

24  saying that if you are not allowed to challenge the trademark

25  you would nevertheless say, well, look, there are seven things

1    here that are really purely descriptors, they're not functional

2    and there are three that are functional?  Suppose you came up

3    with that conclusion.  What would be the relevance of that?

4    What would be the relevance of your isolating three

5    characteristics that are functional in nature?

6            MR. KRUMHOLZ:  Because the only -- the similarity has

7    to be over the nonfunctional features.

8            THE COURT:  I see.  Okay.

9            MR. KRUMHOLZ:  So, if we were going to look at the,

10   you know, the totality, right, you would be looking at various

11   features of the pouch, various features of the label, and many

12   of these features are just aesthetic, which of these features

13   are functional?

14           For instance, to your conversation earlier with

15   counsel, this belly, this bottom part, and it goes to your

16   question of what would the evidence be like, how we would

17   develop it?  There would be factual discovery but also expert

18   discovery about can you make a product that stands up like this

19   that is sturdy, not likely to fall over, without creating this

20   gusset down here --

21           THE COURT:  What is a gusset?

22           MR. KRUMHOLZ:  This structure down here.

23           THE COURT:  Right.

24           MR. KRUMHOLZ:  -- without having it like a belly.

25   Just stating the obvious.  I am no expert but if you have

1    liquid all the way to the top, it makes it more top heavy and

2    easier to knock it over.

3            THE COURT:  It depends how big the belly is.  If you

4    squeeze it this way it looks William Howard Taft, a big belly,

5    right?  If you squeeze it this way, it's a thin guy.

6            MR. KRUMHOLZ:  Right.  And it needs to be able to do

7    both of those things with children squeezing it and gushing at

8    people, throwing it in the freezer and it freezing, it has to

9    be durable, it has to be safe.

10           So, what we would have --

11           THE COURT:  Why is there anything functional

12   potentially about this other than the base so it stands up?

13           MR. KRUMHOLZ:  So, the base certainly is the most

14   prominent functional feature.  Right?  But this is actually a

15   marvel in engineering back in its day and through to today

16   because, I mean, flexible packaging is a science in and of

17   itself.  When we were looking for potential experts you are

18   divided between regular packaging and flexible packaging

19   because there is a lot of science that goes into tensile

20   strength and size and shape, diameter.  They talk about the

21   fact that the side is straight.  The side is straight because

22   cost and efficacy are really the two factors of functionality

23   that we would be talking about.  Right?  So, how do you do it

24   cheaply and safely and well.  Right?  So having a straight edge

25   is cheaper than having a curved edge.

1          THE COURT:  So, in terms of functionality, to the

2    extent you are challenging functionality, discovering

3    functionality as a basis of the infringement analysis, would

4    you essentially be inquiring of the same questions as you would

5    be with respect to invalidity?  Is the discovery essentially

6    the same?

7          MR. KRUMHOLZ:  Yes.  I think so.  I think you have to

8    identify -- part of functionality is what are alternative

9    designs.  Right?  So you have to identify, *Can I do this*

10   *without this belly, this gusset?*  Right?  What would it look

11   like and would that be competitive?  If you can only do it this

12   way --

13         THE COURT:  Couldn't you clearly do it without the

14   belly?  If you had vertical struts here that essentially

15   prevented the billowing, wouldn't that achieve -- you would

16   still have the balance, it would just be thinner and you would

17   avoid the belly.

18         MR. KRUMHOLZ:  And higher cost and other unintended

19   consequences.

20         I am not going to pretend that -- obviously neither

21   one of you or -- we have talked with potential experts to hire

22   if we get to go forward with this defense and there is an

23   entire, there are laboratories about how to make this.

24         THE COURT:  Yes.

25         MR. KRUMHOLZ:  We are getting into, again, patent-like

1    issues about everything has consequences and unintended

2    consequences and that would need to be developed factually and

3    through experiments.

4         THE COURT:  Let me ask you.  The discovery demands in

5    the prior case transferred to Judge Wood, did they explore the

6    issues that you and I are now talking about?

7         MR. KRUMHOLZ:  Yes.

8         THE COURT:  Is there anything about the discovery

9    demands in this case that would likely be materially different

10   from the discovery demands that were put forward in that case?

11        MR. KRUMHOLZ:  Probably not materially.  I haven't

12   looked --

13        THE COURT:  Essentially.

14        MR. KRUMHOLZ:  Same topics.

15        THE COURT:  It is a do-over of that case, is it not?

16        MR. KRUMHOLZ:  Not a do-over because discovery -- I

17   don't think --

18        THE COURT:  It would be up to the point of the 27-day

19   mark, up to the point where the litigation stopped due to

20   settlement.  Save at the margin, this would be a do over.

21        MR. KRUMHOLZ:  Yes.  I guess I take issue with the

22   word "do-over" because no discovery was produced.

23        THE COURT:  Mulligan.

24        I don't mean it to be jaundiced.  The point is that

25   the play book, the pattern, the nature of the discovery sought

1    would essentially, up to the point at which the clock stopped

2    and there is a settlement, would essentially be that case, the

3    old case.

4              MR. KRUMHOLZ:  Yes.

5              THE COURT:  One moment.  Let me just go back to

6    plaintiff's counsel for a moment.

7              Let's suppose, hypothetically, you were to prevail in

8    enforcing the no challenge provision.  That would not mean,

9    though, that functionality questions are irrelevant.  Would

10   they be to the infringement analysis?  In other words, suppose

11   there is something that is strictly functional even if there

12   are other parts of this that are not.  Is Mr. Krumholz right

13   that a feature that is strictly functional could not be

14   considered part of the trademark for the purpose of

15   infringement analysis?

16             MR. MANCINI:  So, if may indulge the Court?  I would

17   like to offer my associate an opportunity for a few minutes to

18   rebut that point.

19             THE COURT:  Yes.

20             MR. MANCINI:  I think it is important for the Court to

21   hear rebuttal on the *Rates* point as well, if we may.

22             THE COURT:  Go ahead.  That is Mr. Thomas?

23             MR. THOMAS:  Yes.  Good afternoon, your Honor.

24             THE COURT:  Just move the mic close.

25             Let me just say good for you, Mr. Mancini.  I always

 1  salute counsel for giving younger lawyers an opportunity.

 2       Go.

 3       MR. THOMAS:  So, as Mr. Mancini said, we will address

 4  the first question the Court asked about the potential

 5  relevance of trademark functionality to the Court's

 6  infringement analysis.

 7       THE COURT:  Right.

 8       MR. THOMAS:  And then we will also, if the Court will

 9  indulge us, discuss key differences between *Rates*.  And turning

10  to the first question, it is interesting because ABC relies

11  extensively on *Stormy Clime* to stand for the proposition that

12  absent the no challenge provision, functionality is somehow

13  part of this particular Court's infringement analysis.  And the

14  first reason that that reliance on *Stormy Clime* is misplaced is

15  that, as Mr. Mancini alluded to earlier, we have a federal

16  trademark registration for our pouch mark.  In *Stormy Clime*,

17  the plaintiff is asserting a claim under Section 43(a) for

18  unregistered trade dress.  That's a fundamental difference

19  because of the burden shifting that Mr. Mancini talked about.

20       THE COURT:  But it doesn't take the issue off the

21  table, it just shifts the burden over to them, right?

22       MR. THOMAS:  Well, ABC is not wrong that functionality

23  would be a part of this Court's infringement analysis.  ABC is

24  wrong about where in this Court's infringement analysis

25  trademark functionality comes into play.

1      Now, as we cited in our opening brief and our reply

2   brief, right down the hall, the Southern District of New York

3   in *Louis Vuitton v. Dooney & Bourke*, that was a design mark

4   case.  It is clear in that case.  And the literal subheading

5   was trademark infringement under the Lanham Act.  Subsection 1,

6   validity of the mark.  Subsection 1B, aesthetic functionality.

7   And then what is the second subheading?  Likelihood of

8   confusion.  The Court does not discuss trademark functionality

9   and the context of likelihood of confusion.  The Court

10   discussed trademark functionality under the first step of the

11   infringement analysis which, coincidentally --

12      THE COURT:  Which is what?

13      MR. THOMAS:  Which actually overlaps with the first

14   question presented in this case which is trademark validity and

15   protectability.

16      So, when you have a trademark registration, Section 32

17   of the Lanham Act, the infringement analysis is two steps.

18   Step one is validity and protectability which, again, is

19   actually the first question presented in this case.

20      THE COURT:  But as to that I am hypothesizing that you

21   have neutralized the defense table's ability to raise that on

22   account of enforcing the no challenge provision.

23      MR. THOMAS:  Correct.

24      THE COURT:  But look, just to twist the facts a bit

25   here, indulge the hypothetical that in point of fact this was

1    only functional, entirely functional product, but that you have

2    an enforceable settlement agreement that the Court would

3    enforce, just indulge that hypothetical.

4                MR. THOMAS:  Okay.

5                THE COURT:  Then, when we get to infringement, how

6    does the fact that there are at least significant functional

7    dimensions to the trademarked thing play in?  I mean, you have

8    said a moment ago that functionality plays some role in the

9    infringement analysis.  How would that work?

10               MR. THOMAS:  In that hypothetical?

11               THE COURT:  Yes.

12               MR. THOMAS:  It would not because, in the first step,

13   trademark validity and protectability, the no challenge

14   provision plainly expressly prohibits a direct challenge to the

15   validity of the pouch trademark.  Arguing functionality is a

16   direct challenge to the pouch trademark's validity.

17               Now, in the second step, likelihood of confusion,

18   there is eight Polaroid factors.  Not one of them mentions

19   functionality.  In fact, if you lock at *Stormy Clime* it is

20   interesting because even though *Stormy Clime* has this

21   distinction between Section 32, registered trade dress which is

22   our case; Section 43A, unregistered straight trade dress in

23   *Stormy Clime*, the Second Circuit in *Stormy Clime* discussed the

24   aesthetic functionality doctrine and the context of

25   protectability.  That's the first step, not the second step.

In fact, the direct quote is, "we believe that the
functionality inquiry in the present case should have focused
on whether bestowing -- and here is the key language -- trade
dress protection upon *Stormy Clime*'s arrangement."  There is no
discussion of likelihood of confusion and that makes sense
because consumers have associated this iconic pouch trademark
with our client for 33 years.

          THE COURT:  Sorry.  Let me try the hypothetical a
little differently.

          Suppose there are functional dimensions and
nonfunctional dimensions here.  The defense is not allowed,
hypothetically, to challenge the trademark but wouldn't my
analysis as to infringement properly focus only on the
nonfunctional factors?

          MR. THOMAS:  Respectfully, your Honor, in the first
step, in the no challenge provision, ABC's predecessor in
interest expressly and not only did they agree not only to
challenge the pouch mark's validity, they expressly
acknowledged the pouch mark's validity.  So, by doing that, the
implication is it is not functional.

          THE COURT:  No, no, no.  It means it is not entirely
functional but it doesn't mean that there might be some aspect
of that which is being protected here which is functional.

          MR. THOMAS:  So, if I understand the question it is
that under the likelihood of confusion analysis, in particular

1    the second Polaroid factor, similarity of the marks, what I

2    understand ABC's counsel to suggest is that this Court needs to

3    parse out -- and again I am indulging a hypothetical here --

4    the functional and nonfunctional, that's not proper.  We are

5    not before the trademark trial appeal board, we are in the

6    federal district court.  The Polaroid factors assess the

7    overall commercial impression that trademarks create in the

8    marketplace.  So, it doesn't matter if it is a word mark or a

9    logo or a slogan or, in this case, pouches.  You assess how the

10   consumers encounter these pouches in the marketplace and when

11   consumers go to the marketplace --

12            THE COURT:  I suppose that's right because the

13   consumer is never going to have the hypothetical of removal of

14   some structural feature, right?

15            MR. THOMAS:  Exactly.

16            THE COURT:  Then you are in a world that literally

17   just doesn't exist.

18            MR. THOMAS:  Consumers go to the grocery store, they

19   see this iconic pouch, they have seen it for 33 years.  They

20   don't say, oh, I think this part is functional and then I see

21   this pouch and, oh, that's not how it works.  That's why you

22   view the pouch's overall commercial impression.

23            THE COURT:  What do I need to look at, from your

24   perspective, to put to rest the defense claim that if the no

25   challenge provision is sustained the functionality analysis

1    doesn't play a role in infringement.

2            What is the best cases or cases for you?

3            MR. THOMAS:  So, I think there is two.  I will start

4    with our case which is, we cited in our opening brief, the case

5    is *Louis Vuitton v. Dooney & Bourke*.  The case number is 340 --

6            THE COURT:  If it is in the brief, I'm fine.

7            MR. THOMAS:  And, again, in that particular case -- I

8    mean this is not, I am quoting.

9            THE COURT:  That's one case.  What else?  You said two

10   cases.

11           MR. THOMAS:  Sure, *Stormy Clime*.

12           THE COURT:  *Stormy Clime*.  Okay.

13           MR. THOMAS:  Several instances in that decision the

14   Second Circuit discussed trademark functionality in connection

15   with trade dress protection.  Trademark protection and

16   trademark validity are the first step in the infringement

17   analysis.

18           THE COURT:  I want to give everyone -- I want to

19   adjourn shortly but you had a second point that you wanted to a

20   address?

21           MR. THOMAS:  Sure.  It is a combination of *Rates*

22   *Technology* and *Idaho Potato*.

23           I understood opposing counsel's argument to suggest

24   that their client is in the same position as the licensees in

25   those cases.  Respectfully, that's not the case.  And as the

1    Court is aware in this case, the settlement and license

2    agreement is unique in the sense that it is both, it is a

3    trademark litigation settlement agreement and it is also a

4    trademark license agreement.  That wasn't present in *Lear* or in

5    *Idaho Potato*.

6            THE COURT:  Right, but I mean I am focusing on the

7    settlement part because the license agreement part appears, in

8    the case law, not to get a ton of weight if we are in the

9    patent area.  So, indulging that this is properly analyzed by

10   the *Lear* line of cases, we have here the circumstance of a case

11   that went deep into the discovery period although, as it

12   happens, the lawyers were promptly talking settlement and

13   didn't respond to the discovery demands that were promulgated.

14           How does that compare and contrast, first of all, to

15   *Rates*?

16           MR. THOMAS:  So, that's interesting.

17           As the Court has alluded to, *Rates* sets out this very

18   nice framework where at the time the Second Circuit authored

19   that decision, they were envisioning four scenarios where a no

20   challenge provision could be within something titled Agreement.

21   And the specific scenario before the Second Circuit in *Rates*

22   was a no challenge provision in a patent settlement agreement

23   but the key distinction was it was a pre-litigation settlement

24   agreement.

25           THE COURT:  I understand.  And this is a

1    post-litigation.

2              MR. THOMAS:  Correct.

3              THE COURT:  But it is also the case that all agree

4    that no consequential discovery in fact happened.  And so *Rates*

5    also, Judge Lynch also says there the formality of initiating a

6    lawsuit can't transform, by quality, qualitatively, a license

7    agreement into not carrying the day to carrying the day.  On

8    the other hand he basically says, you know, if you go very far

9    down the road in litigation, it is different.  And so, you have

10   a -- you know, you have got kind of a litigation interrupted

11   quality here of, you know, we have talked about it, there are

12   47 days away but very little discovery.  The question is how

13   that fact pattern which is, you know, where the settlement

14   occurs at some point in the litigation that is certainly not at

15   the beginning of the litigation but it also isn't deep into

16   actual discovery even if it is deep into the discovery

17   calendar.  How do you analyze that?

18             MR. THOMAS:  Sure.

19             So, in *Rates* the Second Circuit in discussing that

20   fourth scenario, which we are in here, discusses the

21   possibility of a no challenge provision being in a litigation

22   settlement agreement.  And the Court said, and this is the key

23   language, is that when you agree to the no challenge provision

24   in a litigation settlement agreement, what is significant is

25   that you had the "opportunity" to take discovery on validity.

1    And the citation that the Second Circuit had in *Rates* was to

2    *Flex-Foot*.  And as *Flex-Foot*, quite frankly we quote in our

3    brief, if you just stake the word "patent" out of the Court's

4    holding in *Flex-Foot* and you put "trademark" in, that is the

5    exact fact pattern that we have here.

6              And, as we also discuss in our reply brief at page 7,

7    as you said we are 27 days away from the close of fact

8    discovery.  We also discussed how ABC's predecessor served

9    rather extensive discovery.  That is opportunity by any other

10   name.

11             THE COURT:  Did Judge Wood sign off on the settlement

12   agreement or is it simply a notice of voluntary dismissal?

13             MR. THOMAS:  The parties filed, on July 21, 2016, a

14   proposed stipulation and order.  The next day, July 22, 2016,

15   Judge Wood So Ordered that.

16             THE COURT:  Right, but some settlement agreements are

17   made part of the court record and are adopted so that, for

18   example, a breach of the settlement agreement would then be --

19   could then be pursued as a federal court matter as opposed to a

20   contract action somewhere else.  Was the settlement agreement

21   made part of the court record?

22             MR. THOMAS:  No.

23             THE COURT:  Let me just take a moment with my staff

24   for a moment to see if I have other questions.

25             (pause)

1            THE COURT:  I will try one more time to see if anybody

2     has got any authority that deals with the somewhat hybrid

3     quality of trademark case functionality defense.  I understand

4     each of you has your arguments about why this ought to be seen

5     in the first instance as a trademark problem or as a patent

6     problem.  I guess the answer -- I have now put it to you a

7     couple of times but supposing I were to see the case as sort of

8     a hybrid, that it is sort of straddling the two areas.  How

9     would that change the analysis?

10            Briefly, Mr. Krumholz?

11            MR. KRUMHOLZ:  So, if I understand the question, I

12     think if there was a case that -- can I have the question

13     again?

14            THE COURT:  Yes.  I have pretty much asked it before

15     but what is analytically tricky about the case, among other

16     things, is that the functionality analysis is formally arising

17     in trademark but has a strong echo of patent.  I get each of

18     your arguments as to why it ought to be, in the first instance,

19     put in the category you prefer and maybe there is simply a

20     third way in the middle but, in the end, there is no case law

21     that seems to guide me on that.  I understand the appeal from

22     first principles of the defense argument, I understand the

23     appeal from the classification of this is a trademark case from

24     the front table but it doesn't look like there is a case that

25     guides me as to what to do with this problem.

1          MR. KRUMHOLZ:  I think there are lots of cases that

2     guide you.  I don't think there is a case on all fours.

3          THE COURT:  There is no case here that deals with

4     functionality that sort of says if it is functionality it ought

5     to be seen as patent.

6          MR. KRUMHOLZ:  Correct.  And I know everybody needs to

7     go and I need to catch a plane so I am as interested as anybody

8     but there is one thing I need to correct.

9          THE COURT:  One thing.

10         MR. KRUMHOLZ:  We got to the nub of it on the

11    discovery on *Rates Technology* and counsel said *Flex-Foot* was on

12    all fours.  In *Flex-Foot* there was full discovery and summary

13    judgment.

14         THE COURT:  All these other cases are arising

15    essentially on the pleadings, right?  I mean, for example,

16    *Rates* is a pleadings case?

17         MR. KRUMHOLZ:  *Rates* is, yes, I think it is a

18    pleadings case.  But, yes, but the Second Circuit used the

19    words it is significant to us, when talking about this issue of

20    discovery, it is significant to us that the parties "have

21    conducted."  Those are, twice it says "have conducted" when it

22    talks about the policy reasons why discovery is important which

23    is it shows that people made a knowing decision.

24         THE COURT:  The problem is, you know, if it seems to

25    be acknowledged that corporate big wigs of the company were

1    engaged with this and made a considered decision to suspend the

2    provision of discovery so they could settle the case.  I mean,

3    to the extent what we are concerned about is that the parties

4    took the case seriously and that there is meaning to what they

5    did when they decided to settle on a no challenge basis,

6    everything about this all but screams that it was taken

7    seriously at the highest levels.

8            MR. KRUMHOLZ:  I would agree that the case was taken

9    seriously but the question is whether the defense was taken

10   seriously and I would argue the opposite, that when there is

11   the opportunity to take discovery and one chooses not to take

12   it -- look.  The Second Circuit said, look, by taking discovery

13   you are telling me that you have fully, you have full knowledge

14   when you decide to waive your right and that you have taken

15   this defense seriously.  The opportunity to take discovery and

16   the choice not to take it is just the opposite.

17           THE COURT:  I understand each of you has a different

18   spin on it.  Unless there is a case beyond asking me to parse

19   that linguistic dimension of *Rates*, is there anything further

20   that says it's the response to the discovery rather than the

21   discovery demands that is determinative?  Is there anything you

22   have beyond the form of words used there?

23           MR. KRUMHOLZ:  No.

24           THE COURT:  Okay.

25           MR. MANCINI:  Your Honor, may I?  I know it is very

1    late.  I think there is a case on point.

2            THE COURT:  Give me the cite.

3            MR. MANCINI:  *Paperlet Company v. Shepherd Specialty.*

4    *Flex-Foot* only required litigation to be initiated, thereby

5    proceeding an opportunity for the challenger to conduct

6    discovery on validity issues.

7            THE COURT:  Although *Rates* basically says the mere

8    filing of the lawsuit, which is an opportunity for there to be

9    discovery, doesn't cut it, so *Rates* implies that the mere

10   filing, which carries with it the opportunity, doesn't get you

11   there.  So, I think there is some purchase to Mr. Krumholz'

12   point that something more than filing, which carries with it

13   the right in court to take discovery, has to happen.

14           All right.  I think I have heard enough.  Thank you.

15   I do need to return the care package because I think if I have

16   a sip of the Capri Sun I will be conflicted.  But, I thank you.

17           This has been extremely helpful.  It is an unusual

18   problem on my docket and it appears in the case law; I am

19   looking forward to digging into it more.  At this stage I take

20   it all are in agreement that the case is not moving forward

21   until I clear away these motions, correct?

22           MR. MANCINI:  If I may address that, your Honor?

23           The parties are about to come to your Honor with an

24   interim measure, mindful of the case management order, to

25   extend internal deadlines on the fact discovery front by 90

1    days that do not address the ultimate deadlines.

2          THE COURT:  Let me see if I have got this right

3    because I am now going to resolve this and I cannot tell you on

4    what time table.  You want to make sure that you have conformed

5    the other deadlines in the case to the fact that this issue is

6    sub judice.

7          MR. MANCINI:  Yes, but depending how long your Honor

8    takes, we may need to revisit.

9          THE COURT:  That's fine.  Look.  Get me an agreed

10   Order along those lines, in effect, to preserve the rationality

11   of the schedule given that I am only now digging into this and

12   have other things on my docket, I would be happy to

13   accommodate.  The last thing I want to do is create a mouse

14   trap that doesn't work for you.

15         MR. MANCINI:  Thank you.

16         THE COURT:  Thank you.  We stand adjourned.  Safe

17   travels.

18                          o0o

19

20

21

22

23

24

25