**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CAPRI SUN GMBH,

               Plaintiff,

    vs.

AMERICAN BEVERAGE CORPORATION,

             Defendant.

Case No. 1:19-cv-01422 (PAE)

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF CAPRI SUN GMBH'S *DAUBERT* MOTION**
**TO EXCLUDE SURVEYS, OPINIONS AND TESTIMONY OF HAL PORET**

MAYER BROWN LLP
A. John P. Mancini
Jonathan W. Thomas
Margaret Wheeler-Frothingham
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Plaintiff*
*Capri Sun GmbH*

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ............................................................................ 1

II.   LEGAL STANDARDS .................................................................................... 3

III.  FACTUAL BACKGROUND .......................................................................... 4

    A.    The Incontestable '517 Registration for the Unique Shape of Capri Sun's Pouch ................................................................................................................ 4

    B.    ABC's Unlicensed Pouch ........................................................................... 6

    C.    The Identical Nature of the Parties' Pouches ............................................. 6

    D.    ABC's Unlicensed Pouch Caused Actual Confusion ................................ 7

    E.    The Myriad Flaws in Mr. Poret's Surveys ................................................ 7

          1.    Mr. Poret Failed to Simulate Marketplace Realities ................................. 8

          2.    Mr. Poret Utilized an Improper Universe of Survey Respondents .......... 10

          3.    Mr. Poret Used Improper Stimuli ............................................................ 10

          4.    Mr. Poret Asked Improper Questions ..................................................... 11

          5.    Mr. Poret Did Not Conduct a Pre-Test or a Pilot Survey ....................... 11

IV.  ARGUMENT .................................................................................................. 12

    A.    THE COURT SHOULD EXCLUDE PORET'S REPORT BECAUSE IT FAILED TO REPLICATE MARKETPLACE CONDITIONS. ....................... 12

          1.    Mr. Poret's Surveys Do Not Simulate the Point-of-Sale Conditions Because He Failed to Show CAPRI SUN-Brand Products in the Pouch Mark to Respondents ................................................................... 12

          2.    Mr. Poret Impermissibly Allowed Survey Respondents to View ABC's Pouch for an Indefinite Period .................................................... 15

          3.    Mr. Poret Does Not Adequately Address Post-Sale Conditions.............. 16

    B.    THE COURT SHOULD EXCLUDE PORET'S REPORT BECAUSE IT CONSISTED OF AN IMPROPER UNIVERSE OF PARTICIPANTS ............ 17

          1.    Mr. Poret Included Past Purchasers of Juice Drinks in His Pool of Respondents ............................................................................................. 17

          2.    Regarding Future Purchasers, Mr. Poret Limited His Pool of Respondents to Those Likely to Purchase Fruit Juice Only in a Pouch ....................................................................................................... 18

          3.    Mr. Poret Excluded Retailers and Children From His Pool of Respondents ............................................................................................. 19

    C.    THE COURT SHOULD EXCLUDE PORET'S SURVEYS BECAUSE THEY INCLUDED IMPROPER STIMULI .................................................. 20

i

**TABLE OF CONTENTS**
(continued)

**Page**

D.    THE COURT SHOULD EXCLUDE PORET'S SURVEYS BECAUSE
THEY INCLUDED IMPROPER QUESTIONS ................................................. 21

E.    THE COURT SHOULD EXCLUDE PORET'S SURVEYS BECAUSE
HE FAILED TO CONDUCT A PILOT/PRE-TEST .......................................... 23

V.    CONCLUSION............................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)................................................................................................4

*Conopco, Inc. v. Cosmair, Inc.*,
   49 F. Supp. 2d 242 (S.D.N.Y. 1999).................................................................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).................................................................................................. *passim*

*Gross v. Bare Escentuals Beauty, Inc.*,
   641 F. Supp. 2d 175 (S.D.N.Y. 2008)...............................................................................13

*Kargo Global, Inc. v. Advance Mag. Publishers, Inc.*,
   2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007).....................................................................20

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986)..............................................................................................16

*Malletier v. Dooney & Bourke, Inc.*,
   525 F.Supp.2d 558 (S.D.N.Y. 2007)..................................................................... *passim*

*Medisim Ltd. v. BestMed LLC*,
   861 F.Supp.2d 158 (S.D.N.Y. 2012).................................................................................17

*Saxon Glass Techs., Inc. v. Apple Inc.*,
   393 F. Supp. 3d 270 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020) .....................20

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010)..........................................................................3, 4, 14

*Universal City Studio, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984)..............................................................................................21

**Statutes**

15 U.S.C. § 1115(b) ...............................................................................................................1

**Other Authorities**

Fed. R. Evid. 403 ........................................................................................................3, 4, 12, 24

Fed. R. Evid. 702 ........................................................................................................3, 4, 12, 24

## I.    PRELIMINARY STATEMENT

The surveys, opinions, and testimony of Defendant American Beverage Corporation's ("**ABC**") putative consumer confusion expert, Mr. Hal Poret, are divorced from marketplace realities and, thus, this Court should exclude them under *Daubert*.

Capri Sun's famous and uniquely shaped, stand-up juice pouch has been intricately woven into the fabric of American society since 1978.  Since 1986, Capri Sun has owned a federal trademark registration for the unique shape of its juice pouch, namely, U.S. Trademark Registration No. 1,418,517, which is incontestable pursuant to 15 U.S.C. § 1115(b) (the "**517 Registration**" and "**Pouch Mark**").  ABC is intimately aware of the Pouch Mark.

In October 2016, ABC acquired a non-exclusive license from Faribault Foods, Inc. concerning the use of the Pouch Mark for fruit-juice drinks (the "**License**").  Under the License, the parties agreed that the pouch ABC was using for its fruit-juice products (the "**Licensed Products**") was the Pouch Mark (the "**Licensed Pouch**").  While the License was in effect, ABC stamped the consumer-facing portion of its Licensed Pouch (and multi-pack cartons of Licensed Products in its Licensed Pouch) with a notice that Capri Sun (then dba "SiSi") owned a trademark registration for the shape of the Licensed Pouch/Pouch Mark.  Prior to the License's termination, ABC—in its own words—slightly tweaked the upper left-and-right-hand corners of the Licensed Pouch/Pouch Mark, and then continued using it to sell fruit-juice drinks after the License terminated ("**ABC's Unlicensed Pouch**").

In February 2019, Ocean Spray began using ABC's Unlicensed Pouch to sell its "Growing Goddess" product in the same section of physical retail stores as CAPRI SUN-brand products in the Pouch Mark.  Thereafter, consumers began contacting Ocean Spray and inquiring whether it was associated with Capri Sun (which it is not), and complaining about alleged quality issues with CAPRI SUN-brand products in the Pouch Mark, which Ocean Spray does not

1

manufacture or sell. These documented instances of actual consumer confusion were not surprising given that: (i) consumers associate the Pouch Mark with the CAPRI SUN brand, and (ii) Ocean Spray was using ABC's Unlicensed Pouch, which <u>is</u> the Licensed Pouch/Pouch Mark with slightly tweaked upper corners.

Nonetheless, Mr. Poret opines that three products (out of 24) offered in ABC's Unlicensed Pouch do not create a likelihood of confusion with CAPRI SUN-brand products in the Pouch Mark and/or the trade dress featured on Capri Sun's "Original" line of products (the "CAPRI SUN Packaging Trade Dress"). The disconnect between marketplace realities and Mr. Poret's opinions are attributable to the myriad flaws in the three surveys on which he bases his opinions. Indeed:

- Mr. Poret did not show the CAPRI SUN-brand products in the Pouch Mark to survey respondents even though, as he conceded in his deposition, consumers encounter the parties' pouches in close proximity in the marketplace—including side-by-side on some retailers' websites;

- Mr. Poret allowed survey respondents to view products in ABC's Unlicensed Pouch for as long as they wanted to even though, as he conceded in his deposition, he has no research to confirm that this is how consumers interact with products offered in ABC's Unlicensed Pouch in the marketplace;

- Mr. Poret limited his universe of survey respondents to consumers who were likely to purchase fruit-juice drinks only in a pouch even though, as he conceded in his deposition, fruit juice drinks are available for sale in several packaging formats in the marketplace;

- Mr. Poret also used improper stimuli—he fails to explain how the three products he tested in ABC's Unlicensed Pouch are representative of the 24 products that ABC sells in its Unlicensed Pouch;

- Mr. Poret asked improper questions; and

- Mr. Poret failed to conduct a pilot/pre-test of the survey.

At bottom, Mr. Poret's surveys and opinions are irrelevant, unreliable, would confuse the trier of fact about marketplace realities, and would prejudice Capri Sun if admitted into evidence.

Accordingly, this Court should exclude Mr. Poret's surveys and opinions (and any additional testimony about them) under *Daubert*, and FED. R. EVID. 403 and 702.

## II.     LEGAL STANDARDS

The Court's gatekeeping role under *Daubert* requires it to evaluate the admissibility—or, in this case, the inadmissibility—of a proffered trademark-confusion survey, as well as opinions and testimony about the survey, under FED. R. EVID. 403 and 702.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (A court's responsibility is "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

As background:

"While courts in the Second Circuit rely mainly on Rule 403 to exclude unreliable surveys, we note that Rule 702 is clearly applicable as well, because the result of a survey is essentially expert testimony, and Rule 702 requires that such testimony must be reliable. The bottom line is that if the survey suffers from substantial methodological flaws, it will be excluded under both Rule 403 and 702."

*Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 564 n. 19 (S.D.N.Y. 2007).

Accordingly, under Rule 403, a Court may properly exclude a proffered trademark-confusion survey if its "probative value, if any, is substantially outweighed by its potential to mislead the jury and to create unfair prejudice."  *Malletier*, 525 F. Supp. 2d at 603; *accord* FED. R. EVID. 403; *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010).

Under Rule 702, a Court may properly exclude a proffered trademark-confusion survey if it was not "produced through a reliable application of reliable methods" and/or "where [its] flaws are deemed to cumulatively undermine its relevance and reliability."  *Malletier*, 525 F. Supp. 2d at 603; *id.* at 564; *accord* FED. R. EVID. 702; *THOIP,* 690 F. Supp. 2d at 229-30.  Additionally, where, as here, an expert's opinion/testimony "is based on data, a methodology, or studies that are simply *inadequate to support the conclusions* reached, *Daubert* and Rule 702 mandate the

exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *accord Daubert*, 509 U.S. at 592–93.

Moreover, "courts have been advised to carefully scrutinize [trademark] survey evidence particularly where a jury rather than a bench trial is contemplated." *Malletier*, 525 F. Supp. 2d at 562.    To that end, Rules 403 and 702 mandate that a trademark-confusion survey "approximate[s] marketplace conditions" to be admissible.    *Malletier*, 525 F. Supp. 2d at 581; *accord THOIP,* 690 F. Supp. 2d at 231.  Rules 403 and 702 also require the Court to "consider a number of [other] criteria, including whether:(1) the proper universe was examined and the representative sample was drawn from the universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such survey; (3) the questions were leading or suggestive; (4) the data gathered was accurately reported; and (5) persons conducting the survey were recognized experts." *Malletier*, 525 F. Supp. 2d at 580 (internal citations omitted).

Finally, while the Court is the "gatekeeper" under *Daubert*, it is "[t]he proponent of expert evidence [who] bears the initial burden of establishing admissibility by a preponderance of proof." *THOIP,* 690 F. Supp. 2d at 230.

## III.    FACTUAL BACKGROUND

### A.    The Incontestable '517 Registration for the Unique Shape of Capri Sun's Pouch

The Pouch Mark (which is the subject of the incontestable '517 Registration) covers the unique shape of Capri Sun's juice pouch in Int. Cls. 32 "for: fruit juice drinks containing water":

Int. Cl.: 32
Prior U.S. Cl.: 45

United States Patent and Trademark Office    Reg. No. 1,418,517
Registered Nov. 25, 1986

TRADEMARK
PRINCIPAL REGISTER



*See* CSMF[1] at ¶¶ 7-15.

Set forth below are representative images of CAPRI SUN-brand products offered for sale in the United States in the Pouch Mark:



*See* CSMF at ¶¶ 4, 56.

When CAPRI SUN introduced products in its Pouch Mark to American consumers in 1978, cans and bottles were the standard packaging formats for beverages. *See* CSMF at ¶¶ 4, 5. Since then, Capri Sun has invested millions of dollars over the past 40 years in advertising, promoting, and selling CAPRI SUN-brand products in its Pouch Mark. *See id.* at ¶¶ 19-29. CAPRI SUN-brand products in the Pouch Mark also have been the subject of: (i) national-advertising campaigns; (ii) partnerships with Olympic athletes, a national-restaurant chain, a hit-

---

[1] "CSMF" refers to Plaintiff Capri Sun GmbH's Rule 56.1 Statement of Material Facts, filed June 2, 2021.

television series, and a widely used ride-sharing application; and (iii) unsolicited media coverage, wherein such products have been referred to as "classic" and "iconic."  *See id*. at ¶¶ 30-44.  Based on Capri Sun's extensive efforts over the past 40 years, consumers associate the Pouch Mark with the CAPRI SUN brand.  *See id*. at ¶¶ 16-18.

**B.    ABC's Unlicensed Pouch**

Inset are images of two examples of products in ABC's Unlicensed Pouch:



*See* CSMF at ¶ 78.

**C.    The Identical Nature of the Parties' Pouches**

The inset chart depicts images of the front, back, left profile, and right profile of a Wild Cherry "Original" CAPRI SUN-brand juice drink in the Pouch Mark (left), and a refreshing! Wild Cherry Unlicensed Product in ABC's Unlicensed Pouch (right):



*See* CSMF at ¶ 89.

The inset chart depicts images of the front, back, left profile, and right profile of a Strawberry Kiwi "Original" CAPRI SUN-brand juice drink in the Pouch Mark (left), and a Strawberry Kiwi FULL CIRCLE Unlicensed Product in ABC's Unlicensed Pouch (inset right):



As discussed, *supra*, discovery confirmed why products in ABC's Unlicensed Pouch look identical to CAPRI SUN-brand products in the Pouch Mark: ABC's Unlicensed Pouch <u>is</u> the Licensed Pouch/Pouch Mark with slightly tweaked upper left-and-right-hand corners. *See* CSMF at ¶¶ 73-92.

### D.    ABC's Unlicensed Pouch Caused Actual Confusion

In February 2019, Ocean Spray began offering its "Growing Goodness" fruit-juice product in ABC's Unlicensed Pouch in the same section of grocery stores as CAPRI SUN-brand products in the Pouch Mark. Dkt. No. 78 at ¶ 326, 380, 318. Thereafter, Ocean Spray received for the first time: (i) a consumer inquiry about whether it was affiliated with Capri Sun, which it is not; (ii) complaints about CAPRI SUN-brand products in the Pouch Mark, which Ocean Spray does not manufacture or sell; and (iii) a request that Ocean Spray start manufacturing CAPRI SUN-brand products in non-pouch formats. *See id*. at ¶¶ 401-405.

### E.    The Myriad Flaws in Mr. Poret's Surveys

On December 19, 2020, Mr. Hal Poret served a report in this action titled, *Survey to Assess Whether the Design of the Pouch Used with ABC Juice Products Creates a Likelihood of Confusion with Capri Sun's Claimed Pouch Design Trademark and Trade Dress.* *See* J. Mancini Decl., Exhibit 1 (the "**Poret('s) Report**").

Notwithstanding the document instances of actual consumer confusion caused by Ocean Spray's use of ABC's Unlicensed Pouch, in Mr. Poret's Report, he concluded: "it is my opinion to a reasonable degree of professional certainty that there is no likelihood of confusion between

the ABC pouch design (or products) and the Capri Sun Mark or its claimed trade dress." J. Mancini Decl., Exhibit 1  at ¶ 18.  The bases of this opinion were three "*Eveready*" surveys that Mr. Poret designed, wherein he purportedly tested whether the three inset products offered in ABC's Unlicensed Pouch, create a likelihood of confusion with CAPRI SUN-brand products in the Pouch Mark:



*See* J. Mancini Decl., Exhibit 1 at ¶ 80, 82, 83.

According to Mr. Poret, the net-confusion rate for the WILD HARVEST product was 0%; the net-confusion rate for the HYVEE "Refreshing" product was -1.5%; and the net-confusion rate for the JUICY JUICE Splashers product was -1.0%.  J. Mancini Decl., Exhibit 1 at ¶ 19.    These net-confusion rates, as well as the surveys and Mr. Poret's opinions and testimony about those surveys, are irrelevant and unreliable for numerous reasons, including:

**1.    Mr. Poret Failed to Simulate Marketplace Realities**

Despite the parties using their identical-looking pouches to sell identical products to identical customers in identical trade channels at nearly identical retail-price points (*see* CSMF at ¶¶ 93-101), Mr. Poret claims in his Report: "the CAPRI SUN Mark and the accused ABC Pouch design are not typically seen [by consumers] in close proximity in the marketplace."  J. Mancini

Decl., Ex. 1 at ¶ 24.  Mr. Poret is wrong; consumers <u>do</u> regularly encounter the parties' identical pouched-juice drinks in close proximity in the marketplace.  *See* CSMF at ¶¶ 93-101.

When shopping online, consumers encounter images of the parties' pouches side-by-side on a retailers' websites.  *See* CSMF at ¶¶ 97, 98.   For example, Amazon.com displays an image of a CAPRI SUN-brand product in the Pouch Mark next to an image of a JUICY JUICE Splashers product in ABC's Unlicensed Pouch. *See id.* at ¶ 98.  Consumers also encounter side-by-side images of the parties' pouches on websites such as Kroger.com, StopandShop.com, and HEB.com. *See id.*; *see also* J. Mancini Decl., Exhibit 3 at 147:16-20 (Mr. Poret identified that Capri Sun and Juicy Juice Splashers appear next to each other on Stop and Shop's website). Consumers also encounter images of the parties' pouches on the same page of retailers' websites. *See id.*  For example, when shopping for juice drink products on Walmart's website, a consumer sees an image of the CAPRI SUN-brand product in the Pouch Mark and an image of Poppilu in ABC's Unlicensed Pouch on the same page. *See id.*

In physical retail stores (*e.g.*, Walmart, and Kroger), cartons of CAPRI SUN-brand products offered in the Pouch Mark—many of which include "POUCHES" on the consumer-facing portion of the carton—and cartons of products offered in ABC's Unlicensed Pouch are available for sale in the "Juice" aisle.  CSMF at ¶ 96.  Cartons of the parties' pouched-products also appear on the same shelf in other physical retail stores (*e.g.*, Star Market).  *See id.*

Despite this close proximity, Mr. Poret conceded in his deposition that he did not show a single CAPRI SUN-brand product in the Pouch Mark to survey respondents. J. Mancini Decl., Exhibit 3 at 129:24-130:3; 137:17-20.  Mr. Poret also permitted survey respondents to view ABC's Unlicensed Pouch for as long as they wanted to, despite conceding in his deposition that

he has no evidence to suggest, let alone confirm, that consumers interact with ABC's Pouch in this manner at the point of sale or in the post-sale context. *Id*. at 267:10-268:5.

### 2.     Mr. Poret Utilized an Improper Universe of Survey Respondents

The parties' identical pouched-juice drinks are part of the kids single-serve beverage market, which includes juice drinks packaged and sold in tetra boxes, bottles, and cans in addition to pouches.  Both parties market their pouched-juice drinks to prospective customers who are interested in juice drinks, in general, and without any predetermined preference as to the packaging format. J. Mancini Decl., Exhibit 3 at 101:10-102:3. Despite these numerous packaging options and broad prospective-customer base, Mr. Poret limited his universe of survey respondents to adults who were likely to purchase fruit juice only in a pouch or who had recently purchased fruit juice only in a pouch. *Id.* at 89:5-21. Mr. Poret also failed to include other proper survey respondents, including children and retailers. *Id*. at 83:8-19; 87:7-17.

### 3.     Mr. Poret Used Improper Stimuli

ABC contends that it currently uses its Unlicensed Pouch for 24 products in four categories, namely: (i) private label (e.g., "SIMPLY NATURE and FULL CIRCLE); (ii) co-pack (e.g., OCEAN SPRAY); (iii) ABC-branded (e.g., GREEN BEGINNINGS); and (iv) generic (e.g., "Refreshing").  *See* JSMF at ¶¶ 289, 290.  Yet, Mr. Poret tested only three products in ABC's Unlicensed Pouch.  In Mr. Poret's Report, he offers nothing more than *ipse dixit* assertions as to how the WILD HARVEST, "Refreshing," and JUICY JUICE Splashers products allegedly are representative of all 24 products (sold in different designs) in these four categories. J. Mancini Decl., Exhibit 1 at ¶¶ 80, 81, 82, 83. He fared no better at his deposition. J. Mancini Decl., Exhibit 3 at 281:12-285:14.

#### 4.       Mr. Poret Asked Improper Questions

The questions that Mr. Poret used in his screening of respondents and actual survey were riddled with errors. Mr. Poret asked potential respondents in "[i]n the past 6 months, in which of the following containers have you personally purchased fruit juice or juice-based fruit-flavored drinks?" J. Mancini Decl., Exhibit 4 at 4. Mr. Poret gave a few different answer choices to this question, including pouches, bottles, and cans. *Id.* Only respondents who answered "pouches" were able to move on with the survey. *Id.*

Mr. Poret then asked in the actual survey at Q150 "[i]n the next 6 months, in which of the following containers are you likely to purchase fruit juice or juice-based fruit-flavored drinks?" *Id.* This question gave a few answer choices which included "pouches" as one of the responses. *Id.* If respondents chose "pouches," they were informed one question later in Q180 that they "ha[d] qualified to take the survey." *Id.* at 5. Next, in Q240 Mr. Poret presents respondents with an unclear and imprecise question that asks "[d]o you think the company or brand that makes or puts out the product we just showed you also makes or puts out any other products that you are aware of?" *Id.* at 8. Finally, in Q250 Mr. Poret simply asks "[w]hat other products?" *Id.* at 8.

#### 5.       Mr. Poret Did Not Conduct a Pre-Test or a Pilot Survey

Mr. Poret neglected to conduct a pre-test or a pilot survey before conducting his survey. While Mr. Poret did ask screener questions to cull the number of respondents, he did not adequately vet his survey before conducting it. In fact, nowhere in Mr. Poret's report does he address the fact that he did not conduct a pre-test or pilot survey. When asked about this in his deposition, Mr. Poret stated that "I did not do what I would consider a formal pretest because that is not standard or at all common for survey methods." J. Mancini Decl., Exhibit 3 at 278:18-24. Mr. Poret's failure to recognize the need for such a pre-test or pilot survey as being standard industry practice demonstrates how unreliable his survey truly is.

## IV.    ARGUMENT

As discussed, *infra*, the totality of the myriad flaws in Mr. Poret's surveys, and opinions about/based on those surveys, render them inadmissible under Rules 403 and 702.  Accordingly, this Court should exclude them—and any further testimony from Mr. Poret about them—under *Daubert*.

### A.    THE COURT SHOULD EXCLUDE PORET'S REPORT BECAUSE IT FAILED TO REPLICATE MARKETPLACE CONDITIONS.

"As with any survey, to be found admissible and reliable an Internet based survey must try to replicate as far as possible the actual conditions under which Internet users are likely to encounter the trademarks."    6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:165.25 (5th ed. 2021).

Here, Mr. Poret's surveys failed to replicate marketplace conditions for at least three reasons.  *First*, Mr. Poret failed to show CAPRI SUN-brand products in the Pouch Mark to survey respondents even though consumers encounter the parties' marks in close proximity. *Second*, Mr. Poret allowed survey respondents to view products in ABC's Unlicensed Pouch for an indefinite period even though he has no research or evidence to suggest, let alone prove, that is how consumers encounter products in ABC's Unlicensed Pouch.  *Third*, Mr. Poret failed to adequately address how consumers encounter the parties' pouches in the crucial, post-sale context.

#### 1.    Mr. Poret's Surveys Do Not Simulate the Point-of-Sale Conditions Because He Failed to Show CAPRI SUN-Brand Products in the Pouch Mark to Respondents

Two survey formats purport to measure actual consumer confusion, namely: (i) *Eveready*, and (ii) *Squirt*.  *See* MCCARTHY at § 32:173.  Both survey formats utilize questions to determine whether the junior user's mark causes actual confusion as to source, affiliation,

approval, sponsorship, etc.  *See id.*; *see also* J. Mancini Decl., Exhibit 1 at ¶ 24.  However, the surveys go about this in different ways: in an *Eveready* survey, respondents see only the junior user's infringing mark; in a *Squirt* survey, respondents see the senior user's and the junior user's marks.  *See* MCCARTHY at §§ 32:174, 32:174.50.

Here, Mr. Poret utilizes the *Eveready* format for all three of his surveys.  According to Mr. Poret he utilized the *Eveready* format because "the Capri Sun Mark and the accused ABC pouch design are not typically seen in close proximity in the marketplace" and because the *Squirt* format allegedly "would not portray the proper market conditions at issue here." J. Mancini Decl., Exhibit 1 at ¶ 24.  This is false.

As shown and discussed, *supra*, consumers encounter the parties' pouches in close proximity in the marketplace—including side-by-side on major retailers' websites, and on the same shelf in major retailers' stores.  To be sure, Mr. Poret conceded during his deposition that he recalls seeing Capri Sun branded-products in the juice aisle of the store with a variety of different packaging and with Capri Sun products and the ABC's Pouch in the same section. J. Mancini Decl., Exhibit 3 at 71:2-16; 72:20-24.

Accordingly, Mr. Poret needed to show CAPRI SUN-brand products in the Pouch Mark _and_ products offered in ABC's Unlicensed Pouch to survey respondents to replicate marketplace conditions; however, as Mr. Poret conceded throughout his deposition, he did not do so.  *See* J. Mancini Decl., Exhibit 3 at 35:3-36:7 (Mr. Poret describing that a *Squirt* survey is appropriate "if the parties' marks or products are judged to be sufficiently proximate in the marketplace."); *see also Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 190-91 (S.D.N.Y. 2008) (parties sold skincare products in many of the same retail stores; accordingly, proper survey format "was the line-up survey method [wherein] respondents are shown the plaintiff's trade

dress and then, after a short delay, shown a line-up of other brands, including the accused product").

As explained by Dr. Steckel in his rebuttal report of Mr. Poret's report, "the fact that ABC and Capri Sun products and brands would be seen together on the same shelf or in the same product category is key real-world contextual information the Poret Survey does not allow respondents to have." J. Mancini Decl., Exhibit 2 at ¶ 14. Dr. Steckel further goes on to explain that Mr. Poret's report fails to consider several key elements of the real-world marketplace, including: "[h]ow the at-issue ABC products and Capri Sun products are sold in physical stores and online, and the available imagery on the carton or in the photos shown in product descriptions pages online; Capri Sun's extensive marketing and advertising highlighting the CAPRI SUN Pouch Trademark; and that in the real world, consumers would have the context that the at-issue ABC products and Capri Sun products are sold on the same shelf or in the same category." *Id.* at ¶ 16.

In short, by failing to show CAPRI SUN-brand products in the Pouch Mark to respondents, Mr. Poret's *Eveready* surveys do not replicate marketplace conditions. This "diminishes the reliability and probative value of the survey[s] and correspondingly raises the risk of jury confusion and prejudice"; thus, this Court should exclude Mr. Poret's surveys, and his opinions about the surveys. *Malletier*, 525 F. Supp. 2d at 633 (*Eveready* format not appropriate where consumers encountered the parties' "marks at issue one after the other in a store or mall"); *see also THOIP*, 690 F.Supp.2d at 235-36 (*Eveready* format not appropriate in a scenario where "two skincare lines sold in many of the same outlets […]").

2.      **Mr. Poret Impermissibly Allowed Survey Respondents to View ABC's Pouch for an Indefinite Period**

Not only must a survey replicate marketplace conditions regarding the stimuli that respondents see, but also respondents must interact with the stimuli during the survey as they would in the marketplace.  *See* MCCARTHY AT § 32:171 ("[P]rior to removing the stimulus, [the interviewer should] instruct[] the respondent to look at the products, advertisements or marks at issue as they would normally when considering a purchase").

Here, both at the point of sale, and in the post-sale context, consumers have quick, impulsive interactions with the parties' products.  Yet, Mr. Poret inexplicably instructed survey respondents to "play each video as many times as you like," thereby giving respondents an indefinite period to evaluate ABC's Pouch.  J. Mancini Decl., Exhibit 1 at ¶ 101.

The survey questions also fail to put respondents in the appropriate state of mind to mimic marketplace conditions. While Mr. Poret seems to believe that his survey is indicative of actual confusion, he fails to consider that his questions impacted the respondents answers. For example, Mr. Poret never asked respondents to think about what they would do if they were entering a supermarket buying these pouches or shopping on the Internet for them. J. Mancini Decl., Exhibit 2 at ¶ 29.  Mr. Poret's failure to identify what scenario the respondents would be purchasing these pouches impacts their state of mind and therefore cannot be reliable. Dr. Steckel addresses this in his rebuttal report where he states that there is extensive research regarding behaviors and attitudes being strongly influenced by features of the research instrument. *Id*. The pouches are presented to respondents on a blank screen that rotates, which is not at all how respondents would encounter the marks in the marketplace.

Just like failing to show CAPRI SUN-brand products in the Pouch Mark to survey respondents, allowing them to view ABC's Pouch for an indefinite period before answering

survey questions fails to replicate marketplace conditions.  This renders Mr. Poret's surveys, and his opinions and testimony based thereon, irrelevant, unreliable, and prejudicial.  Accordingly, this Court should exclude them.

### 3.    Mr. Poret Does Not Adequately Address Post-Sale Conditions.

The post-sale context is "crucial" to the Court's likelihood-of-confusion analysis under the *Polaroid* factors.  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986) (evaluating the post-sale context under each *Polaroid* factor; holding that, in the post-sale context, the "striking similarity" between the parties' jeans-stitching pattern "no doubt will cause consumers to transfer the goodwill they feel for appellee to appellants, at least initially. This misuse of goodwill is at the heart of unfair competition").

Yet, throughout Mr. Poret's Report, and his surveys, he makes baseless assumptions that do not account for all possible post-sale conditions.  For example, Mr. Poret assumes that consumers will only purchase either ABC's product or Capri Sun's product – he never accounts for a situation in which a consumer would buy both products. Thus, there are situations that may exist where a consumer would have exposure to both pouches in the post-sale context.  As another example, consumers might have multiple children who have different juice preferences, consumers who are purchasing numerous products for a children's sporting event, a child's birthday party, or another event.  Once again, Mr. Poret's surveys do not account for these post-sale conditions in which individuals would have exposure to CAPRI SUN-brand products in the Pouch Mark, and products in ABC's Unlicensed Pouch.

Mr. Poret's failure to adequately address post-sale conditions in his surveys is even more glaring given that Ocean Spray's use of ABC's Unlicensed Pouch caused actual confusion in the post-sale context.  Indeed, as discussed, *supra*, <u>after</u> consumers purchased Ocean Spray's "Growing Goddess" juice-drink product in ABC's Unlicensed Pouch, consumers began

contacting Ocean Spray about whether it was affiliated with Capri Sun, and about alleged quality issues with CAPRI SUN-brand products in the Pouch Mark.

In short, by failing to address the "crucial" post-sale context, Mr. Poret's surveys, opinions, and testimony are irrelevant, unreliable, and prejudicial. Accordingly, this Court should exclude them.

### B.    THE COURT SHOULD EXCLUDE PORET'S REPORT BECAUSE IT CONSISTED OF AN IMPROPER UNIVERSE OF PARTICIPANTS

A survey should be excluded when the universe selected is inappropriate. *See* MCCARTHY § 32:159 ("But if the universe selected is significantly skewed away from the proper group of people whose perception is at issue, it may be excluded from evidence altogether."). Additionally, "even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." *Id*; *see also Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 179 (S.D.N.Y. 2012) (finding that incorrect universe of respondents lead to irrelevant results that were inadmissible).

That is precisely the case, here, as Mr. Poret improperly: (i) included past purchasers in his universe of survey respondents; (ii) limited the pool of future purchasers to those likely to purchase fruit juice only in a pouch; and (iii) excluded retailers and children.

### 1.    Mr. Poret Included Past Purchasers of Juice Drinks in His Pool of Respondents

"It is well-established that only potential future purchasers, not past purchasers, are relevant to a confusion study." *Malletier*, 525 F. Supp. 2d at 604. This is because past purchasers are likely to be more familiar with the parties' pouches than prospective purchasers would be. And if respondents are familiar with particular brands, then they may have skewed the results of the survey because they came in with improper knowledge. Yet, Mr. Poret included past purchasers of juice in pouches in his pool of survey respondents.

### 2. Regarding Future Purchasers, Mr. Poret Limited His Pool of Respondents to Those Likely to Purchase Fruit Juice Only in a Pouch

"To be probative and meaningful, a survey must rely upon responses from all potential consumers of the product in question." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999),

In Mr. Poret's survey, he states he "constructed a sampling plan in order to represent the demographics of relevant customers – *i.e.* consumers of fruit juice pouches and/or juice-based fruit-flavored pouches." J. Mancini Decl., Exhibit 1 at ¶ 37. Yet, Mr. Poret gives no evidence or reasoning to demonstrate why limiting the target population in such a drastic way was appropriate. J. Mancini Decl., Exhibit 2 at ¶ 34. This sampling plan improperly excludes a large portion of the relevant consumer pool: *i.e.*, consumers that set out to purchase juice drinks in general and without a pre-determined notion about whether to purchase juice drinks in a pouch or in some other type of receptacle. Such a narrow target population also demonstrates Mr. Poret's fundamental misunderstanding of the marketplace and competitive conditions.

When consumers are shopping online for juice drinks, the relevant category they would click on to browse these options would be "juice drinks." Once the consumer arrives on the "juice drinks" page, they will be presented with multiple options for single-serve juice drinks that appear in a variety of receptacles. Similarly, when consumers enter brick-and-mortar stores in search of single-serve juice drinks, they walk down the aisle that contains juice drinks. This means they are presented with various options for juice drinks, also in a myriad of receptacles that are not only limited to pouches. Unlike consumers who allegedly know they want to purchase fruit juice only in a pouch, these packaging-agnostic consumers lacks preconceived notions regarding what brands of juice products are offered in specific packaging formats. As Dr.

Steckel states, "[b]y limiting the target population to pouch consumers, the Poret Survey is likely under-inclusive of relevant consumers in a way that may bias the results in favor of ABC." *Id.*

### 3.     Mr. Poret Excluded Retailers and Children From His Pool of Respondents

Mr. Poret also excluded two major categories of  prospective purchasers: retailers and children.  Retailers are a proper category of consumers to include in the survey because they make the decisions about what products to stock. ABC itself considers retailers to be within the relevant universe of purchasers of fruit juice. *See* J. Mancini Decl., Exhibit 5 at 19:12-19 (identifying "private label customers" as "Kroger, Publix, Wal-Mart, Trader Joe's, Aldi, Wegman's and Topco."); 51:2-7 (identifying Poppilu as a customer); J. Mancini Decl., Exhibit 6 at 50:3-6 ("I know the Refreshing brand that you're calling "brand" is sold to a customer called Hyvee and others"); 55:18-21 ("Hyvee was a customer of this Refreshing product, correct? That's correct.").

Additionally, children are the biggest group of consumers for single-serve juice products and Mr. Poret did not include them in his sampling pool.  Children are proper candidates for the sampling pool because they are most likely the ones requesting certain beverages and maybe even brands.  Similarly, children may be confused by CAPRI SUN-brand products in the Pouch Mark and products in ABC's Unlicensed Pouch when reaching into the cooler at a soccer game or when receiving a juice pouch at a birthday party.  Mr. Poret also agreed during his deposition that children are listed as consumers under ABC marketing PowerPoint. *See* J. Mancini Decl., Exhibit 3 at 86:17-87:11. Children are therefore relevant and necessary consumers that should have been included in Mr. Poret's survey.

At bottom, without a proper universe of respondents, Mr. Poret's surveys are irrelevant, unreliable, and prejudicial. Accordingly, this Court should exclude them, as well as his opinions and testimony based on the faulty surveys.

### C.    THE COURT SHOULD EXCLUDE PORET'S SURVEYS BECAUSE THEY INCLUDED IMPROPER STIMULI

When evaluating the stimuli used in a survey, courts have held that "[a] survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions. A survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone." *Malletier*, 525 F. Supp. 2d at 591 (quoting *Conopco, Inc*., 49 F. Supp. 2d at 253 ("To have substantial probative value, a survey, in addition to testing the proper universe, must also be designed to examine the impression presented to the consumer by the accused product. Therefore, a survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions")); *see also Kargo Global, Inc. v. Advance Mag. Publishers, Inc*., 2007 WL 2258688, at *10 (S.D.N.Y. Aug. 6, 2007) ("To be probative of actual confusions, a survey must use stimuli that approximate what a potential customer would encounter in making purchasing decisions. A survey that uses stimuli that differ from what a consumer is actually like to see in the marketplace does not accurately test for actual consumer confusion and thus lacks probative value.") (internal citations and quotation omitted); *Saxon Glass Techs., Inc. v. Apple Inc*., 393 F. Supp. 3d 270, 289 (W.D.N.Y. 2019) (excluding expert report for numerous flaws including utilizing an improper stimulus that was not representative of the proper stimulus that would accurately replicate marketplace conditions), *aff'd*, 824 F. App'x 75 (2d Cir. 2020).

Mr. Poret incorrectly chose the test pouches and improperly presented the test pouches used in his survey. Mr. Poret chose a Wild Harvest juice pouch, a Hyvee Coolers juice pouch,

and a Juicy Juice juice pouch for the Test Group pouches because they allegedly were representative of the larger set of ABC products. J. Mancini Decl., Exhibit 1 at ¶¶ 80; 82; 83. However, Mr. Poret presents no evidence that these pouches are representative of all the at-issue ABC brands. J. Mancini Decl., Exhibit 2 at ¶ 25 (Dr. Steckel explains that Mr. Poret provides "no independent evidence that these products or the particular packages/flavors selected are representative of all at-issue ABC products…").  While he states that he is able to draw reasonable conclusions from these pouches against the full set of products, Mr. Poret gives no evidence to support this. J. Mancini Decl., Exhibit 1 at ¶ 84. Dr. Steckel also points out this issue by identifying that Mr. Poret's failure to delineate or provide systematic back up for his selection process is a major flaw in his survey. J. Mancini Decl., Exhibit 2 at ¶ 27. Nor does he even list out the full list of the many at-issue products that the three pouches are representative of. Further, Mr. Poret never identifies how he believes the survey results might have been changed if the Test Pouches selected were different. For these reasons, Mr. Poret's survey and opinions should be excluded.

### D.    THE COURT SHOULD EXCLUDE PORET'S SURVEYS BECAUSE THEY INCLUDED IMPROPER QUESTIONS

Courts have found surveys to be "badly flawed" where it posed unfair and leading questions to respondents. *Universal City Studio, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984).

Here, Mr. Poret's line of questioning for the respondents contained numerous flaws. First, there was a focus on "pouches" throughout the line of questioning, especially in the initial screening questions. For example, Q150 asked the respondents to select from the following categories (including pouches, bottles, cans, or none of these) which of these were they likely to purchase fruit juice or juice-based fruit-flavored drinks in within the next 6 months. J. Mancini

Decl., Exhibit 4 at  4. This question is flawed because it fails to contain the option of "boxes." J. Mancini Decl., Exhibit 2 at ¶ 36. This further shows that Mr. Poret lacks an understanding of the product category and the market in general. *Id*. Also, respondents were only able to move forward in the survey if they selected "pouches" as one of their answers. Then, in Q180, only one question after Q150, respondents were informed that they had "qualified" to take the survey. *Id*. at 5.  This line of questioning indicates that respondents had clearly "passed" the screener questions by selecting pouches. Upon seeing the Test and Control images, this belief that they had passed would only be confirmed. These type of leading questions can allow for respondents to understand the purpose of the survey, which in turn negates the purpose of the survey. Further, Mr. Poret failed to insert a "red herring," *i.e.*: "answer options that are not legitimate options […] [which are] very effective in identifying 'bad' survey takers who may provide unreliable data." J. Mancini Decl., Exhibit 2 at  ¶ 43.

Likewise, the questions presented to the respondents were unclear, imprecise, and biased. For example, Q240 asks respondents "[d]o you think the company or brand that makes or puts out the product we just showed you also makes or puts out any other products that you are aware of?" Respondents were then able to answer "yes," "no," or "I don't know."  J. Mancini Decl., Exhibit 2 at fn 87.  This question states "other products" without clarifying what products Mr. Poret is looking for. Without clarification, respondents could have been confused by the phrasing and not fully understood that Mr. Poret was actually asking if respondents believed the company or brand made other juice pouch products. Additionally, Q250 was a question that elicited open ended responses from the respondents stemming from Q240. The answers to this question demonstrate that respondents misunderstood the phrasing of Q240. Some answers to this question included "coffee," "pizza," "eggs," "black beans," and other various categories of

food.  Based on these answers, it is clear that respondents interpreted "other products" to mean other product categories. Dr. Steckel believes that this is most likely a result of the screening questions and stimuli being focused on the concept of container types and pouches specifically. J. Mancini Decl., Exhibit 2 at ¶ 50, 51. This may "nudge" respondents to respond with other product categories as opposed to other brands. *Id*. This type of questioning that confuses the respondent and doesn't clearly lay out the question is deemed improper and should be excluded. Further, the combination of these flaws in the survey bias respondents responses in favor of ABC and drive down the net rate of confusion in the results. *Id*. at ¶ 51.

### E.    THE COURT SHOULD EXCLUDE PORET'S SURVEYS BECAUSE HE FAILED TO CONDUCT A PILOT/PRE-TEST

"It is standard practice for the survey expert to conduct a pre-test or pilot test of a proposed survey in order to evaluate the clarity and usefulness of the survey method, structure and questions."  MCCARTHY at § 32:163.50.  A pre-test/pilot test allows for the survey expert to unearth problems with the survey questions and gives them the opportunity to refine the survey before administering the actual survey.  Further, a pre-test/pilot test also identifies issues where respondents can discern the purpose of the survey.  It also "allows for a way to reduce demand artifacts and inoculate against ambiguities and unclear questions." J. Mancini Decl., Exhibit 2 at ¶ 53. Without a pre-test/pilot test, there is no way to be certain that respondents weren't nudged in a certain direction based on the format and presentation of the questions. *Id.* at ¶ 46, 58. There is also no way to identify other potential flaws that may exist in the survey without conducting a pre-test/pilot test.  Accordingly, "[t]he final survey is [] changed and questions re-worded as a result of feedback from the pilot test."  MCCARTHY at § 32:163.50.

Despite this standard practice, Mr. Poret did not conduct a pre-test or pilot of any of his surveys.  Mr. Poret had no reason to go against standard practice and fail to conduct a pre-test or

pilot test.  There are numerous academic resources that support the idea that failing to conduct a pre-test or pilot is always recommended and that surveys should not even be conducted if no such pre-test or pilot is conducted. *See discussion* at J. Mancini Decl., Exhibit 2,¶¶ 54, 55. Before the actual survey was administered, Mr. Poret had ample time to conduct a pre-test or pilot test. *See* J. Mancini Decl., Exhibit 3 at  39:17-19; 280:07-281:11.

In short, because Mr. Poret went against industry standards by failing to conduct a pre-test/pilot test that would have revealed the numerous problems with his survey, the survey and Mr. Poret's expert opinions should be excluded.

## V.    CONCLUSION

For all of the foregoing reasons, Capri Sun respectfully requests that the Court exclude Mr. Poret's surveys and opinions under *Daubert*, as well as Fed. R. Evid. 403 and 702.

Dated: June 2, 2021
     New York, New York                    Respectfully submitted,

                                          A. John P. Mancini
                                          Jonathan W. Thomas
                                          Margaret Wheeler-Frothingham
                                          MAYER BROWN LLP
                                          1221 Avenue of the Americas
                                          New York, New York 10020-1001
                                          Tel.: (212) 506-2500
                                          Fax: (212) 262-1910
                                          Email: JMancini@mayerbrown.com
                                          Email: JWThomas@mayerbrown.com
                                          Email: MWFrothingham@mayerbrown.com

                                          *Attorneys for Plaintiff Capri Sun Gmb*

24