**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CAPRI SUN GMBH,

               Plaintiff,

v.

AMERICAN BEVERAGE CORPORATION,

               Defendant.

Case No. 1:19-cv-01422 (PAE)

**MEMORANDUM OF LAW IN SUPPORT OF**
**CAPRI SUN GMBH'S MOTION TO EXCLUDE**
**<u>OPINIONS OF ERICH JOACHIMSTHALER</u>**

**MAYER BROWN LLP**
A. John P. Mancini
Jonathan W. Thomas
Margaret Wheeler-Frothingham
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Plaintiff*
*Capri Sun GmbH*

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ........................................................................... 1

II. LEGAL STANDARD ....................................................................................... 2

III. ARGUMENT .................................................................................................... 4

    A.  THE COURT MUST EXERCISE ITS ROLE AS GATEKEEPER AND PRECLUDE MR. JOACHIMSTHALER'S INADMISSIBLE TESTIMONY ........................................................................................... 5

        1.  Mr. Joachimsthaler Fundamentally Misstates the Proper Analytical Framework ............................................................................ 5

        2.  The Report is Comprised of a Number of Impermissible and/or Unsupported Opinions ................................................................. 9

    B.  MR. JOACHIMSTHALER'S OPINIONS ARE UNSUPPORTED AND SPECULATIVE .......................................................................................... 9

        1.  Mr. Joachimsthaler Failed to Provide a Reasonable Basis or Calculation for His Statements Regarding Capri Sun's Sales ................. 10

        2.  Mr. Joachimsthaler Cannot Credibly Opine on the Framework or Model that Dr. Steckel Should Have Employed ..................................... 11

        3.  Mr. Joachimsthaler's Deposition Testimony Contradicts his Written Testimony, Underscoring its Unreliability ................................. 13

    C.  MR. JOACHIMSTHALER PROFFERS IMPERMISSIBLE LEGAL CONCLUSIONS, WHICH MUST BE EXCLUDED ......................................... 15

IV. CONCLUSION ............................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Co. v. Performance Supply, LLC*,
  458 F. Supp. 3d 181 (S.D.N.Y. 2020)....................................................................16

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...................................................................................3

*Beastie Boys v. Monster Energy Co.*,
  983 F. Supp. 2d 354 (S.D.N.Y. 2014).....................................................................9

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
  2020 WL 1673687 (S.D.N.Y. Apr. 6, 2020), *aff'd*, 839 F. App'x. 545 (Fed.
  Cir. 2021) .............................................................................................................8, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..................................................................................... *passim*

*E.E.O.C. v. Bloomberg L.P.*,
  2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010)........................................................5

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  75 F. Supp. 2d 235 (S.D.N.Y. 1999), *aff'd*, 314 F.3d 48 (2d Cir. 2002) ..................5

*Foley v. United States*,
  294 F. Supp. 3d 83 (W.D.N.Y. 2018) ...................................................................18

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...............................................................................................11

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999)....................................................................................3

*Houser v. Norfolk S. Ry. Co.*,
  264 F. Supp. 3d 470 (W.D.N.Y. 2017) .................................................................17

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).................................................................................................2

*Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*,
  2009 WL 969930 (S.D.N.Y. Apr. 6, 2009)....................................................2, 3, 4

*Major League Baseball Props., Inc. v. Salvino Inc.*,
  542 F.3d 290 (2d Cir. 2008)................................................................................2, 3

*Ortega v. Burgos*,
  2014 WL 2124957 (E.D.N.Y. May 22, 2014) .......................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Price v. L'Oreal USA, I*nc.,
2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)....................................................8, 10

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004).........................................................16

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016).................................................................17

*Snyder v. Wells Fargo Bank, N.A.*,
2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ........................................9, 15

*Somera Cap. Mgmt., LLC v. Somera Rd., Inc.*,
2020 WL 2506352 (S.D.N.Y. May 15, 2020) .........................................12

*Tchatat v. City of New York*,
315 F.R.D. 441 (S.D.N.Y. 2016) .................................................................9

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992)........................................................................................7

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994)..............................................................................16

**Statutes**

15 U.S.C. § 1052(e) .............................................................................................5

15 U.S.C. § 1065 .................................................................................................16

15 U.S.C. § 1115(b) ..............................................................................................5

15 U.S.C. § 1125(c)(2)(a) .....................................................................................6

**Other Authorities**

1 McCarthy on Trademarks and Unfair Competition § 8:8.50....................................7

4 McCarthy on Trademarks and Unfair Competition § 24:106....................................6

COMPETITION § 24:106 ........................................................................................6

Fed. R. Evid. 702 ....................................................................................2, 4, 9

No. 51, Functionality Order ..................................................................................16

## I.    PRELIMINARY STATEMENT

The opinion and testimony of Defendant American Beverage Corporation's ("**ABC**") putative expert, Mr. Erich Joachimsthaler, is rife with unreliable, *ipse dixit* assertions that would confuse the trier of fact in this case. Accordingly, Plaintiff Capri Sun GmbH ("**Capri Sun**") brings this *Daubert* motion to exclude Mr. Joachimsthaler's opinion and testimony.

ABC proffers Mr. Joachimsthaler as a putative marketing and branding expert to rebut the opinions offered by Capri Sun's expert witness, Joel Steckel, Ph.D., regarding the fame and continuing acquired distinctiveness of Capri Sun's iconic, stand-up juice pouch, for which Capri Sun owns a federally registered, incontestable trademark, namely: 1,418,517 (the "'**517 Registration**" and the "**Pouch Mark**").

The thrust of Mr. Joachimsthaler's opinion is that Dr. Steckel failed to provide sufficient evidence supporting his conclusions and to conduct the required scientific analysis and inquiry to establish that the Pouch Mark is likely famous and/or has maintained its acquired secondary meaning, which Capri Sun first established in 1986 when prosecuting what matured into the '517 Registration. But is it Mr. Joachimsthaler's opinions, *not* Dr. Steckel's opinions, that are unreliable, unsupported, conclusory, and fall woefully short under *Daubert*.

Mr. Joachimsthaler bases his criticisms on assumptions that he is unable to support with either record evidence or with an explanation of any reliable, acceptable methodology. For example, Mr. Joachimsthaler bases some of his criticisms on premises flatly contradicted by the very record evidence he cites. During his deposition, he also could not articulate any framework through which he performed his analysis. In fact, in some cases, he admits he did no analysis at all, but just took issue with Dr. Steckel's analysis. What is more, Mr. Joachimsthaler states bald legal conclusions, which are inappropriate for expert testimony.

Based on the foregoing, Mr. Joachimsthaler's speculative, unsupported testimony—which does not follow expert methodology or apply scientific or analytical principles, and which rests on improper legal conclusions— is inadmissible under Fed. R. Evid. 702 and, thus, this Court must exclude it under *Daubert*.

## II.    LEGAL STANDARD

"Under *Daubert*, the district court functions as the gatekeeper for expert testimony." *Major League Baseball Props., Inc. v. Salvino Inc*., 542 F.3d 290, 311 (2d Cir. 2008) (referencing *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993)). This gatekeeping role "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks omitted).

As the gatekeeper, the Court must ensure that the proffered testimony satisfies Rule 702 of the FEDERAL RULES OF EVIDENCE,, which provides, *in toto*:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702

To perform this gatekeeping role, the Court must ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*, 2009 WL 969930, at *1 (S.D.N.Y. Apr. 6, 2009) (citing *Kumho Tire Co*., 526 U.S. at 152).  This requires the Court to  "examine the

expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)); *see also Daubert*, 509 U.S. at 592–93 (requiring the district court to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue").

For example, the Court must not admit testimony when, as here, an expert's opinion "is based on data, a methodology, or studies that are simply *inadequate to support the conclusions* reached." *Amorgianos*, 303 F.3d at 266 (emphasis added).  In fact, the Court in *Lucky Brand Dungarees, Inc*. excluded portions of Mr. Joachimsthaler's report in that case based on the "insufficientialy validated nature of [his] study methodology." 2009 WL 969930 at *2.

As another example, the Court must not admit – or even consider at summary judgment – the expert's opinion if it lacks a "factual basis [or is] based on speculation or conjecture." *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are [] inappropriate material for consideration on a motion for summary judgment;" "The admission of expert testimony based on speculative assumptions is an abuse of discretion.") (internal quotation marks omitted).

In ruling on the admissibility of expert testimony, the "Court's task 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*, 2009 WL

969930, at *1 (S.D.N.Y. Apr. 6, 2009) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Court's gatekeeping role also requires it to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. 597; *see also* FED. R. EVID. 702 (An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue.); *Daubert*, 509 U.S. at 591.

Finally, while the Court is the "gatekeeper" under *Daubert*, it is "[t]he proponent of an expert's testimony [who] bears the burden of establishing its admissibility by a preponderance of the evidence." *Lucky Brand Dungarees, Inc*., 2009 WL 969930 at *1.

## III.    ARGUMENT

ABC cannot carry its burden of establishing the admissibility of Mr. Joachimsthaler's opinions and testimony under Fed. R. Evid. 702 for at least three reasons:

*First*, Mr. Joachimsthaler misstates the proper analytical framework, as he conflates the non-legal concept of "brand equity" with the well-settled trademark concepts of fame and secondary meaning.

*Second*, Mr. Joachimsthaler proffers a host of unsupported and speculative opinions, including, for example, his opinions about sales of CAPRI SUN-brand products in the Pouch Mark.  In fact, the undisputed evidence flatly contradicts his opinion about such sales.

*Third*, Mr. Joachimsthaler proffers improper legal conclusions, including, for example, that the United States Patent and Trademark Office (the "PTO") did not determine whether the Pouch Mark was distinctive of CAPRI SUN-brand products when issuing the '517 Registration, as well as that the '517 Registration does not establish the Pouch Mark's distinctiveness.  What is more, Mr. Joachimsthaler's improper legal opinions reinforce his unfamiliarity with trademark law in general.  Indeed, it is black-letter law that the PTO only registers marks if they are

4

distinctive. *See* 15 U.S.C. § 1052(e) ("[N]othing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce"). It also is black-letter law that a mark is conclusively distinctive as a matter of law if it is the subject of an incontestable federal trademark registration. *See* 15 U.S.C. § 1115(b).

For these reasons, and those discussed, *infra*, this Court should exclude Mr. Joachimsthaler's opinions and testimony under *Daubert*.

### A.    THE COURT MUST EXERCISE ITS ROLE AS GATEKEEPER AND PRECLUDE MR. JOACHIMSTHALER'S INADMISSIBLE TESTIMONY

#### 1.    Mr. Joachimsthaler Fundamentally Misstates the Proper Analytical Framework

ABC did not retain Mr. Joachimsthaler to opine on the strength of the Capri Sun brand or the Pouch Mark's strong ability to identify CAPRI SUN-brand products in the marketplace. Instead, after receiving Dr. Steckel's expert report, ABC tasked Mr. Joachimsthaler with rebutting Dr. Steckel's assessment of the evidence in this case as it relates to two constructs of trademark law: fame and secondary meaning.

Mr. Joachimsthaler purports to critique Dr. Steckel's analysis as failing to account for factors he should have considered in determining whether the Pouch Mark has obtained secondary meaning and fame. Leaving aside, for a moment, that Capri Sun established the Pouch Mark's secondary meaning 35 years ago when prosecuting what matured into the '517 Registration, Mr. Joachimsthaler demonstrates, through his written testimony and confirmed in his deposition, his lack of familiarity—let alone any expertise—with these constructs of trademark law. As such, Mr. Joachimsthaler's opinion would be of zero assistance to the trier of fact in this case. *See e.g., E.E.O.C. v. Bloomberg L.P.,* 2010 WL 3466370, at *17 (S.D.N.Y. Aug. 31, 2010) (finding expert testimony inadmissible where expert's "methodology" was flawed and "will not assist the trier of fact"); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F.

Supp. 2d 235, 239 (S.D.N.Y. 1999) (excluding expert testimony where it "would not assist the jury" and in fact, "would only confuse and distract the jury"), *aff'd*, 314 F.3d 48 (2d Cir. 2002).

Throughout his critique, rather than reference the accepted framework used to assess fame and secondary meaning in the trademark context, Mr. Joachimsthaler broadly applies a marketing standard he refers to as "brand equity."  According to Mr. Joachimsthaler, brand equity is "a well-known and proven process of analyzing the strength of a brand, or evaluating its state or health."  *See* Jan. 19, 2021, Expert Rebuttal Report of Mr. Joachimsthaler ("Joachimsthaler Report") (Declaration of A. John P. Mancini ("Mancini Declaration") Ex. 1) ¶¶ 33; 35(iv); 70-71. But this broad marketing industry standard is not the appropriate framework under which to analyze secondary meaning or fame for legal purposes, let alone the *only* framework for doing so.

The applicable standards governing these concepts are not the same as Mr. Joachimsthaler's vague articulation of "brand equity."  Each is governed by its own distinct standard, which Mr. Joachimsthaler did not apply – and with which he is apparently unfamiliar.

Under the Trademark Dilution Revision Act of 2006, fame of a trademark is established when the mark is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(a). The factors to determine whether a mark qualifies as fame are: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered under the Act. *See id*.; *see also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:106, Federal factors relevant to whether a mark is "famous" (5th ed.).  Dr. Steckel evaluated the

record evidence in light of these factors when reaching his opinion that the Pouch Mark is likely famous. *See, e.g.,* December 21, 2020, Expert Report of Dr. Joel Steckel ("Steckel Report") (Mancini Declaration Ex. 2) ¶¶ 19; 20.

Secondary meaning (also referred to as "acquired distinctiveness") exists when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 766 n. 4, 769 (1992); *accord* 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION at § 8:8.50, Proving secondary meaning for trade dress (5th ed.). Dr. Steckel evaluated the record evidence in light of this test when reaching his opinion that the Pouch Mark's secondary meaning has increased since Capri Sun first established it in 1986. *See, e.g.*, Steckel Report ¶16.

But despite the fact that the distinct legal standards governing each of these two concepts is distinct from "brand equity" as Mr. Joachimsthaler described it, throughout his written and deposition testimony, he—unlike Dr. Steckel—did not follow an accepted framework. On the contrary, Mr. Joachimsthaler conflated the concept of brand equity with the concepts of secondary meaning and fame. *See, e.g*., February 8, 2021, Deposition Transcript of Erich Joachimsthaler ("Joachimsthaler Dep. T.") (Mancini Declaration Ex. 3) at 22:13-23; 21:24-26:04; Joachimsthaler Report ¶¶ 33; 71. Specifically, during his deposition, he testified that he uses the term "brand equity" interchangeably with "secondary meaning," and that he prefers to speak to "brand equity" because "secondary meaning" is a legal term. Joachimsthaler Dep. T. at 22:13-22 ("For me, a secondary meaning is when basically if the – the way I translate into the brand world, the brand has strength and that's what – brand equity. That's what I speak in my world, an expert on branding. So that's what secondary meaning is. That identifies the source of

the brand – can be identified as a source."); *id.* at 25:21-26:04 ("Q: Do you use those terms interchangeably, brand equity and secondary meaning?" A: Yes, I do. For me, I prefer to speak to brand equity because that's what I do in my ordinary course of business. The secondary meaning is a legal definition."); *id.* at 58:20-24 (testifying that "the equity of the brand" is "what is in the law called secondary meaning and fame").

Not to put too fine of a point on it, but the concept of "brand equity" does not apply to the analysis of secondary meaning or fame in the relevant trademark context. Mr. Joachimsthaler's conflation and misstatement of the applicable standards for secondary meaning and fame—which, again, Dr. Steckel appropriately relied upon in forming his opinions (*see* Steckel Report ¶¶ 19; 16; 22)—renders Mr. Joachimsthaler's putative "expert" opinion inadmissible. While it is possible that Mr. Joachimsthaler may have identified other additional, potentially acceptable frameworks for analyzing contexts related to fame and secondary meaning, he has not closed the gap to show that Dr. Steckel's applied framework is not among those accepted.[1] And while "[t]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.'" *See Price v. L'Oreal USA, I*nc., 2020 WL 4937464, at *7 (S.D.N.Y. Aug. 24, 2020); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 2020 WL 1673687, at *4 (S.D.N.Y. Apr. 6, 2020) (excluding expert testimony where expert "failed to bridge the 'analytical gap' between the evidence and his opinion"), *aff'd,* 839 F. App'x. 545 (Fed. Cir. 2021).

---

[1] Indeed, as discussed *infra* Section B(3), when Mr. Joachimsthaler later enumerated factors he would use to assess the fame of Coca-Cola, that list included many of the very same factors that Dr. Steckel considered.

Moreover, this is not the first time that Mr. Joachimsthaler has offered testimony that is inadmissible testimony due to his misstatement of the relevant framework for trademark analysis. In *Beastie Boys v. Monster Energy Co.*, the court excluded Joachimsthaler's expert testimony where Mr. Joachimsthaler conflated the "concept of 'likelihood of association' with the Lanham Act liability standard of 'likelihood of confusion,'" which "could be mistakenly understood as reformulating the liability standard." *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364 (S.D.N.Y. 2014). As the court did in that case, it should exclude his opinion here.

### 2. The Report is Comprised of a Number of Impermissible and/or Unsupported Opinions

Where, as here, an expert report is comprised of a number of impermissible and/or unsupported opinions, the report should be excluded as a whole. *See Bobcar Media, LLC,* 2020 WL 1673687 at *4 (excluding an expert report "in its entirety" where the report is "pervaded with impermissible legal conclusions" and the expert's opinions "are not based on any evident reliable methodology"); *Snyder v. Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (excluding an expert report in full where it "is so ridden with improper statements and opinions").

### B. MR. JOACHIMSTHALER'S OPINIONS ARE UNSUPPORTED AND SPECULATIVE

"Rule 702 requires that expert testimony rest on knowledge that is more than 'subjective belief or unsupported speculation.'" *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) (quoting *Atl. Specialty Ins. v. AE Outfitters Retail Co*., 970 F. Supp. 2d 278, 291 (S.D.N.Y. 2013)). But Mr. Joachimsthaler's report and testimony are riddled with opinions that rest on nothing more than speculation or his own subjective beliefs. These opinions must be excluded.

### 1.    Mr. Joachimsthaler Failed to Provide a Reasonable Basis or Calculation for His Statements Regarding Capri Sun's Sales

As a centerpoint of his report, Mr. Joachimsthaler criticizes Dr. Steckel's expert opinion that Capri Sun has category-leading sales, asserting that Dr. Steckel "misle[]d the reader" by using "highly inflated numbers relating to Capri Sun's U.S. Sales." *See* Joachimsthaler Report ¶ 81(a). Specifically, Mr. Joachimsthaler opines—without any authority to support his conclusion—that "yearly sales of the brand are approximately between $21 million and $34 million." *Id.*

There is no support for this statement. In fact, it is flatly controverted by the very evidence Mr. Joachimsthaler cites in its favor. At his deposition, when presented with the sales figures reflected in the document Dr. Steckel relied on—which showed Capri Sun's total annual sales at $613 million—Mr. Joachimsthaler conceded that the figures in the document did not reconcile with his own numbers. *See* Joachimsthaler Dep. T. 141:4-21.  Nor could he offer any methodological support for the numbers he reached or identify a source he relied upon to reach them. *Id.* (stating that "I did not analyze it, as I said, in any depth.").  When asked how he came up with "his numbers", he explained that he could not give an answer with analyzing the underlying data. *Id.* But it turns out that Mr. Joachimsthaler had not even taken those analytical steps himself: When pressed, he conceded that he had not performed his own assessment or investigation of the sales figures; rather, he just criticized the figures cited in Dr. Steckel's report without any investigation or further developing his own analysis. *See* Joachimsthaler Dep. T. 132:14-21. This is not sufficient explanation to show a "reliable foundation" for his criticism. *See Price v. L'Oreal USA, Inc.*, 2020 WL 4937464, at *7 (S.D.N.Y. Aug. 24, 2020) (citing *Amorgianos*, 303 F.3d at 265).

Mr. Joachimsthaler's criticisms regarding the assessment of "category leader" are unfounded, and entirely unreliable. It is well established that *ipse dixit* testimony is not admissible, especially where the expert's opinion is speculative and where he did not examine the relevant facts himself. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). That is the very sort of testimony Mr. Joachimsthaler offers here, and it should not be allowed.

### 2.    Mr. Joachimsthaler Cannot Credibly Opine on the Framework or Model that Dr. Steckel Should Have Employed

In an attempt to undermine Dr. Steckel's credibility, Mr. Joachimsthaler frames Dr. Steckel's opinions as offered "without applying a scientific framework or any model used by marketing professionals or scientists to guide his conclusions." *See* Joachimsthaler Report ¶¶ 56; 76-80. But this framing is wholly unsupported and, in fact, is contradicted by Mr. Joachimsthaler's own testimony. Mr. Joachimsthaler's opinions that Dr. Steckel should have done something different or something more in his analysis is not enough. Any layperson can opine that the other guy "did it wrong."

Mr. Joachimsthaler fails to support these criticisms with any reason why Dr. Steckel's approach was inappropriate or unsupported. All Mr. Joachimsthaler is able to show is that in some instances, other accepted methods for performing the relevant analysis exist and are used within the marketing industry. *See, e.g.*, Joachimsthaler Dep. T. 62:22-63:06 (testifying that he "customarily works" with Keller's brand planning model, but that he also "work[s] with other models"); Joachimsthaler Dep. T. 63:05-21 (stating that the frameworks referenced in his report are "not the only accepted models" in the industry); Joachimsthaler Report ¶ 34 (opining that there are a number of "established frameworks and models" used to assess the strength of a

brand); ¶ 49 (noting that there are "three major" "dominant frameworks in the field"). But he cited no support for his bald assertion that Dr. Steckel's methods are not generally accepted or are unreliable.

It is unclear how Mr. Joachimsthaler is even qualified to opine on what he appears to believe to be the exclusive method to analyze fame and secondary meaning. As noted *supra*, Mr. Joachimsthaler himself misstated and conflated two separate applicable trademark standards with a single industry standard that does not squarely align with either. And Mr. Joachimsthaler is apparently not currently familiar with the framework set forth in the leading authority on issues in trademark law: McCarthy on Trademarks. When asked whether he was familiar with McCarthy's framework for fame, Mr. Joachimsthaler testified that McCarthy's is an "older framework from the nineties or something." Joachimsthaler Dep. T. at 65:03-09. He went on to state that he does not know how often the treatise is updated. *Id.* at 65:03-09; 108:14-109:09. But this is not so. It is well-established (including by recent rulings of this very court) that, in the context of trademark law and analysis, McCarthy's treatise is the leading authority. *See, e.g., Ortega v. Burgos,* 2014 WL 2124957, at *1 (E.D.N.Y. May 22, 2014) (referring to McCarthy on Trademarks and Unfair Competition as "the leading treatise on trademark law"); *Somera Cap. Mgmt., LLC v. Somera Rd., Inc.*, 2020 WL 2506352, at *6 (S.D.N.Y. May 15, 2020) (same).

And, as he himself conceded, Mr. Joachimsthaler performed no independent investigation or analysis of the materials provided – other than to point fingers at how Dr. Steckel performed his own analysis. For example, Mr. Joachimsthaler took issue with Dr. Steckel's conclusion that Capri Sun is the category leader, in part arguing that the conclusion was incorrect because Dr. Steckel failed to define the category in which Capri Sun competes. *See* Joachimsthaler Report ¶¶ 41(i); 44-46. But when asked how Mr. Joachimsthaler would define the category for the Pouch

Mark, however, he explained that he could not offer a definition because he "was not asked to analyze the categories." Joachimsthaler Dep Tr. at 85:22-86:07. Without having analyzed the category for the Pouch Mark himself, Mr. Joachimsthaler could not reliably conclude that Dr. Steckel improperly defined it. *See* Joachimsthaler Dep Tr. at 76:18-10 (criticizing Dr. Steckel for "innappriate[ly] using "many definitions of the market," despite the fact that he could not define the market because he "was not asked to define it").

Further, the fact that Dr. Steckel did not use Joachimsthaler's preferred methodology in his assessment of fame and secondary meaning does not render Dr. Steckel's opinion unreliable. As Mr. Joachimsthaler himself testified, there are a number of different methodologies that experts in the field use to assess the strength of a brand. *See* Joachimsthaler Dep. T. at 78:07-20 ("There are many different methodologies. And I'm perfectly happy with any kind of methodology that is accepted from a scientific perspective or that is part of our professional practice over the last 20 or 30 years. I pretty much am familiar with them. We use a lot of combinations in my work on a daily basis"); 63:18-21 ("Q: Would you say these are the only accepted models? A: No. They're not the only accepted models"). He explained that he "customarily" works with Keller's brand planning model, but that he also "work[s] with other models"—including Diamond, Swann, and McCarthy. *Id*. at 62:22-63:14; 105:24-110:06.

### 3.    Mr. Joachimsthaler's Deposition Testimony Contradicts his Written Testimony, Underscoring its Unreliability

Throughout his report, Mr. Joachimsthaler criticizes Dr. Steckel for relying on four main factors to assess the fame and secondary meaning of the Pouch Mark: market leadership, brand awareness, advertising, and media coverage. Mr. Joachimsthaler opines that Dr. Steckel should have considered other factors in his analysis, and that his failure to do so makes his report "fundamentally unreliable and invalid." *See* Expert Report of Joachimsthaler ¶¶ 31-32; 36. But

Mr. Joachimsthaler is unable to back up that assertion with any conclusive authority; and his own testimony indicates that these factors are, in fact, appropriately considered in the analysis.

At deposition, Mr. Joachimsthaler testified that there are a host of factors, any number of which an expert may consider when assessing secondary meaning or fame. In describing those factors, he admitted that, had he done the analysis himself (he did not) he would have used the same factors that Dr. Steckel considered. *See, e.g.*, Joachimsthaler Dep. T. at 55:12-19 ("Q: Now, is it fair to say these are not the factors you would use? A: No. I would use them too. These are some of the factors that go into an analysis of the strengths of a brand"); *see also id*. at 26:17-29:05 (explaining that one of the many factors he would consider is "the awareness of a brand and the knowledge of a brand in [a] consumers' mind"); *id*. at 56:12-15 (explaining that there are so many factors that "it would be most of [his] testimony . . . if [he] had to go through all the factors").

Joachimsthaler argues that, to assess the impact of advertising, Dr. Steckel should have considered, in addition to advertising spend or investments, the impact of those efforts – including by looking at advertising objectives, advertising message, and the type of media used. See ¶ 59. Joachimsthaler also claims that to assess the strength of a brand, Dr. Steckel should have analyzed several factors (including with respect to unaided awareness), only one of which is brand awareness. See ¶ 35(iv) fn. 57.

But, when explaining during his deposition how he himself would assess the fame of Coca-Cola, Mr. Joachimsthaler enumerated a laundry list of factors he would consider – including the very same factors that Dr. Steckel considered. Specifically, Mr. Joachimsthaler testified that to establish the fame of Coca-Cola without a survey, he would consider the fact that "Coca-Cola spends $900 million on advertising. It's been around for hundreds of years. It's the

only brand. It's a dominant leader in beverages." Joachimsthaler Dep. T. at 127:10-128:09. Dr. Steckel conducted the very same analysis in his assessment of the fame of Capri Sun – namely, Dr. Steckel considered the extent of Capri Sun's advertising spend and the fact that it has been a dominant leader in the single-serving beverage market for many years. *See* Steckel Report ¶¶ 32-35.

Put simply, the multitude of errors pervading Mr. Joachimsthaler's report renders the entirety of it unreliable and inadmissible. *See Snyder v. Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (declining to "identify the limited portions that might qualify as expert testimony" where an expert report contained so many "improper statements and opinions").

### C.    MR. JOACHIMSTHALER PROFFERS IMPERMISSIBLE LEGAL CONCLUSIONS, WHICH MUST BE EXCLUDED

Mr. Joachimsthaler's testimony should be excluded for an additional reason, namely he proffers impermissible legal conclusions when he opines that "the United States Trademark and Patent Office (USPTO) does not make a determination as to whether a mark has acquired secondary meaning; the '517 registration provides a presumption of secondary meaning, [but] it does not establish it." Joachimsthaler Report ¶ 52(b).

As a preliminary matter, Mr. Joachimsthaler's above-quoted testimony underscores his unreliability as to the facts of this case, and trademark law.

The undisputed evidence in this case confirms that Capri Sun established secondary meaning in the Pouch Mark in 1986. Indeed, while prosecuting what ultimately became the '517 Registration, Capri Sun submitted evidence: (a) that the Pouch Mark had been used for five years prior to registration; (b) survey and research studies, evidencing that the Pouch Mark had become a source identifier for Plaintiff's CAPRI SUN-brand fruit-flavored beverages offered in

the Pouch Mark; and (c) that more than $26 million had been spent on advertising CAPRI SUN-brand fruit-flavored beverages in the Pouch Mark during the five years prior to registration. *See* Doc. No. 78 at ¶¶ 3-17.  After receiving this evidence, the PTO determined that the shape of the Pouch Mark was distinctive as to CAPRI SUN-brand products and, thus, eligible for registration on the Principal Trademark Register. *See id.* at ¶ 18. The PTO also has acknowledged Capri Sun's Section 15 Declaration of Incontestability filed for the '517 Registration. *See id.* at ¶ 25; *see also* 15 U.S.C. § 1065 (a registered trademark becomes "incontestable" after five years of continued use, meaning that the mark is conclusively presumed to be valid and entitled to protection); Doc No. 51, Functionality Order (This Court also recognized the incontestability of the '517 Mark in the Functionality Order; "Capri Sun "still owns the incontestable '517 Rusdegistration, which covers the Pouch Trademark for 'fruit juice drinks containing water.'").

Moreover, contrary to Mr. Joachimsthaler's testimony, the '517 Registration does not afford a presumption of secondary meaning in the Pouch Mark; rather, its incontestable status means that the Pouch Mark enjoys secondary meaning as a matter of law. *See 3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 194 (S.D.N.Y. 2020) ("As discussed, *supra*, the 3M Marks are incontestable. Accordingly, the 3M Marks have acquired secondary meaning as a matter of law.").

Nonetheless, it is well established that expert witnesses are not permitted to opine on the ultimate legal conclusions raised in a case, and expert testimony that states a legal conclusion must be excluded. *See United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) (The Second Circuit "requires the exclusion of testimony which states a legal conclusion."); *see also In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (quoting *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 2009)) (The court must exclude evidence where the expert

provides testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (noting that courts exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court"). But this is exactly what Mr. Joachimsthaler does where he concludes that "the '517 registration provides a presumption of secondary meaning, [but] it does not establish it." Joachimsthaler Report at ¶ 52(b). Mr. Joachimsthaler's conjecture about the legal effect of a trademark registration must not be admitted. This is especially true given that his opinion is wrong as a matter of law and, thus, would confuse the trier of fact about the proper evidentiary weight to afford the '517 Registration and Pouch Mark covered thereby.

Not only is Mr. Joachimsthaler's opinion regarding the legal effect of the '517 Registration an impermissible legal conclusion; it is faultily formed because it is not based on a complete or supported understanding of crucial relevant history of the Pouch Mark and this case. When asked about the Functionality Order at his deposition, Mr. Joachimsthaler could not recall having seen it. Not only was Joachimsthaler unfamiliar with the Functionality Order—an order central to understanding the key piece of intellectual property addressed in Dr. Steckel's testimony and in this litigation (*see* Joachimsthaler Dep. T. at 91:05-18)—but he also disregarded or was apparently unfamiliar with the '517 File Wrapper – which contains key information about the secondary meaning of the Pouch Mark as ruled upon by the USPTO.

These blanks in key knowledge of the subject matter of his testimony are not the hallmarks of a supported or reasonable opinion. *See, e.g., Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 477 (W.D.N.Y. 2017) (finding an expert's report "speculative" because it was

based on an "unsupported and inaccurate interpretation of the record evidence"); *Foley v. United States*, 294 F. Supp. 3d 83, 94 (W.D.N.Y. 2018) (finding an expert's opinion unreliable where it is "based on a grossly inaccurate reading of the record and pure speculation").

Even if Mr. Joachimsthaler's opinion was not an impermissible legal conclusion, and even if it were not demonstrably incorrect, his testimony on this point must be excluded for the additional and independently sufficient reason that, to the extent it seeks to frame the Pouch Mark as unprotectable or functional, ABC is prohibited from challenging the validity of the '517 Pouch. *See* Doc No. 51, Functionality Order.

## IV.    CONCLUSION

For all of the foregoing reasons, Capri Sun respectfully requests that the Court exclude Mr. Joachimsthaler's expert opinions.

Dated: June 2, 2021
    New York, New York          Respectfully submitted,

A. John P. Mancini
Jonathan W. Thomas
Margaret Wheeler-Frothingham
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Tel.: (212) 506-2500
Fax: (212) 262-1910
Email: JMancini@mayerbrown.com
Email: JWThomas@mayerbrown.com
Email: MWFrothingham@mayerbrown.com

*Attorneys for Plaintiff Capri Sun GmbH*