UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CAPRI SUN GMBH,

                    Plaintiff,

              -v-

AMERICAN BEVERAGE CORPORATION,

                    Defendant.

---

19 Civ. 1422 (PAE) (DCF)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves a trademark dispute over the shape of foil pouches that hold fruit juice.

Plaintiff Capri Sun GmbH ("Capri Sun") has a trademarked pouch (the "Pouch Trademark" or

"Pouch Mark"). It principally alleges that defendant American Beverage Corporation ("ABC"),

after terminating a licensing agreement (the "SLA") with Capri Sun that had authorized ABC to

make use of Capri Sun's Pouch Mark in connection with the sale of its fruit juices, continued to

manufacture, sell, and license fruit-juice pouches that were near-replicas of—and confusingly

similar to—Capri Sun's Pouch Mark.

Capri Sun brings 12 claims: for (i) breach of the SLA, under New York law; (ii) federal

trademark infringement under 15 U.S.C. § 1114; (iii) federal unfair competition and false

association with the Pouch Mark under 15 U.S.C. § 1125(a); (iv) federal trade-dress infringement

under 15 U.S.C. § 1125(a); (v) federal unfair competition and false association with Capri Sun's

trade dress under 15 U.S.C. § 1125(a); (vi) federal trademark dilution under 15 U.S.C. § 1125(c);

(vii) trademark infringement under New York common law; (viii) unfair competition with the

Pouch Mark under New York common law; (ix) trade-dress infringement under New York

common law; (x) unfair competition with Capri Sun's trade dress under New York common law,

and (xi) dilution of the Pouch Mark under New York General Business Law ("NYGBL") § 360-

*l*; and (xii) dilution of Capri Sun's trade dress under NYGBL § 360-*l*.  With discovery complete,

each party has moved for summary judgment on all claims.  Capri Sun has further moved to

exclude testimony of two of ABC's experts (Hal Poret and Dr. Erich Joachimsthaler) and ABC

has so moved with respect to one of Capri Sun's experts (Dr. Joel Steckel).  ABC has also moved

to preclude Capri Sun from pursuing as a remedy for ABC's alleged trademark infringement and

trademark dilution, disgorgement of ABC's profits derived from these illegalities.

 For the reasons that follow, the Court denies Capri Sun's summary judgment motion in

full; grants in part and denies in part ABC's summary judgment motion; denies Capri Sun's

*Daubert* motion as to Poret; denies, save as to a minor point, ABC's *Daubert* motion as to Dr.

Steckel; grants in part and denies in part Capri Sun's *Daubert* motion as to Dr. Joachimsthaler;

and grants ABC's motion to limit Capri Sun's recoverable damages.

## I. Background

### A. Factual Background[1]

#### 1. The Parties

 Capri Sun is a Gesellschaft mit beschränkter Haftung (limited liability company)

organized under the laws of, and headquartered in, Germany.  JSUF ¶ 1.  Until December 17,

---

[1] The Court draws its account of the facts from the parties' submissions on summary judgment, including their joint Rule 56.1 statement. Dkt. 78 ("JSUF").  The Court has also considered Capri Sun's Rule 56.1 statement, Dkt. 116 ("Pl. 56.1") and ABC's Counterstatement to Capri Sun's Rule 56.1 statement, Dkt. 134 ("Def. Counter 56.1"); ABC's Rule 56.1 statement, Dkt. 98 ("Def. 56.1"), Capri Sun's Counterstatement to ABC's Rule 56.1 statement, Dkt. 121 ("Pl. Counter 56.1"), and ABC's response to Capri Sun's Rule 56.1 counterstatement, Dkt. 155 ("Def. Resp. 56.1"); and the parties' joint stipulation of undisputed facts filed in connection with the Court's Functionality Decision; Dkt 31-1 ("Functionality JSUF").

2018, Capri Sun's name was Deutsche SiSi-Werke Betriebs GmbH ("SiSi"). *Id.* ¶ 29. Capri Sun's predecessor-in-interest and parent is Rudolf Wild International GmbH & Co KG (formerly named Zick-Zack-Werk Rudolf Wild) ("Wild"). *Id.* ¶¶ 2, 5, 27, 30, 32.

ABC is a corporation organized and existing under Delaware law, with its principal place of business in Pennsylvania. *Id.* ¶ 2. ABC's predecessor-in-interest was Faribault Foods, Inc. ("Faribault"). *Id.* ¶¶ 257–259.

Importantly, as reviewed in detail *infra*, Faribault was a defendant in an earlier lawsuit (the "Faribault Lawsuit") in which Capri Sun alleged that Faribault was infringing SiSi's rights in and to the Pouch Trademark. *Id.* ¶ 221. On July 1, 2016, Capri Sun and Faribault executed the SLA to resolve that lawsuit, under which Faribault received a license to use the Pouch Mark but was required to pay royalties to do so. *Id.* ¶ 222. In October 2016, in conjunction with ABC's purchase of certain of Faribault's beverage-business assets, Faribault assigned its rights and obligations under the SLA to ABC. *Id.* ¶ 257.

ABC manufactures beverage pouches for various brands that individually brand and dress those pouches. *Id.* ¶¶ 276, 279, 281. At issue in this litigation are 24 of those pouches (the "Accused Pouches"). *Id.* ¶ 290. ABC has one branded pouch product—Green Beginnings—that it directly sells to HEB, a Texas retailer, and which is one of the 24 pouches at issue. *Id.* ¶ 278.

---

Citations to a JSUF or party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### 2.  The Pouch Trademark and the Utility Patent

On July 11, 1985, Wild applied for a registration for a trademark of a "pouch design" for "fruit drinks" with the United States Patent and Trademark Office ("PTO").  JSUF ¶ 3.  On November 25, 1986, the application was registered on the principal register as U.S. Trademark Registration No. 1,418,517 (the "'517 Registration").  *Id.* ¶ 20.  The '517 Registration includes an image of the Pouch's design.  *Id.* ¶ 21.  It looks like this:

Int. Cl.: 32

Prior U.S. Cl.: 45

**United States Patent and Trademark Office**  Reg. No. 1,418,517
Registered Nov. 25, 1986

**TRADEMARK**
**PRINCIPAL REGISTER**



*Fig. 1: The Pouch Mark.  JSUF ¶ 21.*

The '517 Registration is incontestable.  *Id.* ¶ 25.  Capri Sun currently owns the '517 Registration, which covers the Pouch Trademark for "fruit juice drinks containing water."  *Id.* ¶¶ 22, 24.

The Pouch Mark does not describe the dimensions of the pouch; the parties dispute its exact description.  *See* Pl. Counter 56.1 ¶ 13.  It is, however, not disputed that the pouches sold under the Pouch Mark hold 6 ounces of juice and, when flat and unfilled, are 100 millimeters wide, 150 millimeters tall.  Pl. 56.1 ¶ 86; JSUF ¶¶ 43, 321.

### 3.    Capri Sun's Pouch Business and Brand

Beginning in 1969, Capri Sun first sold orange-flavored pouched juice drinks in Germany. Pl. 56.1 ¶ 2. It has continuously sold pouched drinks for more than 50 years. *Id.* ¶ 3.

Within the United States, since 1991, Kraft General Foods, Inc. ("Kraft") has held an exclusive license as to products branded with the Capri Sun trademark in the Pouch Mark's pouch shape. JSUF ¶¶ 32–33, 36, 136. That license derives from a stock purchase agreement: On April 11, 1990, Wild granted an exclusive license to the Pouch Mark in the United States to non-party Capri Sun, Inc., a domestic concern. *Id.* ¶¶ 30, 32–33. In November 1991, Kraft purchased Capri Sun, Inc., from Wild pursuant to a stock purchase agreement, and with it, the license. *Id.* ¶ 36. Although that license is exclusive as to products in the Pouch Mark's pouch shape that are branded with the Capri Sun trademark, it is non-exclusive as to products in the Pouch Mark's pouch shape that are *not* branded with the Capri Sun trademark. *Id.* ¶¶ 136–137.

According to the '517 Registration, the Pouch Mark was first used in the United States on August 31, 1978. *Id.* ¶ 23. Capri Sun's primary customer base for the Pouch Mark are children and their parents. *Id.* ¶ 44. Two representative Capri Sun pouch products, as currently sold, look like this:



*Fig. 2: Two exemplars of the Capri Sun Pouch.  JSUF ¶ 40.*

The parties represent that the Capri Sun brand has offered product lines named "Original," "Organic," "100% Juice," "Fruit Refreshers," "Fruit & Veggie," "Roarin' Waters," and "Sport."  *Id.* ¶ 42.  Capri Sun's "Original" line alone now features flavors such as lemonade, wild cherry, grape, strawberry, strawberry kiwi, red berry, tropical punch, mountain cooler, coastal cooler, pacific cooler, surfer cooler, splash cooler—and, of course, orange.  *Id.* ¶ 50.  In 2020, Capri Sun tested, but did not continue, a product line offering filtered water in its Pouch.  *See id.* ¶¶ 68–70.

Since September 2001, Kraft—in addition to selling the Capri Sun brand—has sold juice pouch products—called "Jammers"—in the Pouch Mark pursuant to a license agreement with Capri Sun.  *Id.* ¶ 138.  Jammers is, however, the only authorized product that Capri Sun has licensed to use the Pouch Mark that is outside the Capri Sun brand.  On August 20, 2001, shortly before Jammers sales began, Capri Sun's owner, Hans-Peter Wild, wrote a letter to Dave Johnson—Kraft's vice president, and president of beverages, desserts and cereals—emphasizing

that, although "approv[ing] your request for the [Jammers] product[] . . . . it jeopardizes the uniqueness of the pouch . . . . I want to stress that we [Capri Sun] do not want you to further dilute the pouch with additional brands." Def. 56.1 ¶ 40.

According to a Nielsen report, Capri Sun's sales for Capri Sun-branded products in the Pouch Mark were $751 million in 2012; $690.4 million in 2013; $686.9 million in 2014; $647.2 million in 2015; and approximately $500 million in 2016. JSUF ¶¶ 81, 83; Pl. 56.1 ¶¶ 49–52, 54–55. Capri Sun's 2016 market share in the kids single-serve beverages market was 22.8%, higher than that of any other brand. JSUF ¶ 81.

Capri Sun-branded pouches are sold in cartons of 10, 30, and 40, but never in individual pouches. *Id.* ¶¶ 45–46. Neither the pouches nor the Pouch Mark is depicted on the cartons. *See id.* ¶¶ 47, 53, 55. As such, consumers do not see the Capri Sun Pouch or Pouch Mark at the point of sale when selecting among different pouch and non-pouch beverages. *See id.* ¶¶ 47, 54–59.

According to a report titled "Children's Drink F.A.C.T.S. 2019" that traces its data to the report's authors and to Nielsen, Capri Sun's annual advertising spend between 2013 and 2018 across all its sub-brands was consistently between $19.8 million and $20.1 million. *Id.* ¶ 77. In those ads, the Pouch often appears prominently. For example, in 2008, Capri Sun launched an ad campaign—which won the prestigious Gold Effie advertising award in 2010—entitled "Respect the Pouch." *Id.* ¶¶ 71–72, 74.[2] In August 2009, one year after the campaign's airing, 49% of children recognized the tagline "Respect the Pouch"—second only to McDonald's "I'm lovin'

---

[2] In those ads, children after drinking a Capri Sun branded juice were usually shown to blow air into the empty pouch, pursue mischief with it—stepping on it, hitting it with a baseball bat, jumping on it with a pogo stick—and be comically projected into space, turned into a fire hydrant, or cause a car alarm to go off. Those ads led children to record versions of this trope and post them to YouTube. In 2013, Capri Sun released four commercials for its Roarin' Waters line featuring famous athletes—baseball player David Ortiz, gymnast Gabrielle Douglas, wrestler John Cena, and basketball player Stephen Curry.

it." Dkt. 79-22 at 5. In 2019, Capri Sun launched the "Hold My Pouch" campaign, whose commercials prominently featured Capri Sun Pouches. JSUF ¶ 75. The Pouch appears in some form in more than 50 video commercials. *See id.* ¶¶ 85–135. Other places in which consumers encounter the Pouch or Pouch Mark are Capri Sun's website, and its account on YouTube, Facebook, Instagram, and Twitter. *Id.* ¶ 61.

The Pouch Mark has been mentioned in unsolicited media coverage. Such has referred to Capri Sun's pouches as "distinctive," the "kid-favourite silver pouch," "familiar," "the trademark silver pouch," "classic," a "signature pouch," "iconic," and "famous." Other coverage has ranked Capri Sun flavors, discussed a KFC menu offer including a pouched Capri Sun drink, and covered Capri Sun's cooperation with Lyft in which, within the Lyft app, icons of moving cars turn into icons of Capri Sun juice pouches. *Id.* ¶¶ 62–66, 68–70, 79; Dkts. 79-15, 111-5–111-7.

### 4.    ABC's Pouch Business

ABC manufactures pouch and bottle products, also sold in cartons. JSUF ¶ 276. ABC manufactures pouch products for companies that own their own brand (also known as "co-packing"); privately branded products (or "store brands") for certain companies; and the one branded pouch, Green Beginnings. *Id.* ¶¶ 278–282. ABC's co-pack customers include brands such as Juicy Juice, Poppilu, Tree Top, and SunnyD. *Id.* ¶ 280.

The 24 branded pouch products that ABC currently manufactures are in the shape which Capri Sun contends infringes its trademark (the Accused Pouch shape). *Id.* ¶ 289. Each brand is available in several flavors and directly competes with Capri Sun's pouched products. *Id.* ¶¶ 291–292. Capri Sun's pouches, Capri Sun's Licensed Pouches, and ABC's Accused Pouches have the same height (150 mm) and width (100 mm) when flattened and unfilled. *Id.* ¶¶ 293–296.

### 5. Capri Sun's History with ABC and Its Predecessors

ABC and its predecessors have designed and manufactured pouches over the years, with varying degrees of similarity to Capri Sun's Pouch Mark. Critically, this lawsuit is the second between the adversaries. In the 2015 Faribault Lawsuit, Capri Sun's predecessor SiSi challenged Faribault's pouch, which ended with the parties' execution of the SLA. *Id.* ¶¶ 215–222. Under the SLA, Faribault, and later ABC, manufactured and sublicensed pouches in the shape of Capri Sun's Pouch Mark. At issue here is ABC's 2017 decision—which it acknowledges was driven by its desire to avoid paying the royalty fees due under the SLA—to terminate the SLA and thereafter sell a modified pouch, which deviates from Capri Sun's pouches and Pouch Mark only in that its upper corners are more rounded. *See* Def. 56.1 ¶¶ 21–22, 28, 32.

#### a. The 2005 Pouch

Between 2005 and 2009, Faribault manufactured and sold juice pouches with a height of 160 millimeters and a volume of 6.75 fluid ounces (the "2005 Pouch"). *Id.* ¶¶ 1, 5. The 2005 Pouch had rounded upper corners. *See id.* ¶ 1.



*Fig. 3: Two exemplars of the 2005 Pouch. Def. 56.1 ¶ 1.*

Capri Sun did not take legal action to claim that the 2005 Pouch infringed its trademark. *Id.* ¶ 2.

b.      **The 2010 Pouch and the Faribault Lawsuit**

Between late 2009 and January 2010, Faribault made several changes to its 2005 Pouch.

The resulting pouch (the "2010 Pouch") reduced the 2005 Pouch's volume from 6.75 fl. oz. to 6

fl. oz., and its height from 160 mm to 150 mm. *Id.* ¶ 6. These changes tracked Capri Sun's

reduction in volume around the same time. *Id.* ¶ 5. Relative to the 2005 Pouch, the 2010

Pouch's upper corners were less rounded, yielding a more rectangular shape that, all agree, made

it identical in shape to Capri Sun's Pouch Mark. *See id.* ¶ 6; JSUF ¶¶ 222, 227, 242.[3]



*Fig. 4: ABC's "SunnyD" product in the 2010 Pouch.  Def. 56.1 ¶ 6.*

On July 24, 2015, Capri Sun, then known as "SiSi," challenged Faribault's 2010 Pouch in

the Faribault Lawsuit, initially filed in federal district court in Minnesota. *See Deutsche SiSi-*

*Werke Betriebs GmbH v. Faribault Foods, Inc.*, No. 15 Civ. 3138 (D. Minn.).  JSUF ¶ 7; *see also*

---

[3] Capri Sun asserts that the Licensed Pouch and Capri Sun's Pouch Mark are identical.  *See* Pl.
Counter 56.1 ¶ 18 (citing JSUF ¶ 227).  SLA § 3.2 says as much: "The Parties acknowledge and
agree that Faribault's current use of the Trademark as shown in Schedule B is acceptable and
consistent with the standards required by this Agreement."  JSUF ¶ 227.  The parties jointly
confirmed this in a letter on March 21, 2022.  Dkt. 176.

*id.* ¶ 220 (side-by-side comparison of Capri Sun's Pouch Mark and the 2010 Pouch, drawn from the Second Amended Complaint in the Faribault Lawsuit). On December 8, 2015, the case was transferred to this District and assigned to the Honorable Kimba M. Wood. *Id.* ¶¶ 215–216.

In the final operative complaint in the Faribault Lawsuit, SiSi brought substantially the same legal claims that Capri Sun brings here. *Id.* ¶¶ 219–221; Compl. ¶¶ 151–320. It alleged that the 2010 Pouch "adopt[ed], at least, the same shape and height/width ratio" as Capri Sun's Pouch Mark. JSUF ¶ 220. Faribault, in its answer, acknowledged that the 2005 Pouch was "substantially similar to the design" of the 2010 Pouch. But it noted that Capri Sun had never challenged the 2005 Pouch, to which it likened its 2010 Pouch. Def. 56.1 ¶ 12.b.

The 2005 Pouch and 2010 Pouch, compared side-by-side, without labeling, look like this:



*Fig. 5: Left: 2010 Pouch. Right: 2005 Pouch. Def. 56.1 ¶ 12.*

### c.    July 2016: Settlement of the Faribault Lawsuit and the SLA

On July 1, 2016, the parties settled the Faribault Lawsuit with the execution of the SLA. Def. 56.1 ¶ 8; JSUF ¶ 222. Under the SLA, Faribault received a license authorizing it to sell

pouches in the shape of Capri Sun's Pouch Mark (the "Licensed Pouch")[4] in exchange for an annual royalty fee of $650,000 or $0.00225 per Licensed Pouch, whichever was greater. *See* JSUF ¶¶ 222–225, 229. When unfilled and flat, the Licensed Pouch is 150 mm tall and 100 mm wide. *Id.* ¶¶ 293, 295; *see also* Pl. 56.1 ¶ 82; JSUF ¶ 300.

Other salient terms of the SLA included the following:

*Non-exclusive license*: In § 2.2.1, Faribault's license to use Capri Sun's Pouch Mark was made non-exclusive. JSUF ¶¶ 224–225.

*Right to grant sublicenses*: In § 2.2.2, Faribault was given the right to grant sublicenses to the Pouch Mark to its then-current and future customers if "such Licensed Products are manufactured by Faribault on behalf of those customers." *Id.* ¶ 238.

*Acknowledgment of validity*: In § 6.3, Faribault acknowledged the validity of Capri Sun's mark and/or Capri Sun's ownership of it. *Id.* ¶ 232.

*Limitations on damages*: In § 8.4, the parties agreed that, except in connection with indemnification obligations, neither party (or its affiliates or agents) shall be liable to the other "for any consequential, indirect, punitive, incidental or special damages, including lost profits, whether foreseeable or unforeseeable and whether or not that Party has been advised of the possibility thereof, arising from any cause of action whatsoever, including those based upon contract, warranty, strict liability or negligence, related to this agreement or any breach hereof." *Id.* ¶ 253.

---

[4] The 2010 Pouch, the Licensed Pouch, and the Pouch Mark are thus all identical. *See* Dkt. 176 (parties jointly stipulating and confirming that the 2010 Pouch and Pouch Mark are identical).

*No admission of liability*:  In § 11.2, the parties agreed that their settlement and the adoption of the SLA did not imply any "past or present wrongdoing" or liability on the part of any party. *Id.* ¶ 255.

*Mechanics of termination*:  In § 5.2.3, Faribault was given the right to terminate the SLA at any time on 120 days' written notice," with specified consequences as to royalties. *Id.* ¶ 262.

*Continuing obligations upon termination*:  In § 5.4, the parties agreed that Faribault's acknowledgments of the Pouch Mark's validity and Capri Sun's ownership in § 6.3, the damages limitation § 8.4, and non-admission of liability in § 11.2 shall survive the Agreement's termination. *Id.* ¶ 256.  In § 5.3.1, they agreed that, upon expiration or termination, "Faribault shall immediately cease using the Trademark, including any confusingly similar variations thereof." *Id.* ¶ 230.  In § 5.3.2, the parties agreed that upon the Agreement's expiration or termination, Faribault would have six months in which to sell off its inventory of existing licensed products, after which "all rights of Faribault with respect to the use of the Trademark shall cease and right of Faribault hereunder shall terminate." *Id.* ¶ 231.

### d.      October 2016: Faribault's Assignment to ABC

In October 2016, Faribault assigned its rights and obligations under the SLA to ABC in conjunction with ABC's purchase of certain of Faribault's beverage business assets, making ABC its successor-in-interest. *Id.* ¶¶ 257–259.

By October 2017, ABC had sublicensed and manufactured pouches under the Pouch Mark for use by 14 brands. *See id.* ¶¶ 242, 285.[5]

### e.      November 2017:  ABC Begins to Use the Accused Pouch

---

[5] ABC refers to manufacturing 17 such brands, and states that 14 "were on the market" by that time. Def. SJ Mem. at 4 & n.6.  Capri Sun concurs. *See* Pl. SJ Opp'n at 10.

Soon after the SLA's execution, Faribault began "exploring the use of a new pouch shape that would not be implicated by the SLA." Def. 56.1 ¶ 22. On August 8, 2016, John Lawrie, a Faribault plant manager, sent an email attaching five potential designs for a new pouch. *Id.* ¶ 23. Of those, four proposed to increase the pouch's height from 150 mm to 155 mm. *See id.* ¶ 27. The fifth design proposed keeping the height at 150 mm while rounding out the upper corners. *See id.* ¶¶ 27–30.

In November 2017, ABC began selling Accused Pouches to one of its customers—Nature's Nectar—consistent with Lawrie's fifth design, without paying royalties to Capri Sun. JSUF ¶ 288; *see also* Def. 56.1 ¶ 21. The Accused Pouch deviated from the shape of the Licensed Pouch in one respect: by rounding off the top corners. *See* JSUF ¶¶ 300, 302–303. Otherwise, the dimensions of the Accused Pouch were the same as those of the Licensed Pouch: a height of 150 mm and a width of 100 mm. *Id.* ¶¶ 293–294; Pl. 56.1 ¶ 82; *cf.* Def. 56.1 ¶ 6.[6] ABC has stated that, in designing the Accused Pouch, it turned "for inspiration" to Faribault's 2005 Pouch, Def. 56.1 ¶¶ 18, 35, which Capri Sun and its predecessors had not challenged, and which promised cost savings, *id.* ¶¶ 35–36, 38.

Internal records within ABC and its affiliates chronicle the development and rollout of the Accused Pouch—and the extent to which it was viewed as similar to the Pouch Mark. These exchanges spanned the period between October 9, 2017 and November 13, 2018 and involved

---

[6] The parties at oral argument agreed that the height and width of the Accused Pouches was identical to that of the Pouch Mark.

A curiosity of the record in this case is the parties' agreement at JSUF ¶ 296 that, "[w]hen flat and unfilled with liquid, the Accused Pouch is 65 mm wide at the top," citing Dkts. 79-138, 79-139. Those exhibits, however, show drawings displaying a designated width of 100 mm at the top, consistent with Pl. 56.1 ¶ 82. The Court treats it as established that the top width of the Accused Pouch, when unfilled, is 100 mm.

the president and vice president of sales, the chief marketing officer, senior brand managers, and the director of R&D of Harvest Hill Beverage Company ("Harvest Hill"), ABC's parent. These individuals, in the main, emailed each other or ABC retail customers discussing design changes to shape of the Licensed Pouch, characterizing these changes as "slightly . . . round[ing]" the pouch's top corners, an "ever so slight[]" change, "a very subtle change to the pouch," or "slight tweaks." *Id.* ¶¶ 302–305. Other such exchanges discussed "mock ups" of the new design, and requests for a Capri Sun "knockoff" or a "Capri Sun-like product." *Id.* ¶¶ 311–313. These exchanges are reviewed in more detail, *infra*.

By the time Capri Sun commenced this litigation, ABC was manufacturing and selling pouches in the Accused Pouch shape for 24 brands. *See id.* ¶ 290. Each brand is available in different flavors and directly competitive with Capri Sun-branded products. *Id.* ¶¶ 291–292.

Side-by-side images of the Licensed Pouch and the Accused Pouch appear below:



*Fig. 6: Left: Flattened Licensed Pouch. Right: Flattened Accused Pouch. Pl. 56.1 ¶ 80.*

A drawing superimposing the Accused Pouch over the Licensed Pouch appears below:



*Fig. 7: Drawing of unfilled Licensed Pouch and unfilled Accused Pouch, superimposed.  Pl. 56.1*
*¶ 82.*

A side-by-side comparison of a filled Licensed and Accused Pouches—bearing their

external labeling—appears below:

  

*Fig. 8: Left: Exemplar of ABC product in the Licensed Pouch.  Right: Exemplar of ABC product*
*in the Accused Pouch.  JSUF ¶¶ 286, 287.*

### f.    July 2018:  ABC Terminates the SLA

On March 26, 2018, ABC sent Capri Sun a written 120-day notice of termination of the

Agreement.  JSUF ¶ 263.  On July 26, 2018, the Agreement terminated, *id.* ¶ 264, triggering

(through January 26, 2019) a six-month selloff period under the SLA, *id.* ¶ 268.

16

ABC's sales of the Accused Pouches, without the payment of royalties, increased during the six-month selloff period following its July 26, 2018 termination of the SLA, including by selling of Juicy Juice Splashers Organic products. *Id.* ¶¶ 33, 273, 285.

On October 8, 2018, Capri Sun wrote ABC, asking why the introduction of the Juicy Juice Splashers Organic line did not breach the SLA, insofar as it prohibited ABC from selling "confusingly similar variations thereof." *Id.* ¶¶ 269, 273; *see* Dkt. 5-3. On October 31, 2018, ABC responded, denying that it was manufacturing infringing pouches. *See* Dkt. 5-4. On December 19, 2018, Capri Sun sent a letter demanding that ABC cease its manufacturing the allegedly infringing pouches, provide an accounting of all sales of the Juicy Juice Splashers product, and provide Capri Sun with a sample of the Juicy Juice Splashers "Organic" pouch. Dkt. 5-5 at 3–4. On January 30, 2019, Capri Sun sent another demand letter to ABC. Dkt. 5-6. The record does not reflect a response from ABC.

### 6.    Capri Sun's Actions with Respect to Allegedly Infringing Pouches

On April 1, 2020, and again on July 13, 2020, Capri Sun sent demand letters to Poppilu LLC, an ABC customer that sold an Accused Pouch. JSUF ¶ 310. Poppilu has not ceased selling the products in the Accused Pouches. Def. SJ Opp'n at 9.

On December 14, 2016, Capri Sun's licensee Kraft sent a letter to Redrum Bar, LLC, proprietor of the bar "Green Light Social," protesting its use of "Capri Sun pouches infused with alcohol" and demanding that Green Light Social immediately cease its use of that product. JSUF ¶ 211; Dkt. 79-120 at 2. On January 27, 2020, Kraft sent a substantially similar letter to the bar

"Rumba." JSUF ¶ 212; Dkt. 79-121. According to Capri Sun, both bars later ceased selling those products. Pl. 56.1 ¶ 58.[7]

### B.   Pertinent Procedural Background

On February 14 and 15, 2019, Capri Sun filed the Complaint. Dkt. 4 ("Compl."). On March 11, 2019, ABC answered. Dkt. 14. On July 16, 2019, Capri Sun filed a motion to strike ABC's affirmative defenses and discovery requests relating to the functionality of the Pouch Mark, in light of the SLA's no-challenge provision. Dkts. 39–41. In a decision issued October 29, 2019, the Court granted the motion, striking all references to the Pouch Trademark's alleged functionality from ABC's affirmative defenses and precluding discovery requests as to functionality. Dkt. 51 ("Functionality Decision"), reported at *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414 (S.D.N.Y. 2019) ("*Capri Sun*").

Numerous extensions of fact and expert discovery followed, including due to the pandemic, with the result that fact and expert discovery closed, respectively, on September 29, 2020, and February 8, 2021. *See* Dkts. 48, 55, 59, 65. On March 15, 2021, the Court set a briefing schedule for the parties' anticipated cross-motions for summary judgment and *Daubert* motions, Dkt. 74 which it revised on May 6, 2021, Dkt. 83. On April 15, 2021, the parties filed their Joint Statement of Undisputed Facts, Dkt. 78 ("JSUF"), and supporting exhibits, Dkt. 79, and sent additional materials, such as .mp4 files, to the Court over email by secure file share, *see*

---

[7] There are at least two other pouched juice drinks in the market: Hapi Water and Tropicana KiDS. JSUF ¶¶ 312, 417. The record does not reflect how the shapes of the pouches used for such drinks compare to the Pouch Mark. Capri Sun has not taken legal action against either.

Dkt. 81. The parties thereafter filed briefs and materials in support on the schedule set by the Court.[8] Argument on the motions was held on March 17, 2022.

## II.    *Daubert* Motions

Before turning to the merits of the parties' respective summary judgment motions, the Court addresses first the admissibility of certain expert opinions. ABC proposes to offer the expert testimony of Hal Poret, who, based on a survey that he conducted, opines as to the absence of actual confusion between Capri Sun's pouches and ABC's Accused Pouches. Capri Sun, in turn, has offered the expert testimony of Dr. Joel Steckel, as to the fame and secondary meaning of Capri Sun's Pouch Mark. In rebuttal, ABC offers the expert opinion of Dr. Erich Joachimsthaler, who opines that Dr. Steckel's report is methodologically unreliable. The Court here resolves the pending motions to exclude all three experts' reports and proposed testimony under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

---

[8] On June 2, 2021, the parties (1) supplemented the JSUF's supporting exhibits, Dkts. 92, 93; (2) filed their own Rule 56.1 statements, Dkts. 116 ("Pl. 56.1"), 98 ("Def. 56.1"); (3) filed summary judgment motions and memoranda in support, Dkts. 109, 113 ("Pl. SJ Mem."), 94, 95 ("Def. SJ Mem."); and (4) exhibits in support; Dkts. 100, 101, 108, 112, 114, 115. That same day, the parties filed *Daubert* motions: Capri Sun moved to exclude the report of ABC's expert, Poret, Dkt. 105 ("Pl. Poret *Daubert* Mem."), and ABC's rebuttal expert Dr. Joachimsthaler, Dkt. 107 ("Pl. Joachimsthaler *Daubert* Mem."), and filed supporting exhibits, Dkts. 103, 106; ABC moved to partially exclude the report of Capri Sun's Dr. Steckel, Dkt. 90 ("Def. Steckel *Daubert* Mem."), and filed supporting exhibits, Dkt. 88. On June 30, 2021, the parties filed (1) counterstatements to each other's Rule 56.1 statements, Dkts. 121 ("Pl. Counter 56.1"), 134 ("Def. Counter 56.1"); (2) oppositions to each other's opening summary judgment motions, Dkts. 124 ("Pl. SJ Opp'n"), 132 ("Def. SJ Opp'n"); (3) supporting exhibits to those oppositions, Dkts. 123, 135, 137; (4) oppositions to each other's *Daubert* motions, Dkts. 139 ("Def. Poret *Daubert* Opp'n"), 126 ("Pl. Steckel *Daubert* Opp'n"), 128 ("Def. Joachimsthaler *Daubert* Opp'n"); and (5) supporting exhibits to those oppositions, Dkts. 125, 129, 140. On July 14, 2021, the parties filed (1) replies in support of their summary judgment motions, Dkts. 146 ("Pl. SJ Reply"), 153 ("Def. SJ Reply"); (2) supporting exhibits to those replies, Dkts. 148, 157; and (3) replies in support of their *Daubert* motions, Dkts. 158 ("Pl. Poret *Daubert* Reply"), 150 ("Def. Steckel *Daubert* Reply"), 160 ("Pl. Joachimsthaler *Daubert* Reply"). On July 15, 2021, the parties filed responses to each other's Rule 56.1 counterstatements. Dkts. 121 ("Pl. Counter 56.1"), 155 ("Def. Resp. 56.1").

### A.    Applicable Legal Standards

Trial courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). Under Federal Rule of Evidence 702, after the witness is qualified as an expert, the party seeking to admit expert testimony must show that, "(1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *United States v. Pryor*, 474 F. App'x 831, 834 (2d Cir. 2012) (summary order) (quoting Fed. R. Evid. 702). The proponent of the expert's testimony must further show that (4) "the testimony is relevant and will assist the jury." *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

*Qualification*: "Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (citing *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005)) (further citations omitted), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (summary order). Under Rule 702, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *In re Mirena*, 341 F. Supp. 3d at 240 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

These words must "be read in light of the liberalizing purpose of" Rule 702. *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), *cert. denied*, 475 U.S. 1141 (1986).

      *Reliability*: "In *Daubert*, the Supreme Court set out a list of non-exclusive factors that courts should consider in determining whether an expert's methodology is reliable.  These are: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether there is a high error rate for the expert's technique, and whether there are 'standards controlling the technique's operation'; and (4) whether the expert's technique or theory is generally accepted by the relevant scientific community." *In re Mirena*, 341 F. Supp. 3d at 240 (citing *Daubert*, 509 U.S. at 592–94; *Nimely*, 414 F.3d at 396).  However, "[a] proffered opinion may fail all four *Daubert* reliability factors and still be admitted." *Id.*  And although a court in such a situation "must 'carefully scrutinize,' pause, and take a 'hard look' at the expert's methodology," *id.* (citations omitted), "[t]he district court has broad discretion" in "*how* to determine reliability." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *Kumho Tire Co., Ltd. pv. Carmichael*, 526 U.S. 137, 142 (1999)) (emphasis in *Kumho Tire*).  "[T]he types of factors that are appropriate to consider will 'depend[] upon the particular circumstances of the particular case at issue.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 150); *see also E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383 (LAP), 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("The fact that a social scientist's approach might have inherent methodological limitations and does not produce a testable hypothesis or a known or potential rate of error, does not necessarily render the resulting testimony unreliable under Rule 702." (citations and internal quotation marks omitted)).  Ultimately, the Court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

*Relevance*: To ensure relevance, the Court must ensure that the expert's testimony "'fits' the facts of the case." *LVL XIII Brands*, 209 F. Supp. 3d at 641 (quoting *Daubert*, 509 U.S. at 591–92). Even where the expert's method is reliable, her testimony may fail *Daubert*'s fit requirement where (1) her data "is materially different from the data relevant to the facts of the case," (2) the expert "has failed to consider the necessary factors" or based the analysis "upon a faulty assumption," or (3) the expert's "methodology [was] transposed from one area to a completely different context, and there is no independent research supporting the transposition." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) (citations and internal quotation marks omitted), *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 F. App'x 76 (Fed. Cir. 2003) (summary order).

*Assisting the Trier of Fact*: The Second Circuit instructs district courts to exclude expert testimony if it is "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). Courts should also exclude "testimony that usurp[s] either the role of the trial judge instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (internal quotation marks and citation omitted) (alteration in original). "Finally, as with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay." *LVL XIII Brands*, 209 F. Supp. 3d at 636 (citation omitted).

**B.    Capri Sun's Motion to Preclude ABC's Expert Hal Poret**

ABC has retained Poret to provide expert testimony on consumers' likelihood of confusing (1) ABC's products with Capri Sun's Pouch Trademark, and (2) ABC's Juicy Juice Splashers design with Capri Sun's trade dress. *See* Dkt. 112-10  ("Poret Rep.") ¶ 9.  Capri Sun has moved to exclude Poret's report, opinions, and testimony in their entirety under Federal Rules of Evidence 702 and 403.

**1.    Poret's Report**

Poret's report opines that there is "no likelihood of confusion" between ABC's pouch design or products and Capri Sun's trademark or trade dress. *Id.* ¶ 18.  Poret derives his finding from an online survey he conducted of 1,200 respondents aged 18 or older who had either purchased pouched juice drinks in the prior 6 months, or self-identified as likely to do so in the next six months. *Id.* ¶¶ 37, 46–47, 49–56.

Poret's study uses the well-established *Eveready* format, in which respondents see only the allegedly infringing product, trademark, or trade dress and are tested as to whether they, by themselves, connect or confuse the alleged infringer with the senior product, mark, or trade dress. *Id.* ¶ 24.  The *Eveready* format is an alternative to another well-established format, the *Squirt* format.  In a *Squirt* format, respondents are shown the allegedly infringing and the senior product, mark, or trade dress side-by-side. *Id.*  Poret justifies using the *Eveready* format based on its wide acceptance by federal courts, its more accurate simulation of market conditions in which consumers do not find the accused and senior products in close proximity to each other, and its simulation of Capri Sun's theory that consumers buy the accused products because they see and, even without side-by-side comparison, confuse them with Capri Sun's. *Id.* ¶¶ 24, 29.

Because ABC's Accused Pouches are currently used in 24 products, each of which comes in numerous flavors dressed with individual logos, words and artwork, *see* JSUF ¶¶ 289–290,

Poret determined that a statistically significant test on all of them would not have been feasible, Poret Rep. ¶ 80. To obtain statistically significant results in a survey format that was feasible, Poret, after "careful[] stud[y]," chose three "reasonably representative" example of ABC's 24 Accused Pouches (all of which have the same shape). *Id.* ¶¶ 80–81. Each selected pouch product was shown to a test group of 200 respondents, who answered screener questions and viewed repeatable 30-second videos of a full rotation of the carton and the pouch. *Id.* ¶¶ 85–88. Respondents proceeded to answer questions designed to test for confusion: for example, which brand sold the product they had seen, whether that brand sold additional products, and whether the identified brand likely had licensing agreements or similar affiliations with any other brand. *Id.* ¶¶ 109, 113, 116, 118–119. Each test group had a control group of 200 respondents who took the identical survey, save that their videos contained visibly different-shaped pouches. *Id.* ¶ 89.

Throughout the survey, numerous quality control questions were asked to ensure that respondents were human, paid attention, did not guess, were from diverse regions, were age 18 or older, clearly understood the instructions, were not biased and did not know the survey's purpose or sponsorship, did not work in a related field, and had clearly seen the videos. *Id.* ¶¶ 35–41, 60–62, 68–79, 101, 106.

Poret's report concludes that the net confusion rates of each test group—Wild Harvest, HyVee Coolers, and Juicy Juice Splashers—were zero. *Id.* ¶¶ 18–19. That is because, for each product, the percentage of respondents in the test group who confused the product they viewed with a Capri Sun product was the same or slightly lower than the percentage in the control group confusing their product. *Id.* Poret therefore concludes that any confusion was due to noise and not because the Accused Pouch's shape was confusingly close to that of the product before the test group. The study's numerical findings are as follows:

| Product | Test [Group's Confusion Rate] | Control [Group's Confusion Rate] | Net [Confusion] |
|---|---|---|---|
| Wild Harvest | 6% | 6% | 0% |
| HyVee Coolers | 12% | 13.5% | −1.5% |
| Juicy Juice Splashers | 5% | 6% | −1% |

### 2.   Analysis

#### a.   Qualification

Poret is amply qualified to opine on the likelihood that consumers actually confuse ABC's Accused Pouches with Capri Sun's Pouch Mark.[9]

He holds a B.S. in Mathematics from Union College, an M.A. in Mathematics (Statistics) from SUNY Albany, and a J.D. from Harvard Law School. *Id.* ¶ 17. He is a member of the American Association of Public Opinion Research, the International Trademark Association, and the NAD. *Id.* ¶ 15. He has designed, supervised, and executed more than 1,000 surveys on consumer perceptions and opinions, 500 of which pertained directly to trademarks and trade dress, and 500 of which have been conducted online. *Id.* ¶ 14. He has done so as senior vice president of the research consultancy firm ORC International from 2004 to 2015, and as president of Hal Poret LLC since 2016. Poret's surveys have been admitted into evidence in numerous cases in this District and others. *See, e.g., A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 303, 302–03 (S.D.N.Y. 2019) (denying motion to exclude Poret's consumer confusion study); *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 581–82 & n.16 (S.D.N.Y. 2015) (same); *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 643–45 (S.D.N.Y. 2011) (admitting study in *Eveready* format and study in

---

[9] For much the same reasons, he is qualified to opine on a secondary issue he addresses: whether the packaging trade dress of a single ABC juice brand—Juicy Juice Splashers Organic—is likely to cause actual confusion with the trade dress of Capri Sun's "Original" brand. Poret opines that this packaging does not cause actual confusion. Because the Court grants summary judgment to ABC on that claim, it does not dwell on this aspect of Poret's report.

*Squirt* format); *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 461–65 (E.D. Va. 2019) (same, *Eveready* format), *aff'd*, 851 F. App'x 357 (4th Cir. 2021) (summary order); *Bd. of Regents v. Hous. Coll. of L.*, 214 F. Supp. 3d 573, 593–95 (S.D. Tex. 2016) (crediting Poret *Eveready* consumer confusion study over competing expert's).

In sum, there is no question—and Capri Sun does not dispute—that Poret is qualified to opine on the likelihood of confusion. Given Poret's education, skill, training, and experience in conducting consumer confusions surveys, his participation will "probably aid the trier of fact in his search for the truth." *Nemes v. Dick's Sporting Goods, Inc.*, No. 17 Civ. 1688 (NSR), 2019 WL 3982212, at *3 (S.D.N.Y. Aug 23, 2019); *see LVL XIII Brands*, 209 F. Supp. 3d at 636.

### b.     Admissibility

#### i.      *Legal Standards Applicable to Consumer Surveys*

"[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary meaning." *LVL XIII Brands*, 209 F. Supp. 3d at 638–39 (collecting cases). "To evaluate the validity and reliability of a survey, a court should consider whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449–50 (S.D.N.Y. 2017) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738 (S.D.N.Y. 2011); *see also Limited v. Macy's Merch. Grp., Inc.*, No. 15 Civ. 3645 (KMW), WL 4094913, at

*8–9 (S.D.N.Y. Aug. 2, 2016) (same), *aff'd*, 695 F. App'x 633 (2d Cir. 2017) (summary order).[10]

A "survey suffer[ing] from substantial methodological flaws . . . will be excluded under both

Rule 403 and Rule 702." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581

(S.D.N.Y. 2007). "In cases arising under the Lanham Act, the Court's gatekeeper function is of

heightened importance because the pivotal legal question virtually demands expert survey

research on issues such as consumer perception." *Id.* at 562 (cleaned up). And "[w]here, as

here, a trademark action contemplates a jury trial rather than a bench trial, the court should

scrutinize survey evidence with particular care." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d

218, 231 (S.D.N.Y. 2010) (citations omitted). Grouping Capri Sun's objections under the factors

recited by *Coty*, the Court now does just that.

*ii.*     *Analysis*

Capri Sun challenges the admissibility of Poret's survey on the grounds that (1) the

universe of respondents was unrepresentative; (2) it improperly failed to simulate market

conditions; (3) there was no pretest or pilot conducted; and (4) it included certain improper

questions. The Court addresses each in turn.

***Universe of Respondents***: Capri Sun argues that Poret's survey was (i) overinclusive in

considering past purchasers of pouched juice drinks, and underinclusive in not considering (ii)

future potential consumers who are indifferent to their packaging when they buy single-serve

juice drinks and (iii) children and retailers. Pl. Poret *Daubert* Mem. at 17–19. All three of these

challenges to the admissibility of Poret's report fail.

---

[10] *See also* Manual for Complex Litigation § 11.493 at 103 (Federal Judicial Ctr. 4th ed.
2004) (setting out seven criteria).

A secondary meaning survey is of "dubious value" where its universe is not keyed to the relevant market. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 652 F. Supp. 1105, 1110–11 (S.D.N.Y. 1987), *aff'd*, 830 F.2d 1217 (2d Cir. 1987), *overruled on other grounds*, *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993); *see also LVL XIII Brands*, 209 F. Supp. 3d at 643 (finding survey universe not tied to relevant market). "[I]f the wrong [universe is surveyed], the results are likely to be irrelevant." *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 179 (S.D.N.Y. 2012) (second alteration in original) (citation omitted), *aff'd on reconsideration in part*, No. 10 Civ. 2463 (SAS), 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012). To avoid being overinclusive, such a survey should "encompass only the potential buyers of the products at issue." *Lon Tai Shing Co. v. Koch+Lowy*, No. 90 Civ. 4464 (LJF), 1992 WL 18806, at *3 (S.D.N.Y. Jan. 28, 1992). To avoid being underinclusive, it must not "defin[e] a group narrower than the ideal universe, thus leaving out a group of persons whose perception is relevant." 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:161 (5th ed. 2022) (collecting cases).

Capri Sun first objects that Poret's survey included past purchasers of pouched juice drinks even though "[i]t is well-established that only potential future purchasers . . . are relevant to a confusion study." Pl. Poret *Daubert* Mem. at 17 (quoting *Malletier*, 525 F. Supp. 2d at 604). Past purchasers' familiarity with pouch brands, Capri Sun argues, may have skewed the confusion study in ABC's favor and is thus unreliable. *Id.*

Capri Sun is mistaken. Courts have frequently admitted consumer confusion studies—including Poret's—whose universe included past purchasers alongside potential future purchasers. *See, e.g., Gap, Inc. v. G.A.P. Adventures, Inc.*, No. 07 Civ. 9614 (AKH), 2011 WL 2946384, at * (S.D.N.Y. June 24, 2011) ("[The] universe [in Poret's consumer confusion study]

was designed to include both actual and prospective purchasers."); *GoSMiLE*, 769 F. Supp. 2d at 644 (admitting Poret study in which "[n]early two-thirds of participants had either recently shopped or would consider shopping through QVC, HSN or Sephora"); *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112 (AJP), 2014 WL 814532, at *21 (S.D.N.Y. Mar. 3, 2014) (denying motion to exclude expert report by Dr. Steckel in which he "defined the relevant population as Internet shoppers . . . who purchased jeans . . . within the past twelve months"), *appeal dismissed*, No. 14-1156 (2d Cir. May 19, 2014). Thus, Capri Sun's sweeping assertion that past purchasers cannot properly be included in a consumer confusion study's universe—or that including past purchasers would render such a study inadmissible—finds no support in case law.

Capri Sun relies on *Malletier* for the broad proposition that "[i]t is well-established that only potential future purchasers . . . are relevant to a confusion study." 525 F. Supp. 2d at 604. But Capri Sun overreads *Malletier*. *Malletier* and the case law it cites on this point do not hold that past purchasers must *always* be excluded from a confusion study's universe, or find that past purchases can *never* indicate the potential for a future purchase. *See id.* Rather, *Malletier* found, in the context of the case at hand, that consumers' past purchases indicated an unlikelihood of future purchases because the item was expensive, and thus rarely bought. *See id.* (unknown portion of respondents included in the universe "only because" they had purchased the item "'in the past year or two,' *but* were not likely to do so in the 'next year or so'"). No such correlation exists in circumstances—such as here—where the consumer good at issue is inexpensive and frequently or routinely bought. On the contrary, a recent past purchase *is* an indicator of a potential future purchase. *See Gap*, 2011 WL 2946384, at *9 (clothing and apparel); *GoSMiLE*, 769 F. Supp. 2d at 634 (teeth-whitening products); *Denimafia*, 2014 WL 814532, at *21 (jeans).

Indeed, Capri Sun's own expert Dr. Steckel has opined in this case that past purchases of pouched juice drinks predict future such purchases. *See* Steckel Rep. ¶ 41. The Court rejects the argument that Poret's survey universe is overinclusive.

Capri Sun's second argument is that Poret's survey universe is underinclusive—because it is limited to future potential consumers who specifically intend to buy drinks in a pouch, while excluding "packaging agnostic[s]." Poret *Daubert* Mem. at 18. The proper universe, Capri Sun proposes, would include all "consumers who set out to purchase juice drinks in general." *Id.*

This argument is unpersuasive for two reasons. First, Poret's universe was proper. It "encompass[ed] only the potential buyers of the products at issue." *Lon Tai Shing*, 1992 WL 18806, at *3. The Poret Report included all potential future juice drink customers who had selected pouches as among their possible containers. *See* Poret Rep. ¶¶ 57–59. Only pouch-averse respondents were excluded; everyone in the market for buying a pouched drink was included. Second, *Capri Sun*'s proposed survey universe would be overbroad. The group of "all consumers who set out to purchase juice drinks in general" can be divided into two distinct subsets: those who intend to buy pouched drinks (either exclusively, or among drinks in other containers); and those intending to buy drinks in any container other than a pouch. The latter subgroup is pouch-averse and falls outside "the potential buyers of the products at issue." *Lon Tai Shing*, 1992 WL 18806, at *3.

Capri Sun's third argument is that Poret's universe is underinclusive for excluding children and retailers, "two major categories of prospective purchasers" who run the risk of confusion. Pl. Poret *Daubert* Mem. at 19. This argument, too, fails. As to retailers, the Second Circuit has instructed that they "are assumed to be more sophisticated buyers and thus less prone to confusion." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir. 1993), *abrogated*

*on other grounds, Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39 (2d Cir. 1994). It follows that, if Poret's survey shows its universe was not confused, retailers would not be, either.

As to children, Capri Sun has not adduced evidence that they constitute a significant proportion of the population that buys 10-, 30-, or 40-count cartons of pouched drinks off the shelf. But even assuming that the proper universe would have included children, "errors in survey methodology usually go to the weight of the evidence" and do not warrant wholesale exclusion. *THOIP*, 690 F. Supp. 2d at 231.

The Court therefore finds that "the proper universe was examined and the representative sample was drawn from that universe." *Coty*, 277 F. Supp. 3d at 449.

***Methodology and Execution***: Capri Sun next argues that Poret's survey failed to properly simulate market conditions by (1) not using *Squirt*'s format of sequentially showing the senior and junior product to model their real-life proximity; (2) giving respondents too much time to inspect the products; (3) failing to account for post-sale encounters of the products; (4) testing only three of ABC's 24 Accused Pouches and improperly presenting them during the survey; and (5) failing to conduct a pretest. Pl. Poret *Daubert* Mem. at 14–16, 20–21, 23–24.

To have substantial probative value, a survey must "be designed to examine the impression presented to the consumer by the accused product." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999). "[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." *THOIP*, 690 F. Supp. 2d at 231 (alteration in original) (quoting 6 MCCARTHY ON TRADEMARKS § 32:163 at 32–333). However, "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions, . . . [and i]t is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by

another." *Gucci Am.*, 831 F. Supp. 2d at 738. "[A] survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." *Troublé v. Wet Seal*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001).

Capri Sun's first critique is that *Squirt*'s sequential format should have been used because Capri Sun's and ABC's pouches are often displayed near one another on websites and shelves. Pl. Poret *Daubert* Mem. at 12–14. That argument fails because it rests on a faulty legal premise. Capri Sun does not point to any authority that, when the junior and senior products are sold in the same store or on the same website, *Squirt*'s side-by-side approach is required to be used in lieu of the *Eveready* approach.[11] To the contrary, courts in this District and elsewhere have found *Eveready* studies admissible—and sometimes preferable—in such circumstances. *See, e.g., Phillips-Van Heusen Corp. v. Calvin Clothing Co.*, 444 F. Supp. 2d 250, 256–57 (S.D.N.Y. 2006) (admitting *Eveready* survey where Calvin Klein and junior mark were sold in same store); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 521–23 (10th Cir. 1987) (affirming admission of *Eveready* survey where competing fishing reel brands were sold in same store).[12]

Capri Sun's second critique is that the Poret survey gave respondents too much time to view the accused products' cartons and individual pouches—by allowing them to repeat, as often as they liked, the videos showing the pouches rotating against a blank background. It argues that that condition does not adequately model a consumer's purchasing experience, in which products

---

[11] The Court does not have occasion to resolve the parties' debate as to whether and to what extent Capri Sun's and the accused pouches are sold side-by-side. *See* Pl. Poret Daubert Mem. at 13–14; Dkt. 139 at 14–15 (calling Capri Sun's characterization "highly misleading").

[12] *Gross v. Bare Escentials Beauty, Inc.* 641 F. Supp. 2d 175 (S.D.N.Y. 2008), on which Capri Sun relies, is inapposite. There, the court denied a *Daubert* motion to exclude a *Squirt*-based consumer confusion study on junior and senior skincare products sold in the same store, on the ground that *Squirt* was "an approved format." *Id.* at 191. *Gross* did not, however, hold or even imply that use of the *Eveready* format would have been impermissible.

tend to be viewed from one side on a densely populated shelf or website.  Pl. Poret *Daubert* Mem. at 15 (noting that consumers "have impulsive, quick interactions with the parties' products").

This argument also fails.  In real life, the length and depth of a customer's engagement with a product she encounters varies by customer.  As a result, "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions," *Gucci Am.*, 831 F. Supp. 2d at 738.  Two 30-second videos showing a full rotation of a carton and a pouch meet the requirement of "roughly simulating marketplace conditions." *Troublé*, 179 F. Supp. 2d at 308. Capri Sun's concern over the length of respondents' exposure is especially unfounded because, as ABC notes, only 3% of respondents watched the video more than once.  Def. Poret *Daubert* Opp'n at 15.  The vast majority of respondents therefore interacted with virtual replica of an Accused Product for a short time only before forming judgments about them—much as in a brick-and-mortar store or online.  *See* Pl. Poret *Daubert* Mem. at 15.[13]

Capri Sun's third critique is that Poret's survey did not account for post-sale scenarios in which end-consumers may encounter assortments of pouches in which Capri Sun pouches and Accused Pouches are intermingled, such as at a birthday party or sporting event.  *Id.* at 16–17. But consumer confusion studies—and the corresponding case law—naturally focus on the point of sale.  That is because they test confusion of "future potential *purchasers*," *Conopco*, 49 F. Supp. 2d at 253, "potential future *purchasers*," *Malletier*, 525 F. Supp. 2d at 604; or "prospective *purchasers*," *Gross*, 641 F. Supp. 2d at 189; *Gap*, 2011 WL 2946384, at *8; *GoSMiLE*, 769 F.

---

[13] Notably, Dr. Steckel's rebuttal report addressing the Poret survey "does not cite th[is] flaw[] among the myriad critiques in his report." *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 201 (S.D.N.Y. 2011).

Supp. 2d 644 (emphases added). That the survey did not test post-sale encounters with the products goes to its weight, not its admissibility. *THOIP*, 690 F. Supp. 2d at 231.[14]

Capri Sun's fourth critique is that Poret has not independently demonstrated why the three pouches that formed the basis of his study are representative of the 24 Accused Pouches. Pl. Poret *Daubert* Mem. at 20–21. Capri Sun argues that Poret should have randomly allocated the 24 Accused Pouch products among the survey participants. Pl. Poret *Daubert* Reply at 9. But that critique is a mismatch for the issue in the case. The issue of trademark infringement in this case turns on the *shapes* of the senior and junior pouches. As such, selecting a single ABC pouch, testing it for consumer confusion, and exposing the control group to a different-shaped but otherwise identical pouch would have been enough to "examine the impression presented to the consumer by the accused product." *Conopco*, 49 F. Supp. 2d at 253. The addition of two other pouches adds assurance that survey responses were not skewed by the distinctive dress (*e.g.*, colors and labels) of a particular pouched drink. But to achieve reliability there was no need to conduct this exercise on all 24 Accused Pouches. Such would have been overkill.

***Failure to Pretest***: Capri Sun's final objection is that Poret did not conduct a pretest or pilot to assure clarity, accuracy, and reliability. Pl. Poret *Daubert* Mem. at 23–24. Capri Sun relies on the precept that "[i]t is standard practice for the survey expert to conduct a pre-test or pilot test of a proposed survey in order to evaluate the clarity and usefulness of the survey method, structure and questions." *Id.* at 23 (quoting MCCARTHY ON TRADEMARKS § 32:163.50).

Again, the caselaw does not rigidly require the duty to pretest that Capri Sun posits. Capri Sun has not cited authority that a lack of a pilot test, itself, calls into doubt the reliability of a consumer confusion survey, let alone requires its exclusion. Rather, as the treatise that Capri

---

[14] This ostensible methodological deficiency is also unmentioned in Dr. Steckel's rebuttal report.

Sun cites explains, a pretest may enhance the court's confidence in a survey's reliability. *See* MCCARTHY ON TRADEMARKS § 32:163.50. Here, however, given Poret's extensive experience designing and conducting consumer confusion studies using the same format, and given that courts in this District and elsewhere have admitted such surveys without requiring a pretest, the formality of a pretest was not obligatory. *See A.V.E.L.A.*, 364 F. Supp. 3d at 325–27; *Flushing Bank*, 138 F. Supp. 3d at 581–82 & n.16; *GoSMiLE*, 769 F. Supp. 2d at 643–45; *Combe*, 382 F. Supp. 3d at 461–65; *Bd. of Regents*, 214 F. Supp. 3d at 593–95.

To be sure, courts have excluded consumer confusion studies for discarding unfavorable pretest results, much as they have done where the expert altered the pretest survey without adequate explanation where the alteration yielded superior results. *See, e.g., Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 277 (S.D. N.Y. 2018) ("[N]o credible explanation was offered for the changes made between the pre-test survey and the reported survey, and this suggests a potentially improper purpose."); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 450 n.196 (S.D.N.Y. 2004) ("Dr. Jacoby discarded these results on account of what he called interviewee 'fatigue' and rewrote some of the questions to 'focus" respondents' attention. It *is* legitimate to run a pilot study for purposes of improving a study. But in this case the circumstances hint at a darker purpose." (citation omitted) (emphasis and alteration in original)), *aff'd in part, vacated in part on other grounds*, 454 F.3d 108 (2d Cir. 2006). Merely foregoing a pretest does not, however, raise such red flags. *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co.*, No. 15 Civ. 8459 (LGS), 2017 WL 3142072, at *2 (S.D.N.Y. July 24, 2017).

Accordingly, the Court finds that the Poret "survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys." *Coty Inc.*, 277 F. Supp. 3d at 449–50.

***Improper Questions***: Capri Sun finally objects to two questions in Poret's survey that, it argues, were flawed and drove down net confusion rates. Capri Sun argues that question 150's instruction to select "pouches" among the answer choices in order to "qualify" for the survey revealed the survey's purpose to respondents, and that question 240's inquiry whether respondents could think of "any other product" belonging to the brand that they had just viewed was ostensibly imprecise and biased against Capri Sun. Pl. Poret *Daubert* Mem. at 22–23.

"A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008) (quotation marks omitted). "Suggestive questions render a survey unreliable by creating 'demand effects' or 'cues' from which a respondent can infer the purpose of the survey and identify the 'correct' answers." *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 288 (W.D.N.Y. 2019) (citation omitted), *aff'd*, 824 F. App'x 75 (2d Cir. 2020) (summary order). Ordinarily, however, objections to specific survey questions go to "the weight of the expert report rather than its admissibility." *A.V.E.L.A.*, 364 F. Supp. 3d at 326 (citing *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999)).

The questions here do not come close to requiring exclusion of the survey. Question 150 offered five answer choices—"pouches," "bottles," "cans," "none of these," and "not purchased/likely to purchase." Poret Rep. ¶¶ 55, 58. Capri Sun does not point to any feature of Question 150 that made the answer choice "pouches" so prominent as to reveal the survey's purpose to respondents. And Question 150 was just one of 11 screener questions that

respondents had to answer before taking the survey.  As for Question 240, its open-ended nature similarly is not close to "inherently suggestive." *Procter & Gamble*, 574 F. Supp. 2d at 352.  It did not lead respondents to infer the purpose of the survey or to identify the 'correct' answers." *Saxon Glass Techs.*, 393 F. Supp. 3d at 288 (citation omitted).  Rejecting Capri Sun's critique, the Court finds that Poret's questions were neither "leading [n]or suggestive." *Coty*, 277 F. Supp. 3d at 450.

The Court accordingly denies Capri Sun's *Daubert* motion to exclude Poret's testimony and the survey on which it is based.

## C.    ABC's Motion to Preclude Capri Sun's Expert Dr. Joel Steckel

Capri Sun retained Dr. Joel Steckel, a professor of marketing and vice dean for doctoral Education at N.Y.U.'s Stern School of Business, to opine on (1) the potential fame of Capri Sun's Pouch Mark and (2) the continued acquired distinctiveness of the Pouch Mark under the Trademark Dilution Act.  Dkt. 112-9 ("Steckel Rep.") ¶¶ 1, 12.  ABC has moved to exclude Dr. Steckel's opinion testimony under Rule 702 and *Daubert*.[15]  Dkt. 87.

### 1.    Dr. Steckel's Report

Dr. Steckel concludes that Capri Sun's Pouch Mark is "likely famous" and "has continued to have acquired distinctiveness for consumers."  Steckel Rep. ¶ 51.  Dr. Steckel's report does not overtly describe his methodology, but his mode of analysis is revealed by a review of his report.  His report begins by reviewing academic accounts of how advertising techniques create and maintain associations in consumers' minds between a product's design

---

[15] ABC does not, however, move to exclude Dr. Steckel's January 19, 2021, rebuttal report, Dkt. 112-11, except to the extent it reprises opinions in the Steckel Report.  Def. Steckel *Daubert* Mem. at 1 n.1.  As the Court denies ABC's *Daubert* motion to exclude Dr. Steckel's report, except as to any trial testimony on the applicable legal standards under the Trademark Dilution Revision Act of 2006, the same limitation applies to Dr. Steckel's rebuttal report.

element (such as its packaging) and the brand. *Id.* ¶¶ 17–18. He then identifies factors that under the Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c), indicate when an association is strong enough to amount to fame: high sales, high awareness, extensive and consistent advertising, and unsolicited media coverage. Steckel Rep. ¶¶ 19–21. Dr. Steckel then groups and evaluates his evidence under these factors. Reviewing this evidence item by item, the report reaches the conclusion, based on the weight of the evidence, that the Pouch Mark is likely famous and has acquired distinctiveness. *See generally id.* ¶¶ 22–50.

Dr. Steckel's analysis proceeds in two steps. First, he concludes that Capri Sun, over the past four decades, has consistently attempted to make the Pouch Mark famous by creating a link in consumers' minds between the Pouch as a branding element and the Capri Sun brand. *Id.* ¶ 15. After such a link had been established, he opines, the Pouch Mark acquired secondary meaning, *i.e.*, consumers came to recognize the Pouch Mark as "being associated with a single brand, company, and/or source of the [Pouch]." *Id.* ¶ 16.

As to the Pouch Mark's fame, Dr. Steckel bases this conclusion on four insights he states were revealed by his research.

First, Capri Sun leads in sales in the category of single-serve juice pouches, and has high top-of-mind awareness among consumers in this category. For this point, Dr. Steckel cites, *inter alia*, a 2017 Nielsen data report, internal 2017 data by Kraft, a 2016 Ipsos household penetration survey, the Complaint in this case, a 2020 YouGov poll, and a 2018 Statista survey. *See id.* ¶¶ 27–31. The Statista survey, for example, found that 38.6% of U.S. individuals aged 18 to 29, 31.3% of individuals aged 30 to 49, and 13.3% of individuals aged 50 to 64 had consumed Capri Sun beverages within the past four weeks. *Id.* ¶ 28. The Ipsos survey showed that 89% of mothers with children aged 6 to 12 had considered buying Capri Sun products, and that 74% had

in fact purchased Capri Sun. *Id.* ¶ 30. Such market leadership and top-of-mind awareness of Capri Sun, Dr. Steckel concludes, suggests that the Pouch Mark is widely recognized—or likely famous—among the U.S. public. *Id.* ¶ 31.

Second, Capri Sun has, over the past four decades, invested in marketing that specifically placed the Pouch Mark in the foreground. Dr. Steckel analyzes TV ads from Capri Sun's "Respect the Pouch," "Seize the Pouch," and "Hold My Pouch" campaign, as well as ads from 1982, the 1990s, the 2000s, 2016, and 2020, and a magazine advertisement. He also analyzes Capri Sun's collaboration with the rideshare app Lyft, as a result of which, at the press of a button, the cars on Lyft users' screens morphed into moving juice pouches. *See id.* ¶¶ 34–36. Such marketing efforts, Dr. Steckel notes, all prominently feature the Capri Sun Pouch. He notes, too, Nielsen data that Capri Sun spent $20 million on advertising in 2018 across all sub-brands, more than five times the $4.9 million spent on behalf of ABC's prominent Juicy Juice brand by ABC and its co-pack customers using Accused Pouches. On the basis of these sources, Dr. Steckel concludes that Capri Sun is demonstrably making "efforts to continue supporting brand recognition and consumers' top-of-mind awareness of the [Pouch Mark]." *Id.* ¶ 33.

Third, Dr. Steckel reviews unsolicited articles in consumer-facing media to conclude that its coverage "suggests that the [Pouch Mark] designates Capri Sun." *Id.* ¶¶ 37–40.

Fourth, Dr. Steckel reviews 2017 Nielsen purchase data of kids' single serve beverages, which concludes that the "container is the best purchase predictor." This, he opines, reinforces that Capri Sun's Pouch Mark contributes to Capri Sun's sales. *Id.* ¶ 41.

These insights, taken together, are the basis of Dr. Steckel's first conclusion—that Capri Sun's Pouch Mark is likely famous.

As to Dr. Steckel's second conclusion—that the Pouch acquired secondary meaning after becoming famous—Dr. Steckel relies on similar evidence as the first. He emphasizes that Capri Sun's advertising expenditures have consistently been high, that its marketing efforts have been consistently focused on the Pouch, and that "top-of-mind" brand awareness has remained steady or increased. *Id.* ¶¶ 43–45. Dr. Steckel notes, too, screen shots of products on Capri Sun's homepage between 2014 and 2020. *Id.* ¶¶ 46–49. Dr. Steckel concludes that this evidence, in the aggregate, suggests that the Pouch Mark is "source-designating," *i.e.*, that it has acquired secondary meaning.

The materials on which Dr. Steckel bases his report largely consist of discovery he was furnished by Capri Sun's counsel, including from discovery in this litigation. These include internal Capri Sun data on marketing, ad expenditures, and ad campaigns. Dr. Steckel also relies on Capri Sun's Complaint; facts stipulated to by the parties on the issue of functionality, *see* Dkt. 31-1; three pieces of academic literature; a Nielsen report on Capri Sun's household penetration; the deposition of Ronald Weening; several dozen publicly available news articles; a few YouTube videos of Capri Sun ads; and several statistical reports. Steckel Rep. at C-1 to C-4.

### 2.  Analysis

#### a.  Qualification

Dr. Steckel is qualified to opine on issues of fame and secondary meaning under the Trademark Dilution Act. He is a professor of marketing at the N.Y.U. Stern School of Business, where he joined the faculty in 1989 and chaired the marketing department between 1998 and 2004. Steckel Rep. ¶ 1. He has held faculty appointments at the business or management schools of Columbia University, UCLA, Yale University, and the Wharton School. *Id.* Dr. Steckel is also the founding president of the Institute for Operations Research and Management Science (INFORMS), a well-known professional group dedicated to "the development and

application of management science theory and tools in marketing." *Id.* ¶ 2. He has specialized

in marketing research methodology, marketing and branding strategies, and digital marketing.

*Id.* ¶ 3. He has written four books and more than 50 articles, and published on the Trademark

Dilution Act, the growth and evolution of the discipline of marketing science, on product

differentiation, and on individual choice behavior in purchasing decisions. *Id.* ¶ 4, A-3 to A-6.

The Court finds—and ABC does not dispute[16]—that Dr. Steckel is qualified to opine on the

Pouch Trademark's fame and secondary meaning.

### b.    Admissibility

#### i.    *Applicable Legal Standards*

"Because there are areas of expertise, such as the social sciences in which the research,

theories and opinions cannot have the exactness of hard science methodologies, trial judges are

given broad discretion to determine 'whether *Daubert's* specific factors are, or are not,

reasonable measures of reliability in a particular case.'" *Bloomberg*, 2010 WL 3466370, at *14

(quoting *Kumho Tire*, 526 U.S. at 153). *Daubert's* "fit" requirement is satisfied where the

"expert testimony proffered in the case is sufficiently tied to the facts of the case [such] that it

will aid the jury in resolving a factual dispute," so long as that testimony does not "usurp either

---

[16] Dr. Joachimsthaler's rebuttal report for ABC asserts that Dr. Steckel is not an expert on branding but on marketing. Assuming *arguendo* that that nicety matters such that branding experts in general would be better equipped to opine on fame and secondary meaning, the pertinent point involves Dr. Steckel's qualifications for this assignment, which clearly suffice. "[C]ourts in the Second Circuit liberally construe expert-qualification requirements in consideration of the 'thrust' of the Federal Rules and their general relaxation of traditional barriers to opinion testimony." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) (citations and quotation marks omitted). Accordingly, "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1674796 at *3 (S.D.N.Y. May 2, 2011).

the role of the trial judge . . . or the role of the jury." *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *5 (S.D.N.Y. Nov. 11, 2021) (quoting *Alto v. Sun Pharm. Indus., Inc.*, No. 19 Civ. 9758 (GHW), 2021 WL 4803582, at *3 (S.D.N.Y. Oct. 13, 2021), and *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). An expert report usurps the jury's factfinding role, however, when it "undertakes to tell the jury what result to reach," "repeatedly track[s] the exact language of the statute[]," or "use[s] judicially defined terms." *Duncan*, 42 F.3d at 101.

ii.    Analysis

ABC challenges the admissibility of Dr. Steckel's report on three grounds: it purportedly (1) fails to use a scientific methodology or specialized knowledge; (2) makes lay determinations that usurp the role of the factfinder; and (3) draws conclusions from unreliable, incomplete, and biased data. Though ABC's critiques are not without force, the report is admissible under Rule 702 and *Daubert*.

***Lack of Scientific Methodology and Specialized Knowledge***: ABC argues that Dr. Steckel does not employ a methodology or specialized knowledge that an expert in his field would use. Instead, ABC argues, Dr. Steckel identifies some of the legal factors used by the Trademark Dilution and Revision Act of 2006 to determine a brand's fame and distinctiveness, applies "evidence supplied by counsel" to gauge those factors, and declares that the Pouch Trademark is "likely" famous and has maintained acquired distinctiveness. Def. Steckel *Daubert* Mem. at 5. Questioned at his deposition about the areas in which his opinions were based on a scientific methodology or expertise, Dr. Steckel responded that his expertise enabled him to (1) identify that Capri Sun is a sales leader for pouched juices (2) reconcile two inconsistent figures for Capri Sun's 2019 revenue; (3) recognize that Capri Sun's ads on YouTube were nationally run; and (4) discern that household penetration studies would be relevant to a fame and distinctiveness analysis. *Id.* at 5–7 (citing Steckel Dep. Tr. at 166, 173–74, 209–14). None of

these, ABC argues, qualifies as an application of a scientific method or expertise. This failure, ABC argues, is substantial, insofar as rigorous methods to determine fame and distinctiveness—most obviously, consumer surveys—exist in the field. *Id.* at 7–8.

ABC has a point. Dr. Steckel's decision to forego a survey on an issue on which it stood to be impactful and reliable is striking and curious—and opens Capri Sun to the critique that his conclusions are unacceptably impressionistic. Nonetheless, on balance, the Court finds that Dr. Steckel's conclusions, which at bottom are based on an array of diverse and collectively telling data sources, clears the admissibility bar. "The Second Circuit instructs district courts to exclude expert testimony if it is 'speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith.'" *LVL XIII Brands*, 209 F. Supp. 3d at 636 (quoting *Zerega*, 571 F.3d at 214 (further citation and quotations marks omitted)). Nothing in Dr. Steckel's report suggests speculation, conjecture, or bad faith. He relies on established academic authorities to explain the concept of branding elements, the different types of branding elements (such as packaging), how companies' investment and branding strategies can foster consumer associations between those branding elements and the brand, and how, based on those associations, a branding element can acquire distinctiveness. Steckel Rep. ¶¶ 15–18. Dr. Steckel then applies this framework to media reports, statistical reports, and advertisements across several decades bearing on the Pouch Mark. Much, though not all, of this he found through independent research. Dr. Steckel draws a moderate conclusion from his analysis: that the evidence is "consistent with" or "suggests" that the Pouch Trademark is "likely" famous. *See* Steckel Rep. §§ III., III.A., III.A.3., III.A.4., III.B, ¶ 51.

Dr. Steckel's report thus does not fall below the minimum requirement for admissibility in this Circuit: that its data and methodology are "simply inadequate to support the conclusions

reached," *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005), or based on "assumptions so unrealistic and contradictory as to suggest bad faith," *Restivo*, 846 F.3d at 577. ABC's contention that other, more sophisticated methods could have been used, although a fair ground for cross-examination and critique at trial, is not the decisive test on a motion to preclude under *Daubert* or Rule 702. ABC's arguments that Dr. Steckel forewent easy ways to test his conclusions "go to the weight, not the admissibility" of his report, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), and "are better addressed through cross-examination" at trial, *A.V.E.L.A.*, 364 F. Supp. 3d at 326.

***Usurping the Role of the Factfinder***: ABC next argues that Dr. Steckel usurps the role of the factfinder by, purportedly, telling the jury what legal conclusion to draw from certain data. Def. Steckel *Daubert* Mem. at 8–13.[17]

That is wrong. Dr. Steckel does not conclude that the Pouch Mark *is* famous or *has* acquired secondary meaning within the meaning of the Trademark Dilution Act. He states that the evidence he considered, in totality, "suggests" or is "consistent with" the inference that the Pouch Trademark is, in the vernacular, "likely" famous. That is a fair characterization of the assembled evidence which does not "undertake[] to tell the jury what result to reach." *Duncan*, 42 F.3d at 101.

Importantly, Dr. Steckel does not "repeatedly track[] the exact language of the" Trademark Dilution Act or mechanistically "use judicially defined terms." *Id.* The vast majority of his report analyzes data and other evidence and evaluates it through the prism of marketing terminology drawn from literature in the field—*e.g.*, "top-of-mind awareness," "consumer

---

[17] This data consists of Capri Sun sales figures, household penetration studies, advertisements, social media presence, marketing spends, unsolicited media coverage, and "sales drivers."

associations," "brand recognition"—or common usage—*e.g.*, "recognition," "awareness,"

"strong connection." Although the Trademark Dilution Act's key terms guide his focus, his

report does not force the facts into a legal mold that would deprive the average juror of her

ability to make factual determinations of fame and secondary meaning on her own. To the extent

his locutions have potential to cross that line during trial, the remedy is to exclude any such

linguistic excesses then, rather than to preclude his opinion testimony outright.

 Nor does Dr. Steckel's largely expository approach render his report inadmissible. While

use of a survey would have neutralized this critique, it is well-established that "[e]xpert

testimony is . . . admissible where it 'synthesizes' or 'summarizes' data in a manner that

'streamline[s] the presentation of that data to the jury, saving the jury time and avoiding

unnecessary confusion.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y.

2016) (quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504

(S.D.N.Y. 2015) (*quoting Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012))

(second alteration in *Scott*); *see also In re Aluminum Warehousing*, 336 F.R.D. at 31 (same).

That is what Dr. Steckel has done. His report unites large and varied types of data to support a

conclusion grounded in a field in which he has genuine expertise.

 The Court finds, too, that Dr. Steckel has usefully "draw[n] inferences that would not be

apparent without the benefit of experience or specialized knowledge." *Scott*, 315 F.R.D. at 45

(quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)). For

example, it would be by no means obvious to a lay juror how and in what manner household

penetration studies, sales figures, or ad spots speak to fame or distinctiveness. Dr. Steckel

synthesizes Capri Sun's ad spend, its campaigns spanning 1982 to 2018 centered on the Pouch

Mark, the Gold Effie marketing award it won in 2010, as to conclude, all in, that Capri Sun's

"'look-for' advertising campaigns have been largely successful." Steckel Rep. ¶ 35; *id.* ¶¶ 33–36. These inferences reinforce the fair conclusion that Capri Sun has invested heavily and successfully in the Pouch Mark in a manner, giving it a presence and niche that makes it valuable corporate intellectual property. Such insights, communicated by a professional drawing on genuine expertise, do not usurp the role of the jury.

   ***Unreliable, Incomplete, and Biased Data***: ABC next takes issue with Dr. Steckel's data. ABC argues that it is biased because Capri Sun's counsel selected it—and because Dr. Steckel did not request additional materials save for one report, did not confirm that he had received all relevant documents, and did not verify their accuracy. Def. Steckel *Daubert* Mem. at 13–14, 18–19. As a result, ABC asserts, Dr. Steckel relied on third-party reports in lieu of more reliable sales data, advertising costs, or marketing presentations that he could have sought from within Capri Sun. *Id.* at 14–15. ABC further asserts that Dr. Steckel cherry-picked among sales data, ignoring a 2019 Capri Sun sales figure of $33.8 million established by discovery because it was implausible in light of the company's advertising spend that year of $20.1 million, and choosing instead to treat as accurate a higher but unsubstantiated factual allegation about sales in Capri Sun's complaint and a higher sales figure from 1991 ($100 million) that appeared in a *Chicago Tribune* news article. *Id.* at 15–16, 19–20. ABC also faults Dr. Steckel for overlooking the extensive use of the Pouch Trademark by third parties, which, it argues, undercut Capri Sun's claim that the Pouch Mark is distinctive, and for not reviewing the deposition testimony of Jan Strubel, Capri Sun's marketing and advertising representative. *Id.* at 14, 16–17. Finally, ABC notes, Dr. Steckel did not verify the accuracy of the independent surveys and statistics on brand recognition he consulted, or the media coverage upon which he drew. *Id.* at 22–23.

These critiques are overstated.  At the threshold, "an expert may rely on data that she did

not personally collect."  *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000).  But

Dr. Steckel did not in fact, as ABC inaccurately implies, rely solely on the materials provided by

Capri Sun's lawyers.  Although he did not request additional materials from *them*, he testified

that he conducted significant independent research for his report.  *See* Pl. Steckel *Daubert* Opp'n

at 16  (citing Steckel Dep. Tr. at 18).  Dr. Steckel also testified that he asked ABC's counsel to

furnish him additional materials that it believed he ought to consider—but received nothing.  *Id.*

(citing Steckel Dep. Tr. at 233).

And the cases on which ABC relies as a basis for using such methodological choices as a

basis for exclusion under *Daubert* are far afield.  In *Faulkner v. Arista Recs. LLC*, the expert had

falsely characterized as "abysmal" the records produced by the *other* party, ignoring substantial

records that the party had produced to him.  46 F. Supp. 3d 365, 369, 372, 377, 380–81

(S.D.N.Y. 2014).  Here, Dr. Steckel disclosed the basis for his report, which included but was not

limited to voluminous records produced by the party that retained him, supplemented these

records with independently obtained materials, and invited the litigation adversary to furnish him

with other apposite records.  And in *E.E.O.C. v. Bloomberg L.P.*, the expert had not done any

independent research to verify the accuracy and representativeness of the documents and data he

had received.  2010 WL 3466370, at *14.  Here, Dr. Steckel conducted some such research.

*Rowe Ent., Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2003 WL 22124991

(S.D.N.Y. Sept. 15, 2003), is inapposite for the same reason.  *See id.* at *3 ("[A]ny expert should

be aware that a party and counsel in a litigation have an interest in the outcome and that an

expert study should not be dependent on the information they supply.").

The remainder of ABC's critiques of Dr. Steckel's report are suitable subjects for cross-examination but do not warrant exclusion.  Consistent with its faulting Dr. Steckel for foregoing a study, ABC is at liberty to impeach him for being less thoroughgoing than he might have been: for not seeking out certain internal data from Capri Sun, for relying on unverified revenue figures as part of his analysis, for cherry-picking among sales data, and for underlying limited verification of data.  But even crediting these critiques, there is adequate, if not ample, factual basis for "the conclusions reached." *A.V.E.L.A.*, 364 F. Supp. 3d at 325.  Dr. Steckel's expert testimony, the Court finds, thus "falls within 'the range where experts might reasonably differ,'" making "the duty of determining the weight and sufficiency of the evidence on which the expert relied [one for] the jury, rather than the trial court." *Scott*, 315 F.R.D. at 43 (quoting *Kumho Tire*, 526 U.S. at 153).  Far from offending the Second Circuit's "rather broad standard for the admissibility of expert witness testimony," *Bacardi & Co. v. New York Lighter Co.*, No. 97 Civ. 7140 (JS) (VVP), 2000 WL 298915, at *2 (E.D.N.Y. Mar. 15, 2000), the asserted divots in Dr. Steckel's data and approach are best left for adversarial testing at trial.

   ***Stating Legal Standards***:  Although ABC does not move on this ground, the Court notes that Dr. Steckel repeatedly quotes legal standards from the Trademark Dilution Revision Act of 2006.  *See* Steckel Rep. ¶ 22.  The Court has not relied on this aspect of Dr. Steckel's report in sustaining his testimony against ABC's *Daubert* challenge.  However, for avoidance of doubt, the Court will preclude Dr. Steckel from stating (let alone applying) those legal standards during his trial testimony.  Such testimony would "usurp[] . . . the role of the trial judge instructing the jury as to the applicable law." *Nimely*, 414 F.3d at 397.

The Court accordingly denies the motion to preclude Dr. Steckel's testimony, which comports with Rule 702 and *Daubert*, save that the Court precludes any testimony as to the applicable legal standards.

### D.    Capri Sun's Motion to Preclude ABC's Dr. Expert Erich Joachimsthaler

ABC retained Dr. Erich Joachimsthaler to provide an expert rebuttal report to the report of Dr. Steckel. Dkt. 112-14 ¶¶ 1, 3, 8–10 ("Joachimsthaler Rep."). Capri Sun has moved to exclude the Joachimsthaler Report under Rule 702 and *Daubert*. Dkt. 104.

#### 1.    Dr. Joachimsthaler's Report

Dr. Joachimsthaler's rebuttal report concludes that "the conclusions in Dr. Steckel's report are not justified, reliable, or valid, and are contrary to the accepted practices in the field" of branding and marketing. Joachimsthaler Rep. ¶ 12. He bases these conclusions on his review of Dr. Steckel's report, the materials underlying the Steckel Report, discovery materials provided by ABC's counsel, and his independent research of several dozen online articles, several academic books and articles, and online advertising spots. *Id.* ¶ 13, *id.* at 75–78.

Dr. Joachimsthaler opines that, although the methods, models, and framework used in marketing and branding studies have evolved over the years, *id.* ¶¶ 34–35, there are four basic steps in every analysis of a brand's fame and secondary meaning that the Steckel Report should have taken: to (1) define and outline the relevant product category (pouched juice drinks), the major players in it, and its strategic landscape; (2) analyze what the brand stands for in consumer's minds; (3) study the company's efforts to build the brand and whether and how consumers responded to those efforts; and (4) understand whether and how a brand's strength translates into consumer awareness, associations, and preferences. *Id.* ¶ 35. Using Dr. Joachimsthaler's terminology, these four combined metrics make up a brand's "equity." *Id.* He criticizes Dr. Steckel for failing to rigorously take all four steps, and for instead "cherry-picking

a few parts of the overall methodology" and "only leveraging selective, anecdotal, and at times even false or improper evidence." *Id.* ¶ 36 (cleaned up).

These failures, Dr. Joachimsthaler opines, produced eight specific shortcomings that make Dr. Steckel's report "fundamentally unreliable and invalid." *Id.*

First, the Steckel report fails to rigorously analyze the product category and strategic context in which Capri Sun operates. *Id.* ¶¶ 39–46. According to Dr. Joachimsthaler, this requires an evaluation of the product category, the competitors within that category, the subject brand's performance in that competitive landscape, and consumer perception of that brand. *Id.* ¶ 39. Dr. Joachimsthaler would (i) define the category's size, growth rate, growth drivers, trends and substitutes, key players, and competitive dynamics; (ii) set out Capri Sun's origins, growth story, and competitive advantages, and role in contemporary culture; (iii) provide specific context on the Pouch Mark, *i.e.* its history, introduction to the market, the role it plays in Capri Sun's overall success, marketing strategy, and differentiation; and (iv) discuss how consumers apprehend and encode brands in that product category, and what this implies for Capri Sun's Pouch Mark. *Id.* ¶ 41. Although Dr. Steckel's report "echoes this thought process," *id.* ¶ 39, he has only "sprinkled [it] with some category and business facts," did not do sufficient independent research, consult enough peer-reviewed literature, or conduct interviews with Capri Sun executives, *id.* ¶¶ 39, 43–44. Further, Dr. Joachimsthaler opines, had Dr. Steckel invested the requisite rigor in crafting his report, he would have recognized that pouches are an extremely common beverage container throughout the world and the United States; that references to the Pouch in advertisements are standard for the industry; and that sales data do not, in fact, suggest that Capri Sun is the market leader in pouched juices. *Id.* ¶ 45.

Second, Dr. Joachimsthaler opines, the Steckel Report did not use a branding model to understand what the Capri Sun brand stands for, and what specific role the Pouch plays with respect to that brand. *Id.* ¶¶ 47–56. A branding model is a more "identity-based," or inside-out-looking approach than Dr. Steckel's "market-based," or "outside-in" framework[]. *Id.* ¶ 49. Applying such a model would have focused more on Capri Sun's branding strategy, entailed more robust research, and led to more comprehensive and correct data on consumer perceptions of Capri Sun's brand and the degree to which the Pouch Mark evokes favorable associations with the brand. *Id.* ¶¶ 49–51. Having foregone this data, Dr. Joachimsthaler opines, Dr. Steckel relies on outdated and unreliable sources to support his conclusion that the Pouch Mark has acquired fame and secondary meaning. *Id.* ¶¶ 52–53.

Third, Dr. Joachimsthaler opines, the Steckel Report does not analyze what impact, if any, Capri Sun's marketing spend had on consumer behavior, or even identify a coherent marketing strategy by Capri Sun. *Id.* ¶¶ 57–61. Beyond touting raw numbers on Capri Sun's ad spend—which he failed to verify—Dr. Steckel failed to set out how much was spent specifically on the brand or on the Pouch (outside the "Respect the Pouch," "Seize the Pouch," and "Hold my Pouch" campaigns); and whether these ads are creative or differentiated from other competitors' (other than its 2010 Effie award). *Id.* ¶¶ 57, 60.

Fourth, Dr. Joachimsthaler contends, Dr. Steckel has not sufficiently shown that the Pouch Trademark is a source identifier uniquely associated with Capri Sun-branded products. *Id.* ¶¶ 62–67. This inquiry generally requires a five-factor analysis. Although these factors include studying the Pouch Mark's uniqueness, and consumers' association of the Pouch Mark with Capri Sun, Dr. Steckel did neither. *Id.* ¶ 63. In fact, Capri Sun's extensive licensing of the Pouch Mark to Kraft under the Kool-Aid brand, and to Faribault and ABC's customers under

their brands pursuant to the SLA, has filled the market with competing juice pouches and their similarly shaped successors since the SLA's discontinuance. *Id.* ¶¶ 63–64.

Fifth, Dr. Joachimsthaler opines, Dr. Steckel did not analyze the Capri Sun brand's strengths, or how ABC's actions harmed those strengths. *Id.* ¶¶ 68–75. Such would have first involved a brand equity analysis, *i.e.*, an analysis of consumers' awareness of, and associations with the Capri Sun brand, and whether the Pouch strengthens the brand by evoking positive consumer associations with it. *Id.* ¶¶ 69, 71. Dr. Steckel should then have examined how ABC's actions ostensibly harmed those equities, *e.g.*, by showing that these gradually whittled away at the positive associations with Capri Sun's brand. *Id.* ¶¶ 73–74.

The three remaining shortcomings that Dr. Joachimsthaler identifies are (6) an overall lack of "scientific perspective or process" as a result of Dr. Steckel's alleged failure to ground his analyses and conclusions in well-established, peer-reviewed models, *id.* ¶¶ 76–80; (7) factual mistakes and misrepresentations as to sales numbers, market shares, advertising spend, the accuracy of the extent of unsolicited media coverage, and consumer brand awareness, *id.* ¶¶ 81–82; and, finally, (8) that, as a specialist in marketing, Dr. Steckel, as a professor of marketing, assertedly lacks the proper qualification to opine on branding, *id.* ¶¶ 83–84.

### 2. Analysis

The Court grants in part and denies in part Capri Sun's motion to preclude Dr. Joachimsthaler's expert report, opinions, and testimony. The Court finds Dr. Joachimsthaler amply qualified to opine as a rebuttal expert on the issues of fame and continued acquired secondary meaning—the issues of Dr. Steckel's report. The Court further finds his report and testimony admissible under *Daubert*. The Court, however, excludes Dr. Joachimsthaler's legal conclusions about trademark law. And although the Court will permit the entirety of Dr. Joachimsthaler's critique of Dr. Steckel's work to reach the jury, the Court precludes Dr.

Joachimsthaler from presenting that critique in *Daubert* terms, so as to state or imply before the jury that Dr. Steckel's expert opinion did not satisfy admissibility standards.

### a.    Qualification

Capri Sun states in passing that "it is unclear how Mr. Joachimsthaler is even qualified to opine on what he appears to believe to be the exclusive method." Pl. Joachimsthaler *Daubert* Mem. at 12. Capri Sun bases this argument on a portion of Dr. Joachimsthaler's deposition testimony in which he appeared to show a lack of familiarity with McCarthy's treatise on trademark law. *Id.* To the extent Capri Sun's gloss is meant to challenge Dr. Joachimsthaler's qualification as an expert, it fails. Any such challenge would be frivolous.

Dr. Joachimsthaler is clearly qualified to opine on the standards governing the inquiry undertaken by Dr. Steckel into the Pouch Mark's fame and secondary meaning. He has researched and published extensively on marketing and branding strategies. *See* Joachimsthaler Rep. ¶ 3; *id.* Ex. 1 at 6–8. He has written three books on marketing strategy, which, as he discusses in his report, developed the framework he applies. *Id.* ¶¶ 3, 34–35. He has more than 30 years of practical experience in strategic brand promotion, marketing, and innovation. *See* Joachimsthaler Rep. Ex. 1 at 2. He is the CEO of a consulting firm focusing on strategic band promotion, marketing, and innovation, which he founded in 1999. *Id.* ¶ 1; *id.* Ex. 1 at 2. That firm, Vivaldi Group, frequently conducts the same type of brand analysis that Dr. Joachimsthaler conducted in the instant report. *See id.* ¶¶ 33, 50. He is a member of the American Marketing Association, and has taught marketing as an adjunct, visiting, or assistant professor at U.S. institutions and the IESE in Barcelona, Spain. *Id.* ¶ 4; *id.* Ex. 1 at 2. He holds undergraduate degrees in economics, business administration, and computer science from the universities of Giessen and Frankfurt, Germany; a Master of Science in marketing research and a Ph.D. in business administration from the University of Kansas; and completed a post-doctoral fellowship

at Harvard Business School. *Id.* Ex. 1 at 1. Dr. Joachimsthaler's education, knowledge, and experience abundantly qualify him to opine on the rigor, or lack thereof, of Dr. Steckel's methodology and execution.

### b.    Admissibility

#### i.    *Legal Standards Applicable to Expert Rebuttal Reports*

"The 'task of a rebuttal expert is different from that of an affirmative expert. A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis.'" *Aluminum Warehousing*, 336 F.R.D. at 29 (quoting *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11 Civ. 681 (KBF), 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015)). Rebuttal experts thus "have a less demanding task because they have no burden to produce models or methods of their own; they need only attack those of plaintiff['s] expert[]." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) (internal quotation marks omitted) (second alteration in original).

"The scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report, but district courts have been reluctant to narrowly construe the phrase 'same subject matter.'" *Scott*, 315 F.R.D. at 44 (citation and internal quotation marks omitted). "[H]owever, rebuttal experts must [still] meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Id.* (collecting cases). And like any expert, a rebuttal expert may not usurp the court's role in instructing the jury on the law. *See Rosario v. City of New York*, 18 Civ. 4023 (LGS), 2021 WL 1930293, at *8 (S.D.N.Y. May 13, 2021). Nor may the "[rebuttal] expert witness[]" usurp the role of the trial court to "act as 'gatekeepers' to ensure the relevance and reliability of all expert testimony." *T.N. Incorp., Ltd. v. Fid. Nat'l Info. Servs.*,

*Inc.*, No. Civ. 18-5552, 2021 WL 5980048, at *14 (E.D. Pa. Dec. 17, 2021) (citing *Kumho Tire*, 526 U.S. at 147. *See also Washington*, 105 F. Supp. 3d at 307 ("Still, while a district court has broad latitude in deciding both how to determine reliability and in reaching its ultimate reliability determination, it may not abandon its gatekeeping function." (cleaned up)).

ii.     *Analysis*

***Speculative Conclusions and Unsupported Data***: Capri Sun moves to exclude Dr. Joachimsthaler's report in its entirety because a "multitude of errors," "speculations," and "subjective beliefs" render it unreliable. Pl. Joachimsthaler *Daubert* Mem. at 9, 15. *See Snyder v. Wells Fargo Bank, N.A.*, No. 11 Civ. 4496 (SAS), 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012) (excluding expert report in full where it was "so ridden with improper statements and opinions" that the court "decline[d] to identify the limited portions that might qualify as expert testimony"). Most of Capri Sun's objections go to Dr. Joachimsthaler's methodology. According to Capri Sun, Dr. Joachimsthaler (1) arbitrarily touts a different method as superior to Dr. Steckel's; (2) failed to perform his own analysis and merely "point[ed] fingers at how Dr. Steckel performed his own analysis,"; (3) stated at his deposition that other accepted methodologies of assessing brand strength exist; and (4) admitted that his own analysis of the Pouch Mark's fame and secondary meaning would have relied on largely the same factors as Dr. Steckel did. *Id.* at 11–15. Capri Sun also challenges Dr. Joachimsthaler's reliance on unverified sales and market data. *Id.* at 10.

Capri Sun's bid fails—badly. Although the Court holds that both experts may testify consistent with *Daubert*, a review of the competing reports makes evident that Dr. Joachimsthaler's work was carried out with far greater rigor and attention to detail than Dr. Steckel's. In light of that, Capri Sun's lame methodological salvos at Dr. Joachimsthaler are strikingly un-self-aware.

To begin, Dr. Joachimsthaler does not promote an arbitrary, rigid, "exclusive method to analyze fame and secondary meaning," *id.* at 12. As Capri Sun itself points out, Dr. Joachimsthaler acknowledged that other accepted models than his own exist. *Id.* at 13. It concedes that "it is possible that Mr. Joachimsthaler may have identified other additional, potentially acceptable frameworks for analyzing contexts related to fame and secondary meaning," *id.* at 8, and that his analysis would have included the same factors that Dr. Steckel used (and then add several more), *id.* at 14. Far from propounding an arbitrary method, Dr. Joachimsthaler distills a common methodological denominator in an evolving field. His report faults Dr. Steckel for purportedly not meeting the *minimum* standard of rigor imposed by that evolving methodology, and for having instead "cherrypicked a few parts of the overall methodology" and "leveraged selective, anecdotal, and at times even false or improper evidence." Joachimsthaler Rep. ¶ 36 (cleaned up) (emphasis added). Dr. Joachimsthaler therefore carries out precisely the charge of a rebuttal expert: to "criticiz[e] [the analysis] presented by another party." *Aluminum Warehousing*, 336 F.R.D. at 29. Indeed, even though a rebuttal expert "need only attack [the models or methods] of [the other party's] expert," and has no burden to "identify alternative or better methodologies," *id.* (citing *Digital Music*, 321 F.R.D. at 78; *Joffe v. King & Spalding LLP*, No. 17 Civ. 3392 (VEC), 2019 WL 4673554, at *14 (S.D.N.Y. Sept. 24, 2019)), Dr. Joachimsthaler did so, and proposed an alternative methodology. Accordingly, the Court rejects Capri Sun's claims that Dr. Joachimsthaler's proposed method is arbitrary, that he should have conducted his own affirmative analysis,[18] or that his admission at

---

[18] In some parts of his report, Dr. Joachimsthaler does conduct his own analysis and draws his own conclusions—which are contrary to Dr. Steckel's. *See, e.g.*, Joachimsthaler Rep. ¶¶ 45 (pouches are a common format of packaging for beverages), 57 ($20 million in annual ad spend not extensive in light of Coca Cola's spend of $913 million in 2019), 63–64 (Capri Sun's

deposition that other methods exist or that his own analysis would have partially utilized Dr. Steckel's factors undermine his methodology. At bottom, a rebuttal expert need not proffer a methodology or model, but only critique the opposing expert's.

As to Dr. Joachimsthaler's data, Capri Sun objects only to the yearly sales figures of $21 million and $34 million that he contrasts with Dr. Steckel's purported $7 billion for the period from 2009 to 2014. Joachimsthaler Rep. ¶ 81(a); *cf.* Steckel Rep. ¶ 27. As discussed in connection with ABC's critique of Dr. Steckel, this quibble over a data point goes to the report's "weight, not [its] admissibility." *Boucher*, 73 F.3d at 21.

*Lack of Methodological Fit*: Capri Sun next argues that Dr. Joachimsthaler's rebuttal report relies on a flawed competing methodology that conflates the legal terms "fame" and "secondary meaning" on the one hand with the marketing term "brand equity" on the other. Pl. Joachimsthaler *Daubert* Mem. at 5–9. This methodological mismatch, Capri Sun argues, makes the Joachimsthaler Report unhelpful to the trier of fact.[19] *Id.* at 5 (citing *Bloomberg*, 2010 WL 3466370, at *17). The only proper analytical method for an expert opining on a factual matter pertaining to a dilution claim, Capri Sun asserts, is to apply the statutory factors of the Trademark Dilution Act itself.

Capri Sun is wrong because it reads *Daubert*'s "fit" requirement too narrowly. It does not point to any caselaw—and the Court found none—that an expert opining on the likelihood of

---

extensive licensing of its Pouch Mark has undermined the exclusivity—and thus the strength—of the Pouch Mark and Capri Sun brand)..

[19] In attacking Dr. Joachimsthaler, Capri Sun cites this Court's opinion in *Beastie Boys v. Monster Energy Co.*, criticizing Dr. Joachimsthaler for conflating the concept of likelihood of association (relevant to damages) with the liability standard of likelihood of confusion. Pl. Joachimsthaler *Daubert* Mem. at 9. Although the Court faulted Monster Energy (and Dr. Joachimsthaler) for inviting such conflation, it did not exclude Dr. Joachimsthaler's testimony. The Court merely restricted Dr. Joachimsthaler's testimony to statements that were relevant to damages. *See* 983 F. Supp. 2d 354, 363–64 (S.D.N.Y. 2014).

fame and secondary meaning under the Trademark Dilution Act must rigidly use the statutory factors, or what evidence they should consider under those factors. Instead, Dr. Joachimsthaler's update to Dr. Steckel's method offers a "competing analysis"—more than he is required to do as a rebuttal expert, *Aluminum Warehousing*, 336 F.R.D. at 29—that is well within the "same subject matter encompassed in the opposing party's expert report," *Scott*, 315 F.R.D. at 44. Dr. Joachimsthaler's concept of brand equity views the Pouch Mark in broader context, undertakes a more searching analysis of Capri Sun's marketing strategies on consumers' minds, and considers a greater universe of evidence. For Dr. Steckel's conclusions to be reliable, Dr. Joachimsthaler opines, these inquiries should have been undertaken. *See Washington*, 105 F. Supp. 3d at 327–28 (finding rebuttal expert report reliable where expert relied on general accounting principles and over plaintiff's objection that his method had not been "accepted by experts in the field"); *Senchyshyn v. BIC Sport N. Am., Inc.*, No. 17 Civ. 162 (LEK) (TWD), 2020 WL 4500992, at *4 (N.D.N.Y. Aug. 5, 2020) ("Despite Reitman's opposite conclusions and objections that Rao's analysis is flawed, Rao's analysis falls within 'the range where experts might reasonably differ.'"); *Clark v. Edison*, 881 F. Supp. 2d 192, 212 (D. Mass. 2012) (finding rebuttal expert report "within the range where experts might reasonably differ," even where rebuttal expert's theory was "highly controversial" in that field).

In sum, Capri Sun is at liberty to defend its expert's approach, but Dr. Joachimsthaler's critique is not out of bounds on account of its different, and more demanding, methodology.

**Conclusions on the Law, the Steckel Report's Admissibility, and Dr. Steckel's Qualifications**: Capri Sun last moves to exclude Dr. Joachimsthaler's report on the basis that it contains the impermissible legal opinion that the Pouch Trademark's registration establishes a

"presumption of secondary meaning, [but] does not establish it." Pl. Joachimsthaler *Daubert* Mem. at 15 (quoting Joachimsthaler Rep. ¶ 52(b)).

On this point, Capri Sun is correct. Perhaps because Dr. Joachimsthaler's report was deployed in part to persuade the Court to exclude Dr. Steckel's testimony under *Daubert*, Dr. Joachimsthaler's report traffics considerably in legalese. Such portions of his report that apply substantive legal standards or the *Daubert* standard may not be reprised in testimony before the jury. For example, the opinion expressed in paragraph 52(b) regarding secondary meaning, if admitted, would plainly "instruct[] the jury as to the applicable law" and thereby "usurp the role of the trial judge." *Nimely*, 414 F.3d at 397.

The Court therefore will exclude paragraph 52(b) from Dr. Joachimsthaler's report, and precludes him from testifying at trial to the same effect, as well as the legal significance of the '517 registration, including whether it established a presumption of secondary meaning when it was approved by the PTO. But that is all: To the extent that Capri Sun envisions the wholesale exclusion of Dr. Joachimsthaler's testimony on account of his report's inclusion of legal points, exclusion on this scale would be grossly excessive.

ABC retorts that Dr. Joachimsthaler's statement was a fair and correct response to Dr. Steckel's statement that the Pouch Mark acquired secondary meaning when the PTO approved the '517 registration in 1986. *See* Def. Joachimsthaler *Daubert* Opp'n at 16. But, whether correct or incorrect, Dr. Joachimsthaler's statement is a legal opinion that usurps the Court's role in "instructing the jury as to the applicable law." *Nimely*, 414 F.3d at 397. Nor is it persuasive for ABC to argue that Dr. Joachimsthaler's statement was simply a predicate for him to opine on the strength of the Pouch Mark. Def. Joachimsthaler *Daubert* Opp'n at 16. To the extent

instruction on the law is in order on this point, it will come from the Court.  The Court excludes

paragraph 52(b) of the Joachimsthaler Report.

The Court will also exclude at trial any testimony by Dr. Joachimsthaler purporting to

guide application of the gatekeeping *Daubert* standard.  Understandably, Dr. Joachimsthaler's

report, at numerous points, concludes that the Steckel Report is unreliable, invalid, shoddy, or

unscientific.  *See, e.g.*, Joachimsthaler Rep. ¶¶ 12, ("[T]he conclusions in Dr. Steckel's report are

not justified, reliable, or valid[.]"), 36 ("Dr. Steckel's report is fundamentally unreliable and

invalid[.]"), 78 (referring to ¶ 14 of the Steckel Report as "unhelpful, unscientific and not

reliable), 80 ("I conclude that Dr. Steckel has not adopted a scientific methodology to offer an

informed opinion in this case.  As such, his conclusions are not valid or reliable, and . . . his

opinions are highly speculative in nature.").  It is fair for Dr. Joachimsthaler to strike hard blows

at the rigor and value of Dr. Steckel's work.  But to the extent his terminology in court would

imply that Dr. Steckel's work falls below the legal threshold for admissibility, it may not be put

before the jury.  The Court's central gatekeeping function as to expert testimony may not be

usurped by a rebuttal expert marshalling of legal standards before the jury.  *T.N. Incorp., Ltd.*,

2021 WL 5980048, at *14.

Relatedly, at trial, Dr. Joachimsthaler may not opine on the qualification of another

expert to testify on a particular subject.  *See* Joachimsthaler Rep. ¶¶ 83–84 (opining that Dr.

Steckel, being an expert in marketing and not branding, lacks the qualification to opine on the

Pouch Mark's fame and secondary meaning).  That, too, is a judicial function, and the Court has

found Dr. Steckel qualified to render the opinions he proposes.  The Court accordingly excludes

paragraphs 83 and 84 of the Joachimsthaler Report.

The Court accordingly denies in principal part Capri Sun's motion to preclude Dr. Joachimsthaler's testimony. The Court, however, grants Capri Sun's motion to the narrow extent that it precludes Dr. Joachimsthaler from opining either on matters of law (*e.g.*, on legal presumptions regarding secondary meaning) or admissibility (*e.g.*, regarding the application of *Daubert* and Rule 702 to Dr. Steckel's testimony).

### III.    The Motions for Summary Judgment

#### A.    Overview of Capri Sun's Claims

Capri Sun brings the 12 claims listed earlier. For purposes of analysis, these are usefully sorted into four buckets: for (1) trademark infringement and unfair competition under federal and New York common law (the "Trademark Claims"); (2) breach of contract (the "Contract Claim"); (3) dilution under federal and NYGBL § 360-*l* (the "Dilution Claims"); and (4) trade dress infringement and unfair competition under federal and New York common law (the "Trade Dress Claims"). The Court analyzes these claims in that order.

Two thematic threads cut across these categories.

First is the degree of similarity between the Pouch Mark and the Accused Pouches. Throughout its submissions, Capri Sun casts the two as either literally identical or effectively indistinguishable. On that basis, it argues that confusion between the two—given ABC's status as a former licensee of Capri Sun—can be found as a matter of law, entitling it to prevail on the first two categories of claims. That, the Court holds, is wrong. Because the pouches have distinct shapes, a searching multi-factor "*Polaroid*" analysis into the likelihood of confusion must be undertaken to resolve the Trademark Claims. One factor within *Polaroid* requires a fact-intensive analysis as to the degree of similarity between the Pouch Mark and the Accused Pouches. This analysis prefigures the analysis necessary to resolve the Contract Claim, which

turns on whether ABC sold "confusingly similar variations" of the Licensed Pouch during and after the SLA's selloff period.

Second is the strength of Capri Sun's Pouch Mark. The stronger that mark is, the stronger are Capri Sun's Trademark Claims. Capri Sun attempts to establish that the Pouch Mark has secondary meaning (or acquired distinctiveness), but its evidence of that is not that strong. And because Capri Sun must make a higher showing as to its Mark's strength—namely, that it is famous—to prevail on its federal dilution claim, that claim fails as a matter of law.

### B. Legal Standards Governing Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of proving the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Summary judgment is not favored in cases involving materially conflicting expert reports." *Solorio v. Asplundh Tree Expert Co.*,

402 F. Supp. 2d 490, 497 (S.D.N.Y. 2005) (citing *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002)).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

### C.     The Trademark Claims

At the heart of Capri Sun's federal and state law claims of trademark infringement and unfair competition is whether there exists a likelihood of confusion between the shape of ABC's Accused Pouches and the shape of Capri Sun's trademarked pouches. As discussed below, because the pouches are not identical so as to enable a likelihood of confusion to be found as a matter of law, an analysis under the eight *Polaroid* factors is required.

### 1.     Applicable Legal Standards

Section 43(a) of the Lanham Act protects registered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another

person." 15 U.S.C. § 1125(a).  To prevail on a trademark infringement or unfair competition and false association claim under this provision, a plaintiff must show that (1) he or she has a valid mark that is entitled to protection, and (2) the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods.  *See, e.g., Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216–17 (2d Cir. 2012); *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).  "The modern test of infringement is whether the defendant's use [is] likely to cause confusion *not just as to source*, but also as to sponsorship, affiliation or connection." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016) (citation omitted) (emphasis and alteration in original).

As to the second element—likelihood of confusion—a plaintiff need not show "actual or potential confusion *at the time of purchase*," as "initial-interest confusion" and "post-sale confusion" are equally actionable.  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir. 1986) (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975)) (emphasis in *Grotrian*).  But the plaintiff must demonstrate "'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'" *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (quoting *Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993)) (internal quotation marks omitted).

Important here, a likelihood of confusion can be shown in one of two ways.

First, "likelihood of confusion is established as a matter of law" where "an ex-licensee continues to use a mark after its license expires." *Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 WL 1856471, at *6 (S.D.N.Y. May 8, 2014) (quoting *L&L Wings, Inc. v.*

*Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009)) (further citations omitted). Confusion in such a situation "is almost inevitable because consumers have already associated the formerly licensed infringer with the trademark owner." *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15 Civ. 1092 (JMF), 2015 WL 845711, at \*5 (S.D.N.Y. Feb. 26, 2015) (citing *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986)).

Second, where a finding of confusion as a matter of law cannot be made, courts in this Circuit assessing the likelihood of confusion consider the "*Polaroid* factors" famously articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *See also Star Indus.*, 412 F.3d at 384. Those are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith, or lack thereof, in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the plaintiff's customers. *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999); *see also Polaroid*, 287 F.2d at 495. In assessing the *Polaroid* factors, "[t]he proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharm.*, 984 F.2d at 572 (citing *Lois Sportswear*, 799 F.2d at 873). "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020) (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)) (internal quotation marks omitted).

For a trademark infringement claim under New York common law, "[i]t is well-established that [its] elements . . . mirror the Lanham Act claim[']s." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018) (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)).

A plaintiff bringing an unfair competition claim under New York common law "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant's] bad faith." *LVL XIII Brands*, 209 F. Supp. 3d at 678 (citing *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y.2005)) (quotation marks omitted) (alterations in *LVL XIII Brands*); *see also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 383 (2d Cir. 2000). A plaintiff "must prove: (1) actual confusion or a likelihood of confusion; and (2) the defendant's bad faith." *LVL XIII Brands*, 209 F. Supp. 3d at 678 (citing *Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 346 F. App'x 721, 723 (2d Cir. 2009) (summary order)).

## 2.   Analysis

### a.   Validity of the Pouch Mark

"A certificate of registration with the PTO is *prima facie* evidence that the mark is registered and valid (*i.e.*, protect[a]ble), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Capri Sun*, 414 F. Supp. 3d at 433 (quoting *Louboutin*, 696 F.3d at 217 n.10) (alteration in *Capri Sun*). Capri Sun's certificate of the '517 Registration of the Pouch Mark satisfies its *prima facie* burden. ABC does not—and cannot—challenge the Pouch Mark's validity. As the Court held earlier in this litigation, ABC is "estopped from challenging the validity of the Pouch Trademark" under the SLA's no-challenge clause. *Id.* at 432. In such circumstances, the Court "need not tarry with the first prong of the

infringement test." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 70 (S.D.N.Y. 2021) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004)).

The Court holds that, as a matter of law, the Pouch Mark is valid.

### b.      Likelihood of Confusion as a Matter of Law

Capri Sun argues that the second element of its trademark infringement and unfair competition claims—likelihood of confusion—is established as a matter of law because ABC has "continue[d] to use [the Pouch] [M]ark after its license expire[d]." Pl. SJ Mem. at 13 (quoting *Microban Prods.*, 2014 WL 1856471, at *6). Capri Sun draws upon a line of cases holding that application of the *Polaroid* factors "may be unnecessary in the case of an ex-licensee using a previously licensed mark where only one trademark is involved." *L&L Wings, Inc.*, 676 F. Supp. 2d at 189; *see also C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 223, 241 (S.D.N.Y. 2013) (same). The reasoning underlying this line is that, when an alleged infringer "loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor." *Church of Scientology*, 794 F.2d at 44; *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("[A]fter a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the licensor.").[20]

---

[20] Other circuits have likewise held that an ex-licensee's continued use of the formerly licensed trademark permits a finding of a likelihood of confusion without the need to undertake that circuit's *Polaroid*-equivalent multifactor analysis. *See U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) ("We perceive that there is great likelihood of confusion when an infringer uses the exact trademark [of its former licensor]."); *Little Caesar Enters., Inc. v. Miramar Quick Serv. Rest. Corp.*, No. 19-1860, 2020 WL 4516289, at *3 (6th Cir. June 25, 2020) ("[P]roof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" (internal quotation marks omitted) (alteration in original); *Burger King Corp. v. Mason*, 710 F.2d

ABC makes four arguments why this line of case authority is inapplicable here. The first three are quickly put to one side, but the fourth cannot—and it carries the day for ABC.

ABC first notes that none of the cases Capri Sun cites—*Microban*, *L&L Wings*, and *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615 (CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012)—involved a license agreement entered into in order to settle ongoing litigation. ABC argues that where a license agreement is entered into in the ordinary course of business, it "serves the purpose of creating a clear association between the licensee and licensor," but that no such purpose can be presumed for an agreement like the SLA, which resolved a pending lawsuit. Def. SJ Opp'n at 2. But those decisions, and similar ones the Court has found, did not turn on the subjective aims of the parties who entered into the license agreement. The courts there instead found a likelihood of confusion because the existence of the licensing arrangement had given rise to an association between licensor and licensee, and because sales using the infringing mark continued after the license agreement's expiration with nothing having been done to dispel that association. *See Microban*, 2014 WL 1856471, at *6–7; *L&L Wings*, 676 F. Supp. 2d at 188; *MyPlayCity*, 2012 WL 1107648, at *20–21.

ABC next notes that Capri Sun's cases resolved disputes over word marks and logos, whereas this case turns on product packaging (its shape)—is of no moment. The cases above did not so limit their holdings, and there is no principled basis for that distinction. *See Microban*,

---

1480, 1492 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."). *But see Shakey's Inc. v. Covalt*, 704 F.2d 426, 432 (9th Cir. 1983) ("The law of unfair competition does not impose upon [an ex-franchisee] a duty to ensure that all customers are aware that they are no longer affiliated with [them], but merely a duty not to promote the perpetuation of the perception that they are.").

2014 WL 1856471, at *6–7; *L&L Wings*, 676 F. Supp. 2d 188; *MyPlayCity*, 2012 WL 1107648, at *20–21.

ABC's third argument is that the cases above did not involve claims of infringement by multiple brands, whereas here, its Accused Pouches span 24 brands, with diverse flavors and pouch designs. This factor, ABC posits, reduces the likelihood of confusion. Def. SJ Opp'n at 3. But the fact that the ex-licensee's unauthorized continued use of the licensor's mark spans many products does not logically eliminate the tendency of buyers to associate that mark with its lawful source, and none of the cases at issue so suggest. Moreover, the mark at issue here—the *shape* of the foil pouch—is identical across the 24 brands, regardless of how the brands' outer packaging is dressed. Capri Sun's claim that ABC is an "ex-licensee using a previously licensed mark where only one trademark is involved," *L&L Wings*, 676 F. Supp. 2d at 188, equally applies whether ABC's continued use is limited to one or many products of the same shape, insofar as the mark at issue is defined solely by its shape.

ABC's final argument is that the case authority above applies only where the licensee continued to use the *identical* mark after the license expired. There is no authority, it notes, for finding likely of confusion as a matter of law—*i.e.*, without undertaking a *Polaroid* analysis— where the mark used by the licensee after expiration of the license agreement has changed. And here, ABC argues, it demonstrably—indeed deliberately—altered the shape of its pouches from the shape as licensed from Capri Sun. Specifically, it emphasizes, the rounded upper corners on the Accused Pouches distinguish its shape from the Pouch Mark. Def. SJ Opp'n at 2–3.

This argument is meritorious. Except where the senior and junior marks are identical, the Court has not found—and Capri Sun has not cited—any authority finding likelihood of confusion as a matter of law between a previously licensed mark and the former licensee's new

mark. Instead, the Second Circuit has instructed that "[w]hen the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them [under *Polaroid*]." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003) (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir. 1979) ("[E]ven close similarity between two marks is not dispositive of the issue of likelihood of confusion."), *superseded on other grounds by* Fed. R. Civ. P. 52(a). Courts therefore use the *Polaroid* factors to assess the likelihood of confusion presented by "distinct, albeit similar, marks," and have foregone this familiar analysis as unnecessary only "where use of an *identical* mark—that is, a counterfeit mark—is at issue." *C=Holdings*, 992 F. Supp. 2d at 241 (emphasis added); *see also L&L Wings*, 676 F. Supp. 2d at 189 (same); *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 400 (S.D.N.Y. 2000) (same); *see* 15 U.S.C. § 1127 (defining "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark"); *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003).[21]  Indeed, even where the infringing post-license product has been identical to the senior mark, courts have sometimes undertaken a confirmatory *Polaroid* analysis in addition to finding likelihood of confusion as a matter of law. *See Microban*, 2014 WL 1856471, at *7; *L&L Wings*, 676 F. Supp.

---

[21] To be sure, on motions for preliminary relief, courts have found that confusion as a matter of law existed where the infringing mark is "virtually identical"—but not literally identical—to the challenged mark. *See, e.g.*, *Barefoot Contessa Pantry*, 2015 WL 845711, at *7 (granting preliminary injunction on trade dress infringement claim where defendant's packaging was "strongly similar—if not virtually identical to" plaintiff's). There is no similar authority at the summary judgment stage.

2d at 188–89; *Ryan*, 107 F. Supp. 2d at 400 ("[A]pplying the factors to the present case can only

drive the point home by further demonstrating that there is a likelihood of confusion.").[22]

Here, notwithstanding Capri Sun's repeated characterizations,[23] the Pouch Mark and

Accused Pouches are very clearly *not* identical.  The shapes of the two undeniably are similar.

But their differing upper corners precludes a finding that they are identical.  Indeed, Capri Sun,

elsewhere in its briefs, has referred to ABC's Pouches as having "slightly tweaked upper

corners" and having "slight tweaks."  Pl. SJ Mem. at 7, 10, 11.  And Capri Sun's own side-by-

side comparison of the two in its Rule 56.1 Statement illustrates the distinction.  Although the

upper corners of each product are rounded, the rounding on the Pouch Mark is confined to a

smaller area, such that the corner presents as close to being squared off.  In contrast, the rounding

on the Accused Products begins lower on the pouch and plays out over a greater surface area:

 

---

[22] *See also Victorinox AG v. B&F Sys.*, 114 F. Supp. 3d 132, 140–41 (S.D.N.Y. 2015), *aff'd*, 709
F. App'x 44 (2d Cir. 2017) (summary order) (in non-post-licensee context, undertaking *Polaroid*
analysis despite finding that junior mark was a counterfeit).

[23] *See, e.g.*, Pl. SJ Mem. at 7–8, 10 (referring to "the parties' identical-looking pouches," the
"identical nature of the parties' pouch products").  Lewis Carroll notwithstanding, Capri Sun's
repeated assertions that the products are identical does not make it so.  *See* Lewis Carroll, The
Hunting of the Snark 3 (1876) ("I have said it thrice: What I tell you three times is true.")
(quoted in *Parhat v. Gates*, 532 F.3d 834, 848–49 (D.C. Cir. 2008)).

*Fig. 9: Side-by-Side Comparison of a pouch in the Pouch Mark shape and an Accused Pouch, Front and Back.  Pl. 56.1 ¶ 89*

Accordingly, to assess the second element of these claims—likelihood of confusion—the Court must undertake a *Polaroid* analysis.

### c.      Likelihood of Confusion Under the *Polaroid* Factors

A court assessing the likelihood of confusion must examine whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark." *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012) (quotation marks and citation omitted).  "This question is usually reserved for a jury, as it requires a fact intensive examination of 'the probable reactions of prospective purchasers of the parties' goods.'" *A.V.E.L.A.*, 364 F. Supp. 3d at 309 (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d at 579, 584 (2d Cir. 1990)).

#### i.      Strength of the Pouch Mark

"The first *Polaroid* factor 'focuses on the distinctiveness of the mark, or more precisely, its tendency to identify the goods as coming from a particular source.'" *LVL XIII Brands*, 209 F. Supp. 3d at 667 (quoting *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991)). "Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace," *i.e.*, secondary meaning.  *Id.* at 667– 68 (quoting *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998)).

A mark has secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Louboutin*, 696 F.3d at 216 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)).  "The crucial question in a case involving secondary meaning always

is whether the public is moved in any degree to buy an article because of its source." *Id.* at 226 (citation omitted).

The Second Circuit has identified six non-exclusive factors that bear on this inquiry: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Id.* (internal quotation marks and citation omitted). Although the Second Circuit has "supported summary judgment in cases where the proponent of the alleged trademark has failed to raise a material issue of fact on the question of secondary meaning," it has generally "stated that district courts should be cautious in weighing these factors at the summary judgment stage." *Easy Spirit*, 515 F. Supp. 3d at 61 (quoting *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 344 (E.D.N.Y. 2007) (collecting cases)). That is because "proof of secondary meaning entails vigorous evidentiary requirements." *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (internal quotation marks and citation omitted). "A plaintiff bears the burden of proving that his mark acquired secondary meaning by the time the allegedly infringing product came on the market." *LVL XIII Brands*, 209 F. Supp. 3d at 654 (citing *Thompson Med. Co.*, 753 F.2d at 217).

Neither party has addressed in its briefing whether the Pouch Mark is inherently distinctive.[24] Accordingly, in assessing the Pouch Mark's strength, the Court will undertake the six-factor analysis that bears on whether the Pouch Mark has acquired distinctiveness, *i.e.* secondary meaning.

---

[24] *But see* Compl. ¶ 183 (alleging, under federal trademark infringement claim, that "[t]he CAPRI SUN Pouch Trademark is inherently distinctive"). As part of Capri Sun's narrower trade dress infringement claim, the parties do contest whether Capri Sun's packaging trade dress is inherently distinctive. *See* Pl. SJ Mem. at 23–24; Def. SJ Opp'n 24–25; Def. SJ Mem. at 19; Pl. SJ Opp'n at 23–24; Def. SJ Reply at 9–10.

*(1) Advertising Expenditures*: Advertising expenditures are regarded as "indirect evidence of the possible effect that advertising may have on consumers' association of the [trademark] with the source of the product." *LVL XIII Brands*, 209 F. Supp. 3d at 654–55 (citing *Ergotron, Inc. v. Hergo Ergonomic Support Sys.*, No. 94 Civ. 2732 (SAS), 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996). But "[m]erely showing that a certain amount was spent on advertising provides little support for secondary meaning. It must be shown that there was promotion of the mark as an identifier for the product." *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 371 (alteration in original) (citation omitted).

Capri Sun has marshalled impressive data chronicling its advertising spend in the years leading up to this suit. A 2019 report by the University of Connecticut's Rudd Center for Food Policy & Obesity, titled "Children Drink F.A.C.T.S. [Food Advertising to Children and Teens Score] 2019," chronicled that Capri Sun's annual advertising spend across all its sub-brands was consistently between $19.8 million and $20.1 million each year between 2013 and 2018. JSUF ¶ 77 (citing Dkt. 79-26 at 38). The report, on which Capri Sun's expert Dr. Steckel relies, *see* Steckel Rep. ¶ 33 n.43, sources this data to the Nielsen Corporation and the authors of the report. Dkt. 79-26 at i, 38. A 2014 article by the advertising news outlet AdAge similarly stated that "Capri Sun spent nearly $20.5 million on measured media" in 2013, which the article sourced to the Kantar Media Group. JSUF ¶ 78 (citing Dkt. 79-27 at 2).

ABC questions this data because it derives from third parties. It argues that Capri Sun should have requested advertising spend data directly from its U.S. licensee, Kraft. Def. SJ Mem. at 8. Only ABC chose to subpoena Kraft for this data; it obtained a single document regarding the period from 2015 to 2019, which, according to ABC, "is indecipherable without testimony from Kraft." Neither side deposed a Kraft representative on this point. *Id.*

Capri Sun's data, including as collected by Dr. Steckel, is not nearly as problematic as ABC claims. The "Children Drink F.A.C.T.S." report, whose data derives from Nielsen, is reliable, as courts in this District have recognized. *See Matrix Essentials v. Quality King Distribs.*, 522 F. Supp. 2d 470, 474 (E.D.N.Y. 2007) ("The Nielsen Data is unbiased and based upon an analysis of millions of units of Matrix product. The court finds the Nielsen Data to be reliable."), *vacated in part on other grounds*, 324 F. App'x 22 (2d Cir. 2009) (summary order). That data alone, which chronicles Capri Sun's ad spend for the five years predating this litigation, suffices to support Capri Sun's point. And although other documentary sources cited by Dr. Steckel with regard to Capri Sun's heavy ad expenditures would require authentication if offered on its own, an expert has the latitude to rely on a broader array of material. *See Astra Aktiebolag*, 222 F. Supp. 2d at 491 ("Pursuant to Rule 703, an expert may rely on any facts or data 'of a type reasonably relied upon by experts in the particular field.'"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 401 (S.D.N.Y. 2015) (same), *aff'd*, 945 F.3d 83 (2d Cir. 2019).

As to the 2014 AdAge article, the Court treats it as corroborative of the Nielsen data referenced above. In light of this showing, ABC's criticism that Capri Sun did not seek out information from Kraft, or that Kraft's internal data is "indecipherable" without testimony, is beside the point. Capri Sun has adduced sufficient evidence of its substantial advertising spend for the years before ABC's challenged conduct.

Beyond raw numbers on advertising spend, Capri Sun must adduce evidence "that there was promotion of the [Pouch Mark] as an identifier for the product." *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 371. To that end, Capri Sun presents evidence of ad campaigns that centered around the Pouch Mark: in 2008, its "Respect the Pouch" campaign, for which it won

the advertising industry's 2010 Gold Effie award[25]; in 2014, its "Seize the Pouch" campaign; and in 2019, its "Hold my Pouch" campaign.[26] Pl. SJ Mem. at 3. As to the "Respect the Pouch" campaign, Capri Sun provides a slide of an internal Kraft Heinz PowerPoint presentation detailing that Kraft had spent $2.9 million on campaign ads from October to November 2008 alone, and an Effie press release stating that Kraft's overall spend for 2008 was between $20 million and $40 million. Dkts. 79-101 at 2; 79-22 at 4–5.[27] In August 2009, one year after the campaign aired, 49% of children recognized the tagline "Respect the Pouch"—second only to McDonald's "I'm lovin' it." Dkt. 79-22 at 5.

More broadly, the undisputed record shows that, between the 1970s and 2017, at least 51 Capri Sun commercials aired on television. In all of these spots, the Capri Sun Pouch makes an appearance, often—but not always—prominently so. *See* JSUF ¶¶ 85–135 (citing to Dkts. 79-24 through 79-26, 79-37 through79-83). These ads feature contained, in the 1970s, endorsements by Muhammad Ali, and, more recently, by baseball player David Ortiz, gymnast Gabrielle Douglas, wrestler John Cena, and basketball player Stephen Curry. *Id.* ¶ 79. To further link its Pouch Mark-promoting commercials to its advertising spend figures, Capri Sun cites to an

---

[25] In those spots, the pouch is front and center. Children who "disrespect" the pouch—*e.g.*, by stepping on it, running over it with a bike, or hitting it with a baseball bat—are comedically catapulted into the air, transformed into an animal, or suddenly left in their underwear. Those spots all end with a closeup of the pouch and voice exhorting the viewer to "Respect the Pouch! Respect it!"

[26] The 2019 "Hold my Pouch" campaign, however, occurred after ABC's challenged conduct began in November 2017. Because a plaintiff must show its "mark acquired secondary meaning by the time the allegedly infringing product came on the market," *LVL XIII Brands*, 209 F. Supp. 3d at 654, the Court disregards the evidence of this campaign.

[27] ABC disputes the reliability of the latter figure, which derives from an Effie press release. Def. Counter 56.1 ¶ 22. Consistent with the principle on summary judgment that reasonable inferences are to be drawn in the non-movant's favor, the Court will disregard this evidence in resolving Capri Sun's motion for summary judgment.

internal Kraft Heinz PowerPoint presentation of May 11, 2016.  There, Kraft contemplated spending $1 million on re-shooting a children-targeted ad with the aim "to drive stronger desire for the pouch." *Id.* (citing Dkt. 79-25 at 8).

ABC next objects that Capri Sun's evidence of its advertising efforts does not show that its marketing efforts promoted the Pouch Mark as such—*i.e.* the shape of the pouch—as an identifier of the source product.  It casts this advertising as promoting the Capri Sun brand.  ABC points to an internal Kraft presentation which opined that the uniqueness of Capri Sun's brand derives from other attributes such as the pouch's metallic foil, its response to the touch, the characteristically blue background color, fruit-based flavors, trusted and all-natural ingredients, and appeal to children.  Def. SJ Mem at 9 (citing Def. 56.1 ¶¶ 109–110).

It is true and important that the advertising evidence, by its nature, does not specifically promote the shape of the pouch, as opposed to the pouch in all its attributes, shape included.  But that does not negate Capri Sun's ad spend of all force for this purpose, given that the Pouch, including depictions capturing its distinctive shape and size, is prominent in this advertising.  And the annual ad spend of $19.8 million to $20.1 million between 2013 and 2018, as captured by Nielsen, is impressive.  Because Capri Sun is a pouch-only brand, and spent amply on advertisements centered on the Pouch Mark, a finder of fact could reasonably infer that some of that spend was intended to, and effectively did, promote the Pouch Mark.

Capri Sun's advertisements also appear to have been effective.  Dr. Steckel points to credible data that, in 2017, 41% of U.S. households had purchased Capri Sun Pouches; that in 2018, almost 40% of all U.S. adults "aged 18 to 29 had consumed Capri Sun in the past four weeks" and that over one-third of all U.S. adults aged 30 to 49 had consumed Capri Sun in the prior four weeks; and that in 2020, 95% of U.S. consumers had heard of the Capri Sun brand.

*See* Steckel Rep. ¶ 28; Pl. 56.1 ¶¶ 45–47 (citing Dkt. 79-2).  In sum, Capri Sun has comfortably

established that it spent considerable amounts on advertising encompassing its Pouch Mark, and

that its ads generated high awareness among consumers.  *See also* Steckel Rep. ¶¶ 43–45

(opining that advertising efforts comport with Capri Sun's steady top-of-mind brand awareness).

The advertising expenditures factor favors Capri Sun.

*(2) Consumer Studies Linking the Pouch Mark to Capri Sun*:  Courts in this District

"have long held that consumer surveys are the most persuasive evidence of secondary meaning."

*LVL XIII Brands*, 209 F. Supp. 3d at 638.  *See also, e.g.*, *Sports Traveler, Inc. v. Advance*

*Magazine Publishers, Inc.*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) ("[C]onsumer surveys have

become the usual way of demonstrating secondary meaning."); *Ergotron, Inc.*, 1996 WL 143903,

at *8 ("A consumer survey is the most persuasive element in demonstrating secondary meaning,

because such a survey provides direct evidence." (citing, *inter alia*, *20th Century Wear, Inc. v.*

*Sanmark-Stardust Inc.*, 815 F.2d 8, 10 (2d Cir. 1987))).  At bottom, "the ultimate determination

of whether a particular trademark or trade dress has acquired secondary meaning remains an

'empirical question of consumer association.'"  *LVL XIII Brands*, 209 F. Supp. 3d at 639

(quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 770–71 (1992)).

Capri Sun elected not to conduct a consumer survey or other empirical study showing

consumers' association between the Pouch Mark and Capri Sun.  This is particularly striking

given that Capri Sun has produced an expert report—the Steckel Report—that asserts that the

Pouch Mark has acquired secondary meaning in the marketplace.  Rather than undertake an

empirical consumer survey testing that proposition, the Steckel Report relies on third-party

sources to conclude circumstantially that consumers likely associate the Pouch Mark with Capri

Sun.  Capri Sun's failure to back up its thesis with a study "makes little sense in light of the

significant resources the parties have spent litigating this case"—and of Capri Sun's having commissioned an expert on the very topic of secondary meaning—and weighs against Capri Sun on this factor. *Cross Com. Media, Inc. v. Collective, Inc.*, No. 13 Civ. 2754 (KBF), 2014 WL 11343849, at *8 (S.D.N.Y. Aug. 21, 2014), *vacated in part on other grounds*, 841 F.3d 155 (2d Cir. 2016); *see also Denimafia*, 2014 WL 814532, at *12 (failure to submit consumer study weighed against finding of secondary meaning); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 370 (same); *Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 534–35 (S.D.N.Y. 2002) (same, especially in light of plaintiff's financial means).

Capri Sun counters that it did, in fact, "conduct[] and submit[] consumer surveys to the PTO in 1986, which the PTO accepted as proof that the Pouch Mark had acquired distinctiveness." Def. SJ Opp'n at 9–10 (citing to such study results at Dkt. 31-4 at 150–61). The four excerpts of long-ago studies to which Capri Sun points, however, do not assist it here. The 1986 submissions to the PTO contained only "summaries" of the underlying studies. *See* JSUF ¶ 15 (citing Dkt. 31-4 at 100). The first study is expressly presented as a "[q]ualitative [i]nvestigation of Capri Sun['s]" perception of the Pouch Mark and features no empirical data. Dkt. 31-4 at 150–51. The third is similarly non-empirical. *See id.* at 158. And the second and fourth present survey data unrelated to consumers' mental association of the pouch with Capri Sun. *See id.* at 153–56, 160. These shards do not assist Capri Sun to clear the high bar required for a survey to reliably establish secondary meaning. *Thompson Med. Co.*, 753 F.2d at 217.

Moreover, those studies were conducted between February 1983 and June 1984—more than *30 years* before ABC is alleged to have begun to sell the Accused Pouches in violation of the SLA. *See* Dkt. 31-4 at 150, 160. A plaintiff must prove that its "mark acquired secondary meaning by the time the allegedly infringing product came on the market." *LVL XIII Brands,*

209 F. Supp. 3d at 654; *see also Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F.

Supp. 2d 405, 409 (S.D.N.Y. 2000) ("The critical question is whether [plaintiff's mark] had

gained secondary meaning by the time [defendants] entered the market[.]"); *Easy Spirit*, 515 F.

Supp. 3d at 61 (same). But just as evidence of secondary meaning postdating a defendant's

entrance into the market must be disregarded, so does ancient evidence predating such entrance

by decades. Consumer association may fade over time, when one generation of consumers has

given way to another. Had Capri Sun's evidence established a consumer association between the

Pouch Mark and Capri Sun in 1983 and 1984, this would not reliably speak to whether such an

association existed at the time ABC began selling the Accused Pouches in November 2017. The

link between those periods is especially tenuous given relevant intervening events—including

Capri Sun's extensive licensing, after 1983–1984, of the Pouch Mark to third-party vendors such

as Kraft (for its Kool-Aid Jammers product), Faribault, and ABC.

  Capri Sun also cites a marketing study it conducted in June 2017. It, according to an

internal Kraft presentation, "suggest[ed] the pouch alone is enough to communicate Capri Sun."

Pl. SJ Mem. at 2–3; Dkt. 79-113 at 11 (cited in JSUF ¶ 175). ABC debunks the study on the

ground that the conclusion was not based on an impartial consumer survey, but on a study by

Capri Sun's U.S. licensee Kraft into children's brand awareness and associations after watching

Capri Sun commercials. *See* Dkt. 79-113 at 4–5. *See Dreyfus Fund, Inc. v. Royal Bank of

Canada*, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981) ("To be probative and meaningful, . . .

surveys must be impartially prepared and implemented by competent professionals."). On close

inspection of the Kraft presentation, it appears that the children's study was designed by Ipsos

ASI, a reputable, independent marketing research firm. *See, e.g.*, Dkt. 79-113 at 2, 4, 9, 10, 21

(PowerPoint slides featuring Ipsos ASI label or name). But even if so, this study gives limited

aid to Capri Sun. It has not adduced any evidence as to sample size or the questions asked or the percentage of responses. Even according to Kraft, the data merely "suggest[ed]" that "the pouch alone is enough to communicate Capri Sun." JSUF ¶ 175. And Kraft admitted at the time that these associations were in flux: "While ads bring Capri Sun top-of-mind for some, overall attribution is still an opportunity." *Id.* The 2017 study provides, at best, shaky evidence that consumers associate the Pouch Mark with Capri Sun, failing to satisfy the "vigorous evidentiary requirements" for showing secondary meaning. *Thompson Med. Co.*, 753 F.2d at 217.

Finally, Capri Sun adduces a 2020 blind taste test for its "Water" campaign, which aimed to introduce a product line of water using the Pouch Mark. Pl. SJ Mem. at 3; JSUF ¶ 68. There, children tasted the contents of a plain, unbranded pouch in the shape of the Pouch Mark, and, according to Capri Sun, still recognized it as a Capri Sun pouch. Pl. 56.1 ¶ 18; JSUF ¶ 68. The Court disregards this evidence because it postdates the start of ABC's challenged conduct. *See LVL XIII Brands*, 209 F. Supp. 3d at 654.[28]

All evidence considered, the consumer studies factor weighs strongly in ABC's favor. "[A]lthough failure to undertake a consumer survey concerning recognition of [its] mark is not by itself fatal to [a] plaintiff['s] assertion of secondary meaning, where the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiff['s] position." *Brown v. Quiniou*, 744 F. Supp. 463, 470 (S.D.N.Y. 1990); *see also Pan Am. World Airways, Inc. v. Panamerican Sch. of Travel, Inc.*, 648 F. Supp. 1026, 1035 (S.D.N.Y. 1986) ("[T]he "absence of [a consumer survey] here is damaging to plaintiff [where it] has offered nothing but its own conclusion[s].")", *aff'd*, 810 F.2d 1160 (2d Cir. 1986).

---

[28] ABC independently objects to Capri Sun's "Water" campaign study as failing to "be impartially prepared and implemented by competent professionals." Def. SJ Opp'n at 6–7 (quoting *Dreyfus Fund*, 525 F. Supp. at 1116). This critique also appears well-founded.

*(3) Unsolicited Media Coverage of the Pouch*: "[E]xtensive, unsolicited media coverage of a product is a strong indication that a mark has obtained secondary meaning." *RVC Floor Decor*, 527 F. Supp. 3d at 320 (collecting cases) (emphasis in original).  Capri Sun points to 12 assertedly unsolicited articles covering the Pouch Mark: (1) a 1991 article in the *Chicago Tribune* referring to Capri Sun's "distinctive foil-pouch packaging"; (2) a 2009 article on www.foodbev.com referring to "Capri-Sun Sunrise['s] . . . kid-favourite silver pouch"; (3) a 2013 article from www.eater.com discussing a KFC menu offer including a pouched Capri Sun drink; (4) a 2013 article on *Food Business News* referring to "the familiar Capri Sun pouch"; (5) a 2016 *Washington Post* article discussing Wild and the "trademark silver pouch"; (6) a September 2017 article ranking Capri Sun flavors; (7) another September 2017 article on www.foodingredientsfirst.com referring to "the classic Capri Sun pouch"; (8) a 2018 article on www.bustle.com discussing Capri Sun's cooperation with Lyft in which moving icons of cars in the Lyft app would turn into icons Capri Sun juice pouches; (9) a 2020 article on www.campaignlive.com discussing Capri Sun's newly introduced pouched water line; (10) a 2020 *Yahoo! Finance* article referring to Capri Sun's "signature pouch[]"; (11) a 2020 article on www.shootline.com referring to Capri Sun's "iconic juice pouch[]"; and (12) a 2020 *Fox Business* web article referring to Capri Sun's "famous" pouch.  JSUF ¶¶ 62–66, 68–70, 79; Dkts. 79-15, 111-5–111-7.

Of these, articles (8) through (12) must be disregarded, because they were published after ABC began selling Accused Pouches to its first customer in November 2017.  JSUF ¶ 288.  *See LVL XIII Brands*, 209 F. Supp. 3d at 654.  Of the remaining seven, articles (3) and (6) do not mention the juice pouch, but discuss Capri Sun beverages only in general.  *See* Dkts. 79-14, 79-15.  The remaining five articles are responsive, but are fairly cast as a mere "a handful of cursory

mentions and brief blurbs in . . . national and regional periodicals" and "a few industry-specific articles that discuss its business and goods," and as such are insufficient to tilt the factor of unsolicited media coverage in Capri Sun's favor. *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012); *see also Denimafia*, 2014 WL 814532, at *12 ("[I]solated incidents of . . . unsolicited media coverage in several industry-specific publications are insufficient to show secondary meaning."); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004) ("dozen or so unsolicited articles that praise[d plaintiffs' product]" not probative of secondary meaning).

The unsolicited media coverage factor, too, favors ABC.

*(4) Sales Success*: "The sales success of a product may be indicative of whether or not a substantial portion of the purchasing public associates the [mark] with the source of the goods." *RVC Floor Decor*, 527 F. Supp. 3d at 320 (quoting *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998)) (further quotation marks and citation omitted) (alteration in *Tri-Star*). In assessing sales success, courts have considered sales volume, *Easy Spirit*, 515 F. Supp. 3d at 64–65; market share, *Conn. Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 414–15 (D. Conn. 2008); whether sales grew or declined over time, *RVC Floor Decor*, 527 F. Supp. 3d at 320; whether sales data was broken down by year, *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 321 (S.D.N.Y. 2012), *as amended* (Sept. 19, 2012) (citing cases); and whether sales data were convincingly linked to the mark-bearing product, *Therapy Prods., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009), *aff'd in relevant part sub nom. Erchonia Corp. v. Bissoon*, 410 F. App'x 416 (2d Cir. 2011) (summary order).

Capri Sun presents impressive sales data. For 1991, Capri Sun adduces a sales figure of $100 million for its pouched products from a *Chicago Tribune* article. *See* JSUF ¶ 79 ("That $100 million is what Capri Sun now generates in annual volume, according to Kraft's announcement."). For the years 2012–2016, Capri Sun points to a Nielsen report, which contains the following sales numbers for Capri Sun-branded products using the Pouch Mark: $751 million in 2012; $690.4 million in 2013; $686.9 million in 2014; $647.2 million in 2015; and approximately $500 million in 2016. JSUF ¶¶ 81, 83; Pl. 56.1 ¶¶ 49–52, 54–55.[29] Capri Sun's 2016 market share in the kids single-serve beverages market was 22.8%, higher than any other brand's. JSUF ¶ 81. In 2017, according to the Steckel Report, that market share was 21.7%. Steckel Rep. ¶ 27. As to sales figures for the period after which the alleged infringement began, Capri Sun points to a presentation produced by SunnyD, a brand that purchases Accused Pouches from ABC. It estimates that, in 2019, Capri Sun's U.S. sales totaled $597.7 million— $399.3 million of which was attributable to the "Original" product line. JSUF ¶ 84; Pl. 56.1 ¶ 56.

Courts in this District have found sales success on numbers many times smaller than Capri Sun's. *See, e.g.*, *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ($4 million in sales indicative of secondary meaning); *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) ($3 million in sales termed "indisputable sales success"); *Easy Spirit*, 515 F. Supp. 3d at 65 (finding sales success where plaintiff's data "reflect[ed] millions-of-dollars in sales revenue"). To be sure, Capri Sun's sales have declined by more than $250 million between 2012 and 2016. *Cf. RVC Floor Decor*, 527 F. Supp. 3d at 320.

---

[29] Capri Sun also claims that, for the period June 2015 to June 2016, it "sold approximately $35[ million] worth of" its "'Original' Fruit Punch" brand. Pl. 56.1 ¶ 53. This information derives from an internal document of ABC customer SunnyD. Def. SJ Opp'n at 10; Def. SJ Mot. at 8.

Nonetheless, Capri Sun's long-term sales increased from $100 million in 1991 to $500 million in 2016.[30] And notwithstanding the recent trend, the brand retains the largest market share in the children's single-serve beverages market. *See Conn. Cmty. Bank*, 578 F. Supp. 2d at 414–15 (finding sales success to favor plaintiff whose market share was 3.95% in a competitive market). Capri Sun's data indicate ample sales success.

In response, ABC makes two sets of arguments. First, it questions the reliability of Capri Sun's sales data on various grounds, each ineffective. *See* Def SJ Mem. at 8–9; Def. SJ Opp'n at 10–11. It faults Capri Sun for "fail[ing] to obtain accurate business records" from Kraft, its U.S. licensee. Def. SJ Opp'n at 10. ABC terms the data from the *Chicago Tribune* (1991), Nielsen (2012–2016), and ABC's customer SunnyD (2016) as "unverified and contradictory information from third parties." *Id.* Capri Sun rejoins that ABC has not pointed to any evidence of unreliability in this data. And, it notes, Nielsen's figures—the vast majority of the sales data at issue—has been held reliable. Pl. SJ Reply at 6–7 & n.9; *Matrix Essentials*, 522 F. Supp. 2d at 474 (so finding). Capri Sun is correct. ABC has not articulated a coherent reason to discredit this data as unreliable, and courts have recognized Nielsen data in particular as trustworthy.

ABC next faults Capri Sun's selected data for covering only disconnected calendar years: 1991, 2012–2016, and 2019, Def. SJ Mem. at 8, the final year of which the Court has put aside as post-dating the alleged infringement. But notwithstanding the gaps in its dataset, Capri Sun has adduced data for each of the five years preceding the alleged infringement—the period most

---

[30] Capri Sun also points to its sales data from 2019, some two years after ABC's alleged infringement began in November 2017. Pl. SJ Reply at 6 n.8. But although one court has, in passing, considered post-infringement sales data, *see Nikon Inc. v. Ikon Corp.*, 803 F. Supp. 910, 915–16 (S.D.N.Y. 1992), the general practice is not to, in light of "plaintiff['s] . . . burden of proving that his mark acquired secondary meaning *by the time* the allegedly infringing product came on the market," *LVL XIII Brands*, 209 F. Supp. 3d at 654 (emphasis added). Such data, in any event, would not have disturbed the Court's assessment of this factor.

relevant to this suit. *See Easy Spirit*, 515 F. Supp. 3d at 65 (finding sales for the two-year period prior to the alleged infringement dispositive for the question of sales success). That Capri Sun has also come forward with data from a 1991 newspaper article does not undermine its data from 2012–2016.

ABC next argues that Capri Sun's sales data is inconsistent with data cited in an article cited by Dr. Steckel in his report. *See* Def. SJ Mem. at 8 (citing Def. 56.1 ¶ 151; Steckel Rept. ¶ 27 n.33)). That article, relying on data by Information Resources, Inc., stated that Capri Sun had had sales of $33.8 million between May 2018 and May 2019. Def. 56.1 ¶ 152; *see* Dkt. 108-51 (underlying article). Dr. Steckel's report disregarded this figure, and at his deposition he rejected it as inconsistent with Capri Sun's advertising spend of $20 million in 2019. Steckel Dep. Tr. at 171. ABC, however, seizes on this figure, which it contends is inconsistent with Capri Sun's reported sales of $597.7 million for 2019. Def. SJ Mem. at 8. The short answer is supplied by Capri Sun, which explains—without refutation—that the $33.8 million figure represents the sales of a single product line—one of eight sold under the Pouch Mark. Pl. SJ Opp'n at 11. In any event, with the Court's having disregarded Capri Sun's 2019 data, ABC's attack on that data does not weaken Capri Sun's case.[31]

ABC next argues that, even if Capri Sun's data was reliable, its sales are insufficiently linked to the Pouch Mark. Def. SJ Opp'n at 8, 11. Capri Sun counters that its formidable sales figures are solely for products using the Pouch Mark, given that they are a pouch-only brand. Pl. SJ Reply at 6. That is correct. Of course, the fact that $500 million in Pouch Mark-denominated

---

[31] And even if the $33.8 million figure accurately reflected Capri Sun's sales of products using the Pouch Mark during a relevant 12-month period, that figure would still be large enough, measured against reported cases, to bespeak sales success. *See R.F.M.A.S.*, 619 F. Supp. 2d at 81 ($4 million); *Metrokane*, 160 F. Supp. 2d at 640 ($3 million).

products were sold in 2016 does not mean that the Pouch Mark was a but-for cause of each such

sale. Other factors were obviously in play. But, from the perspective of this factor, the sheer

scale of Capri Sun's success selling products using the Pouch Mark makes it more likely that

there was a public association between it and the mark. *Cf. R.F.M.A.S.*, 619 F. Supp. 2d at 81

(sales success factor satisfied by sales of $4 million); *Metrokane*, 160 F. Supp. 2d at 640 (same:

$3 million). The sales success factor strongly favors Capri Sun.

   *(5) Attempts to Plagiarize the Pouch Mark*: "Evidence that a mark has been widely

copied is persuasive evidence of secondary meaning because it demonstrates that the mark has

become a 'strong source identifier in the eyes of the purchasing public.'" *Lopez v. Gap, Inc.*, 883

F. Supp. 2d 400, 428 (S.D.N.Y. 2012) (quoting *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900

(KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993)); *accord Centaur Commc'ns*, 652 F.

Supp. at 1109. Relevant to this inquiry is evidence of deliberate copying by the defendant and

by third parties. *See, e.g., See Chum Ltd.*, 198 F. Supp. 2d at 536. "Proof of intentional copying,

by itself, does not trigger any presumption of secondary meaning under Second Circuit

precedent." *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 319

(S.D.N.Y. 2001) (footnote omitted) (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973

F.2d 1033, 1042 (2d Cir. 1992)). Rather, the key question is "whether the copying was done

deliberately, so as to benefit from [the plaintiff's] name and good will." *Cartier, Inc. v. Four

Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004).

   Capri Sun points to three sets of evidence adduced in discovery as proof of deliberate

attempts to plagiarize and gain benefit from the Pouch Mark.

*(i) ABC emails and PowerPoints*:  Capri Sun first points to emails and PowerPoint presentations from within ABC that it construes as bespeaking a plan by ABC to manufacture pouches that would be less expensive replicas of Capri Sun's pouch products.  These are:

- An email, dated October 9, 2017, by Nancy Martin, a senior brand manager at Harvest Hill, to Kurt Leunis.  It requested, *inter alia*, a change to the design of the pouch used for ABC's Juicy Juice Splashers Organic product, which until then had been sold in a Licensed Pouch.  Martin stated, "[t]he shape of the pouch is changing slightly" by "round[ing]" the pouch's top corners.  JSUF ¶ 304.

- An email, dated October 17, 2017, by Mary MacEachern, a Harvest Hill brand manager, to Michelle Riss of the grocery chain Lidl, which was responsible for selling ABC's On-the-Go brand, and which until then also had been sold in the Licensed Pouch.  MacEachern stated that an "ever so slight[]" change would be made to the existing pouch by giving "a slightly rounded edge" to the pouch's upper corners.  *Id.* ¶ 303.

- An email, dated October 18, 2017, by Martin to MacEachern and Candice King at Harvest Hill to describe a forthcoming change to ABC's Little Hug product, also until then sold in the Licensed Pouch shape.  Martin stated that there would be "a very subtle change to the pouch," as "the top left and top right corners" would "become rounded."  *Id.* ¶ 302.

- A PowerPoint presentation for a November 7, 2017 meeting, entitled "Harvest Hill Beverage Company.  Pouch Portfolio Strategy."  ABC there described the "Pouch shape changing slightly to rounded edges."  *Id.* ¶ 308.

- An email, dated January 19, 2018, by MacEachern to Ilene Bergenfeld, Harvest Hill's chief marketing officer, to "request" the design of a "Capri Sun-like product." *Id.* ¶ 313.

- A PowerPoint presentation by Harvest Hill dated February 13, 2018 and titled "Walgreens. Tom Burkemper. Capabilities & Opportunities Overview." It features a pouch of the SunnyD brand, *i.e.* one of ABC's Accused Pouches. *Id.* ¶ 316. It describes that brand as providing "[v]alue to Capri Sun" by costing consumers 17% less than Capri Sun pouches. *Id.*

- A PowerPoint presentation chronicling a meeting between Harvest Hill and Walmart in or about December 2019. It features a slide of a "mockup image of a pouch in the Accused Pouch shape." That pouch drink was intended to "[o]ffer[] a better value [than] Capri Sun." *Id.* ¶ 314.

- A PowerPoint presentation purporting to present a plan for the first half of 2020 features one slide titled "Private Label Juice Pouch," and another presenting a mockup juice carton described as, "Product: Capri Sun NBE Pouch." *Id.* ¶ 315.

- An email, dated March 15, 2018, by Bergenfeld to Selana Najman, a third-party designer, seeking a Capri Sun "knockoff" for a "private label project." *Id.* ¶ 311.

- An email, dated March 19, 2018, by Bob Sopko, a Director of Sales West at ABC, emailed Joyce Lam. The email discussed ABC's O Organics brand, which also had used the Licensed Pouch. Sopko stated that "the only thing we changed were slight tweaks to the graphics and pouch." *Id.* ¶ 305.

- An email, dated March 19, 2018, by Will Magistrelli, a Procurement Manager at a retail customer of Harvest Hills's, to Steven Godfrey of Harvest Hill and others

requesting a "knock off of [the] Honest Juice kids pack." A later email made
clear, however, that the "knock off" requested was of the Honest Kids Appley
Ever After product, which was not a Capri Sun brand. *Id.* ¶ 312.

- An email, dated April 6, 2018, by Gilbert Aguilar, Harvest Hill's external
  manufacturing manager, to colleagues about a planned change in the
  manufacturing of the ABC's SunnyD pouch, which until then had used the
  Licensed Pouch shape. Aguilar stated that "[t]he only [change] to the pouch [is
  that] the top corner radius is changing." *Id.* ¶ 306.

- An email, dated April 12, 2018, by David Champlin, Harvest Hill's then-president
  of sales, to Anthony Raucci, Harvest Hill's executive vice president of sales,
  regarding a planned change to the pouch used for Juicy Juice Splashers.
  Champlin wrote that Harvest Hill would "change the shape of the pouch slightly
  to free us up from paying the [Capri Sun] trademark fee." *Id.* ¶ 301.

- An email, dated November 13, 2018, from Bergenfeld to Jim Chimura, Harvest
  Hill's senior director of R&D, and others. Bergenfeld wrote that "the only
  change" made to the Licensed Pouch "were the top corners." *Id.* ¶ 307.

These documents are subject to competing interpretations—both reasonably reached.
Viewed in the light most favorable to Capri Sun, this evidence can be read to support a deliberate
attempt within ABC to plagiarize the Pouch Mark. The references to slightly altering the
Licensed Pouches, to evade paying royalties to Capri Sun, and to create "Capri Sun-like" and
"knockoff" pouches are easily read as malodorous, consistent with a studied attempt to closely
replicate the Pouch Mark and thereby benefit from the positive associations Capri Sun's
customers had with the mark. Such "comparisons would be meaningless if the audience did not

associate the shape with the brand." *Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F.

Supp. 3d 400, 407 (S.D.N.Y. 2018) (citing *Cartier*, 348 F. Supp. 2d at 231) (discussing

communications by defendant's salespeople with distributors).

On the other hand, viewed in light most favorable to ABC, this evidence, although still

problematic for it, can be viewed as less pungent and more benign. Other than the two emails

dated January 19, 2018 and March 15, 2018, the above documents do not discuss an intent to

*copy* Capri Sun. The communications merely *compare* Capri Sun products to ABC's—shape,

dye-lines, price points, quality, and the like—without overtly bespeaking a plan to "copy[] . . .

deliberately, so as to benefit from [Capri Sun's] name and good will." *Cartier*, 348 F. Supp. 2d

at 243; *see also Can't Live Without It*, 287 F. Supp. 3d at 406–07 (finding a dispute of material

fact as to plagiarization attempts where plaintiff had identified "130 different sources of water

bottles that have the same shape as the [senior mark] S'well Bottle"). Critically, Capri Sun has

not showcased at summary judgment, and apparently did not usably develop, testimonial

evidence from discovery contextualizing these soundbites. It has not, for example, shown that

the parties to these communications had agency over ABC's pouch-design decisions, let alone

that they occurred in circumstances supporting Capri Sun's sinister reading of them.

*(ii) Faribault's earlier alleged misdeeds*: Capri Sun next points to alleged plagiarization

attempts by ABC's predecessor-in-interest Faribault. It notes that, after Faribault did not comply

with its demands to cease and desist from continuing to sell confusingly similar pouches, Capri

Sun filed the Faribault Lawsuit, which ended in the SLA. Pl. SJ Mem. at 5.

These accusations, without more, do little work for Capri Sun. The SLA itself explicitly

disclaimed any finding or admission of wrongdoing of any kind by either party. *See* JSUF ¶ 255

(quoting SLA § 11.4). That agreement did not preclude Capri Sun from later establishing, in this

litigation, the fact of that Faribault had earlier attempted to plagiarize its mark. But Capri Sun points only to its earlier accusations of deliberate copying by Faribault. Beyond the historical fact that Faribault's pouches at the time—in the shape of the 2010 Pouch—were identical to the Pouch Mark, Capri Sun does not point to any evidence of deliberate copying. Its Complaint in the Faribault litigation has no evidentiary value.

*(iii) Cease-and-desist letters to third parties*: Capri Sun next points to cease-and-desist letters that Kraft sent to three alleged infringers of the Pouch Mark. One, dated December 14, 2016, went to Redrum Bar LLC, challenging the "use of the Capri Sun trademarks and packaging for alcoholic beverages." *Id.* ¶ 211. The product at issue was a pouched alcoholic drink dubbed "Capri Rum." A similar letter, dated January 27, 2020, went to Rumba, a restaurant. *Id.* ¶ 212. A third, dated April 1, 2020, followed up by a letter dated July 13, 2020, went to Poppilu, a co-pack customer of ABC's. *Id.* ¶ 310. According to Capri Sun, Redrum Bar and Rumba have ceased selling the challenged products, but Poppilu has not. Def. SJ Opp'n at 9; Pl. 56.1 ¶ 58.

This evidence, too, is ineffective. Although Capri Sun's sending of cease-and-desist letters to vendors may bespeak its perception that those products by third parties and ABC breached its trademark, these letters say nothing about those parties' intentions, let alone establish a deliberate attempt by them to copy the Pouch Mark or to benefit off the goodwill of Capri Sun's consumers. *See Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350, 359 & n.6 (S.D.N.Y. 2015) ("Plaintiffs fail[ed] to identify any attempts to intentionally copy or plagiarize" trademark despite having "issued cease and desist notices to other businesses that used" the mark).

All in, Capri Sun's evidence of plagiarization attempts by ABC is relatively scant. Viewed in the light most favorable to Capri Sun, the emails and PowerPoints are consistent with

the possibility of a scheme within ABC to deliberately attempt to copy Capri Sun's Mark. But these materials do not solidly establish the point; speculation and assumption would be required to get there. And viewed in the opposite light, Capri Sun's evidence is not probative of this factor. *See Chum Ltd.*, 198 F. Supp. 2d at 536 (attempts-to-plagiarize factor weighed against finding of secondary meaning where "no more than one competitor ha[d] attempted to use a mark similar to [plaintiff's]" mark). In light of Capri Sun's failure to nail down admissible, non-conjectural evidence of ABC's malignant intentions, the Court therefore finds the plagiarization factor neutral or close to neutral.

**(6) *Length and Exclusivity of the Pouch Mark's Use*:** "[T]he longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning." *BigStar Ent.*, 105 F. Supp. 2d at 203. In contrast, "[t]he use of part or all of the mark by third parties" cuts against exclusivity of use and thus "weakens its overall strength." *Time, Inc.*, 173 F.3d at 118 (citing *Streetwise Maps*, 159 F.3d at 744); *see also Kind LLC v. Clif Bar & Co.*, No. 14 Civ. 770 (KMW) (RLE), 2014 WL 2619817, at *6 (S.D.N.Y. June 12, 2014) (same).

Capri Sun has sold its Pouch, which became a PTO-registered Mark in 1986, in the United States since 1978. *See* JSUF ¶ 23 (citing the '517 Registration). It has, however, allowed the Pouch Mark to be widely used. In 1991, Kraft obtained "an exclusive license to sell products with Capri Sun trademarks in the Pouch Mark's pouch shape in the United States," and "a non-exclusive license to sell products not branded with Capri Sun trademarks, but are in the Pouch Mark's pouch shape in the United States." *Id.* ¶¶ 36, 136, 137. In September 2001, Kraft began selling, under the latter license, Kool-Aid-branded pouch products called "Jammers" in the Pouch Mark's pouch shape. *Id.* ¶¶ 138–139. These pouches contain a trademark notice that their shape is "a licensed trademark of the Capri Sun Group," but they do not otherwise display the

Capri Sun brand. *Id.* ¶ 140. On August 20, 2001, Capri Sun's owner, Wild, wrote a letter to

Kraft's vice president Dave Johnson emphasizing that, while "approv[ing] your request for the

[Jammer] product[] . . . . it jeopardizes the uniqueness of the pouch . . . . I want to stress that we

[Capri Sun] do not want you to further dilute the pouch with additional brands." Def. 56.1 ¶ 40.

Later, on July 1, 2016, Capri Sun entered into the SLA with Faribault. JSUF ¶ 222. It gave

Faribault "the right to grant sublicenses of the Pouch Mark to its current and future customers,"

so long as Faribault manufactured them. *Id.* ¶ 238. As of October 2017—just before the alleged

infringement began—Faribault and its successor ABC had sublicensed and manufactured

pouches under the Pouch Mark for 17 brands. Def. SJ Mem. at 4 (citing JSUF ¶¶ 242, 285).[32]

      Under these circumstances, ABC rightly states that Capri Sun, through its own doing,

"[f]orewent [e]xclusivity to [m]onetize the Pouch Mark." Def. SJ Mem. at 3. To be sure, from

its approval in 1986, the Pouch Mark was in exclusive use by Capri Sun for 15 years—a fact

that, viewed in isolation, would counsel in favor of finding length and exclusivity. But analysis

of this factor must also take into account Capri Sun's licensing of the mark in the period before

the ABC introduced the junior product that is claimed to infringe. *See Easy Spirit*, 515 F. Supp.

3d at 67 (14-year gap between when plaintiff brought its senior product to market and when

defendant introduced junior product "does not complete this Court's analysis" of this factor).

For the following 15 years—between 2001 and 2016—pursuant to a license from Capri Sun,

Kool Aid drinks were marketed using the Pouch Mark. This long period of moderate non-

---

[32] ABC further argues that at least one third party—Hapi Water—sells flavored drinks in a
"trapezoidal, stand-up 6[-ounce] pouch," and that Kraft and Capri Sun are aware of Hapi's
conduct, but have not taken any action against Hapi. Def. SJ Mem. at 4. The JSUF further
details the existence of Tropicana KiDS, a pouched juice brand against whom Capri Sun and
Kraft have also taken no action. JSUF ¶¶ 417–421.

exclusive use "weakens the [Pouch M]ark's strength" and provides moderate "weigh[t] against a finding of exclusivity." *Rockland Exposition*, 894 F. Supp. 2d at 323.

Most importantly, for the year-and-a-half until ABC's challenged conduct began in November 2017, no fewer than 14 brands using the Capri Sun pouch were on the market but were not sold under a Capri Sun brand. (And ABC was manufacturing such pouches for three additional brands not yet on the market.) These 14 were the Licensed Pouches manufactured pursuant to the SLA. The Pouch Mark's widespread non-exclusive use during this period further weighs against a finding of exclusivity. *See, e.g., MZ Wallace Inc. v. Fuller*, No. 18 Civ. 2265 (DLC), 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) ("The evidence of the ubiquity of this third-party use in the market significantly undercuts the plaintiff's efforts to show that its [mark] has achieved secondary meaning."); *LVL XIII Brands*, 209 F. Supp. 3d at 663 (length and exclusivity factor weighed against finding of secondary meaning where "the record [was] replete with examples of toe plates and other metal shoe ornaments used by [defendants] and other . . . brands").

In sum, the record reflects that Capri Sun made a business decision in 2001 to forgo full exclusivity by granting an exclusive license in its Pouch Mark to Kool-Aid; and that it made a second and more fateful business decision in 2016 to forgo even this partial exclusivity by granting an unrestricted license to Faribault. Between July 2016 and October 2017, Faribault and ABC, unsurprisingly, did what would be expected of a pouch manufacturer which lacked a strong pouch brand of its own: It lawfully manufactured and sold, with Capri Sun's assent in exchange for royalties, the pouch in the shape of the Pouch Mark to as many customers as it could. By the time the alleged infringement commenced, Capri Sun had no more exclusivity to speak of. *See BigStar Ent.*, 105 F. Supp. 2d at 203 ("The Second Circuit has advised . . . that

whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength." (citing *Streetwise Maps*, 159 F.3d at 744)).

The length and exclusivity factor weighs strongly in ABC's favor.

*(7) Weighing the Subfactors*:  In the aggregate, the first *Polaroid* factor—the strength of the Pouch Mark—favors Capri Sun, but only slightly.  Two important factors—advertising expenditures and sales success—favor Capri Sun.  Two other important factors—the absence of a probative, reliable consumer survey associating the Pouch Mark with Capri Sun and a crowded market of pouch products—strongly favor ABC.  The relative dearth of unsolicited media coverage before November 2017 favors ABC but is not a consequential factor.  The inconclusive evidence as to ABC's intent to plagiarize the Pouch Mark, a factor which—depending on how certain documents are construed is either neutral or close—also does not strongly affect the overall balance.

The strength of Capri Sun's Pouch Mark as established in this litigation, therefore is slight.  This factor favors Capri Sun, but only weakly.[33]

        *ii.*      *Similarity Between Capri Sun's Mark and ABC's Pouches*

"In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr*, 991 F.2d at 1078.  This inquiry goes beyond a mere side-by-side comparison; that two marks appear similar is not dispositive.  *See Hormel Foods Corp. v. Jim Henson Prods.*, Inc., 73 F.3d 497, 503–04 (2d Cir. 1996).  Courts compare

---

[33] The Second Circuit has instructed "that district courts should be cautious in weighing these factors at the summary judgment stage." *Easy Spirit*, 515 F. Supp. 3d at 61 (quoting *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 344).  The Court's nuanced assessment reflects that caution, the presence of offsetting factors, and the principle that, on summary judgment, the evidence must be considered in the light most favorable to the non-movant.

the marks "in their entirety, because 'juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar.'" *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 315 (S.D.N.Y. 2000) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984)), *aff'd*, 234 F.3d 1262 (2d Cir. 2000) ; *see also id.* at 316 (finding competing marks not confusingly similar because of "sharp distinctions in the trademarks, the products, logos, advertising, and market appeal between the contested trademarks"). In making that comparison, courts must determine whether "such similarity is more likely than not to cause consumer confusion." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004).

Here, the parties disagree over what is properly considered in assessing the similarity of Capri Sun's and ABC's pouches. Capri Sun urges that the analysis should focus on comparing the pouches' shapes, *i.e.* their "nearly identical . . . height and width," their "straight sides," "flat bottoms," "potbelly" appearance when viewed from the side, and the Accused Pouches' "slightly tweaked," rounded-out upper corners, which consumers are not likely to notice. Pl. SJ Mem. at 17 (citing *Victorinox AG*, 114 F. Supp. 3d at 140; *Source Perrier, S.A. v. Waters of Saratoga Springs, Inc.*, 81 Civ. 178, 1982 WL 51044, at *3 (S.D.N.Y. Dec. 9, 1982)). And as recounted above, the only difference between the shapes, it observes, are the slightly more rounded corners of the Accused Pouch.



*Fig. 10: Drawing of unfilled Licensed Pouch and unfilled Accused Pouch, superimposed. Pl. 56.1 ¶ 82.*

This difference, Capri Sun argues, is minor. It further argues that ABC's use of an otherwise identical pouch is especially likely to confuse consumers because 17 of ABC's 24 Accused Pouches had been sold in the Licensed Pouch before the SLA was terminated, and bore identical trade dress.[34] ABC's "minor tweak[]" to the pouch's upper corners was all the more easy to overlook because consumers buying low-priced fruit drinks are unlikely to pause and notice subtle differences among package shapes. *Id.*

ABC urges a broader perspective. A consumer, it notes, perceives not only a pouch's shape, but its color, brand name, logos, label, font, graphics, and straw placement, which differ, often dramatically, across brands. This, it urges, makes the pouches' shape of limited relevance. Def. SJ Mem. at 11; Def. SJ Opp'n at 12–13. Moreover, ABC notes that "the Accused Pouches are sold in cartons, not individually." Def. SJ Mem. at 11. And because the pouches are not depicted on the cartons of Capri Sun and many of ABC's brands, in store settings, their shapes are not visible at the point of sale. *Id.*

---

[34] The remaining seven Accused Pouches were introduced after ABC terminated the SLA.

Capri Sun rejoins that the fact that the pouched juice brands bear dissimilar outer labeling warrants little weight because, given that ABC sold most of its current brands while a licensee of Capri Sun, consumers may view those brands as still associated with Capri Sun. And when it comes to "confusion as to *association*, as opposed to *source*, labeling is less relevant." *LVL XIII Brands*, 209 F. Supp. 3d at 669 n.87 (citation omitted) (emphasis in original).

The Court agrees with ABC that, methodologically, the extent of the similarity among the parties' pouch shapes must be assessed in the context of the pouches' overall presentation. But, even taking this broader perspective, the similarity factor still, on balance, favors Capri Sun.

The Court begins with a comparison of the shapes of the Pouch Mark and Accused Pouches, *i.e.* stripped of all color, labeling, and writing. *See Hormel Foods*, 73 F.3d at 503. Viewed as such, the Pouch Mark and Accused Pouches are, unsurprisingly, quite similar.



*Fig. 11:  Left: backside of Capri Sun Pouch.  Right: Backside of an Accused Pouch.  Pl. 56.1 ¶ 89.*

They have near-matching shapes: they are the same height, they are each flat at the top, they each have straight edges running down their sides, and they each broaden into a circular base with two pointed angles at the bottom. JSUF ¶¶ 293–294; Def. 56.1 ¶ 6. Each pouch is made of the same tin foil that feels metallic to the touch. When filled with liquid, each pouch is squeezable. The only difference in shape between the two—the Accused Pouches' more rounded upper corners—is, depending on one's perspective, slight or, at most, modest.

However, a consumer never encounters any of the pouches in question in the antiseptic manner depicted and described above—*i.e.*, stripped of all outer colors, pictures, words, fonts, and labels. A consumer instead views and handles the fruit juice products in their full glory. And it is necessary to "examine the visual appearance of each mark in the context of its use." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 735 (2d Cir. 1991). In this context, ABC rightly notes, given all the other stimuli, the importance of the shape of any individual pouch inevitably recedes. Capri Sun, in its analysis of *Polaroid*'s similarity factor, strikingly does not address the pouches' labeling, coloring, and fonts, and the fact that they are sold in cartons, but treats the consumers' "overall impression," *Gruner + Jahr*, 991 F.2d at 1078, as if governed by shape alone. That does not logically or legally follow. As the visual comparisons that ABC has helpfully offered of Capri Sun pouched fruit juices side by side with ABC fruit juices housed in an Accused Pouch illustrate, it is not realistic to assume—without concrete proof—that shape alone or even predominantly drives a consumer's impression as to their similarity. Consider the following examples:



*Fig. 12: ABC's comparison of Accused Pouch and Capri
Sun Pouch.  Def. SJ Mem. at 10.*

   

*Fig. 13: ABC comparison of Capri Sun Pouch (left) with three Accused Pouches.  Def. SJ
Opp'n, at 13.*

To be sure, in other juxtapositions, the differences in outer design among Capri Sun and

ABC products may be less stark.  And some basic elements of these outer designs appear to be

nearly universal—the brand name generally appears at the top, graphics of fruit generally appear

in or around the center, and the name of the flavor generally appears somewhere below the brand

name.  But the colors and graphics of each brand, designed to be eye-catching, differ materially

from ABC brand to ABC brand—and from Capri Sun's.[35]  These features must be viewed as competing for the consumer's attention with the pouch's shape.

The Court has assessed the importance of the similarity in shape in the context of the overall trade dress of the parties' fruit-juice drinks.  This exercise has entailed comparing the Capri Sun pouched products to the 24 Accused Pouches, which are depicted below.



Back to Nature



Essential Everyday



Food Club
Thirst Splashers



Full Circle Organic



Great Value Organic



Green Beginnings Organic



Greenwise



Hy-Vee Coolers



Juicy Juice Splashers
Organic



Juicy Juice +Protein

---

[35] Consider just the design element of color.  Capri Sun's pouches all present its graphics against a blue background.  None of the Accused Pouches has such a color scheme.  Of the Accused Pouches, only the brands Food Club Thirst Splashers, Hy-Vee Coolers, Nature's Nectar, Ocean Spray Growing Goodness, On-the-Go, and Simply Balanced even contain the color blue.  Of those, only portions of the backgrounds of Nature's Nectar, Ocean Spray Growing Goodness, and On-the-Go contain blue.  Simply Balanced's background is a teal color.  And as to Food Club Thirst Splashers and Hy-Vee Coolers, the fact of blue background is offset and realistically overcome by the different font, color of the writing, and placement of graphics.



*Fig. 14: The 24 Accused Pouches.  JSUF ¶ 290.*

In Lanham Act cases involving claims of misappropriated product shapes, courts have

reached different outcomes as to the importance of the shape of the accused mark relative to its

labeling.  *Compare Source Perrier*, 1982 WL 51044, at *4 ("Even if, due to the different labels

and the minor distinctions in the bottle shape, a consumer were able to eventually conclude that

the parties were not related, Perrier would still be injured by the confusing similarity of the bottle

designs."); *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 959 (E.D.N.Y. 1992)

("Even different labels on nearly identical bottles may cause confusion."), *with Kind LLC*, 2014

WL 2619817, at *8 (finding no similarity where "[t]he MOJO trade dress differs from the KIND trade dress in its color scheme, fonts, and number and placement of design elements"); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("[T]he presence of the prominent and distinctive labels [on similarly shaped bottles] alone negates any possibility of a likelihood of confusion.").

The Court's assessment is ultimately that this factor favors Capri Sun—but only to a modest extent. In light of the competing factors reviewed above, reasonable minds can reach different conclusions as to the extent of similarity between the parties' marks. A person viewing the pouch shapes in isolation could find ABC's modification of the Pouch Mark trifling—or more substantial. And the surrounding stimuli—the coloring, labeling, fonts and other outer elements of the pouches—draw attention from the shape of the pouches as a salient factor to the consumer, but to what extent is a point on which minds can differ. A further complicating fact is that the pouches' outer features largely appear the same or similar to those used during the period when Faribault licensed Capri Sun's pouch shape. And when it comes to "confusion as to *association*, as opposed to *source*, labeling is less relevant—a consumer could appreciate that the [infringing product] was marketed by [the defendant], but still believe it was the product of a collaboration with [the plaintiff]." *LVL XIII Brands*, 209 F. Supp. 3d at 669 n.87.

The similarity factor thus favors Capri Sun—albeit not certainly or decisively. [36]

---

[36] In so holding, the Court has considered ABC's argument that, at the point of sale, consumers encounter cartons, not pouches; that Capri Sun's cartons do not display a pouch; and that only some of the 24 Accused brands' cartons do. *See* JSUF ¶¶ 47 (showing all sides of a Capri Sun Original brand carton, displaying no pouch); 329–352 (showing images of flattened cartons of the 24 Accused brand—17 of which display a pouch). This fact is not influential, for three reasons. First, a likelihood-of-confusion analysis is not confined to the point of sale, but includes the post-sale context. *See Lois Sportswear*, 799 F.2d at 872–73 (explaining that "initial-interest confusion" and "post-sale confusion" are equally actionable). Second, in a market such as that

### iii.    Competitive Proximity of the Products

"The 'competitive proximity' factor concerns whether and to what extent products bearing the two parties' marks compete with each other." *Goat Fashion Ltd. v. 1661, Inc.*, 19 Civ. 11045 (PAE), 2020 WL 5758917, at *12 (S.D.N.Y. Sept. 28, 2020); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996).  Courts assessing this factor consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal." *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) (internal quotation marks and citation omitted); *see also Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993) ("Factors to consider in determining the competitive proximity of the products include appearance, style, function, fashion appeal, advertising orientation and price." (citing *McGregor-Doniger*, 599 F.2d at 1134)).  Where the products "serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582.

ABC agrees with Capri Sun that "the Accused Pouches are directly competitive with Capri Sun's pouch products," Def. SJ Mem. at 12, and that, in retail stores, ABC's products are "sold in competitive proximity" to Capri Sun's, Def. SJ Opp'n at 13–14; *see also* JSUF ¶¶ 292 (Accused Pouches "directly competitive" with Capri Sun's), 323–328 (brands in ABC-manufactured pouches sold in same stores as Capri Sun's).  Beyond brick-and-mortar stores, Capri Sun's pouches and Accused Pouches are sold on retailers' websites, where they may appear next to each other, in each other's vicinity, or several pages apart.  JSUF ¶¶ 317–318; Pl.

---

here—for an inexpensive good that is characterized by repeat consumers—the consumer will likely have an image of the pouch product in his or her mind regardless whether the pouch is depicted on the carton.  Third, as the parties agree, internet vendors show images of individual pouches at the virtual point of sale.  Pl. Poret *Daubert* Mem. at 12–15.

56.1 ¶ 98; Pl. 56.1 Resp. ¶ 86.  It is also undisputed that the primary customer bases for both the

Pouch Mark and the Accused Pouches are children and parents with children.  JSUF ¶¶ 44, 322.

This evidence establishes that ABC's and Capri Sun's "products serve the same purpose" and

"share similar geographic distribution, market position and audience appeal." *La Cibeles*, 2000

WL 1253240, at *7; *see also Lopez v. Adidas Am., Inc.*, No. 19 Civ. 7631 (LJL), 2020 WL

2539116, at *9 (S.D.N.Y. May 19, 2020) (finding competitive proximity where "parties both

operate[d] in the [same general] arena [and] operate[d] online and in physical stores").

Attempting to tilt this factor in its favor—or at least mitigate its weight—ABC makes

three arguments.  First, it insists that consumers in brick-and-mortar stores are less likely to be

confused because they tend to encounter only cartons containing the parties' pouch products, and

do not see the pouches themselves.  Def. SJ Mem. at 12; Def. SJ Opp'n at 14.  This argument,

however, repackages the argument rejected above, in the discussion of similarity.  *See supra*,

Section III.2.c.ii.  Further, as to this *Polaroid* factor, the focus is simply the competitive

proximity of the "products." *La Cibeles*, 2000 WL 1253240, at *7; *Jordache Enters.*, 841 F.

Supp. at 517; *Streetwise Maps*, 159 F.3d at 745; *Lang*, 949 F.2d at 582.  It is undeniable that

Capri Sun's and ABC's products are encountered in each other's vicinity.

Second, ABC terms the proximity factor weak because, in its view, the first *Polaroid*

factor—strength of the Mark—weighs in its favor.  Def. SJ Mem. at 12 (citing *Patsy's Brand,*

*Inc. v. I.O.B. Realty, Inc.*, No. 99 Civ. 10175 (JSM), 2001 WL 170672, at *10 (S.D.N.Y. Feb. 21,

2001) (finding that "weakness [of plaintiff's mark] undermines the proximity of the products in

the marketplace")).  The Court, however, has not so held.  It has found the first *Polaroid* factor to

weigh, slightly, in Capri Sun's favor.

Third, ABC argues that there is a genuine dispute of fact whether, with respect to online purchasers, searches on retailers' websites present Capri Sun's and the Accused Pouches "far apart," and, "in one instance, . . . seven pages" apart from each other. Def. SJ Opp'n at 14 (emphasis removed). But even if so on some webpages, the evidence would still support a finding, overall, of competitive proximity.

The competitive proximity factor thus favors Capri Sun.

### iv.    Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387 (citation omitted). This factor "protects the plaintiff's interest in being able to enter a related field at some future time." *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 619 (2d Cir. 2008) (summary order) (citing *Savin Corp.*, 391 F.3d at 459–60). Where, as here, the parties' products are already in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis." *Star Indus.*, 412 F.3d at 387 (treating this factor as neutral where both parties used marks on liquor bottle labels); *accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (same, where both parties used marks in connection with sale of coffee products); *Sunny Merch.*, 97 F. Supp. 3d at 496 (same, where both parties' marks appeared on sunglasses).

Accordingly, this factor is neutral. Because the Court has resolved the competitive proximity factor on Capri Sun's favor, the bridging the gap factor is irrelevant.

### v.    Actual Confusion

Although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear*, 799 F.2d at 875, "[t]here can be no more positive or substantial proof of the likelihood of confusion," *Dooney & Bourke*, 561 F. Supp. 2d at 385 (quoting *Savin Corp.*, 391

F.3d at 459) (alteration in *Dooney & Bourke*).  Accordingly, "courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport*, 86 F. Supp. 2d at 319 (collecting cases).  As the Second Circuit has observed, "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." *McGregor-Doniger*, 599 F.2d at 1136 (internal quotation marks and citation omitted).

"Evidence of actual confusion may consist of anecdotal or survey evidence." *Paco Sport*, 86 F. Supp. 2d at 319.  To be relevant under the Lanham Act, the confusion must be of a type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang*, 949 F.2d at 583; *see also Trs. of Colum. Univ. v. Colum./HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

As the Court noted, Capri Sun elected not to present any survey evidence whatsoever as to consumer confusion. *See Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, No. 96 Civ. 9469 (RWS), 1999 WL 191527, at *12 (S.D.N.Y. Apr. 7, 1999) ("[A] plaintiff's failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." (collecting cases)).  Nor has it pointed to a single communication it has received bespeaking such confusion.[37]  Its case on this point is based instead on nine consumer communications that Ocean Spray—an ABC customer selling the Growing Goodness brand in an Accused Pouch—received between June 26, 2015 and May 19, 2020.  JSUF ¶¶ 401–402 (citing Dkt. 79-194).

---

[37] The parties have stipulated that "Capri Sun has not produced any evidence of actual consumer confusion between Capri Sun, Capri Sun's pouch products, or the Pouch Mark on the one hand, and any of the Accused Pouches [or Licensed Pouches] on the other."  JSUF ¶¶ 406–407.

This showing is anemic. Of the nine communications, four must be disregarded. They were made when Ocean Spray was still selling the Licensed Pouch under Capri Sun's Pouch Mark, *i.e.*, before it had begun selling the separate and different Accused Pouch product which Capri Sun claims to have caused actual confusion. *Id.* ¶ 402.

Of the remaining five, four indicate a degree of actual confusion between Ocean Spray and Capri Sun. Three complained about the quality of the product, which the consumer had mistook for a Capri Sun product. The first complained that about five pouches in a "Capri [S]un 30 [v]ariety [p]ack [w]ere [e]mpty." Dkt. 79-194 at 3. The second complained that a pouch drink in a "box of [C]apri [S]un" tasted spoiled. *Id.* at 5. The third complained that she had found "mold in a [C]apri [S]un." *Id.* at 6. The fourth contained a suggestion premised on the assumption that Ocean Spray sold Capri Sun products: "Please! Start making 1 gallon jugs or 16 fl oz bottles of [C]apri [S]un!!!" *Id.* at 4. The fifth did not indicate confusion between Capri Sun and Ocean Spray.[38]

The four communications that survive present *de minimis* evidence of actual confusion. As this Court held in *LVL XIII Brands* on similar facts, these limited instances "do[] not go far toward demonstrating that an *appreciable* number of ordinarily prudent purchasers are likely to be confused." 209 F. Supp. 3d at 673–74 (holding so based on one text message and two Instagram posts indicating actual confusion) (citing *O'Keefe*, 590 F. Supp. 2d at 524) (alteration in original) (quotation marks and further citations omitted). In context, Ocean Spray receives

---

[38] Rather, it inquired whether Ocean Spray was affiliated with Capri Sun. *See* Dkt. 79-194 at 2. But "[c]ourts have held such inquiries not probative of actual confusion." *LVL XIII Brands*, 209 F. Supp. 3d at 672 (quoting *Nora Beverages*, 269 F.3d at 124 ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.")).

thousands of consumer communications every year. *See* JSUF ¶ 399. It is only one of 24 brands selling Accused Pouches. All of these brands presumably generate meaningful consumer communications, whether complaints or other commentary. Together, more than 380 million pouches of these brands are sold every year. Def. SJ Opp'n at 15. Yet, across an almost three-year period of the Pouch Mark and Accused Pouches' coexistence in the market (November 2017 until the close of fact discovery in September 2020), Capri Sun was able to adduce only the four communications above indicative of actual consumer confusion, all from a single brand. Such "a small number of incidents[ ]of confusion in light of the total course of competition [does not] require[] a finding in plaintiff's favor." *Flushing Bank*, 138 F. Supp. 3d at 589; *see also George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 398–99 (4th Cir. 2009) (finding "four instances of [actual] consumer confusion" "at best *de minimis*" when measured against significant sales volume).

This factor thus weighs heavily in ABC's favor. That is so on each side's motion for summary judgment. It is all the more so on Capri Sun's. That is because ABC, despite not having the burden of proof, commissioned Poret's survey into consumer confusion, which showed a 0% likelihood of confusion. *See* Poret Report. At trial, Capri Sun would be at liberty to minimize these findings, including based on claims of methodological imperfections in the study, but on its motion for summary judgment, the Poret survey must be credited as probative. *See Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (finding "no evidence of any consumer confusion" where defendants' survey showed a confusion rate of less

than 3%); *Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 254 (E.D.N.Y.

2001) (same for survey showing confusion rate of 7.84%).[39]

Capri Sun makes two arguments why its failure to adduce helpful evidence on this factor

does not damage its case. First, Capri Sun and ABC are "not retailers, and thus, less likely to

hear directly from a duped consumer"; and second, the low price of pouched fruit drinks makes it

"less likely [that consumers would] take the time to complain" about them. Pl. SJ Opp'n at 7–8

(quoting *Coty*, 277 F. Supp. 3d at 453).  Those circumstances do help explain the paucity of

complaints.  But they neither make the factor of actual confusion irrelevant nor relieve Capri Sun

of its onus to come forward with such evidence.  In fact, it makes Capri Sun's failure to produce

a consumer survey—which it was well-positioned to do—all the more striking. *See GMA*

*Accessories, Inc. v. Croscill, Inc.*, No. 06 Civ. 6236 (GEL), 2008 WL 591803, at *8 (S.D.N.Y.

Mar. 3, 2008) ("The lack of any consumer confusion reported in [defendant's] survey, coupled

with [plaintiff's] failure to perform its own consumer survey or adduce any other evidence of

actual confusion, clearly tip this *Polaroid* factor in defendants' favor." (citation omitted)).

---

[39] In this Circuit, "a 15% net confusion rate may be sufficient to show actual confusion, [but is] on the lower end of rates that courts within this Circuit have found sufficient to show actual confusion." *Kind LLC*, 2014 WL 2619817, at *9 (citations omitted). *Kind* drew this conclusion from the following decisions: *Borghese Trademarks Inc. v. Borghese*, 10 Civ. 5552 (JPO) (AJP), 2013 WL 143807, at *11 (S.D.N.Y. Jan. 14, 2013) (15% net confusion rate sufficient to prove actual confusion); *Volkswagen Aktiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447 (DLC), 1995 WL 605605, at *5 (S.D.N.Y. May 11, 1995) (17.2% and 15.8% net confusion rates sufficient); *Energybrands, Inc. v. Beverage Mktg. USA, Inc.*, 02 Civ. 3227 (JSR), 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002)  (17% net confusion rate sufficient); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y.1993) (26% net confusion rate sufficient); *U.S. Polo Ass'n, Inc., v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 532, 535–36 (S.D.N.Y. 2011) (27.8%, 22.5%, and 17.8% net confusion rates sufficient); *Gross*, 641 F. Supp. 2d at 191 (34.5% and 47% net confusion rates sufficient); *Masterfoods USA v. Arcor USA, Inc.*, 230 F. Supp. 2d 302, 311 (W.D.N.Y. 2002) (net confusion rate of at least 29.22% sufficient).

The actual confusion factor weighs strongly in ABC's favor.[40]

<em>vi.    Bad Faith</em>

"The inquiry into willfulness or bad faith 'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp.*, 391 F.3d at 460). "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol-Myers Squibb*, 973 F.2d at 1044 (citation omitted). Where the junior user's mark is not fully identical to the senior mark, the Second Circuit has "upheld findings of bad faith" where the junior user knew of the prior mark and the junior mark showed "similarities so strong that it seems plain that deliberate copying has occurred." *Paddington Corp.*, 996 F.2d at 587 (citation omitted). But "[t]here is a considerable difference between an intent to copy and an intent to deceive." *Starbucks Corp.*, 588 F.3d at 117 (citations omitted). "The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps*, 159 F.3d at 745. Where the junior user "prominently displays" its own mark and "uses a trade dress dissimilar to" the senior user's, such efforts "negate[] an inference of

---

[40] Courts have declined to weight sparse evidence of actual confusion too heavily against a plaintiff where the period of the allegedly infringing conduct was too short to realistically generate a large number of complaints by confused consumers. *See, e.g.*, *LVL XIII Brands*, 209 F. Supp. 3d at 674 (not weighing actual confusion factor heavily where infringing product had been sold for two years); *Lois Sportswear*, 799 F.2d at 875 (finding that "[t]here has been little chance for actual confusion" after two years, and noting that it "would be unfair to penalize [a plaintiff] for acting to protect its trademark rights before serious damage has occurred"); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (lack of actual confusion did not warrant inference against senior user in light of six-month period that junior user's product was on the market). This authority is not controlling here. Between November 2017, when ABC's alleged infringing conduct began, and September 2020, when fact discovery closed, nearly three years elapsed.

intent to deceive consumers as to the source of the product." *Kind LLC*, 2014 WL 2619817, at

*11 (citing *Nora Beverages*, 269 F.3d at 125).

Largely for the reasons reviewed above in the discussion of whether the evidence shows

attempts by ABC to plagiarize the Pouch Mark, the Court finds that a genuine issue of fact exists

as to ABC's intent to deceive consumers and benefit off of consumers' good will in Capri Sun's

brand. The following is undisputed: ABC knew of the Pouch Mark; ABC sought to relieve itself

of having to pay royalty fees to Capri Sun under the SLA, *see* Def. SJ Mem. at 15; Def. 56.1 ¶¶

22–24; *see also* JSUF ¶ 301 (email by Harvest Hill's president of sales to its executive vice

president of sales discussing "chang[ing] the shape of the [Licensed Pouch] slightly to free us up

from paying the [Capri Sun] trademark fee"); and to achieve that, ABC intentionally changed the

upper corners of its pouches, leaving the rest unchanged. JSUF ¶¶ 302, 305–307, 311, 313.

ABC's desire to maximize its profits by avoiding the duty to pay royalties under the SLA

does not, however, equate to bad faith. Such turns instead on whether ABC intended to do so by

impermissibly exploiting the similarities between the Pouch Mark and the Accused Mark. But as

reviewed above, the degree of similarity between the pouches is a point on which reasonable

minds can disagree. And the parties make responsible but competing arguments whether ABC's

motivations for changing its pouch design were malignant (to capitalize on Capri Sun's goodwill

by offering a confusingly similar product) or benign (to avoid a needless cost item, royalties, by

altering its product sufficiently to put avoid Lanham Act liability.

On Capri Sun's telling, ABC made nominal changes with the intent to confuse consumers

and continue to benefit off of the Pouch Mark's goodwill. Pl. SJ Mem. at 19–20. As evidence of

such intentional misconduct, Capri Sun points to the Harvest Hill employees' communications—

internally and with retail customers—between October 18, 2017 and November 13, 2018, as

reviewed above. Those referred, *inter alia*, to the new Unlicensed Pouch as a Capri Sun "knockoff," "Capri Sun NBE Juice Pouch," "Capri Sun 'fighter,'" and a design that was worryingly "close to Capri." JSUF ¶¶ 311, 314, 315; Dkt. 79-151 at 2. They assured retail customers that the change to the pouch would be "very subtle," "slight tweaks," nothing except a change to the "top corners" or the "top corner radius." JSUF ¶¶ 302, 305–307. In Capri Sun's view, the Accused Pouch's "similarities [are] so strong that it seems plain that deliberate copying has occurred," *Paddington Corp.*, 996 F.2d at 587, such that bad faith must be presumed. Capri Sun takes particular offense at ABC's continued marketing of the Accused Pouch after this lawsuit was filed on February 14, 2019.

ABC counters that it deliberately pivoted to selling a meaningfully dissimilar pouch, precisely with the *good*-faith intent to avoid confusion. It makes several points in support of this claim. First, it asserts, its good-faith strategy was to return to the "safe harbor" of its pre-SLA environment. ABC argues that it deliberately reverted to a design similar to that of its 2005 Pouch, which Capri Sun had never challenged for infringing its Pouch Mark. Def. SJ Mem. at 16; Def. SJ Opp'n at 18. There is some force to this argument, insofar as, like the 2005 Pouch, the Unlicensed Pouch had rounded top corners. But unlike the 2005 Pouch, whose height was 160 mm, the Accused Pouch retained the height of the Capri Sun pouch that it had licensed under the SLA: 150 mm.[41] Second, ABC argues that, because its role was to manufacture pouches for

---

[41] ABC ascribes its decision not to revert to the height of the 2005 Pouch to the fact that, its predecessor, Faribault, following an industry trend led by Capri Sun, had reduced the volume held by its pouches from 6.75 fl. oz. to 6 fl. oz.

ABC also asserts that the overlap between the Pouch Mark and the Accused Pouches derives from functional needs, Def. SJ Mem. at 17. The Court's October 29, 2019 decision foreclosed ABC, under the SLA from raising a functionality defense. Dkt. 51. The Court thus disregards this argument.

other brands, it did not have a direct interest in confusing consumers in the way that those brands would.[42]  Def. SJ Mem. at 16.  That argument also has only partial force, because ABC indirectly stood to benefit financially, over time, to the extent the brands it serviced would produce higher sales by benefitting from the goodwill of putatively confused Capri Sun consumers.  Third, ABC argues that Capri Sun's purported documentary evidence of ABC's intent to create a "knockoff," "fighter," or "NBE" product to the Pouch Mark does not show an intent to confuse consumers, but an intent to compete fairly by henceforth selling, in lieu of the Licensed Pouch, one with rounded corners.  *See Streetwise Maps*, 159 F.3d at 745 ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product.").  The force of this argument turns on just how similar a finder of fact would deem the senior and junior pouches to be.

Such offsetting evidence and inferences lead the Court to view this factor as neutral, as a finder of fact could reasonably find the factor to favor either side to some extent, depending on her view of the evidence.  As to this factor, much turns on the finder's assessment of the extent of similarity, a point on which the Court has found fair room for debate.  In general, the more similar the senior and junior marks appear, the fairer it is to presume intentional copying.  *Bristol-Myers Squibb*, 973 F.2d at 1044.  By the same token, if a junior user's "trade dress [is sufficiently] dissimilar to" the senior user's, it may "negate[] an inference of intent to deceive consumers as to the source of the product."  *Kind LLC*, 2014 WL 2619817, at *11.

Again, the similarity factor under *Polaroid* weighs in Capri Sun's favor—but only somewhat.  A finder of fact could, but need not, find a similarity "so striking that it is hard to

---

[42] ABC directly sells one branded pouch product—Green Beginnings—to HEB, a retailer in Texas.  JSUF ¶ 278.  This geographic outlier does not affect the Court's overall assessment.

imagine" that ABC did not design the Accused Pouch with the intent to deceive consumers. *Paddington Corp.*, 996 F.2d at 586–87. On the hand, as explained above, the documentary evidence adduced by Capri Sun from within ABC falls well short of establishing this point. The emails in question contain suggestive sound bites, but no more, and Capri Sun has not developed evidence linking these communications to the process by which ABC determined the design of its new pouches. *See supra*, Section III.C.2.c.i.(5). A finder of fact could equally conclude that ABC "inten[ded] to [fairly] compete by imitating the successful features of [Capri Sun's] product," *Kind LLC*, 2014 WL 2619817, at *11, while seeking to avoid offering a product so close to Capri Sun's as to confuse consumers and give rise to liability, *see Streetwise Maps*, 159 F.3d at 745; *Nora Beverages*, 269 F.3d at 125. *Compare Cheddar Bob's Inc. v. Macsnmelts Mgmt. Co., LLC*, No. 16 Civ. 1331 (RRM) (AYS), 2020 WL 1323018, at *12 (E.D.N.Y. Jan. 14, 2020) (finding disputed issue of fact on bad faith where defendants had knowledge of the senior mark, but "contend[ed] that they believed their mark was sufficiently dissimilar"), *with Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 332 (2d Cir. 2020) (finding bad faith where CEO's emails to an employee urged to "have some fun," "get as close to the Black Ice name as we can," and thereby get "the customers to immediately make the connection.").

The Court finds the sixth *Polaroid* factor neutral. The finder of fact, not the Court, must resolve whom, if either side, it favors.

### vii. *Quality of ABC's Pouch Product*

This seventh factor "directs courts to weigh cross-cutting considerations." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013). "On the one hand, the court must determine 'whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two.' On the other, if the products are roughly equal in quality, the court must also consider whether 'that very similarity of quality'

may tend to create confusion as to source by bringing the products into even closer proximity."
*Id.* (quoting *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 142 (2d
Cir. 1999)).

Capri Sun argues that ABC's pouches are inferior.  It asserts that ABC has "received
thousands of consumer complaints" regarding the quality of its Accused Pouches since the
beginning of the challenged conduct in November 2017, Pl. SJ Mem. at 20, whereas ABC could
identify only "a handful" of such complaints against Capri Sun, Def. SJ Opp'n at 19.  In support,
Capri Sun adverts to a log that purportedly details a slew of complaints.  *See* Dkt. 112-4.  ABC
objects that this log merely captures consumer *contacts*, only a small number of which concern
complaints about quality.  *See* Def. SJ Opp'n at 20–21 (citing Def. Counter 56.1 ¶ 111).  And
most of the products addressed there, ABC represents, "are non-pouch products not at issue in
this litigation," such as juice barrels by Little Hug, alcoholic pouch products by Daily, and juice
bottles by Guzzler.  Def. Counter 56.1 ¶ 111; *see* Dkt 112-4 at 90 (graph setting out aggregate
consumer complaints for those three brands along with Splashers and Big Burst, whose pouch
products are at issue in this litigation).  With such irrelevancies pruned away, ABC claims, there
are only 39 consumer complaints that an Accused Pouch leaked, contained a foreign object, or
posed a flavor issue.  Def. SJ Opp'n at 21; Def. Counter 56.1 ¶ 111.  Measured against the
hundreds of millions of Accused Pouches, this low number of consumer complaints, it asserts,
"is the very definition of *de minimis*" evidence.  Def. SJ Opp'n at 21.

The document in question is opaque.  Capri Sun has not substantiated its suggestion that
the data on the document all relates to covered pouches—or complaints about them.  And ABC,
for its part, in rebutting Capri Sun's claim that "thousands" of consumer complaints were made,
refers to row numbers in Dkt. 112-4.  *See* Def. Counter 56.1 ¶ 111.  But these are not found in

the exhibit filed with the Court. Accordingly, the Court cannot verify ABC's tabulation that it received only 39 relevant consumer complaints.[43] It is possible that a more punctilious analysis and presentation by Capri Sun at trial would yield a greater number.

On the other side of the ledger, ABC points to multiple consumer quality complaints about *Capri Sun's* pouches. It adduces four internal presentations by Capri Sun or Kraft detailing trends in consumer complaints. *See* Def. 56.1 ¶¶ 111–120 (citing Dkts. 115-6, 115-7, 115-9 to 115-11). The first discusses spoilage complaints about Capri Sun pouch products between 2010 and 2013. *See* Dkt. 115-6 at 10. Across six categories of complaints, the chart shows an aggregate of between five and 12 complaints per million shipped for each month during that period. It also states that "[s]poilage complaints correlate with [p]ublicity due to social media [m]old events. *Id.* It also tracks leakage rates of the Capri Sun pouch and the reduction of leak rates incident to manufacturing adjustments and proposes a "[m]old [m]itigation [s]trategy." *Id.* at 11–17. The second presentation provides an update on that mold mitigation plan. *See* Dkt. 115-7. The third discusses mold as one of several "headwinds that have challenged Capri Sun." Dkt. 115-9 at 4. And the fourth highlights parent concerns about mold in Capri Sun pouch products. Dkt. 115-10 at 9. ABC also adduces screenshots of Facebook posts by a mother documenting an incident in which she found a worm in her child's Capri Sun pouch, as well as internal Capri Sun emails discussing a Fox News inquiry about that incident. *See* Def. 56.1 ¶¶ 118–124; Dkt. 115-11.

---

[43] On its own review, the Court identified 93 rows that specified a complaint concerning some aspect of the quality of a Juicy Juice brand product, one concerning an allergic reaction, and five involving food safety. These complaints all had unique reference numbers. However, the numbering system does not make clear whether each row arose from a distinct consumer complaint, or whether multiple rows arose from the complaint. The Court disregards as irrelevant the complaints opaquely termed "Regulatory," or "Sensory," or that otherwise fall outside the categories above.

The evidence of consumer quality complaints is roughly equal on each side.  Although the precise number on each side is unclear, each side appears to have received several dozen quality complaints across several million pouches sold.  Given this equipoise, "nothing in the record suggests that defendants' products are of inferior quality." *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) (assigning "no weight" to quality factor); *see also Star Indus.*, 412 F.3d at 389 (2d Cir. 2005) (finding quality factor "evenly balanced" where "[t]he record [was] insufficient to support a finding that either product is markedly superior in quality to the other").

Absent a palpable difference in quality, Capri Sun has not shown a risk that the quality of ABC's products tarnishes Capri Sun's reputation.  On the record as presented at summary judgment, the quality factor is neutral.

### viii.   Consumer Sophistication

The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (cleaned up).  "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011).  Confusion is therefore more likely "where the goods are cheap and bought casually." *Dooney & Bourke*, 561 F. Supp. 2d at 389 (quoting MCCARTHY ON TRADEMARKS § 23:96) (internal quotation marks omitted).

The parties agree that Capri Sun's pouch products are inexpensive and bought casually.  The parties dispute the precise pricing of Capri Sun's and ABC's pouch products.  Capri Sun asserts that the price range for both its own and ABC's pouch products is between $2 and $20, depending on whether the respective pouch product is sold in a carton of eight or 10 pouches

(ABC's) or in a carton of 10, 30, or 40 pouches (Capri Sun).  Pl. 56.1 ¶ 101 (citing JSUF ¶¶ 316–318).  ABC disputes this assertion insofar as Capri Sun's evidence speaks only to the price of some of Capri Sun's and ABC's pouch products.  Def. Counter 56.1 ¶ 101.  But ABC concedes that its Accused Pouches are "low-priced," "sold at grocery stores," and "do not require a high degree of care [by] the consumer."  Def. SJ Mem. at 18; *see also generally* Def. SJ Opp'n (not disputing Capri Sun's argument that eighth *Polaroid* factor favors it); Def. SJ Reply (same).  As the Court has also found, *supra*, Capri Sun's and ABC's pouch products are in competitive proximity, and often found on the same store shelves.

Where "relatively low-priced items [are] intermingled . . . on supermarket shelves[, c]onsumers are likely to purchase these types of low-priced food items without devoting much time and attention to making the decision . . . . or scrutiniz[ing the packaging]."  *Kraft Gen. Foods*, 831 F. Supp. at 133.  "Under such circumstances, the likelihood [of consumer confusion] is substantially increased."  *Id.*; *see also Victorinox*, 114 F. Supp. 3d at 141 ("[B]ecause defendants' products are relatively low-priced and subject to impulse buying [at $5.95], consumers are unlikely to engage in any substantial research before purchasing them" (internal quotation marks and citation omitted) (finding eighth *Polaroid* factor weighed in plaintiff's favor); *Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC*, 7 F. Supp. 3d 385, 398–99 (S.D.N.Y. 2014) (internal quotation marks omitted) (weighing consumer sophistication factor in plaintiff's favor "[i]n light of the relatively low price of [defendant's] products [$5–$29.50], and the lack of additional evidence in the record substantiating [consumer] sophistication"); *Snuggly Plushez*, 809 F. Supp. at 156 ("Purchasing inexpensive toys for children does not require any sophistication on the part of the buyer.").

The consumer sophistication factor favors Capri Sun.

ix.     *Weighing the Factors*

"The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany*, 971 F.3d at 85. "The *Polaroid* factors are to be weighed holistically in determining whether the party seeking to establish an infringement claim has demonstrated the probability of confusion of a substantial number of consumers of the relevant class." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 366 (S.D.N.Y. 2003). "[T]he Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works*, 7 F. Supp. 3d at 399 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).

Viewed in combination, the *Polaroid* factors do not decisively favor either party as to the ultimate question of whether consumers of pouched juice drinks would likely be confused. The first three factors favor Capri Sun, albeit to varying degrees. The strength of mark factor weakly favors Capri Sun, for the reasons explained. The similarity factor also tips in Capri Sun's favor. The competitive proximity factor favors Capri Sun—and the bridging-the-gap factor is irrelevant as there is no gap to bridge. Of the remaining four factors, the factor of actual confusion strongly favors ABC; the bad faith factor and the quality factor are neutral; and the consumer sophistication factor favors Capri Sun.

All in, the factors tip in Capri Sun's favor, but slightly, with the important qualification that, depending on the light in which the evidence as to various factors is viewed, the balance can be viewed as favoring Capri Sun more decisively, or as tipping in ABC's favor. In this circumstance, the Court cannot enter summary judgment on the likelihood of confusion in favor of either party. Neither party has solidly established that, viewed in totality, "the undisputed

evidence . . . lead[s] only to one conclusion as to whether confusion is likely." *Cadbury Beverages*, 73 F.3d at 478; *see also id.* at 483–84 (on cross-motions for summary judgment, vacating district court's entry of summary judgment for defendant where disputed issues of fact existed as to proximity, bridging the gap, bad faith, quality, and consumer sophistication; strength and similarity favored plaintiff; and actual confusion favored defendant); *see also Easy Spirit*, 515 F. Supp. 3d at 71–76 (where seven of the *Polaroid* factors came out substantially the same as here,[44] and only the factor of similarity differed, denying plaintiff summary judgment on likelihood of confusion); *Akiro*, 946 F. Supp. 2d at 341–42 (denying plaintiff's summary judgment motion where strength, proximity, and bridging the gap favored plaintiff; similarity, actual confusion, bad faith, and consumer sophistication strongly favored defendant; and product quality was neutral); *Mr. Water Heater Enters., Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 589 (S.D.N.Y. 2009) (denying cross-motions for summary judgment where bridging the gap slightly favored plaintiffs; strength, actual confusion, and product quality favored defendants; and similarity, proximity, bad faith, and consumer sophistication were neutral).

The crucial issue of likelihood of confusion must be resolved by a jury at trial.

### d.    Disposition

Because triable issues of fact prevent resolution of the element of likelihood of confusion, the Court denies summary judgment to both parties on Capri Sun's Lanham Act claims for trademark infringement and unfair competition and false association, and on Capri Sun's New York common law claim for trademark infringement. The Court does, however, find, as a matter

---

[44] Proximity favored plaintiff; strength slightly favored plaintiff; actual confusion favored defendant; bad faith, product quality, and consumer sophistication were neutral; and bridging the gap was irrelevant.

of law, that Capri Sun's Pouch Mark is valid.  As to likelihood of confusion, the Court finds that

Capri Sun cannot claim that such likelihood exists as a matter of law.  The issue of likelihood of

confusion must be resolved by a jury, based on the application of the *Polaroid* factors.[45]

For similar reasons, the Court also denies the parties' cross-motions for summary

judgment on Capri Sun's New York common law claim for unfair competition.  On this claim, a

triable issue of fact also exists on the required element that a plaintiff must show in addition to

actual confusion or a likelihood of confusion—the defendant's bad faith.  *LVL XIII Brands*, 209

F. Supp. 3d at 678.

### D.    The Contract Claim

Capri Sun claims that ABC breached the SLA by continuing to sell pouches in the shape

of the Licensed Pouch—or confusingly similar variations thereof—during and after the SLA's

---

[45] The law in this Circuit is unresolved whether, where the likelihood of confusion element has
been held incapable of resolution on summary judgment, a jury must evaluate and weigh all the
*Polaroid* factors, or only those that the Court has found neutral or incapable of resolution on
summary judgment.  *Compare Cadbury Beverages*, 73 F.3d at 483–84 (reversing grant of
summary judgment on likelihood of confusion where material issues of fact existed as to four
factors, but "conclud[ing] that, as a matter of law, the plaintiff's mark is strong and the plaintiff's
and the defendants' marks are virtually identical"), *and RVC Floor Decor*, 527 F. Supp. 3d at
329 ("The likelihood of confusion presents far too many genuine questions of material fact to
justify summary judgment in either party's favor.  Two crucial considerations—the strength of
Plaintiff's mark and Defendant's bad faith—have strong evidence in each party's favor and are
best left for a jury to weigh."), *with Cline v. 1-888-PLUMBING Grp., Inc.*, 146 F. Supp. 2d 351,
367–69 (S.D.N.Y. 2001) (finding that proximity factor "weigh[ed] heavily in Plaintiff's favor,"
but holding that "[a] trial is necessary to assess and weigh *each* factor") (emphasis added), *and
Lexington Furniture Indus., Inc. v. Lexington Co.*, No. 19 Civ. 6239 (PKC), 2021 WL 1146276,
at *6 (S.D.N.Y. Mar. 23, 2021) ("[T]here are triable questions as to several of the *Polaroid*
factors.  Even though certain factors might weigh in a party's favor on the record at summary
judgment, since there must be a trial to determine disputed factual issues, it is preferable that the
weighing of factors and ultimate conclusion be made on a full record at trial."); *see* Dkts. 178,
179 (letters from parties, briefing this issue).  Most often, courts in this Circuit appear to have
given juries latitude to weigh holistically all factors bearing on ultimate question of likelihood of
confusion, *Playtex Prods.*, 390 F.3d at 162; *24 Hour Fitness USA*, 277 F. Supp. 2d at 366, but
the law is not unitary on this point.  There is no need to resolve this question at this time.  In the
event this case nears a jury trial, the Court will commission full briefing on this issue.

six-month selloff period. The parties have cross-moved for summary judgment on this claim. This claim turns on whether the Accused Pouches are confusingly similar variations of the Pouch Mark. Much as the Court found the Lanham Act elements of similarity and likelihood of confusion incapable of resolution on summary judgment in connection with the trademark infringement claims, the Court so finds as to this question. The Court accordingly denies both parties summary judgment motions on the breach-of-contract claim.

### 1.  Applicable Legal Standards

"To establish a contract breach under New York law,[46] a plaintiff must show: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180, 192–93 (S.D.N.Y. 2021) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). The Court interprets the agreement with the "primary objective" of "giv[ing] effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985)).

### 2.  Analysis

ABC does not dispute the existence or validity of the SLA or Capri Sun's performance under it. JSUF ¶¶ 222, 271. The sole issue on summary judgment is whether ABC breached the SLA by manufacturing and selling the Accused Pouch. See; Pl. SJ Mem. at 10; *see* Def. SJ Opp'n at 21–22; Def. SJ Mem. at 20. Capri Sun argues that ABC breached the following three provisions of the SLA:

> § 3.3:  Quality Control. Any pouch container, other than the Permitted Uses, whether used by an existing or future customer of [ABC], shall not be any closer in appearance to the CAPRI SUN packaging, attached as Schedule C, than the

---

[46] All disputes arising out of or relating to the SLA are governed by New York law. SLA § 11.4.

Permitted Uses.  [ABC] shall provide notice to [Capri Sun] and include a sample or image of said pouch container once the final artwork has been developed and agreed with [ABC]'s customer.

§ 5.3.1:  Cessation of Use.  Upon the expiration or other termination of this Agreement as set forth in Section 5, [ABC] shall immediately cease using the Trademark, including any confusingly similar variations thereof.

§ 5.3.2:  Existing Inventory.  Notwithstanding Section 5.3.1, upon termination or expiration of this Agreement, [ABC] has six (6) months to sell its existing inventory of Licensed Products provided that the Licensed Products comply with Section 3 hereof and Royalties are paid on such existing inventory.  Thereafter, all rights of [ABC] with respect to the use of the [Pouch Mark] shall cease and all rights of [ABC] hereunder shall terminate.

The parties agree that ABC terminated the SLA on July 26, 2018, meaning that ABC had until January 26, 2019, to sell off its existing inventory of Licensed Pouches.  JSUF ¶¶ 264, 268.

Capri Sun claims that ABC breached the SLA in two ways.  First, during the six-month sell-off period, ABC continued to manufacture Licensed Pouches (or confusingly similar variations) without paying royalties to Capri Sun.  Second, after the six-month sell-off period, ABC continued to manufacture and sell Licensed Pouches (or confusingly similar variations). Capri Sun's claim of breach runs to all 24 Accused Products, as all—whether manufactured during or after the six-month sell off period—have used the Accused Pouch.  It argues that ABC's Unlicensed Pouch either literally "*is* the Licensed Pouch/Pouch Mark with slightly tweaked upper . . . corners" or is a "confusingly similar variations" of it within the meaning of SLA § 5.3.1.  Pl. SJ Mem at 11-12.

To the extent Capri Sun argues that the Accused Pouch literally is identical to the Licensed Pouch, that theory is unsustainable.  As the Court has explained above, the pouches plainly are not identical.

To the extent Capri Sun argues that the Accused Pouch is a "confusingly similar" variation of the Licensed Pouch within the meaning of the SLA, the SLA does not define the

term "confusingly similar."  But no party argues that that term is ambiguous.  And "[c]ontract

language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of

misconception in the purport of the [contract] itself, and concerning which there is no reasonable

basis for a difference of opinion.'"  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir.

2009) (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)) (alteration in *JP

Apparel*).  Two interpretations of the phrase "confusingly similar variations," both anchored in

the Lanham Act, are conceivable from the parties' briefs.  The first is that this term is

coterminous with *Polaroid*'s similarity factor.  The second is that it is coterminous with the

overall likelihood-of-confusion analysis under *Polaroid*.  The parties do not specify which is

apposite, as they merely refer to their respective briefing of the *Polaroid* analysis, effectively—

and not unreasonably—treating these standards as little apart.  *See* Def. SJ Mem. at 20; Pl. SJ

Mem. at 12 Pl. SJ Opp'n at 4.

 The Court, however, must resolve the dispute with precision.  Importantly, in another

section of the SLA, the parties cabined the term "confusion" with the modifier "likely."  *See*

SLA § 2.5 (providing that no SLA term "shall be construed to prevent Faribault . . . from making

. . . a pouch other than the pouch depicted in the Trademark, a colorable imitation thereof, or a

pouch likely to be confused therewith").  They did not do so, however, in § 5.3.1, the operative

provision here.  And under New York law, "[t]he use of similar but different terms in a single

contract 'strongly implies that the terms are to be accorded different meanings.'"  *Eastman

Kodak Co. Altek Corp.*, 936 F. Supp. 2d 342, 355 (S.D.N.Y. 2013) (quoting *NFL Enters. LLC v.

Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (N.Y. App. Div. 2008)); *see also Atos

Syntel Inc. v. Ironshore Indem. Inc.*, 21 Civ. 1576 (JGK), 2021 WL 4635920, at *4 (S.D.N.Y.

Oct. 6, 2021) (same); *Lavastone Cap. LLC v. Coventry First LLC*, Nos. 14 Civ. 7139, 14 Civ.

7967 (JSR), 2015 WL 1939711, at *15 (S.D.N.Y. Apr. 22, 2015) (same).  It follows that this SLA term does not literally incorporate the "likelihood of confusion" standard.  Among the alternatives that have been proposed, that leaves the second *Polaroid* factor—similarity—as the intended measure of the SLA term "confusingly similar."

That reading accords with case law in this Circuit.  Courts have consistently held the contract term "confusing[] similar[ity]"—unless otherwise defined—to track the similarity factor under *Polaroid*. *See, e.g.*, *Brennan's*, 360 F.3d at 133 ("When evaluating the similarity of marks, . . . . [e]ach mark must be compared against the other . . . in deciding whether [they] are confusingly similar."); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 (2d Cir. 2005) (in clarifying *Polaroid*'s similarity factor, explaining that "products, may still be confusingly similar in the eyes of ordinary consumers encountering the products individually under typical purchasing conditions"); *Dooney & Bourke*, 454 F.3d at 116–17 (reversing district court specifically on similarity factor for erroneously finding that marks were "not confusingly similar"); *Paco Sport*, 86 F. Supp. 2d at 315–16 (under similarity factor, finding that competing marks were "not confusingly similar"), *aff'd*, 234 F.3d 1262 (2d Cir. 2000); *Streetwise Maps*, 159 F.3d at 744 (concluding under similarity factor that marks were "not confusingly similar").[47]

---

[47] Doctrine in the Ninth Circuit is the same. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir. 1979) ("Although in some cases similarity of the marks has been equated with likelihood of confusion, the two inquiries are separate."), *abrogated on unrelated ground by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003).  The Fourth Circuit, by contrast, in construing "confusing similarity," has looked to the multi-factor analysis into likelihood of confusion. *See Adventis, Inc. v. Consol. Prop. Holdings, Inc.*, 124 F. App'x 169, 173 (4th Cir. 2005) (summary order); *see also Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994) (using the terms "confusingly similar," "likelihood of confusing similarity," and "likely confusion" interchangeably); 4 MCCARTHY ON TRADEMARKS § 23:4 ("The phrase 'confusingly similar' is shorthand for saying that concurrent use of conflicting marks will create a likelihood of confusion.").

The contracting parties are assumed to have been familiar with this case law.[48]   Treating the contract term "confusingly similar" as a shorthand for similarity as gauged by the second *Polaroid* factor, thus "give[s] effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs.*, 959 F.2d at 428.

As the Court determined in its *Polaroid* analysis, the similarity factor, although tipping in favor of Capri Sun, cannot be reliably resolved on summary judgment.  Although the shapes of the Pouch Mark and the Accused Pouches are similar, "the overall impression created by the [marks] and the context in which they are found," *LVL XIII Brands*, 209 F. Supp. 3d at 668, mitigates the similarity.  And reasonable minds can differ as to the extent of the similarity, including whether ABC's modification via the rounding of the pouches' upper corners leaves its pouches confusingly similar to Capri Sun's.  Accordingly, the Court denies summary judgment to each side on Capri Sun's breach-of-contract claim.

**E.      The Dilution Claims**

**1.      Capri Sun's Federal Trademark Dilution Claim**

Capri Sun claims that ABC has diluted its Pouch Mark under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).  The parties have cross-moved for summary judgment on this claim.  On the basis of the undisputed facts, the Court finds the Pouch Mark insufficiently famous to sustain such a claim, and therefore grants ABC's summary judgment motion and denies Capri Sun's.

**a.      Applicable Legal Standards**

"Federal trademark dilution claims require showing that '(1) the mark is famous; (2) defendant's use of the mark is made in commerce; (3) the defendant used the [junior] mark after the [senior] mark is famous; and (4) the defendant's use of the mark is likely to dilute the quality

---

[48] Indeed, the contracting parties and their sophisticated counsel had just litigated the Faribault Lawsuit, which turned on claims of trademark infringement.

of the mark by blurring or tarnishment." *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 488 (S.D.N.Y. 2020) (quoting *DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018)).

Under § 1125(c)(2)(A), a "mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." "Under federal law, a higher degree of distinctiveness is required for dilution protection than to show a protectable interest for trademark infringement." *Schutte*, 193 F. Supp. 3d at 283 (citing *George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 648 (S.D.N.Y. 2014)).  In fact, to qualify as a famous mark, a mark generally must "enjoy such broad renown so as to at least approach (if not attain) the status of 'household names.'" *Id.*  (quoting *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 228 F. Supp. 2d 399, 412 (S.D.N.Y. 2002)); *see also Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757–58 (S.D.N.Y. 2012) (citing Budweiser beer, Camel cigarettes, and Barbie dolls as examples of household names); *Starbucks Corp.*, 588 F.3d at 105 ("[T]he requirement that the mark be 'famous' and 'distinctive' significantly limits the pool of marks that may receive dilution protection.").

"In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following: (i) [t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties[;] (ii) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark[;] (iii) [t]he extent of actual recognition of the mark[; and] (iv) [w]hether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." 15 U.S.C. § 1125(c)(2)(A)(i)–(iv).  The "risk [of] some dilution of the identifying or selling power of the mark . . . is generally tolerated in the interest of

maintaining broad opportunities for expression." *AM Gen. LLC*, 450 F. Supp. 3d at 488 (quoting

*Deere & Co.*, 41 F.3d at 44) (further citations omitted) (alteration in original).

**b.    Fame**

The Pouch Mark—meaning the shape of the pouch—is insufficiently famous to sustain a

§ 43(c) claim.  In its analysis of the Pouch Mark's secondary meaning (or acquired

distinctiveness) under the first *Polaroid* factor, the Court found that Capri Sun had demonstrated

that the Mark had slight strength—but not more.  Notwithstanding Capri Sun's substantial

advertising and sales, it had failed to adduce any empirical evidence showing that consumers

associated the Pouch Mark—meaning the pouch's shape—with the Capri Sun brand.  Yet more

than that is required under § 43(c).  "[T]he standard for fame . . . required to obtain anti-dilution

protection is more rigorous than that required to seek infringement protection." *TCPIP Holding*

*Co., Inc. v. Haar Commc'ns., Inc.*, 244 F.3d 88, 95 (2d Cir. 2001) (quoting *I.P. Lund Trading*

*ApS v. Kohler Co.*, 163 F.3d 27, 47 (1st Cir. 1998)) (alteration in original).  As the Second

Circuit has explained, fame is tantamount to a high level of acquired distinctiveness. *Virgin*

*Enters.*, 335 F.3d at 147 ("The second sense of the concept of strength of a mark is 'acquired

distinctiveness,' *i.e.*, fame, or the extent to which prominent use of the mark in commerce has

resulted in a high degree of consumer recognition."); *see also BYC, Inc. v. Broken Yolk*, 21 Civ.

6203 (FPG), 2021 WL 5074720, at *6 (W.D.N.Y. Nov. 2, 2021) ("[T]o qualify as famous," a

plaintiff must show that its senior mark possesses a "high degree of . . . acquired distinctiveness,"

*i.e.* secondary meaning) (ellipses in original).  As a matter of law, having failed to show more

than slight acquired distinctiveness under *Polaroid*'s strength factor, Capri Sun cannot show that

the Pouch Mark has achieved fame.

In any event, reviewed afresh outside the framework of the first *Polaroid* factor, the factors relevant to the recognition requirement of a dilution claim underscore why Capri Sun's claim here cannot proceed.

### i.     *Extent of Advertising and Publicity*

As discussed in the secondary meaning analysis under the first *Polaroid* factor, Capri Sun's Pouch Mark boasts impressive advertising and publicity figures across the United States, particularly in the years preceding this litigation.  Capri Sun spent between $19.8 million and $20.1 million each year on advertising across all its sub-brands between the years 2013 and 2018.  JSUF ¶ 77 (citing Dkt. 79-26 at 38).  That data was sourced to Nielsen, a reliable data company, and corroborated by other sources.  *See, e.g., id.* ¶ 78 (citing Dkt. 79-27 at 2).  The Court further found that Capri Sun spent significant sums on nationally aired ad campaigns, including in 2008 and 2014; obtained endorsements from high-profile athletes and other celebrities; and partnered with Kentucky Fried Chicken, Lyft, and an HBO series.

### ii.     *Extent of Sales*

Capri Sun's national sales figures were also substantial.  They grew from $100 million in 1991, to $751 million in 2012; $690.4 million in 2013; $686.9 million in 2014; $647.2 million in 2015; and approximately $500 million in 2016.  JSUF ¶¶ 79, 81, 83; Pl. 56.1 ¶¶ 49–52, 54–55.

### iii.     *Actual Recognition*

As to actual recognition of the Pouch Mark, Capri Sun did not adduce any evidence whatsoever that consumers associate the Pouch's *shape* with Capri Sun as its source, as the Court reviewed in discussing consumer association in connection with the first *Polaroid* factor—strength.  Its failure to put forward any such evidence was despite the case law's admonition that "the ultimate determination of whether a particular trademark or trade dress has acquired secondary meaning remains an 'empirical question of consumer association.'"  *LVL XIII Brands,*

209 F. Supp. 3d at 639 (quoting *Two Pesos*, 505 U.S. at 770–71). And a mark's fame captures "the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition." *Virgin Enters.*, 335 F.3d at 147. By leaving a blank empirical record as to this point, Capri Sun effectively disarmed itself as to this element.[49]

Further, to the extent recognition of the mark could be assumed, the record reflects steps by Capri Sun that undermined the strength of its mark. Specifically, to obtain royalties, Capri Sun licensed it to Kool Aid in 2001 and Faribault in 2016, which, within the scope of the license, used the mark on 18 other pouch brands (Kool Aid Jammers and the then-17 Accused Pouches by ABC) on the market. *See Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1138–39 (N.D. Cal. 2008) (plaintiff's mark not famous where plaintiff did not show that consumers recognized it, it was not registered, and it was regularly used by third parties as a generic mark).

Also thin evidence of the Pouch Mark's fame are two surveys to which Capri Sun's expert, Dr. Steckel, pointed. A 2016 Ipsos survey found that 89% of mothers with children aged six to 12 had considered buying Capri Sun products; 74% had in fact purchased Capri Sun; and Capri Sun's market share in the kids single-serve beverages market was 22.8% in 2016 and 21.7% in 2017. Steckel Rep. ¶¶ 27, 30; JSUF ¶ 81. And a 2018 Statista survey found that 38.6% of U.S. individuals aged 18 to 29, 31.3% of individuals aged 30 to 49, and 13.3% of individuals aged 50 to 64 had consumed Capri Sun within the past four weeks. Steckel Rep. ¶ 28. Dr. Steckel opined that these statistics made Capri Sun widely recognized and "likely famous" in the

---

[49] For the reasons reviewed above, the substitutes to which Capri Sun pointed—excerpts and summaries of surveys submitted to the PTO in 1986; a June 2017 internal marketing study by Kraft; and a 2020 blind taste test—were ineffectual. The PTO survey submissions were outdated and unilluminating, the Kraft study ambiguous as to recognition, and the 2020 taste test untimely.

United States.  But the Ipsos study, whose large recognition and market share numbers are focused on mothers of children aged six through 12, is indicative at best of "niche fame," *i.e.*, fame "in a particular market sector or group of consumers," which "is generally insufficient to prove a claim of trademark dilution." *Blockchange Ventures I GP, LLC v. Blockchange, Inc.*, No. 21 Civ. 891 (PAE), 2021 WL 4340648, at *7 (S.D.N.Y. Sept. 22, 2021) (collecting cases).  And the Statista survey, while covering consumers nationwide, speaks of consumption patterns, not actual recognition.  Indeed, critically, for whatever force these surveys have in showing the popularity with consumers of Capri Sun beverages, neither says a thing about the distinct issue here—whether consumers draw any distinct conclusion or association from the pouch's *shape*, including recognizing Capri Sun as its source.  Capri Sun thus has not adduced any evidence that it "is widely recognized by the *general consuming public* of the United States as a designation of source of the [Pouch Mark]." *Schutte*, 193 F. Supp. 3d at 283 (quoting 15 U.S.C. § 1125(c)(2)(A)) (emphasis in *Schutte*); *see also E.A. Sween Co., Inc. v. A & M Deli Express Inc.*, 787 F. App'x 780, 786 (2d Cir. 2019) (summary order) (affirming dismissal of federal trademark dilution claim where plaintiff had pled "significant sales" and industry awards, but "did not claim that there was any association made between its brand and [defendant's] store or that [defendant] was intending to deliberately associate itself with [plaintiff's] brand").[50]

---

[50] Although the Court does not consider it on ABC's motion for summary judgment (because that motion is directed to the absence of evidence adduced by Capri Sun), Poret's expert report is powerful admissible evidence of a lack of recognition.  That alone would defeat Capri Sun's motion for summary judgment on this claim.  Insofar as it found a net confusion rate of zero, the Poret report supports that—far from the Pouch Mark's enjoying fame—consumers have a weak to nonexistent recognition of it.  *See GMA Accessories*, 2008 WL 591803, at *10 (granting summary judgment for defendant on trademark dilution claim where record "contain[ed] no evidence of any consumer recognition of [plaintiff's] mark, and the [defendant's consumer confusion] survey suggests that 'actual recognition of the mark is nil'"); *see also Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013) (granting summary judgment against

*iv.*     *Registration*

On November 25, 1986, the PTO approved the application of Capri Sun's predecessor-in-interest for the '517 Registration.  Since then, the Pouch Mark has been registered on the USPTO's principal register, and Capri Sun has owned it.  JSUF ¶¶ 3, 20.

*v.*     *Disposition*

Even construing all inferences in Capri Sun's favor, the assembled evidence would not permit a finder of fact, other than by speculation, to find the showing of fame required to enable its federal dilution claim to reach the jury.  There is simply no evidence of widespread consumer recognition of the Pouch Mark, as opposed to Capri Sun juice products.  Because the cognizable evidence cannot support that Capri Sun's Pouch Mark is famous, the Court grants summary judgment to ABC on Capri Sun's Lanham Act claim of trademark dilution, and denies Capri Sun's cross-motion on that claim.  In light of this finding, there is no need to address the other elements of this claim, including whether Capri Sun has adduced sufficient evidence to establish a likelihood of dilution by tarnishment or by blurring.

**2.     Capri Sun's NYGBL § 360-*l* Dilution Claim**

Capri Sun also bring claims against ABC of dilution of its Pouch Mark and its trade dress under NYGBL § 360-*l*.  Unlike the fame requirement of its federal counterpart, a dilution claim under § 360-*l* requires only a showing that plaintiff possesses a mark that "has a distinctive quality or has acquired a secondary meaning."  Both parties have moved for summary judgment on this claim.  ABC's motion is based on the claim that federal patent law preempts Capri Sun's claim.  For the reasons that follow, the Court grants ABC's motion.

---

trademark dilution claim because "the evidence is rather weak that [plaintiff's] mark has even acquired secondary meaning, much less that it is 'widely recognized by the general consuming public of the United States.' [Plaintiff's mark] simply is not a famous mark.").

a.      **Applicable Legal Standards**

NYGBL § 360-*l* "requires plaintiff to prove '(1) that it possess[es] a strong mark—one

which has a distinctive quality or has acquired a secondary meaning . . . and (2) a likelihood

of dilution by either blurring or tarnishment.'" *RVC Floor Decor*, 527 F. Supp. 3d at 330

(E.D.N.Y. 2021) (quoting *Fireman's Ass'n of State of New York v. French Am. Sch. of N.Y.*, 839

N.Y.S.2d 238, 241–42 (N.Y. App. Div. 2007)) (internal quotation marks and citations omitted).

Section 360-*l* "protects distinctive marks from dilution, [and] does not 'require a mark to be

"famous" for protection against dilution to apply.'" *George Nelson Found.*, 12 F. Supp. 3d at

651 (quoting *Starbucks*, 588 F.3d at 114).

"Courts in the Second Circuit consider six factors to determine dilution by blurring under

New York law: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the

sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the

senior mark; and (vi) the renown of the junior mark." *Id.* (quoting *Starbucks*, 588 F.3d at 114).

"Unlike the Lanham Act, New York law requires the marks be substantially similar." *Id.*

However, as the Supreme Court has instructed, "state regulation of intellectual property

must yield to the extent that it clashes with the balance struck by Congress in our patent laws."

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989). Courts have

construed this principle to preempt dilution claims under § 360-*l* where plaintiff's trademark or

trade dress is "potentially patentable." *Schutte*, 193 F. Supp. 3d at 285 (collecting cases).

"Potentially patentable" extends to products that have become "unpatented and are

unpatentable." *Luv N' Care*, 841 F. Supp. 2d at 760 (quoting *Bonito Boats*, 489 U.S. at 159).

And "[t]o the extent that New York's antidilution statute is designed to prevent defendants from

making, using, or selling . . . designs that allegedly mimic [plaintiff's] design, it promotes the

same goals as the federal patent scheme and must yield to the national interest in uniform patent

law." *E. Am. Trio Prods., Inc v. Tang Elec. Corp.*, 97 F. Supp. 2d 395, 424 n.199 (S.D.N.Y. 2000), *appeal dismissed*, 243 F.3d 559 (Fed. Cir.).

### b.   Analysis

The parties have stipulated that, before registering its Pouch Trademark, Capri Sun held a patent (the "Prior Patent"), which was for a pouch design very similar to the Pouch Mark. Dkt. 31-1 ¶ 52; *see* Dkt 31-12 at 2 (showing an image of the Prior Patent). The Prior Patent expired on April 30, 1985, less than three months before Capri Sun applied for the '517 Registration. Dkt. 31-1 ¶¶ 52, 54. It is further undisputed that Capri Sun still owns the '517 Registration, that it covers the Pouch Trademark, and that it is incontestable. JSUF ¶¶ 22, 24–25. Insofar as the Pouch Mark's technology was patented—and even though today it is no longer patentable—the Pouch Mark plainly falls within the ambit of "potentially patentable." *See Luv N' Care*, 841 F. Supp. 2d at 761 (holding New York antidilution law preempted with respect to claims concerning shape of baby products); *Escada AG v. The Limited, Inc.*, 810 F. Supp. 571, 573–74 (S.D.N.Y. 1993) (same, with respect to claims concerning the shape of bottle designs).[51]

The Court accordingly grants ABC's motion for summary judgment on Capri Sun's state dilution claim under NYGBL § 360-*l* as preempted by federal patent law.

---

[51] Capri Sun counters that federal preemption does not apply because its dilution claim rests on the theory that ABC's Accused Pouches create a likelihood of confusion. This, Capri Sun argues, makes its dilution claim not a concern of federal patent law—which seeks to promote invention—but rather of trademark law—which seeks to promote fair competition. Pl. SJ Opp'n at 22. That is wrong. Capri Sun, throughout its briefing, has insisted that the Accused Pouches are virtually identical to the Pouch Mark. However styled, Capri Sun's theory is essentially, as in *Escada*, that ABC "unlawfully appropriate[ed] and mimick[ed] the [Pouch Mark's] design." 810 F. Supp. at 572. That is precisely the basis on which *Escada* found federal patent law to preempt a NYGBL § 360-*l* dilution claim. *Id.*

### F.     The Trade Dress Claims

Specific to a single brand—ABC's Juicy Juice Splashers Organic brand—Capri Sun has brought claims for trade dress infringement and unfair competition under Lanham Act § 43(a) and New York common law, as well as a claim of false association under Lanham Act § 43(a). It claims that that brand infringes the trade dress of Capri Sun's fruit punch sub-brand, Original. *See* Pl. SJ Mem. at 25 (citing Compl. ¶ 134).

The parties have cross-moved for summary judgment on both claims. For the reasons that follow, the Court grants ABC's motion and denies Capri Sun's.

### 1.     Applicable Legal Standards

"In addition to protecting registered marks, Lanham Act § 43(a) gives a producer a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof which is likely to cause confusion as to the origin, sponsorship, or approval of his or her goods.'" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209, (2000) (quoting 15 U.S.C. § 1125(a)) (cleaned up). "Trade dress" originally "referred only to the manner in which a product was 'dressed up' to go to market with a label, package, display card, and similar packaging elements." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 454 F. Supp. 3d 229, 248 (S.D.N.Y. 2020) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995)), *reconsideration denied*, No. 15 Civ. 10154 (PAE), 2020 WL 2115344 (S.D.N.Y. May 3, 2020). But "trade dress" has since "taken on a more expansive meaning and includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers, . . . including size, shape, color, texture, and graphics." *Id.* at 248–49 (quoting *Jeffrey Milstein, Inc.*, 58 F.3d at 31).

To prevail on a Lanham Act trade dress infringement claim for a product's packaging, a plaintiff must show that the trade dress is (1) "not functional"; (2) "either inherently distinctive or has acquired secondary meaning in the marketplace"; and (3) "likely to confuse consumers as to its source or sponsorship," as determined by the *Polaroid* factors. *Nora Beverages*, 269 F.3d at 118–19.

For a trade dress infringement claim based on a product's design, a plaintiff must make a "more difficult showing" as to the second factor. *Yurman Design*, 262 F.3d at 115 (citing *Wal-Mart*, 529 U.S. at 213–14). Because a product design can never be inherently distinctive, *Wal-Mart*, 529 U.S. at 216, such a trade dress infringement claim requires a showing of (1) non-functionality, (2) secondary meaning, and (3) a likelihood of confusion, *see LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 650 (explaining that "the product design plaintiff . . . must always make the second, more difficult showing" of secondary meaning, as the possibility to prove inherent distinctiveness is not available) (citations and internal quotation marks omitted).

"The standard for proving trade dress infringement under New York common law generally parallels the standard under the Lanham Act, except that there is no requirement to show secondary meaning for distinctive designs." *Michael Kors, L.L.C. v. Su Yan Ye*, No. 18 Civ. 2684 (KHP), 2019 WL 1517552, at *4 (S.D.N.Y. Apr. 8, 2019) (quoting *Cartier, Inc.*, 348 F. Supp. 2d at 250. "[A] common law unfair competition claim under New York law 'is identical to a Lanham Act claim, save for the additional requirement that plaintiff show defendant's bad faith.'" *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 335–36 (E.D.N.Y. 2014) (quoting *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, No. 11 Civ. 1794 (LTS) (AJP), 2011 WL 6600267, at *9 (S.D.N.Y. Dec. 22, 2011)).

2.  **Analysis**

a.  **Non-Functionality**

A design feature is functional, and thus incapable of trade dress protection, "if it is essential to the use or purpose of the article, . . . affects the cost or quality of the article," or, in cases involving an aesthetic feature, if its protection "would put competitors at a significant non-reputation-related disadvantage." *Yurman Design*, 262 F.3d at 116 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32–33 (2001)). "A defendant 'bears the burden of proving functionality as a defense to [a] plaintiff's claim of infringement.'" *L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11 Civ. 4187 (RA), 2013 WL 4400532, at *20 (S.D.N.Y. Aug. 15, 2013) (quoting *Mana Prods., Inc. v. Colum. Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1068 (2d Cir. 1995)).

ABC cannot—and does not attempt—to make this showing.  In its Functionality Decision of October 29, 2019, the Court held that the no-challenge provision of the SLA estopped ABC from raising any functionality defense to the validity of Capri Sun's Pouch Mark in this lawsuit. *See* Functionality Order at 435; Def. SJ Mem. at 19; Def. SJ Opp'n at 24–25.[52]

Capri Sun, in turn, has adduced unrebutted evidence supporting a finding that the dress in question is non-functional.  It correctly observes "there is nothing 'functional' about imagery and lettering on a juice pouch." Pl. SJ Mem. at 25.  The competing products are metallic foil pouches containing juice, with a straw to be inserted near the top.  There are functional benefits

---

[52] Although the Functionality Order was addressed to ABC's functionality defenses with regard to Capri Sun's trade*mark*, its reasoning equally applies to trade dress. As the Supreme Court has recognized, "the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition. There is no persuasive reason to apply different analysis to the two." *Two Pesos, Inc*, 505 U.S. at 773. And the affirmative defenses that the Court struck there—ABC's third and ninth—were formulated as applicable to "[p]laintiff's claims" generally. *See* Dkt. 14 at 31–32.

to such products, including that they are easily portable, lightweight, malleable and responsive to the touch, can be put into the freezer, and lend themselves to playful interaction.  But these features of the pouches are unaffected by the letters, graphics, and labels that appear on them. *Landscape Forms, Inc. v. Colum. Cascade Co.*, 70 F.3d 251, 253 (2d Cir. 1995) (citation omitted) (quoting *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995)).  Nor does Capri Sun's trade dress affect the product's cost and quality.  *Id.*  It therefore does not preclude effective competition in the kids single-serve beverage market.  *See, e.g.*, *Gross*, 641 F. Supp. 2d at 194 (denying summary judgment on functionality where "[n]othing about [counterclaimants'] use of lowercase, unpunctuated 'md formulations,' or their use of white and metallic gray color schemes on their packaging is 'essential to effective competition' in the skincare market.").

The Court finds that the Capri Sun Original's packaging trade dress is non-functional.

### b.      Distinctiveness

A threshold issue as to distinctiveness is whether Capri Sun's trade dress is a packaging trade dress or a design trade dress.  Because Capri Sun classifies it as the former in its filings, *see* Compl. ¶¶ 135–140, 210–220, 226–236; Pl. SJ Mem. at 24, and ABC applies packaging trade standards in its opening brief, Def. SJ Mem. at 19, the Court assumes *arguendo* that Capri Sun's trade dress is a packaging trade dress.

"The Second Circuit evaluates the inherent distinctiveness of a product's packaging on a spectrum of increasing distinctiveness: 'generic, descriptive, suggestive, or arbitrary/fanciful.'" *L'Oreal, Inc.*, 2013 WL 4400532, at *19 (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997)).[53]  Capri Sun argues its trade dress is either suggestive

---

[53] "Suggestive and arbitrary or fanciful trade dresses are deemed inherently distinctive." *Fun-Damental Too*, 111 F.3d at 1000.  Packaging trade dresses "typically will be arbitrary or fanciful and meet the inherently distinctive requirement" because "varieties of labels and packaging

or arbitrary or fanciful, *i.e.*, inherently distinctive and protectable. ABC maintains that it is

descriptive, *i.e.* not protectable, and has not acquired the secondary meaning necessary to make

up for this lack. The Court need not decide this question, because Capri Sun's claim founders on

the third element—likelihood of confusion.

### c.    Likelihood of Confusion

To assess likelihood of confusion in connection with a trade-dress infringement claim,

the Second Circuit applies the *Polaroid* test. *See Nora Beverages*, 269 F.3d 118–19. The

*Polaroid* analysis undertaken above in connection with Capri Sun's trademark infringement

claim is substantially identical and yields the same outcomes with respect to the factors of

---

available to wholesalers and manufacturers are virtually unlimited." *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 521 (S.D.N.Y. 2019) (citations and internal quotation marks omitted). In determining the distinctiveness of a trade dress, courts must ultimately "look[] at all its elements and consider[] the total impression the trade dress gives to the observer." *Fun-Damental Too*, 111 F.3d at 1001. "A descriptive trade dress," too, "can be distinctive and protectable if the producer establishes that it has acquired a secondary meaning, *i.e.*, the trade dress has become associated with the producer rather than the product itself." *Daily Harvest, Inc. v. Imperial Frozen Foods Op Co. LLC*, No. 18 Civ. 5838 (ALC), 2018 WL 3642633, at *3 (S.D.N.Y. Aug. 1, 2018) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir. 1976)).



*Fig. 15: Left: Pouch of Capri Sun's "Original" subbrand.  Right: Pouch of
Juicy Juice Organic Splashers subbrand.  Compl. ¶ 134.*

strength, competitive proximity, bridging the gap, quality, and consumer sophistication.  But the

pertinent comparison here, between the trade dresses of Capri Sun's Original product and ABC's

Juicy Juice Organic product, require a fresh assessment of the factors of similarity, actual

confusion, and bad faith.

*i.    Similarity*

As in the trademark context, courts "look to the overall impression created by the trade

dress and the context in which they are found and consider the totality of factors that could cause

confusion among prospective purchasers."  *Gruner + Jahr*, 991 F.2d at 1078.  "[I]n an

appropriate case, the similarity factor can be dispositive and will warrant summary judgment for

an infringement defendant if the court is satisfied that the [trade dresses] are so dissimilar that no

question of fact is presented."  *Nabisco*, 220 F.3d at 46 (cleaned up); *see also Playtex Prods.*,

390 F.3d at 166–67 (same); *LVL XIII Brands*, 209 F. Supp. 3d at 688 (same).  When comparing

trade dresses, "[t]he presence and prominence of markings tending to dispel confusion as to the

origin, sponsorship or approval of the goods in question is highly relevant to an inquiry

concerning the similarity of the two dresses.  When prominently displayed it can go far towards

eliminating any possible confusion."  *Bristol-Myers Squibb*, 973 F.2d at 1046.

Here, Capri Sun argues that the two trade dresses are similar because Juicy Juice Splashers Organic pouch shows an "identical arrangement of imagery and lettering" as Capri Sun's." Pl. SJ Mem. at 24–25. In response, ABC asserts that the two pouches "make entirely different commercial impressions." Def. SJ Opp'n at 25; *see also* Def. SJ Mem. at 19 (claiming there is no overlap other than showing "the fruit, color, and name of the flavor of the juice").

ABC is right. The trade dresses are clearly dissimilar, in a host of ways. To be sure, at a high level of generality, ABC's Juicy Juice Splashers arranges elements in the same sequence— brand name at the top, images of fruits in the middle, and the name of the flavor at the bottom— as does Capri Sun's Original. But the totality of "all . . . elements" does not create the same—or even similar—"total impression." *Fun-Damental Too*, 111 F.3d at 1001.

The most glaring difference is in the display—prominent in each case—of the pouches' separate brands. The name "Capri Sun" takes up roughly 20 percent of the pouch's front—and the name "Juicy Juice Splashers Organic" occupies roughly 40 percent. These brand names clearly signal the products' different sources and "go far towards eliminating any possible confusion." *Bristol-Myers Squibb*, 973 F.2d at 1046. Another major difference is the dominant background color of each pouch—blue for Capri Sun's, white for Juicy Juice. The perimeters are also different; the Capri Sun pouch's rim (on the front side of the package) is uncolored, giving the pouch a noticeably silver frame, whereas Juicy Juice's white background extends to the edge of pouch without a separate-colored rim. And whereas Capri Sun's fruits are depicted splashing in water, Juicy Juice's are offset against a blotch of color. The flavor specifications also appear differently on the pouches: on the banner (Capri Sun) versus on the background (Juice Juice). Conversely, part of Juicy Juice's brand name—the word "Organic"—appears on a banner, but there is no equivalent banner on the Capri Sun pouch. The fonts in which the brand

and flavor names appear are also different.  Finally, whereas the Juicy Juice pouch on its bottom left features a certification—by the United States Department of Agriculture—that the juice's ingredients are organic, there is no such certification on Capri Sun's pouch.

All in, the two pouches are markedly dissimilar.  The similarity factor here decisively favors ABC.  *See LVL XIII Brands*, 209 F. Supp. 3d at 669–70 (similarity factor "strongly favor[ed]" defendant where trade dresses' differences were "manifest," "marked," and "palpable even from eye-level").

ii.     <em>Actual Confusion</em>

Capri Sun adduces zero evidence of actual confusion.  In connection with its trademark infringement claim, Capri Sun pointed to sparse anecdotes of purported actual confusion as to Ocean Spray.  The record is devoid of even that here.  This factor therefore strongly favors ABC. *See Brockmeyer*, 248 F. Supp. 2d at 298.  And to the extent ABC's expert report from Hal Poret is considered, this factor would even more lopsidedly favor ABC.   It included a consumer confusion survey specific to the Juicy Juice Splasher's trade dress.  *See* Poret Rep. ¶¶ 96–99.  As with its other test results, the Poret Report revealed a net confusion rate of zero between the two traded dresses.  *Id.* ¶ 18.

iii.     <em>Bad Faith</em>

This factor assesses whether the junior user intentionally copied and intended to benefit off the goodwill of the senior user's entire trade dress—"the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers, . . . including size, shape, color, texture, and graphics." *Focus Prods.*, 454 F. Supp. 3d at 248–49.  The Court has found that the Juicy Juice Splashers trade dress does not meaningfully imitate Capri Sun's.  Unsurprisingly then, Capri Sun has not adduced evidence of an intent by ABC to do so.  The only evidence to which it points is

144

the October 9, 2017 email of Harvest Hill's Nancy Martin regarding the planned "slight[]" change of the Juicy Juice Splashers pouch by "round[ing]" out its corners. JSUF ¶ 304. But that email is silent as to any intent or effort to mimic the labeling, graphics, or design of Capri Sun's original pouch.

The bad faith factor on Capri Sun's trade dress claims thus strongly favors ABC.

### iv.    Disposition

Summary judgment is warranted for ABC on Capri Sun's trade dress claims. The trade dresses at issue are markedly dissimilar. *See LVL XIII Brands*, 209 F. Supp. 3d at 688 (granting summary judgment against counterclaim of trademark infringement where "obvious differences between the two marks" precluded that any "reasonable factfinder could conclude that there is a likelihood of confusion"). And Capri Sun has not mustered any evidence of actual confusion or bad faith. *See THOIP*, 788 F. Supp. 2d at 191 (even though proximity, quality, and strength factors favored plaintiff, no reasonable juror could find likelihood of confusion where there was no evidence of actual confusion, bad faith, or a likelihood that defendant's mark would overwhelm plaintiff's); *Playtex Prods.*, 390 F.3d at 166–67 & n.5 (affirming summary judgment for defendant where similarity, actual confusion, and bad faith factors favored defendant, even though the remaining *Polaroid* factors favored plaintiff).

Finally, as to Capri Sun's trade dress infringement claim under New York common law, ABC would independently be entitled to summary judgment based on Capri Sun's failure to adduce support for the required element of bad faith.

### G.    ABC's Motion to Preclude Capri Sun from Recovering ABC's Profits

Finally, ABC moves to limit, based on the SLA, the damages available to Capri Sun on its trademark infringement claims to only royalty payments from ABC. Def. SJ Mem. at 24–25;

Def. SJ Reply at 10.[54]  Capri Sun counters that the SLA permits it to obtain, as its damages on

these claims, ABC's profits from sales of infringing pouches.  For the reasons that follow, the

Court grants ABC's motion and limits Capri Sun's recovery on such claims to royalty payments

from ABC.

### 1.    The SLA's Liability Limitation Clause

Section 8.4 of the SLA states, in relevant part:  "Except in connection with its

indemnification obligations, in no event shall any Party . . . be liable to the other Party . . . for

any consequential, indirect, punitive, incidental or special damages, including lost profits . . .

arising from any cause of action whatsoever, including those based upon contract, warranty,

strict liability or negligence, related to this agreement or any breach hereof."  JSUF ¶ 253.  The

parties agree that, under § 5.4 of the SLA, § 8.4 survived the SLA's termination.  *Id.* ¶ 256.

ABC argues that, although Capri Sun may pursue damages in the form of royalties for

any established acts of trademark infringement, under § 8.4, it may not pursue damages in the

form of recouping ABC's profits from the marketing of Accused Pouches.  That is because, ABC

argues, such profits would represent "indirect" damages "arising from" Capri Sun's infringement

claims, which are, in turn, "related to" the alleged breach of the SLA.  Def. SJ Mem. at 25, Def.

SJ Reply at 10.  Capri Sun makes two counterarguments.  First, it argues, ABC's infringement of

the Pouch Mark would be a freestanding violation of the Lanham Act and New York common

law and thus is not "related to" any breach of the SLA.  Second, it argues, the profits of ABC's

that it would pursue would qualify as "direct" damages and thus fall outside the preclusion of §

8.4.  Pl. SJ Opp'n at 25.

---

[54] ABC also moved to preclude non-injunctive relief on Capri Sun's dilution claims.  Because the
Court has granted summary judgment to ABC on those claims, that request is moot.

## 2.    Analysis

The threshold question on ABC's motion is whether Capri Sun's trademark infringement claims "relate to" the SLA.  In arguing that they do not, Capri Sun emphasizes that the legal bases for its infringement claims are supplied by federal statutory law (the Lanham Act) and New York common law, and not by the SLA.

That point might have been dispositive had SLA § 8.4's preclusion run to claims "arising from" the SLA.  But the term "related to" is different, farther-reaching, and "extremely broad." *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580 (HB), 2008 WL 4833001, at *8 (S.D.N.Y. Nov. 5, 2008) (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997)).  The Second Circuit has defined "related to" as "equivalent to the phrases 'in connection with' and 'associated with,' and synonymous with the phrases 'with respect to' and 'with reference to.'" *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 129 (2d Cir. 2001) (citations omitted); *see also Prod. Res. Grp. v. Martin Prof.*, 907 F. Supp. 2d 401, 414 (S.D.N.Y. 2012) (same) (collecting cases).  Importantly, unlike the term "arising out of," the term "related to" does not require a causal connection between the topics it equates. *Coregis*, 241 F.3d at 128.

Capri Sun therefore addresses the wrong question.  Its argument that its infringement claims rest on a freestanding legal basis might have been dispositive had the issue been whether its claims "arose out of" ABC's alleged breach of the SLA.  But that statutory infringement claims do not arise out of an agreement does not mean they do not "relate to" the agreement.  Judge Karas of this District drew precisely this distinction in a patent infringement case, in which he held that a party's statutory infringement claims triggered a contractual forum selection clause in a licensing agreement. *See Prod. Res. Grp.*, 907 F. Supp. 2d at 414.  Judge Karas reasoned that it was possible that the defendant might invoke the parties' agreement "as a defense to [the]

patent infringement allegations, thereby making the 'dispute' one that is 'related to' the [a]greement[]." *Id.* at 414–15. As such, he noted, "there is little doubt that the patent claims relate to the very agreements that governed Defendants' use of Paintiffs' patents." *Id.* at 414.

The same is so here—and ABC has prefigured exactly that defense from the start of this litigation. Its 10th affirmative defense in its Answer states: "[Capri Sun's] claims are barred to the extent ABC has complied with its contractual obligations and paid all required royalties under the Settlement and License Agreement." Dkt. 14 ("Answer") at 32.

In at least two independent respects, Capri Sun's infringement claims relate to the SLA.

First, according to Capri Sun, ABC's alleged acts of trademark infringement commenced during the pendency of the SLA. During that period, ABC was manufacturing and had begun to market the Accused Pouches. *See* JSUF ¶ 288. To the extent ABC can establish that it was in compliance with the SLA during that period, its compliance with it protected ABC not only from contractual liability but also for liability for trademark infringement.

Second, the standard for post-termination liability under the SLA is interwoven with that under federal trademark infringement law. As context, the SLA settled the Faribault Lawsuit, which involved claims of federal trademark infringement, and put in place a licensing regime. *Id.* ¶ 222. Unsurprisingly, in describing the standard that would govern termination of that license, the SLA used language clearly drawn from—and which the Court has construed to incorporate a component of—the standard of liability under the Lanham Act. In § 5.3.1, the parties agreed that Faribault (or its successor-in-interest) "shall immediately cease using the Trademark, including any confusingly similar variations." The Court has construed that term to track the similarity inquiry required under *Polaroid*. It follows that, to the extent Capri Sun proposes to hold ABC liable for trademark infringement for the period after the termination of

the SLA, the governing standard of liability under the SLA not only "relate[s] to" those of the Lanham Act and New York common law, but closely relates—and exists in deliberate reference—to them. *See Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309–10 (2d Cir. 1994) (contractual provision "to resolve any controversy or claim arising out of or relating to this contract or breach thereof" under New York law held to cover tort claim of fraud); *BMC Software, Inc. v. Int'l Bus. Machines Corp.*, No. Civ. H-17-2254, 2018 WL 7291425, at *9 (S.D. Tex. Aug. 30, 2018) ("[T]he parties' use of the term 'related to' in the jury waiver provision demonstrates to the court the parties' intent to waive their right to a jury trial for 'any claim bearing any connection to the agreements.'").[55]

Having determined that Capri Sun's trademark infringement causes of action relate to the SLA, the next issue is whether Capri Sun may pursue money damages other than royalty payments on these claims. The parties' debate on this issue involves Capri Sun's claim to the profits obtained by ABC to the extent attributable to the manufacture of infringing pouches. (Capri Sun cannot pursue its own lost profits as damages, as the text of § 8.4 squarely precludes "lost profits" damages.) Under § 8.4, this turns on whether ABC's profits qualify as direct or indirect damages for Capri Sun. Only if the former is true are they reachable.

Under New York law, direct damages "are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract." *Edelman Arts, Inc. v. Spoelstra*, No. 17 Civ. 4789 (JGK) (SN), 2021 WL 2207361, at *3 (S.D.N.Y. Jan. 11, 2021) (plaintiff seeking

---

[55] Indeed, even under the narrower contract term reaching claims that "arise from" a contract, another court has held that a statutory (copyright) infringement claim was covered, where the defendant "allegedly breached its post-termination obligation . . . to stop using the software and return it." *Piper Jaffray & Co. v. SunGard Sys. Int'l, Inc.*, No. Civ. 04-2922 (DWF) (JSM), 2007 WL 541679, at *6 (D. Minn. Feb. 16, 2007).

to recover "the loss of the benefit of the bargain") (quoting *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 151–52 (N.Y. App. Div. 2012), *report and recommendation adopted as modified*, No. 17 Civ. 4789 (JGK), 2021 WL 2207351 (S.D.N.Y. Mar. 7, 2021); *see also In re CCT Commc'ns*, 464 B.R. 97, 116 (Bankr. S.D.N.Y. 2011) (direct damages "provide the aggrieved party with the difference between the price he agreed to pay and the value he was to receive through performance"). The profits of the breaching party, on the other hand, "may be recovered as direct damages only when they represent amounts a breaching party agreed to pay under the contract at issue." *In re Lehman Bros. Holdings Inc.*, 544 B.R. 62, 73 (Bankr. S.D.N.Y. 2015).

Viewed in light of this understanding of "direct damages," the profits that ABC gained from manufacturing infringing pouches are not recoverable damages. There is no reading of the SLA under which these could constitute expectation damages for Capri Sun. While the SLA was in effect, Capri Sun's contractual compensation consisted of annual royalty payments from ABC of the greater of $650,000 or $0.00225 per Licensed Pouch. JSUF ¶ 229. Any profits of ABC's in excess of those royalty payments belonged to ABC. *See Edelman Arts*, 2021 WL 2207361, at *3; *In re Lehman Bros.*, 544 B.R. at 73. To the extent that ABC breached by selling pouches as to which Capri Sun held the trademark, ABC's breach did not deprive Capri Sun of damages other than those royalty payments. Therefore, were ABC found in breach, a damage award to Capri Sun of ABC's profits would go beyond putting Capri Sun "in the same position that it would be in had [ABC] performed as promised under the contract," *Edelman Arts*, 2021 WL 2207361, at *3, *i.e.*, expectation damages. Such an award would therefore qualify as indirect damages. It is unavailable under § 8.4.

The Court accordingly grants ABC's motion.  On its trademark infringement claims, Capri Sun may recover royalty payments consistent with the SLA, but it may not recover ABC's profits from the sale of infringing pouches.

## CONCLUSION

For the foregoing reasons, the Court, on the parties' *Daubert* motions:

- denies Capri Sun's motion to exclude the report and testimony of ABC's expert Hal Poret;

- denies ABC's motion to exclude the report and testimony of Capri Sun's expert Dr. Joel Steckel, save as to a minor point; and

- denies in principal part Capri Sun's motion to exclude the report and testimony of Dr. Erich Joachimsthaler, with the limited exceptions noted herein.

And for the foregoing reasons, the Court, on the parties' summary judgment motions:

- denies Capri Sun's motion in full;

- denies ABC's motion as to Capri Sun's federal and common law trademark infringement claims and breach-of-contract claim;

- grants ABC's motion as to Capri Sun's federal and common-law trade dress infringement claims, and Capri Sun's federal and state dilution claims; and

- grants ABC's motion as to the limitation of Capri Sun's recoverable damages on its trademark infringement claims.

This case will now proceed to trial on Capri Sun's surviving claims, which are for trademark infringement and breach of contract.  The parties are directed to submit a joint pretrial order consistent with the Court's individual rules, along with all other filings required by those rules, by **April 22, 2022**.  Upon review of the joint pretrial order, the Court will schedule a

conference to, *inter alia*, resolve any motions *in limine* that have been made and discuss the

setting of a prompt trial date.  The Clerk of Court is respectfully directed to close the motions

pending at docket numbers 87, 94, 99, 104, 109, and 168.

      SO ORDERED.

 

 

PAUL A. ENGELMAYER
United States District Judge

Dated: March 31, 2022
      New York, New York